IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

CAMILO JORDAN,[1]

                     Plaintiff,

                                        9:08-CV-1323
      v.                                 (DNH/DEP)

RABINOWITZ, RAMINENI, FERGUSON,
HARRIS and PHILLIPS,

                     Defendants.

_____

APPEARANCES:                  OF COUNSEL:

FOR THE PLAINTIFF:

CAMILO JORDAN, Pro Se
640 Water Street
Apt 4D
New York, NY 10002

FOR THE DEFENDANTS:

HON. ANDREW CUOMO          CHRISTOPHER W. HALL, ESQ.
Office of the New York State     Assistant Attorney General
Attorney General
State of New York
The Capitol
Albany, New York 12224

_____

       [1]      The plaintiff was inadvertently listed in the court's records as Camilo
Jordon.  The clerk will be directed to amend the docket sheet to reflect the correct
spelling of plaintiff's name.

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Plaintiff Camilo Jordan, a former New York State prison inmate who is proceeding *pro se* and *in forma pauperis*, has commenced this action pursuant to 42 U.S.C. § 1983 claiming deprivation of his civil rights. Alleging claims under the Eighth Amendment and the American with Disabilities Act ("ADA"), 42 U.S.C. §§12101 *et seq*., plaintiff's complaint asserts that he was subjected to cruel and unusual punishment and ADA violations by the defendants, all corrections employees assigned to the facility in which Jordan was housed at the relevant times.  According to the plaintiff, the defendants were deliberately indifferent to and failed to adequately treat his back pain, took away his cane, and denied him accommodations for his disability, including a shower stool and handicap rail.

Currently pending before the court is defendants' motion for summary judgment dismissing plaintiff's complaint in its entirety, in part based upon plaintiff's failure to exhaust his administrative remedies, and substantively in light of the fact that he cannot prove that his Eighth Amendment rights were abridged.  Having carefully considered the record

2

now before the court in light of the defendants' motion and plaintiff's

opposition, I find that no reasonable factfinder could conclude that

plaintiff's Eighth Amendment rights were violated, and that plaintiff failed

to exhaust available administrative remedies with respect to his ADA

claims premised upon the denial of a cane and the requested apparatus

for his shower, and I therefore recommend that defendants' motion be

granted.

I.     BACKGROUND[2]

Plaintiff is a former prison inmate who at all times relevant to the

complaint was entrusted to the care and custody of the New York State

Department of Correctional Services ("DOCS").  *See generally* Complaint

(Dkt. No. 26).  From on or about February 12, 2008 until on or about June

5, 2008, plaintiff was confined in the Mid-State Correctional Facility ("Mid-

State"), located in Marcy, New York.  Defendants' Rule 7.1(a)(3)

Statement (Dkt. No. 30-1) ¶¶ 2, 58; *see also* Ramineni Aff. (Dkt. No. 30-3)

Exh. B.

Prior to his transfer into Mid-State, plaintiff was designated to the

Elmira Correctional Facility ("Elmira"), where he had been receiving

---

[2]     In light of the procedural posture of the case the following recitation is
derived from the record now before the court with all inferences drawn and ambiguities
resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F. 3d 128, 137 (2d Cir. 2003).

treatment for pain resulting from a long-standing spinal injury, including through administration of methadone and other prescription medications, and was permitted to use a cane and a shower seat.  Complaint (Dkt. No. 1) Statement of Facts; *see also* Ramineni Aff. (Dkt. No 30-3) ¶¶ 10, 22. Plaintiff sustained a back injury in 2003 arising out of an infection in his spine, for which he was hospitalized at Beth Israel Hospital in New York City.  Plaintiff's Deposition Transcript ("Tr.") (Dkt. No. 30-6) 58-60.  In association with the residual effects of that illness, on or about June 8, 2004, plaintiff obtained a letter from his attending physician at Beth Israel confirming that at that time, Jordan suffered lumbar facet syndrome and discogenic low back pain, and that his pain was being treated with methadone, soma, lidocaine patches, neurontin, and pulse doses of anti-inflammatory medications; his physical limitation was described as "severe" due to his pain and the underlying degenerative process of his lumbar spine, and it was stated that he was "not expected to perform any full work activities involving weight bearing, lifting, prolong [sic] kneeling, standing, or walking long distances".  Complaint (Dkt. No. 1) Attachment.

At the time of his transfer from Elmira, the medical policy at Mid-State was to avoid prescribing prisoners narcotic medications except in extraordinary circumstances.  Ramineni Aff. (Dkt. No 30-3) ¶ 16.  The day

after he arrived at Mid-State, Jordan was admitted to the infirmary to be detoxified, or weaned off of methadone, a narcotic pain medication, in order to prevent him from developing an addiction.  *Id.* at ¶¶ 10, 12, Exhs. A, B.  Since methadone loses its effectiveness as a pain killer over time, addiction to that narcotic would have resulted in plaintiff requiring increasingly greater doses and developing both a physical and psychological dependency on the drug.  *Id.* at ¶ 14.  Allowing prisoners to become or remain addicted to narcotic drugs can negatively impact prison security and undermine the DOCS' mission of addressing the needs of inmates to enable them to return to their communities better prepared to lead successful and crime-free lives.[3]  *Id.* at ¶ 15.

Upon his admission to the Mid-State infirmary it was noted that plaintiff had a history of chronic low back pain due to arthritis in the spinal column and joints as well as compression of the nerve roots in the lumbar region, and that he was taking various medications for pain, including methadone, flexeril, neurontin, amitriptyline, lidoderm patches, and piroxicam.[4]  Ramineni Aff. (Dkt. No 30-3) ¶¶ 21-22.  It was also noted that

---

[3]      According to plaintiff, his spinal infection resulted from his use of illicit drugs, which included heroin, cocaine, and crack, when he used contaminated water to inject himself with heroin.  Tr. 58.

[4]      Flexiril is a muscle relaxant; neurontin and amitriptyline are nerve pain medicines; lidoderm patches are local anaesthesia used for pain; and piroxicam is an

plaintiff had a transcutaneous electrical nerve ("TENS") unit, which is a device that sends electrical impulses through the skin for pain control. *Id*. at ¶ 24.  During the time that plaintiff was in the infirmary undergoing detoxification he was monitored by the nurses throughout their shifts, who regularly recorded their observations of plaintiff in progress notes. Ramineni Aff. (Dkt. No. 30-3) ¶¶ 27, 34 and Exh. A.  Although gradually reduced dosages of methadone were administered to plaintiff while in the infirmary, initially he was permitted to keep the TENS unit, and he continued to receive the non-narcotic medications he had been receiving before his transfer, with increased dosages of neurontin. *Id.* at ¶ 30; *see also* Tr. 41.  The TENS unit and lidoderm patches were discontinued on February 20, 2008, eight days after his admission into the facility. Ramineni Aff. (Dkt. No 30-3) ¶ 30.

Jordan's progress notes indicate that during the time he was in the infirmary, he was generally ambulating well, sometimes forgetting to use his cane; he spent his days watching television and exhibiting no signs of pain or acute distress, often smiling and laughing; when he twice complained of break through pain, he was given Motrin or Ibuprofen; he was able to sleep; and, he tolerated the medication regime well.  *See*

---

arthritis medicine.  Ramineni Aff. (Dkt. No 30-3) ¶ 23.

Ramineni Aff. (Dkt. No 30-3) Exh. A.

After two weeks in the infirmary, on February 27, 2008, plaintiff was discharged to the general population, after being successfully weaned from the methadone and having suffered no withdrawal symptoms. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 25) ¶¶ 25-26; *see also* Ramineni Aff. (Dkt. No 30-3) ¶¶ 26, 48-49, 67. Upon completion of detoxification, however, Jordan continued to receive his non-narcotic medication.  Defendants' Rule 7.1(a)(3) Statement ¶ 33.  After plaintiff's discharge from the infirmary he was assigned to community work consisting of painting a fence at a town ball park every day, and also raking leaves.  *Id.* ¶¶ 60-63.  Though his range of motion was limited and he took frequent breaks, plaintiff was able to perform the tasks assigned. *Id.*

The day following his release from the infirmary, plaintiff complained that he was unable to sleep and asked for a second mattress, which he received.  *Id.* at ¶¶ 34-35.  On March 4 and 6, 2008, during sick call plaintiff complained of back pain.  Ramineni Aff. (Dkt. No. 30-3) ¶¶ 73-74. At the time, it was noted that Jordan had an appointment with Dr. Rabinowitz scheduled for April 25, 2008.  Plaintiff was seen during sick call on March 7, 2008, requesting to speak to a doctor, and in response

his appointment with Dr. Rabinowitz was moved up to April 14, 2008.  *Id.* at ¶ 75.

Jordan was seen again for back pain on March 11, 2008.  *Id.* at ¶ 76.  After observing plaintiff walk steadily for five to seven feet without the use of his cane, on March 13, 2008, Nurse Ferguson confiscated the cane because allowing him to use it without a medical justification could pose a threat to prison security.  *Id.* at ¶¶ 77, 97.

Plaintiff again complained of back pain during sick call on March 17, 2008, and saw Dr. Ramineni two days later, on March 19, 2008, who noted plaintiff's oral medications, observed that plaintiff was able to walk, sit and stand without difficulty, and concluded that "there [was] no significant objective finding to support the need for any escalation of his symptoms."   Ramineni Aff. (Dkt. No. 30-3) ¶ 79.  Plaintiff was subsequently seen during sick call on March 21, 2008, requesting that his pain medication be adjusted or his cane returned, and on March 28, 2008 for cold symptoms, without voicing any complaints regarding his back.  *Id.* at ¶¶ 81-82.  Ten days later, however, plaintiff went to sick call complaining of increasing back pain, and the nurse once again noted no signs of acute distress.  *Id.* at ¶ 83.

Plaintiff saw Dr. Ramineni on April 14, 2008, less than a week later;

8

during his physical examination of Jordan, Dr. Ramineni observed plaintiff

"bend to pickup from [the] floor & got on table prone & supine [with]

change [in] position [without] difficulty.  Plaintiff was able to do straight leg

raises by voluntarily pushing legs down. . . .[P]laintiff was an 'obese

male'".  Ramineni Aff. (Dkt. No. 30-3) ¶ 84.  Based upon his observations,

Dr. Ramineni opined that plaintiff had "[l]ow back pain with significant

malingering" and ordered that plaintiff remain on his current medications,

exercise, and continue to use a back brace.  *Id.*  There are no further

notations in plaintiff's ambulatory health record ("AHR") of complaints of

back pain while at Mid-State.  *Id.* at ¶ 86.

On the same date that he was returned to the general prison

population, plaintiff filed a grievance, assigned grievance number MS-

18988-08, complaining that he had not received proper medical attention

for "severe back pain" and requesting that he receive "appropriate pain

medication."[5]  Bellamy Aff. (Dkt. No. 30-2) Exh. A.  In that grievance,

plaintiff also stated that he is entitled to know the alternative treatment,

prognosis, and what steps will be taken to alleviate his recurring back

problems/pain.  *Id.* at Exh. A.  In a memorandum dated May 11, 2008

---

[5]      This is the only grievance plaintiff filed while at Mid-State.  Tapia Aff.
(Dkt. No. 30-4) ¶ 7.

addressing the grievance, based upon his review of Jordan's chart upon arrival at the facility, a letter dated June 8, 2004 from a pain clinic physician, and a May 24, 2007 MRI, as well as observations of Jordan during his stay in the infirmary, Dr. Ramineni concluded that it appeared Jordan was exaggerating his symptoms to get narcotic pain medication since tests did not support his claim that he needed additional pain medication.  *See* Bellamy Aff. (Dkt. No. 30-2) Exh. A.  The Inmate Grievance Review Committee ("IGRC") issued a deadlocked response to the grievance on March 19, 2008, noting that the Facility Health Services Directors ("FSHD") have sole responsibility for providing treatment to inmates under their care, that Jordan had medical documents confirming his deteriorating condition, and that the previous facility wherein he was housed provided him with "strong narcotic pain medication."  *See id.* Plaintiff appealed to the superintendent, who accepted the grievance to the extent that Jordan was being treated for his back pain and advised him to address any further medical concerns with medical staff through existing sick call procedures.  *See id.*  Upon plaintiff's appeal of that determination to the Central Officer Review Committee ("CORC"), the

10

superintendent's determination was upheld for the reasons stated.[6]  *See*
*id*.

On March 20, 2008, plaintiff made a written "request for reasonable
accommodation", seeking the return of his cane and asking that he be
provided a shower rod or seat in his bathroom.  Ramineni Aff. (Dkt. No.
30-3) Exh. C.  That request was denied, based upon Dr. Ramineni's
opinion that plaintiff had no functional limitations and that his medical
condition did not warrant a shower seat or rod.  *Id.*  On April 16, 2008,
upon receipt of that determination, plaintiff signed the form, noting his
disagreement with the denial and expressly acknowledging his right to file
a grievance regarding the matter.  *Id.*; *see also* Defendants' Rule 7.1(a)(3)
Statement (Dkt. No. 30-1) ¶¶ 9-11.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on December 8, 2008.  Dkt. No. 1.
Plaintiff's complaint asserts claims under the Eighth Amendment and the
ADA based upon defendants' alleged medical indifference in failing to
treat his back pain as well as the confiscation of his cane and denial of his
request for a shower seat and rod.  *See id.*  In his complaint, plaintiff has

---

[6]     This is the only grievance appeal filed by the plaintiff with the CORC
while at Mid-State.  Bellamy Aff. (Dkt. No. 30-2) ¶ 7.

named prison physicians Rabinowitz and Ramineni, Mid-State Nurses Ferguson and Philips, and Kenneth S. Perlman, the Superintendent of Mid-State, as defendants.  The relief sought by the plaintiff includes an injunction compelling defendants to provide the level of medical treatment previously provided at Elmira and $11 million in compensatory damages.[7]

After the close of discovery, defendants moved pursuant to Federal Rule of Civil Procedure 56 for summary judgment dismissing the complaint, asserting that 1) plaintiff has failed to adduce evidence to support a cognizable Eighth Amendment claim, 2) his claims relating to denial of a cane and shower bench must be dismissed for failure to exhaust administrative remedies, and 3) the ADA does not give rise to claims against the individual defendants.  Dkt. No. 30.  Plaintiff has since responded in opposition to defendants' motion, submitting only an answer to Defendants' Rule 7.1(a)(3) Statement of Material Facts.  Dkt. No. 34.

---

[7]       It appears that Jordan was released from prison in or about November of 2009.  *See* Dkt. No. 31.  A federal court has no authority to decide an issue when the relief sought can no longer be given, or is no longer needed.  *Martin-Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir.1983).  It is well settled in this circuit that transfer from a prison facility moots an action for injunctive relief against the transferring facility. *Prins v. Coughlin*, 76 F.3d 504, 506 (2nd Cir. 1996) (citing *Young v. Coughlin*, 866 F.2d 567, 568 n. (2d Cir.), *cert. denied*, 492 U.S. 909, 109 S. Ct. 3224 (1989), and *Beyah v. Coughlin*, 789 F.2d 986, 988 (2d Cir.1986)); *Candelaria v. Greifinger*, No. 96-CV-0017, 1998 WL 312375, at *2 (N.D.N.Y. June 8, 1998) (Pooler, J. and Scanlon, M.J.).  In this case, plaintiff is no longer incarcerated; consequently, plaintiff's claim for injunctive relief against defendants is moot and should be dismissed.

Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c); *see also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

A.   Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, the entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such

13

that a reasonable jury could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.  Though *pro se* plaintiffs

are entitled to special latitude when defending against summary judgment

motions, they must establish more than mere "metaphysical doubt as to

the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith*

*Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court

to consider whether *pro se* plaintiff understood nature of summary

judgment process).

When summary judgment is sought, the moving party bears an initial

burden of demonstrating that there is no genuine dispute of material fact

to be decided with respect to any essential element of the claim in issue;

the failure to meet this burden warrants denial of the motion.  *Anderson*,

477 U.S. at 250 n.4, 106 S.Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.

In the event this initial burden is met, the opposing party must show,

through affidavits or otherwise, that there is a material issue of fact for

trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553;

*Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve

any ambiguities and draw all inferences from the facts in a light most

14

favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

> B.   <u>Eighth Amendment Medical Indifference Claim</u>

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976). The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain" and is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084 (1986) (citing, *inter alia, Estelle).* While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. *Farmer v.*

*Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).  To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Farmer*, 511 U.S. at 832, 114 S.Ct. at 1976 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S.Ct. 3194, 3200 (1984)) (internal quotations omitted).

A claim alleging that prison officials have violated the Eighth Amendment by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements.   *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, No. 07-CV-2634 (JFB/ARL), 2010 WL 889787, at *7-8 (E.D.N.Y. Mar. 8, 2010).  Addressing the objective element, to prevail a plaintiff must demonstrate a violation sufficiently serious by objective terms, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  With respect to the subjective element, a plaintiff must also demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'"  *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).

Claims of medical indifference are subject to analysis utilizing this Eighth Amendment paradigm.  *See Salhuddin v. Goord,* 467 F.3d 263, 279-81 (2d Cir. 2006).

### 1.   Objective Requirement

Analysis of the objective, "sufficiently serious," requirement of an Eighth Amendment medical indifference claim begins with an inquiry into "whether the prisoner was actually deprived of adequate medical care . . .", and centers upon whether prison officials acted reasonably in treating the plaintiff.  *Salahuddin,* 467 F.3d at 279.  A second prong of the objective test addresses whether the inadequacy in medical treatment was sufficiently serious.  *Id*. at 280.  If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition.  *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003).  If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition.  *Salahuddin*, 467 F.3d at 280.  "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in treatment. . . [the focus of] the inquiry is on the challenged delay or interruption, rather

17

that the prisoner's underlying medical condition alone." *Id.* (quoting *Smith*, 316 F.3d at 185) (internal quotations omitted).  In other words, at the heart of the relevant inquiry is the seriousness of the medical need, and whether from an objective viewpoint the temporary deprivation was sufficiently harmful to establish a constitutional violation.  *Smith*, 316 F.3d at 186.  Of course, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment', but may properly be viewed as a 'refusal' to provide medical treatment."  *Id.* at 186, n.10 (quoting *Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000)).

Since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances.  *Harrison,* 219 F.3d at 136-37 (quoting, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998)). Relevant factors informing this determination include whether the plaintiff suffers from an injury or condition that a "'reasonable doctor or patient would find important and worthy of comment or treatment'", a condition that "'significantly affects'" a prisoner's daily activities, or "'the existence of chronic and substantial pain.'" *Chance,* 143 F.3d at 702 (citation omitted);

18

*Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

"Depending upon the facts presented, severe back pain, especially if lasting an extended period of time . . . may qualify as a serious medical need[]'under the Eighth Amendment." *Benjamin v. Kooi*, No. 9:07-CV-0506, 2010 WL 985844, at * 7 (N.D. N.Y. Feb. 25, 2010) (Homer, M.J.) (citing and quoting *Mendoza v. McGinnis*, No. 05-CV-1124, 2008 WL 4239760 at *10 & n.16 (N.D.N.Y. Sept. 11, 2008); *see also Guarneri v. Hazzard,* No. 06-CV-0985, 2008 WL 552872, at *6 (N.D.N.Y. Feb. 27, 2008) (Mordue, C.J. and Homer, M.J.) (holding that severe back pain, especially if long-lasting, can amount to a serious medical need); *Faraday v. Lantz,* No. 03-CV-1520, 2005 WL 3465846, at *5 (D.Conn. Dec. 12, 2005) (holding that persistent complaints of "lower back pain caused by herniated, migrated discs [and] sciatica ..." leading to severe pain constitute a serious medical need); *Nelson v. Rodas*, No. 01-CV-7887 (RCC/AJP), 2002 WL 31075804, at *14 (S.D.N.Y. Sept.17, 2002) (holding that "[s]evere back pain, especially if lasting an extended period of time, can amount to a serious medical need").

Here, the plaintiff does not dispute that he was provided treatment, but instead merely claims that the treatment for his back pain was

inadequate.   The court's inquiry is therefore more narrowly focused, not on the seriousness of his underlying condition, but on the question of whether that alleged inadequacy caused plaintiff to suffer significant harm. *Williams v. Smith*, No. 02 Civ 4558(DLC), 2009 WL 2431948 at *7 (S.D.N.Y. Aug. 10, 2009) (citing *Salahuddin*, 467 F.3d at 280).  "Even in cases where in inmate 'suffers from an admittedly serious medical condition,' if the alleged deficiencies in treatment are 'minor and inconsequential,' those lapses will not sustain an Eighth Amendment claim."  *Id.* (citing and quoting *Smith*, 316 F.3d at 186).

    In this instance, even assuming plaintiff's back pain constitutes a serious condition, there is no evidence in the record establishing that he experienced any actual harm, or even a risk of harm, as a result of defendants' decision to wean him from narcotic pain medication.  Although plaintiff alleges he has suffered continuous pain as a result of that medical decision, the overwhelming evidence before the court contradicts plaintiff's bald assertion.  Plaintiff's progress notes demonstrate that during the time that he was in detoxification, he did quite well and complained of break through pain only twice in a two-week period.  At the time of those complaints, plaintiff was given ibuprofen, which seemed to resolve the problem.  After he completed detoxification and was released to the

general population, while Jordan did periodically complain of pain, there was no objective medical evidence to support his apparent claim that the pain had worsened, and his treating physician, Dr. Ramineni, opined that plaintiff was malingering in order to obtain narcotics.

Indeed, the evidence in the record shows that while housed at Mid-State plaintiff was able to fully perform his daily activities.  He was consistently observed walking steadily without the use of his cane, which is why the cane was confiscated; he admittedly participated in a community work program, performing light work without incident; and, during his deposition plaintiff admitted that the non-narcotic medication that he continued to receive relieved some of his pain, and he consistently described the pain he continued to experience merely as "discomfort."[8] Tr. 37, 38, 39, 41, 49, 53, 54.  In sum, it is quite obvious on the record before the court that plaintiff's claim amounts to nothing more than a disagreement over the treatment that he believes that he should have received for his pain, a claim that simply is not actionable under section

_____

[8]     It is worth noting that, at the time of plaintiff's deposition on August 6, 2009, more than a year after he was transferred out of Mid-State, he still was not taking narcotic pain medication; yet, he was able sit and testify for a period of approximately three hours without any apparent physical difficulty.  It thus seems clear that weaning plaintiff from narcotic pain medication had no resulting deleterious impact on his physical condition.

1983.  *Walker*, 2007 WL 2994317, at *4 and n.19.

　　　2.　　Subjective Element

Addressing the second, subjective, requirement for establishing an

Eighth Amendment medical indifference claim, it is equally obvious that

the evidence adduced belies any assertion that the defendants acted with

a sufficiently culpable state of mind.  The second prong of the test

mandates a showing of deliberate indifference on the part of one or more

of the defendants.  *Salahuddin*, 467 F.3d at 280 (citing *Wilson v. Seiter*,

501 U.S. 294, 300, 111 S.Ct. 2321, 2325 (1991)).  Deliberate indifference,

in a constitutional sense, exists if an official "knows of and disregards an

excessive risk to inmate health or safety; the official must both be aware

of facts from which the inference could be drawn that a substantial risk of

serious harm exists, and he [or she] must also draw the inference."

*Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach v. Dufrain,* 103 F.

Supp.2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Farmer*); *Waldo v.*

*Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998)

(Kahn, J. and Homer, M.J.) (same).  Deliberate indifference is a mental

state equivalent to subjective recklessness as the term is used in criminal

law.  *Salahuddin*, 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40, 114

S. Ct. 1970).

22

Mere negligence on the part of a physician or other prison medical official in treating or failing to treat a prisoner's medical condition, on the other hand, does not implicate the Eighth Amendment and is not properly the subject of a section 1983 action. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 292; *Chance,* 143 F.3d at 703. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292. Thus, for example, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. If prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," however, such conduct is actionable as deliberate indifference. *Harrison,* 219 F.3d at 138; *Kearsey v. Williams,* No. 99 Civ 8646, 2005 WL 2125874, at *5 (S.D.N.Y. Sep. 1, 2005).

Plaintiff was housed at Mid-State at a time when its medical policy was to avoid prescribing prisoners narcotics, except in extraordinary circumstances, a policy rationally based on concerns for prison security as well as inmates' ability to function in society upon release from prison. The decision to wean plaintiff from his dependence on methadone was

23

motivated not only by this medical policy, but by the recognition that because methadone loses its effectiveness over time and is addictive, plaintiff's need for the drug would continue to increase and he would develop a physical, and perhaps emotional, dependency on the drug. Moreover, there is no evidence indicating that plaintiff's medical treatment was not driven by these concerns and none to contradict Dr. Ramineni's opinion that it is not good or accepted medical practice to allow patients to become addicted to narcotics.  In short, there is not a shred of evidence in the record to suggest that the decision to "detoxify" plaintiff was motivated by ill-will or the desire to impose punishment.

Prison medical staff are afforded wide discretion in formulating treatment plans for their wards, and their decisions are thus entitled to a presumption of correctness.  *Walker*, 2009 WL 2431948, at *9 (citing *Kulak v. City of New York*, 88 F.3d 63, 77 (2d Cir. 1996)).  Subjectively, defendants' treatment plan was supported by legitimate concerns, and once again plaintiff's disagreement with his course of treatment is patently insufficient to state an Eighth Amendment claim.

In view of the foregoing, I have found that no reasonable factfinder could conclude that defendants acted with deliberate indifference to the plaintiff's serious medical needs, and therefore recommend that the court

24

grant defendants' motion as to plaintiff's cause of action asserted under

the Eighth Amendment.

      C.    <u>Failure to Exhaust Administrative Remedies</u>

In their motion, defendants allege that a search of grievance records

at Mid-State has revealed that although plaintiff filed one grievance while

at that facility, that grievance was limited to the complaint that he was not

receiving adequate medical treatment for his back pain and did not include

any reference to his cane, a shower seat, or a shower rod.  As a

procedural matter, defendants contend that plaintiff is therefore precluded

from judicial pursuit of these claims based upon his failure to comply with

the exhaustion requirement of 42 U.S.C. § 1997e(a).

With an eye toward "reduc[ing] the quantity and improv[ing] the

quality of prisoner suits," *Porter v. Nussle*, 534 U.S. 516, 524, 122 S.Ct.

983, 988 (2002), Congress altered the inmate litigation landscape

considerably through the enactment of the Prison Litigation Reform Act of

1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), imposing

several restrictions on the ability of prisoners to maintain federal civil rights

actions.  An integral feature of the PLRA is a revitalized exhaustion of

remedies provision which requires that "[n]o action shall be brought with

respect to prison conditions under section 1983 of this title, or any other

25

Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007).  This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into courtl[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record."  *Jones v. Bock,* 549 U.S. 199, 204, 127 S.Ct. 910, 914-15 (2007) (citations omitted); *see also Woodford,* 548 U.S. at 91-92, 126 S.Ct. at 2386; *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir. 2004).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter*, 534 U.S. at 532, 122 S.Ct. at 992 (citation omitted).

In the event a defendant named in a prisoner action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal.  *See Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y.

Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 94-95, 126 S.Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies).  "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules."  *Woodford*, 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007) (citing *Woodford*). While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA.  *Macias*, 495 F.3d at 43 (quoting *Johnson*, 380 F.3d at 697-98) (emphasis omitted).

New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCS, and recognized as an "available" remedy for purposes of the PLRA.  *See Mingues v. Nelson*, No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson*, 351 F.3d 606 (2d Cir. 2003) and *Snider v. Melindez*, 199 F.3d 108, 112-13 (2d Cir.1999)).  The IGP consists of a three-step review process.  First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the

incident.[9]  7 N.Y.C.R.R. § 701.5(a).  The IGRC, which is comprised of

inmates and facility employees, then issues a determination regarding the

grievance.  *Id.* §§ 701.4(b), 701.5(b).  If an appeal is filed, the

superintendent of the facility next reviews the IGRC's determination and

issues a decision.  *Id.* § 701.5(c).  The third level of the process affords

the inmate the right to appeal the superintendent's ruling to the Central

Office Review Committee ("CORC"), which makes the final administrative

decision.  *Id.* § 701.5(d).  Ordinarily, absent the finding of a basis to

excuse non-compliance with this prescribed process, only upon

exhaustion of these three levels of review may a prisoner seek relief

pursuant to section 1983 in a federal court.  *Reyes v. Punzal*, 206 F.

Supp. 2d 431, 432 (W.D.N.Y. 2002) (citing, *inter alia*, *Sulton v. Greiner*,

No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

The defendants have proven that the only grievance that plaintiff

filed and pursued through appeal to the CORC by the plaintiff concerned

his complaint that he was not receiving proper pain medication.

Additionally, the undisputed evidence shows that plaintiff's request for

reasonable accommodation of his disability, seeking a shower rod or seat

---

[9]     The IGP supervisor may waive the grievance timeliness requirement due
to "mitigating circumstances."  7 N.Y.C.R.R. § 701.6(g)(1)(i)(a)-(b).

and return of his cane, was denied based upon Dr. Ramineni's opinion

that it was not medically warranted; Jordan did not pursue a grievance

regarding the denial of this request, despite having been expressly

advised and acknowledging that he had the right to do so.  Although

plaintiff testified at his deposition that he was unsure whether he had filed

a grievance regarding the denial of his request for reasonable

accommodation, in the face of defendants' motion he has failed to come

forward with evidence establishing that he did, or suggesting that his

failure to do so was warranted by special circumstances.  As a result,

plaintiff's claims that are premised upon the deprivation of a cane, shower

seat, and shower rod must be dismissed due to his failure to exhaust

administrative remedies.  I therefore recommend that this portion of

defendants' motion for summary judgment also be granted.

>    D.    ADA Claim

Defendants' are correct in their contention that plaintiff's ADA claims

against the individual defendants are subject to dismissal on the grounds

that the ADA does not contemplate individual capacity suits against state

officials. *Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn*, 280 F.3d

98, 107 (2d Cir. 2001); *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005

n.8 (8th Cir. 1999); *Shariff v. Coombe*, No. 96 Civ. 3001, 2002 WL

1392164, at *2 (S.D.N.Y. June 26, 2002) (Jones, J.) (citing *Garcia*, 280 F.3d at 107).  Plaintiff's complaint does not allege that he is suing the named defendants in their official capacity which would, in effect, implicate a claim against the state.  *See Kentucky v. Graham*, 473 U.S. 159, 166-67, 105 S. Ct. 3099, 3105 (1985); *Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 361 (1991).  However, to the extent that, liberally construed, plaintiff's complaint can be read to encompass such a claim, in this Circuit ADA Title II claims against the states for monetary damages and injunctive relief may only be reconciled with the prohibitions of the Eleventh Amendment[10] where a plaintiff establishes that a Title II violation was motivated by discriminatory animus or ill will based on a disability.  *Garcia*, 280 F.3d at 111; *see Doe v. Goord*, No. 04-CV-0570, 2004 WL 2829876, at *15 (S.D.N.Y. Dec. 10, 2004); *Lighthall v. Vadlamudi*, No.

---

[10]     It is well settled under Eleventh Amendment jurisprudence that neither a state nor one of its agencies can be sued without either express or implied consent, or an express abrogation by Congress of the state's sovereign immunity.  *See*, *e.g.*, *Kilcullen v. N.Y. State Dep't of Labor*, 205 F.3d 77, 79 (2d Cir. 2000), *implicitly overruled on other grounds by Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 368, 121 S. Ct. 955, 965 (2001); *Hallett v. N.Y. State DOCS*, 109 F. Supp.2d 190, 197 (S.D.N.Y. 2000) (citations omitted).  In this respect, the Eleventh Amendment, while not directly controlling, confirms the broader, "'background principle of sovereign immunity[.]'"  *Garcia*, 280 F.3d at 107 (quoting *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 72, 116 S. Ct. 1114, 1131 (1996)).  When abrogating sovereign immunity, Congress must both unequivocally intend to do so and act pursuant to a valid grant of constitutional authority.  *Garrett*, 531 U.S. at 363, 121 S. Ct. at 962 (citing, *inter alia*, *Seminole Tribe*, 517 U.S. at 54, 116 S. Ct. at 1122); *Garcia*, 280 F.3d at 108 (citations omitted).  The question of whether the Eleventh Amendment bars ADA claims under Title II against a state is an unsettled question among the circuits.

9:04-CV-0721, 2006 WL 721568, at *18 (N.D.N.Y. Mar. 17, 2006) (Mordue, C.J.).  In other words, defendants' conduct must be "based on irrational prejudice or wholly lacking a legitimate government interest." *Garcia*, 280 F.3d at 111.  Since I have already determined that the record lacks any evidence suggesting that defendants' acted with ill-will but establishes that they were motivated by legitimate governmental as well as medical interests, any ADA claims against them in their official capacities cannot stand.

For these reasons, I recommend that defendants' motion requesting summary judgment as to plaintiff's ADA claims also be granted.

IV.    SUMMARY AND RECOMMENDATION

The circumstances out of which this lawsuit arise are uncomplicated and largely undisputed.  When plaintiff was transferred to Mid-State his use of methadone was gradually eliminated under careful medical monitoring over a period of two weeks, while other pain medication he was taking was continued, and in some cases increased.   Though plaintiff was clearly displeased with this medical determination, his mere disagreement with the course of treatment is not enough to implicate the Eighth Amendment, and there is no evidence in the record to suggest that plaintiff has stated and proven a plausible constitutional claim.  While

31

plaintiff also takes issue with the confiscation of his cane and the denial of his request for reasonable accommodation, because he failed to exhaust his administrative remedies any claims premised upon these deprivations must be dismissed.  Moreover, plaintiff's ADA cause of action lacks merit since the Act does not give rise to claims against individuals, and under the circumstances presented, plaintiff's official capacity claims, if any, are barred by the Eleventh Amendment.

It is therefore hereby respectfully,

RECOMMENDED, that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 30) be GRANTED and that plaintiff's complaint be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report.  FAILURE TO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roland v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules; and

It is hereby further ordered that the clerk adjust the court's records
to reflect the correct spelling of plaintiff's name to Camilo Jordan.


David E. Peebles
U.S. Magistrate Judge


Dated:      August 24, 2010
            Syracuse, New York



Not Reported in F.Supp., 1998 WL 312375 (N.D.N.Y.)
(Cite as: 1998 WL 312375 (N.D.N.Y.))

H

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Juan CANDELARIA, Plaintiff,
v.
Robert B. GREIFINGER; Bethlynn Terry; Anthony J.
Annucci; Susan J. Butler; Dr. Lester Wright; Thomas
Lavalley; Daniel A. Senkowski; Philip Coombe, Jr.;
Mark R. Chassin, M.D.,M.P.P., M.P.H.; Public Health
Council of the State of New York; Salvatore Canonico,
Joseph Ostrowsky; Richard L. Herzfeld; David Neier;
Quentin Moore; Kings County District Attorney; New
York City Police Department; Supreme Court of the
State of New York-County of Kings Criminal Term;
George Pataki; Brown and Williamson Tobacco
Corporation; Republic Tobacco Company, Defendants.
No. 96-CV-0017 (RSP/DS).

June 8, 1998.

Juan Candelaria, plaintiff, pro se.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Department of Law, the Capitol, Albany, New
York, for State Defendants, Howard L. Zwickel, Asst.
Attorney General, of counsel.

MEMORANDUM-DECISION AND ORDER

POOLER, J.

**\*1** This matter comes to me following a
report-recommendation by Magistrate Judge Daniel
Scanlon, duly filed on the 24th day of April, 1998. Ten
days after service thereof, the Clerk of the Court has sent
me the entire file, including any and all objections filed by
the parties. No party filed objections.

In this action pursuant to the Rehabilitation Act, the
Americans with Disabilities Act, and various civil rights
statutes, Candelaria challenges the conditions of his
confinement at Clinton Correctional Facility ("Clinton").
Candelaria moved for injunctive relief requiring Clinton
to transport physically disabled inmates in a
wheelchair-accessible vehicle. Dkt. No. 15. On April 9,
1997, I concluded that Candelaria's motion could not be
addressed on the record before me and remanded the issue
to the magistrate judge for further consideration. Dkt. No.
99. Candelaria also renewed his motion for appointment
of counsel, dkt. nos. 115, 116, and 121, and requested an
extension of time in which to provide the United States
Marshall Service with information necessary to effect
service of process on certain of the defendants, dkt. no.
121.

The magistrate judge recommended I deny as moot
Candelaria's motion for injunctive relief, on the grounds
that Candelaria had been transferred from Clinton to
Elmira Correctional Facility. Dkt. No. 123. In addition,
the magistrate judge denied Candelaria's motion for
appointment of counsel, granted his motion for an
extension of time in which to provide information relevant
to service, and recommended that, in the event Candelaria
fails to provide the Court with completed USM-285 forms
for each of the unserved defendants within forty-five (45)
days of the date of the magistrate judge's order, the action
be dismissed as to those defendants for whom Candelaria
had not submitted the forms. *Id.*

After careful review of the record, including the
report-recommendation, to which the parties submitted no
objections, I conclude that the magistrate judge's findings
were not clearly erroneous. It is therefore

ORDERED that the report-recommendation is approved,
and it is further

ORDERED that Candelaria's motion for injunctive relief
concerning the transportation of disabled inmates is
DENIED as moot, and it is further

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 312375 (N.D.N.Y.)
(Cite as: 1998 WL 312375 (N.D.N.Y.))

ORDERED that if Candelaria fails to provide, within forty-five (45) days of the date of this order, completed USM-285 forms for each of the unserved defendants, this action will be dismissed without further order of the Court as to those defendants for whom Candelaria has not submitted the forms, and it is further

ORDERED that the Clerk of the Court serve a copy of this order on the parties by regular mail.

IT IS SO ORDERED.

ORDER and REPORT-RECOMMENDATION

SCANLON, Magistrate J.

Plaintiff Juan Candelaria filed this civil rights action in January 1996 to challenge his conviction and the conditions of his confinement at the Clinton Correctional Facility ("Clinton"). Candelaria alleges causes of action pursuant to the Rehabilitation Act, the Americans with Disabilities Act, and various civil rights statutes. This matter is before the Court for further consideration of that portion of plaintiff's motion for injunctive relief which relates to the adequacy of Clinton's method of transporting physically disabled inmates, in light of the parties' submissions filed pursuant to this Court's Order filed July 9, 1997. See Dkt. No. 107. Also before the Court are renewed motions from Candelaria for the appointment of counsel (Dkt. Nos. 115, 116 and 121), and a request for a further extension of time in which to provide the U.S. Marshal Service with certain information necessary to effect service of process on the remaining defendants. See Dkt. No. 121.[FN1] These matters will be addressed separately below.

> FN1. The Court notes that Candelaria submitted with one of his requests for appointment of counsel a document entitled "Consolidated Next of Kin-Powers of Attorney-and-Last Will and Testament." See Dkt. No. 116.

*I. Injunctive Relief*

**\*2** Candelaria is paralyzed from the waist down and is confined to a wheelchair. By his motion for injunctive relief, Candelaria sought an order of this Court requiring Clinton to transport physically disabled inmates such as himself in a wheelchair-accessible van. According to plaintiff, Clinton's use of a prison station wagon which was neither equipped nor designed to accommodate passengers with physical impairments was both unsafe and in violation of his civil and constitutional rights. See Dkt. No. 68 at ¶ 18.

District Judge Rosemary S. Pooler determined that Candelaria's claim regarding Clinton's method of transporting physically disabled inmates could not be addressed on the record then before the Court and remanded that issue to this Court for review upon further factual development. See Dkt. No. 99. By Order filed July 9, 1997, this Court directed the state defendants to submit affidavits, together with supporting documentary evidence, if any, on the adequacy of Clinton's method of transporting such inmates. See Dkt. No. 107. Plaintiff was afforded an opportunity to respond to such submission and the Court reserved decision on whether an evidentiary hearing would be required prior to the resolution of plaintiff's motion for injunctive relief. Id. at 4.

Pursuant to the Court's Order, the state defendants filed the affidavits of John Mitchell, the Nurse Administrator at Clinton, and Mark Vann, a Correctional Lieutenant at Clinton. See Dkt. No. 114. By these affidavits, the state defendants continue to assert that physically disabled inmates (including Candelaria) have been transported without incident while sitting on a seat in one of the vans used for this purpose. See id. Candelaria filed responding papers in which he asserts that inmates are sometimes required to sit on the floor of the van and that, moreover, disabled persons such as himself are not always able to sit safely on a van seat. See Dkt. No. 117.

Since the entry of the Court's Order, Candelaria has been transferred to the Elmira Correctional Facility ("Elmira"), where he has been housed since December 2, 1997. See Dkt. No. 121.[FN2]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 312375 (N.D.N.Y.)
(Cite as: 1998 WL 312375 (N.D.N.Y.))

FN2. Candelaria was transferred to Green Haven Correctional Facility on July 27, 1997, and was thereafter hospitalized from August 25, 1997 until December 2, 1997, when he was discharged to Elmira. *See* Dkt. No. 121.

It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility. *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (citations omitted) (finding request for injunctive relief moot where inmate transferred from subject facilities). Accordingly, the Court recommends that plaintiff's motion for injunctive relief be denied without prejudice to renew in the event that he is transported from Elmira to outside medical visits in a vehicle which is not equipped for the transport of wheelchair-bound inmates.FN3

FN3. In recommending that plaintiff's motion for injunctive relief be denied as moot, the Court makes no findings with regard to the adequacy of the method of transport utilized at Clinton or the need for an evidentiary hearing to determine same.

II. Appointment of Counsel

Turning to Candelaria's requests for the appointment of counsel, a review of the file in this matter, including plaintiff's most recent submissions requesting appointment of counsel (*see* Dkt. Nos. 115, 116 and 121), in conjunction with the factors a court is to consider when ruling on such motions, *see Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997), indicates no change of circumstances that would warrant appointment of counsel *pro bono* for the plaintiff at the present time. In this regard, Candelaria's apparent poor health does not appear as a matter of record in this action to have prevented him from effectively litigating this action. To the contrary, plaintiff has actively pursued his lawsuit against the defendants and has filed numerous motions during the course of this litigation.

*3 Accordingly, plaintiff's requests for appointment of

counsel are denied for the reasons stated in this Court's prior order concerning this issue. *See* Dkt. No. 107.

III. Service of Process

By its July Order, this Court granted Candelaria's requests for an extension of time in which to effect service of process on four individuals and seven entities named as defendants in this action. *See* Dkt. No. 107 at 18-20. Upon the completion of a new USM-285 form for each unserved defendant containing whatever information Candelaria possessed or was able to obtain in a reasonable period of time, the U.S. Marshals Service (the "Service") was directed to attempt to effect service of process on these defendants in accordance with the Federal Rules of Civil Procedure. *See* Dkt. No. 107.FN4

FN4. The following defendants have not yet been served with the summons and complaint in this action: Mark E. Chassin, M.D.; Salvatore Canonico; Joseph Ostrowsky; Quentin Moore; Brown & Williamson Tobacco Corporation; Republic Tobacco, Company; Public Health Council of the State of New York; New York City Police Department; Supreme Court of the State of New York; County of Kings, Criminal Division; and Kings County District Attorney. *See* Dkt. No. 107.

Candelaria now seeks a further extension of time to permit him to provide the Service with the completed USM-285 forms. *See* Dkt. No. 121. According to Candelaria, his three transfers, including a lengthy hospitalization, prevented him from timely completing that paperwork.FN5

FN5. Candelaria also contends that he is now confined to the infirmary at Elmira Correctional Facility, where he is not permitted "to possess a large quantity of legal papers." *Id.* at 1.

Plaintiff is hereby granted a further extension of forty-five (45) days from the filing date of this Order in which to provide the Service with the completed USM-285 forms. Said forms shall contain any and all information presently

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 312375 (N.D.N.Y.)
(Cite as: 1998 WL 312375 (N.D.N.Y.))

known to plaintiff concerning (i) the whereabouts of the individual defendants, and (ii) the name(s) of the individual(s) upon whom service can be effected on behalf of the seven entities. Upon receipt of same, the Service shall attempt to effect service of process on the these defendants in accordance with the Federal Rules of Civil Procedure and the July Order. [FN6] Candelaria is advised that his failure to timely provide the Service with the completed USM-285 forms will result in the dismissal of his action as against those defendants for whom plaintiff has not completed them.

> FN6. The Service is obligated to effect service of process in accordance with the Federal Rules of Civil Procedure and, if necessary, the Service must make multiple attempts at service. *See Armstrong v. Sears,* 33 F.3d 182, 188 (2d Cir.1994) (where defendant refused to acknowledge Service's request for waiver under Rule 4(d), Service must effect personal service under Rule 4(e)). *Accord, Hurlburt v. Zaunbrecher,* 169 F.R.D. 258, 259 (N.D.N.Y.1996) (Smith, M.J.).

WHEREFORE, it is hereby

RECOMMENDED, that Candelaria's motion for a preliminary injunction (Dkt. No. 19) be denied as moot insofar as it challenges the method of transporting physically disabled inmates at the Clinton Correctional Facility, and it is further

ORDERED, that Candelaria's requests for the appointment of counsel (Dkt. Nos. 115, 116 and 121) are denied, and it is further

ORDERED, that Candelaria's request for an extension of time in which to provide the Service with completed USM-285 forms for each of the unserved defendants in this action is granted. Candelaria shall provide such forms, containing all of the information presently known to him relative to effecting service of process on those defendants within forty-five (45) days of the filing date of this Order, and it is further

RECOMMENDED, that if plaintiff fails to timely provide completed USM-285 forms as discussed herein, this action be dismissed as against those defendants for whom plaintiff has not submitted them, and it is further

ORDERED, that the Service shall attempt to serve each of the remaining defendants in accordance with the Federal Rules of Civil Procedure and the terms of the July Order promptly upon receipt of the completed USM-285 forms from Candelaria, and it is further

**\*4** ORDERED, that the Clerk serve a copy of this Order on the parties hereto, and on the Service, by regular mail.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report-recommendation. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW, *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e) and 72.

IT IS SO ORDERED.

N.D.N.Y.,1998.
Candelaria v. Greifinger
Not Reported in F.Supp., 1998 WL 312375 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

C

United States District Court,
E.D. New York.
Anthony PRICE, Plaintiff,
v.
Sheriff Edward REILLY, Kim Edwards, RN III, Perry
Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, MD,
and Nassau University Medical Center, Defendants.
**No. 07-CV-2634 (JFB)(ARL).**

March 8, 2010.

**Background:** Pro se inmate, who suffered from end stage
renal disease requiring dialysis, filed § 1983 action against
sheriff, nurse practitioner, physician, and medical center,
alleging violations of the Eighth Amendment for
defendants' failure to provide adequate medical care.
Defendants moved for summary judgment.

**Holdings:** The District Court, Joseph F. Bianco, J., held
that:

(1) there was no evidence that administrative remedy was
available to inmate;

(2) prison medical staff's modification of inmate's
medication dosage did not constitute deliberate
indifference to his medical needs;

(3) prison's failure to provide food with inmate's
medication was not sufficiently serious to satisfy objective
prong of test for deliberate indifference to serious medical
needs;

(4) medical staff did not act with culpable intent to
consciously disregard inmate's serious medical needs;

(5) genuine issue of material fact as to whether prison
medical staff was aware of, and consciously disregarded
inmate's request for a kidney transplant test precluded
summary judgment;

(6) genuine issue of material fact as to whether inmate's
shoulder pain was a serious medical condition precluded
summary judgment;

(7) sheriff was not liable under § 1983; but

(8) genuine issues of material fact precluded summary

judgment on § 1983 liability of registered nurse and
doctor.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A** 🔑 **2547.1**

170A Federal Civil Procedure
　　170AXVII Judgment
　　　170AXVII(C) Summary Judgment
　　　　170AXVII(C)3 Proceedings
　　　　　170Ak2547 Hearing and Determination
　　　　　　170Ak2547.1 k. In general. Most Cited
Cases
Generally, plaintiffs' failure to respond or contest facts set
forth by defendants in their statement of facts, submitted
in support of summary judgment, constitutes admission of
those facts, and facts are accepted as undisputed under
local rule. U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

**[2] Federal Civil Procedure 170A** 🔑 **25**

170A Federal Civil Procedure
　　170AI In General
　　　170AI(B) Rules of Court in General
　　　　170AI(B)1 In General
　　　　　170Ak25 k. Local rules of District Courts.
Most Cited Cases
District court has broad discretion to determine whether to
overlook a party's failure to comply with local court rules.

**[3] Federal Civil Procedure 170A** 🔑 **2547.1**

170A Federal Civil Procedure
　　170AXVII Judgment
　　　170AXVII(C) Summary Judgment
　　　　170AXVII(C)3 Proceedings
　　　　　170Ak2547 Hearing and Determination
　　　　　　170Ak2547.1 k. In general. Most Cited

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Cases
District court, when analyzing motion for summary judgment by sheriff and medical personnel in inmate's pro se action alleging cruel and unusual punishment, would treat as admitted only those facts in defendants' statement of facts that were supported by admissible evidence and not controverted by other admissible evidence in the record, given that inmate was acting pro se, he failed to file and serve a response to defendant's statement, but he had identified arguments and factual assertions in statement with which he disagreed. U.S.C.A. Const.Amend. 8; U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

[4] Federal Civil Procedure 170A ☞ 657.5(1)

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases
Court must construe pro se complaint broadly, and interpret it to raise the strongest arguments that it suggests.

[5] Attorney and Client 45 ☞ 62

45 Attorney and Client
    45II Retainer and Authority
        45k62 k. Rights of litigants to act in person or by attorney. Most Cited Cases

Federal Civil Procedure 170A ☞ 657.5(1)

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases

Federal Civil Procedure 170A ☞ 2546

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2542 Evidence
                    170Ak2546 k. Weight and sufficiency.
Most Cited Cases
Though pro se litigant's pleadings and other submissions are afforded wide latitude, pro se party's conclusory assertions, completely unsupported by evidence, are not sufficient to defeat motion for summary judgment.

[6] Civil Rights 78 ☞ 1304

78 Civil Rights
    78III Federal Remedies in General
        78k1304 k. Nature and elements of civil actions.
Most Cited Cases
To prevail on a claim under § 1983, a plaintiff must show: (1) deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, (2) by a person acting under the color of state law. 42 U.S.C.A. § 1983.

[7] Prisons 310 ☞ 317

310 Prisons
    310II Prisoners and Inmates
        310II(H) Proceedings
            310k316 Exhaustion of Other Remedies
                310k317 k. In general. Most Cited Cases
In order to determine if prisoner exhausted his administrative remedies prior to commencement of lawsuit, as required by PLRA, court must first establish from a legally sufficient source that an administrative remedy is applicable, and that the particular complaint does not fall within an exception. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

[8] Prisons 310 ☞ 313

310 Prisons

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

310II Prisoners and Inmates
310II(H) Proceedings
310k307 Actions and Litigation
310k313 k. Trial. Most Cited Cases

Whether administrative remedy was available to prisoner in a particular prison or prison system, and whether such remedy was applicable to grievance underlying prisoner's suit, for purpose of PLRA's exhaustion requirement, are not questions of fact; rather, such issues either are, or inevitably contain, questions of law. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[9] Civil Rights 78** ⟩⟩⟩    **1319**

78 Civil Rights
78III Federal Remedies in General
78k1314 Adequacy, Availability, and Exhaustion of State or Local Remedies
78k1319 k. Criminal law enforcement; prisons. Most Cited Cases

Sheriff and prison medical staff provided no evidence that an administrative remedy was available to inmate who suffered from end state renal disease, and who sought, but did not receive, medical testing to determine if he was a candidate for kidney transplant, and thus inmate's § 1983 action alleging violations of Eighth Amendment would not be dismissed for his failure to exhaust administrative remedies under PLRA; defendants failed to establish procedural framework for grievance resolution at the prison or the availability of any administrative remedies for prisoner's situation. U.S.C.A. Const.Amend. 8; Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[10] Sentencing and Punishment 350H** ⟩⟩⟩    **1533**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1533 k. Deliberate indifference in general. Most Cited Cases

Test for determining whether prison official's actions or omissions rise to level of "deliberate indifference" in violation of the Eighth Amendment, as will allow recovery by prisoner in federal civil rights action, is twofold: first, prisoner must demonstrate that he is incarcerated under conditions posing substantial risk of serious harm, and second, prisoner must demonstrate that defendant prison officials possessed sufficient culpable intent. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[11] Sentencing and Punishment 350H** ⟩⟩⟩    **1533**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1533 k. Deliberate indifference in general. Most Cited Cases

Second prong of test for determining whether prison officials acted with deliberate indifference to rights of prisoners in violation of the Eighth Amendment, that of "culpable intent," in turn involves two-tier inquiry; specifically, prison official has sufficient culpable intent if he has knowledge that inmate faces substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate harm. U.S.C.A. Const.Amend. 8.

**[12] Sentencing and Punishment 350H** ⟩⟩⟩    **1546**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical care and treatment. Most Cited Cases

Mere fact that an inmate's underlying disease is a "serious medical condition" does not mean that prison staff's allegedly incorrect treatment of that condition automatically poses an "objectively serious health risk," in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[13] Prisons 310** ⟩⟩⟩    **192**

310 Prisons
310II Prisoners and Inmates
310II(D) Health and Medical Care
310k191 Particular Conditions and Treatments
310k192 k. In general. Most Cited Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**Sentencing and Punishment 350H** 🗝 **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
        350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's end stage renal disease requiring dialysis was serious medical condition, prison medical staff did not act with deliberate indifference to inmate's medical needs in violation of his Eighth Amendment rights by modifying his medication dosage, since reduction in medication levels posed no objectively serious health risk to inmate; only injury inmate suffered was an increase in phosphorous levels, which was correctable, and a slight rash. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[14] Prisons 310** 🗝 **192**

310 Prisons
    310II Prisoners and Inmates
      310II(D) Health and Medical Care
        310k191 Particular Conditions and Treatments
          310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** 🗝 **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
        350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's prescriptions indicated that his medications for renal disease were to be taken with meals, prison officials' failure to provide food with the medication was not sufficiently serious to satisfy objective prong of test for deliberate indifference to inmate's serious medical needs, in violation of Eighth Amendment; inmate did not suffer any harm from taking medicine without food. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[15] Sentencing and Punishment 350H** 🗝 **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
        350Hk1546 k. Medical care and treatment. Most Cited Cases

An inmate's mere disagreement with prison officials' prescribed medication dosage is insufficient as a matter of law to establish officials' "deliberate indifference" to his medical needs, in violation of the Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[16] Prisons 310** 🗝 **192**

310 Prisons
    310II Prisoners and Inmates
      310II(D) Health and Medical Care
        310k191 Particular Conditions and Treatments
          310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** 🗝 **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
        350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate disagreed with medical treatment he received at prison, medical staff did not act with culpable intent to consciously disregard inmate's serious medical needs, in violation of his Eighth Amendment rights, by adjusting the dosage levels of his prescription medication for renal disease; dosage inmate received adequately treated his condition, he suffered no injury from modification of dosage other than increased phosphorous levels, and officials changed dosage to correct those levels. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[17] Federal Civil Procedure 170A** 🗝 **2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
      170AXVII(C) Summary Judgment
        170AXVII(C)2 Particular Cases
          170Ak2491.5 k. Civil rights cases in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

general. Most Cited Cases
Genuine issue of material fact as to whether prison medical staff was aware of, and consciously disregarded inmate's request for a kidney transplant test, precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[18]** Sentencing and Punishment 350H ⬥ 1546

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases
An inmate's chronic pain can constitute a "serious medical condition" for purposes of claim of deliberate indifference to a serious medical need under the Eighth Amendment. U.S.C.A. Const.Amend. 8;.

**[19]** Federal Civil Procedure 170A ⬥ 2491.5

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether inmate's shoulder pain was a serious medical condition, and whether prison medical staff acted with deliberate indifference by failing to prescribe pain medication or take x-rays, despite inmate's ongoing complaints, precluded summary judgment, in inmate's § 1983 Eighth Amendment claims against medical staff. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[20]** Civil Rights 78 ⬥ 1355

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1355 k. Vicarious liability and respondeat

superior in general; supervisory liability in general. Most Cited Cases
Supervisor liability in § 1983 action can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring. 42 U.S.C.A. § 1983.

**[21]** Civil Rights 78 ⬥ 1358

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal law enforcement; prisons. Most Cited Cases
Sheriff was not liable under § 1983 for alleged deliberate indifference to medical needs of inmate related to inmate's end stage renal disease or chronic shoulder pain; there was no showing that sheriff was personally involved in denying medical treatment to inmate, or that there was a custom or policy at prison of allowing alleged constitutional violations. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[22]** Federal Civil Procedure 170A ⬥ 2491.5

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether registered nurse on prison medical staff was personally involved in prison's alleged failure to arrange for inmate's kidney transplant test precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**[23]** Civil Rights 78 🔑 1358

78 Civil Rights
   78III Federal Remedies in General
     78k1353 Liability of Public Officials
      78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases
If prison doctor denies medical treatment to an inmate, that doctor is "personally involved" in alleged constitutional violation for purposes of § 1983 liability. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[24]** Federal Civil Procedure 170A 🔑 2491.5

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
        170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether doctor denied medical treatment to inmate suffering from end stage renal disease, precluded summary judgment in inmate's § 1983 action alleging prison officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.
***347** Anthony Price, pro se.

Edward J. Troy, Law Office of Edward J. Troy, Greenlawn, NY, for the Defendants.

***348** MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiff Anthony Price (hereinafter "Price" or "plaintiff") alleges, pursuant to 42 U.S.C. § 1983, that Sheriff Edward Reilly, Kim Edwards, RN, Perry Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, and Nassau University Medical Center (hereinafter "defendants") violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical needs while plaintiff was incarcerated at the Nassau County

Correctional Center (hereinafter "NCCC"). Specifically, plaintiff alleges that defendants: (1) prescribed an incorrect dosage of medication for his renal disease; (2) failed to get him tested for a kidney transplant list; and (3) failed to adequately treat him for shoulder pain. Defendants have moved for summary judgment on all of plaintiffs' claims. For the reasons set forth below, defendants' motion is granted in part and denied in part. Specifically, defendants' motion is granted with respect to plaintiff's claim regarding the dosage of his prescription medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

I. FACTS

**[1][2][3]** The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the defendants' Rule 56.1 statement of facts.[FN1] They are not findings of fact by the Court, but rather are assumed to be true for the purposes of deciding this motion. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party-here, the plaintiff. *See Capobianco v. City of New York,* 422 F.3d 47, 50 n. 1 (2d Cir.2005). Unless otherwise noted, where a party's 56.1 statement or deposition is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.

FN1. The Court notes that plaintiff failed to file and serve a response to defendants' Local Rule 56.1 Statement of Facts in violation of Local Civil Rule 56.1. Generally, a "plaintiff['s] failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." *Jessamy v. City of New Rochelle,* 292 F.Supp.2d 498, 504 (S.D.N.Y.2003) (quoting *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.,* 262 F.Supp.2d 134, 139 (S.D.N.Y.2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted); *see*

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

*also* *Giliani v. GNOC Corp.*, No. 04 Civ. 2935(ILG), 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 26, 2006)* (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). In his opposition papers, plaintiff identifies defendants' arguments and factual assertions with which he disagrees. In the exercise of its broad discretion, and given plaintiff's *pro se* status, the Court will deem admitted only those facts in defendants' Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See Jessamy,* 292 F.Supp.2d at 504-05. Furthermore, the Court has carefully reviewed all of the parties' submissions, including plaintiff's deposition, to determine if plaintiff has any evidence to support his claims.

A. Arrival at NCCC and Medication

Plaintiff was incarcerated in the Nassau County Correctional Center from January 7, 2007 to December 11, 2007. (Price Dep. at 6, 35.) Plaintiff has end stage renal disease and has been on dialysis since 2004 related to kidney failure. (*Id.* at 10; Defs.' 56.1 ¶ 2.) Plaintiff takes two daily medications, Renagel and PhosLo, for this condition. (Price Dep. at 10.) Before arriving*349 at the NCCC,[FN2] plaintiff was taking two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 12-13.)

> FN2. Plaintiff was incarcerated at the Elmira correctional facility in 2005 and 2006. (Price Dep. at 7-8.)

When plaintiff arrived at the NCCC, he was interviewed by Perry Intal, a nurse practitioner in the medical intake department. (*Id.* at 21-22.) Plaintiff told Intal about his medical history, including that he was a dialysis patient and that he took medications. (*Id.* at 22.) Plaintiff was given a prescription for one 800 milligram pill of Renagel two times a day and one 667 milligram pill of PhosLo two times a day. (*Id.* at 23-24.) Two or three weeks later, plaintiff went to dialysis treatment and a blood test revealed high phosphorous levels. (*Id.* at 25-26.) As a

result, plaintiff was given an increased dosage of medication. (*Id.* at 25-27.) Thereafter, plaintiff's phosphorous levels decreased and about one month later (*id.* at 30-31), his dosage was decreased to one 800 milligram pill of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 31-33.) This was the dosage plaintiff received for the rest of his incarceration at the NCCC.[FN3] (*Id.* at 32-33.) Plaintiff believed that the dosage he was receiving was "wrong" and that it was "hurting" him. (*Id.* at 59-60.) However, the more plaintiff complained about the dosage hurting him, "the more it seemed like the people got aggravated." (*Id.* at 60.) In addition, plaintiff's prescriptions for Renagel and PhosLo indicate that the medications were to be taken with meals. (*See* Defs.' Ex. E.) Plaintiff alleges, however, that the medications were sometimes given to him without food or at times that interfered with his meals. (Price Dep. at 23, 60.)

> FN3. Plaintiff testified that, at the time of his deposition, he was receiving two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day at the Fishkill correctional facility. (Price Dep. at 11-12.)

Besides receiving medication, plaintiff also received dialysis treatment three times a week at the Nassau University Medical Center. (*Id.* at 30.) On some occasions, plaintiff refused dialysis treatment because he "was feeling good" and "wanted to take a break" from treatment. (*Id.* at 56.) Plaintiff's regular medical treatment at the hospital also included a blood test every 30 days. (*Id.* at 27-28, 30.)

B. Kidney Transplant Request

In February or March 2007, plaintiff spoke with a social worker named "Susan" about getting tested for a kidney transplant. (*Id.* at 76.) A test was required before an inmate could be placed on a waiting list for kidney transplants. (*Id.* at 80-81.) Only two hospitals in the area dealt with such matters: Stony Brook and a hospital in Westchester County. (*Id.* at 75-76.) Susan tried to contact Dr. Benjamin Okonta (hereinafter "Okonta") at Nassau University Medical Center in or about February or March

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

2007 (*id.* at 76-77), but Susan told plaintiff that Okonta did not get back to her.[FN4] (*Id.* at 65-66, 74-78.) Susan also submitted a letter to Okonta in July 2007, stating: "As per our conversation on 7/27/07, I am re-submitting for your review my request [for] your medical services on behalf of our renal dialysis pt., Anthony Price." (*Id.* at 77-78; Defs.' Ex. K.) Plaintiff never received a response from Okonta. (Price Dep. at 82.)

FN4. Plaintiff never interacted with Okonta except through Susan, the social worker. (Price Dep. at 73-74.)

Susan also submitted a letter to Nurse Mary Sullivan (hereinafter "Sullivan"), the **\*350** day supervisor at the NCCC medical center, stating: "As per our telephone conversation, I am submitting in writing Anthony Price's request for referral and evaluation to a kidney transplant center ... Stonybrook Univ. Medical Ctr." (Def.'s Ex. K.) At some point in time, plaintiff was called down to the NCCC medical center and was told by Sullivan that defendants knew about plaintiff's request to get on the kidney transplant list but that they had "other priorities right now." (Price Dep. at 70.) Plaintiff believed Sullivan was referring to his other health issues. (*Id.* at 70.) Plaintiff did not ask when he would be tested for the kidney transplant list. (*Id.* at 71.)

On September 25, 2007, plaintiff filed a formal grievance regarding his request to be tested for the kidney transplant list.[FN5] (*Id.* at 85.) Plaintiff stated on his grievance form that he had "been waiting to take the test I need to take to get on the kidney transplant list" and that his social worker had told him that she had forwarded the paperwork to the jail, but could not get a response. (Defs.' Ex. F.) Plaintiff requested that he be "given the test to see if I'm a candidate for possibly a kidney transplant." (*Id.*) By interdepartmental memorandum dated September 27, 2007, the Inmate Grievance Coordinator informed plaintiff that the medical grievance "is being discussed with and turned over to the Health Services Administrator. The medical unit will evaluate you. A Grievance Unit Investigator will contact you at a later date to conduct an evaluation of your status and to closeout the paperwork." (*Id.*) In another memo dated October 5, 2007, defendant Kim Edwards,[FN6] informed plaintiff:

FN5. This was the only formal medical grievance filed by plaintiff. (Price Dep. at 85.)

FN6. Edwards never wrote medical orders for plaintiff or examined plaintiff. (Price Dep. at 61.) Plaintiff had no interaction with Edwards except her written response to plaintiff's grievance. (*Id.* at 67.)

The social worker can only inform you of treatment options that are available for your medical problem. If you are in need of a "test", documentation must be provided by the attending physician that is responsible for your renal treatment.

(*Id.*) Plaintiff interpreted this response from Edwards to mean that the matter was now in the hands of the medical department, and so he did not further proceed with the grievance and "did not feel it was necessary." (Pl.'s Opp. at 3.)[FN7] Therefore, plaintiff "signed off on the grievance," saying that he had "read it and accepted it." (Price Dep. at 88.)

FN7. Although plaintiff does not offer this explanation in his deposition, the Court construes the *pro se* plaintiff's sworn "verified rebuttal" to defendants' motion for summary judgment as an evidentiary submission. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment."); *see also Hailey v. N.Y. City Transit Auth.,* 136 Fed.Appx. 406, 407-08 (2d Cir.2005) ("The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims.").

Plaintiff did not get the requested test during the remainder of his incarceration at the NCCC. (*Id.* at 90.) Defendants have submitted evidence that they made efforts to get plaintiff tested and, in fact, scheduled plaintiff for a test at Stony Brook University Hospital on November 29, 2007, but that the test had to be cancelled due to "unforeseen circumstances"; the test was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

re-scheduled for January 10, 2008. (Defs.' Ex. G, Reschke Aff. ¶¶ 6-7.) Plaintiff was not informed about any scheduled test (Pl.'s Opp. at 2), and he was **\*351** transferred to a different facility in December 2007. (Price Dep. at 35; Reschke Aff. ¶ 7.)

### C. Shoulder Pain

Plaintiff began complaining about shoulder pain to the medical department at the NCCC on January 17, 2007, stating that his right shoulder was "extremely hurting." (Price Dep. at 36; Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Plaintiff had received treatment for shoulder pain in the past, including a shot of Cortisone while at the Elmira facility (Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.) After the January 17 complaint, plaintiff was seen a couple of days later and given medication to rub on his shoulder. (Price Dep. at 41.) The medication did not help with the discomfort, and so plaintiff complained again later in January. (*Id.* at 42-43.) Although defendants gave plaintiff Motrin and Naprosyn for the pain, no x-rays were taken for several months. (*Id.* at 44, 55; Defs.' Ex. H, Edwards Aff. ¶ 4.) The pain medication continued to be ineffective, and plaintiff continued to complain. (*See, e.g., id.* at 45, 51.) For instance, in June 2007, plaintiff complained that his right shoulder "hurts really bad." (Def.'s Ex. E, Sick Call Request, June 12, 2007.) Plaintiff never refused medication for his shoulder. (Price Dep. at 56.) When plaintiff eventually was given x-rays, in April and November 2007 (Edwards Aff. ¶ 4), plaintiff was told that nothing was wrong with his shoulder.[FN8] (Price Dep. at 44; *see also* Defs.' Ex. J, Discharge Summary, November 2007 ("Although no definite evidence of venous thrombosis is seen with Rt. upper extremity, short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information....").) Plaintiff states that, with respect to his right shoulder, he currently wears a brace for carpal tunnel syndrome, has a separated shoulder, and takes shots for the pain. (Pl.'s Opp. at 4.)

> **FN8.** Plaintiff testified that he stopped complaining about his shoulder at some point because he was frustrated that defendants were not helping. (Price Dep. at 54-55.) There is evidence that plaintiff complained about his shoulder at least as late as June 2007, and again

complained in November 2007, which resulted in the taking of additional x-rays. (*See* Def.'s Ex. E, Sick Call Request, June 21, 2007; Defs.' Ex. J.)

### II. PROCEDURAL HISTORY

On June 28, 2007, plaintiff filed the initial complaint in this action. Plaintiff filed an amended complaint on August 20, 2007 alleging, pursuant to Section 1983, that defendants Sheriff Edward Reilly, Kim Edwards, Perry Intal, and Nassau University Medical Center violated his Eighth Amendment rights with respect to his medication dosage, kidney transplant request, and shoulder pain. On November 14, 2007, plaintiff filed another complaint in a separate action (No. 07-CV-4841) making substantially the same allegations and expanding on his allegations regarding the kidney transplant request. This complaint named Mary Sullivan and Dr. Benjamin Okonta, as well as the Nassau University Medical Center, as defendants. By Order dated July 11, 2008, the Court consolidated both actions (Nos. 07-CV2634 and 07-CV-4841) because the allegations in the two actions were "factually intertwined."

Defendants moved for summary judgment on May 29, 2009.[FN9] Plaintiff submitted**\*352** an opposition to the motion on August 3 and August 11, 2009. [FN10] Defendants replied on August 20, 2009. Plaintiff submitted a surreply on October 6, 2009. This matter is fully submitted.

> **FN9.** Pursuant to Local Rule 56.1, defendants also served plaintiff with the requisite notice for *pro se* litigants opposing summary judgment motions. *See Irby v. N.Y. City Transit Auth.,* 262 F.3d 412, 414 (2d Cir.2001) ("And we remind the district courts of this circuit, as well as summary judgment movants, of the necessity that pro se litigants have actual notice, provided in an accessible manner, of the consequences of the pro se litigant's failure to comply with the requirements of Rule 56.").

> **FN10.** Plaintiff submitted his two identical oppositions and a sur-reply to the instant motion not only in this action, but also in the now-consolidated action (No. 07-CV-4841). The

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Court has considered all of plaintiff's submissions in both actions in deciding the instant motion.

## III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Reiseck v. Universal Commc'ns of Miami, Inc., 591 F.3d 101, 104 (2d Cir.2010). The moving party bears the burden of showing that he or she is entitled to summary judgment. See Huminski v. Corsones, 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir.2004); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.' " Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir.2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original)). As the Supreme Court stated in Anderson, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50, 106 S.Ct. 2505 (citations omitted). Indeed, the "mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Id. at 247-48, 106 S.Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth " 'concrete particulars' " showing that a trial is needed.

R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir.1984) (quoting SEC v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir.1978)). Accordingly, it is insufficient for a party opposing summary judgment " 'merely to assert a conclusion without supplying supporting arguments or facts.' " BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir.1996) (quoting Research Automation Corp., 585 F.2d at 33).

[4][5] Where the plaintiff is proceeding pro se, the Court must "construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." Weixel v. Bd. of Educ. of the City of N.Y., 287 F.3d 138, 145-46 (2d Cir.2002) (alterations in original) (quoting Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir.2000)). Though a pro se litigant's pleadings and other submissions are afforded wide latitude, a pro se party's conclusory assertions, completely unsupported *353 by evidence, are not sufficient to defeat a motion for summary judgment. Shah v. Kuwait Airways Corp., 653 F.Supp.2d 499, 502 (S.D.N.Y.2009) ("Even a pro se party, however, 'may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful.' " (quoting Auguste v. N.Y. Presbyterian Med. Ctr., 593 F.Supp.2d 659, 663 (S.D.N.Y.2009))).

## IV. DISCUSSION

[6] To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir.1993).

There is no dispute for purposes of this motion that defendants were acting under color of state law. The question presented, therefore, is whether defendants' alleged conduct deprived plaintiff of his Eighth Amendment rights. Plaintiff alleges that his Eighth Amendment rights were violated when defendants: (1) prescribed him an incorrect dosage of medication for his renal disease; (2) failed to get him tested for the kidney

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

transplant list; and (3) failed to adequately treat him for his shoulder pain. For the reasons set forth below, after drawing all reasonable inferences from the facts in favor of plaintiff, the Court concludes that defendants are entitled to summary judgment on plaintiff's claim regarding the dosage of his medication and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion for summary judgment is denied in all other respects.

A. Exhaustion

As a threshold matter, defendants argue that plaintiff is barred from raising any Eighth Amendment claim with respect to his kidney transplant request because plaintiff has not exhausted his administrative remedies.[FN11] For the reasons set forth below, the Court disagrees and cannot conclude from this record that plaintiff failed to exhaust his administrative remedies.

> FN11. Defendants raise exhaustion only with respect to plaintiff's kidney transplant request, and so the Court does not consider exhaustion with respect to plaintiff's other claims.

1. Legal Standard

The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under 42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures." Espinal v. Goord, 558 F.3d 119, 124 (2d Cir.2009) (quoting Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Woodford v. Ngo, 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368

(2006). Therefore, the exhaustion inquiry requires a court to "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *354 Espinal, 558 F.3d at 124 (citing Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) and Woodford, 548 U.S. at 88-90, 126 S.Ct. 2378).

Prior to Woodford, 548 U.S. 81, 126 S.Ct. 2378 (2006), the Second Circuit "recognized some nuances in the exhaustion requirement: (1) administrative remedies that are ostensibly 'available' may be unavailable as a practical matter, for instance, if the inmate has already obtained a favorable result in administrative proceedings but has no means of enforcing that result; (2) similarly, if prison officials inhibit the inmate's ability to seek administrative review, that behavior may equitably estop them from raising an exhaustion defense; (3) imperfect exhaustion may be justified in special circumstances, for instance if the inmate complied with his reasonable interpretation of unclear administrative regulations, or if the inmate reasonably believed he could raise a grievance in disciplinary proceedings and gave prison officials sufficient information to investigate the grievance." Reynoso v. Swezey, 238 Fed.Appx. 660, 662 (2d Cir.2007) (internal citations omitted); see also Davis v. New York, 311 Fed.Appx. 397, 399 (2d Cir.2009) (citing Hemphill v. New York, 380 F.3d 680, 686, 691 (2d Cir.2004)). However, the Second Circuit has not decided whether the above-discussed considerations apply post- Woodford. See, e.g., Reynoso, 238 Fed.Appx. at 662 ("Because we agree with the district court that [plaintiff] cannot prevail on any of these grounds, we have no occasion to decide whether Woodford has bearing on them."); Ruggiero v. County of Orange, 467 F.3d 170, 176 (2d Cir.2006) ("We need not determine what effect Woodford has on our case law in this area, however, because [plaintiff] could not have prevailed even under our pre- Woodford case law.").

As the Supreme Court has held, exhaustion is an affirmative defense: "We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." Jones v. Bock, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); see also Key v. Toussaint, 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) ("Failure to exhaust remedies under the PLRA is an affirmative defense, and thus the defendants have the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

burden of proving that [plaintiff's] retaliation claim has not been exhausted." (citations omitted)).

### 2. Application

Defendants argue that plaintiff did not appeal the resolution of his grievance request, i.e., the memo from Edwards dated October 5, 2007, stating that: "If you are in need of a 'test', documentation must be provided by the attending physician that is responsible for your renal treatment." (Defs.' Ex. F.) Therefore, defendants argue, plaintiff has failed to exhaust his administrative remedies under the PLRA. (Defs.' Br. at 25.) Plaintiff argues in response that he did not believe any further action on his grievance was "necessary" because the matter was put into the hands of the medical department. (Pl.'s Opp. at 3.) For the reasons discussed below, the Court concludes that, on this record, defendants have not met their burden of proving that plaintiff failed to exhaust his administrative remedies.

[7][8][9] As discussed above, the PLRA requires exhaustion only with respect to "such administrative remedies as are available." See 42 U.S.C. § 1997e(a). Therefore, in order to determine whether plaintiff exhausted his administrative remedies, the Court "must first establish from a legally sufficient source that an administrative remedy is applicable and that the particular complaint does not fall within an exception. Courts should be careful to look at the applicable set of grievance procedures,*355 whether city, state or federal." Mojias v. Johnson, 351 F.3d 606, 610 (2d Cir.2003); see also Espinal, 558 F.3d at 124 (holding that, when considering exhaustion, courts must "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures" (citations omitted)). "Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They are, or inevitably contain, questions of law." See Snider v. Melindez, 199 F.3d 108, 113-14 (2d Cir.1999). However, "the existence of the procedure may be a matter of fact." Id. at 114.

On the record before the Court on this motion, the Court

is unable to establish from any legally sufficient source that an administrative remedy was available to plaintiff. Defendants have made no submissions to the Court regarding the applicable grievance procedures at the NCCC. See, e.g., Abney v. County of Nassau, 237 F.Supp.2d 278, 281 (E.D.N.Y.2002) (noting that the "Inmate Handbook" for the Nassau County Correctional Facility procedure was "annexed to Defendants' moving papers"). Specifically, defendants have not submitted any evidence, by affidavit or otherwise, that NCCC procedures offer a remedy to address the particular situation in this case.FN12 Therefore, the Court cannot conclude from this record that plaintiff had an available administrative remedy that he failed to exhaust.

FN12. The Court notes that the October 5, 2007 memo from Edwards is unclear as to which party bore the responsibility of obtaining plaintiff's medical records. (Defs.' Ex. F.) Edwards explains in an affidavit that she advised plaintiff that "it would be necessary for his doctors to provide the selected facility with his records before a request for testing would be considered." (Edwards Aff. ¶ 2.) It is unclear whether plaintiff had access to these records or whether the prison would need to obtain them. Thus, there appears to be a factual question as to the implementation of this grievance resolution. A similar situation arose in Abney v. McGinnis, 380 F.3d 663 (2d Cir.2004), in which the Second Circuit held that where a prisoner achieved favorable results in several grievance proceedings but alleged that prison officials failed to implement those decisions, that prisoner was without an administrative remedy and therefore had exhausted his claim for purposes of the PLRA. See id. at 667-68, 669 ("Where, as here, prison regulations do not provide a viable mechanism for appealing implementation failures, prisoners in [plaintiff's] situation have fully exhausted their available remedies."). The Court recognizes that Abney, 380 F.3d 663, was decided before Woodford v. Ngo, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), and that, as discussed above, the Second Circuit has not decided whether the various nuances to the exhaustion requirement apply post- Woodford. However, the Court need not decide the applicability of any such nuances to the

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

exhaustion requirement because, as discussed above, defendants have failed to establish the procedural framework for grievance resolution at the NCCC and the availability of *any* administrative remedies.

Although there may be administrative remedies for such a situation under the New York Department of Corrections regulations, *see* 7 N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(c)(4) ("If a decision is not implemented within 45 days, the grievant may appeal to CORC citing lack of implementation as a mitigating circumstance."), it does not follow that the same procedure applies at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d at 283 ("The flaw in Defendants' argument, however, is that the cases relied upon were all decided under the New York State administrative procedure-none were decided in the context of the procedure relied upon-the Nassau County Inmate Handbook procedure.").

B. Plaintiff's Claims of Deliberate Indifference

1. Legal Standard

"[D]eliberate indifference to serious medical needs of prisoners constitutes the **\*356** 'unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment" and therefore "states a cause of action under § 1983." *Estelle v. Gamble,* 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). As the Second Circuit has explained,

[t]he Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. Moreover, under 42 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate if the officials acted with "deliberate indifference" to the safety of the inmate. However, to state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice.

*Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (citations omitted). Within this framework, "[d]eliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment." *Bellotto v. County of Orange,* 248 Fed.Appx. 232, 236 (2d Cir.2007). Thus, according to the Second Circuit,

[d]efendants may be held liable under § 1983 if they ... exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution. Deliberate indifference is found in the Eighth Amendment context when a prison supervisor knows of and disregards an excessive risk to inmate health or safety .... Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Ortiz v. Goord,* 276 Fed.Appx. 97, 98 (2d Cir.2008) (citations and quotation marks omitted); *see also Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) ("Deliberate indifference will exist when an official 'knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.' ") (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Curry v. Kerik,* 163 F.Supp.2d 232, 237 (S.D.N.Y.2001) (" '[A]n official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' ") (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks omitted)).

[10][11] In particular, the Second Circuit has set forth a two-part test for determining whether a prison official's actions or omissions rise to the level of deliberate indifference:

The test for deliberate indifference is twofold. First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.

**\*357** *Hayes,* 84 F.3d at 620 (internal citation omitted); *see also* *Phelps v. Kapnolas,* 308 F.3d 180, 185-86 (2d Cir.2002) (setting forth two-part deliberate indifference test).

In *Salahuddin v. Goord,* the Second Circuit set forth in detail the objective and subjective elements of a medical indifference claim. 467 F.3d 263 (2d Cir.2006). In particular, with respect to the first, objective element, the Second Circuit explained:

The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious. Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under the Cruel and Unusual Punishments Clause, and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability.

Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is

sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an inmate's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone. Thus, although we sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

467 F.3d at 279-80 (citations and quotation marks omitted); *see also* *Jones v. Westchester County Dep't of Corr. Medical Dep't,* 557 F.Supp.2d 408, 413-14 (S.D.N.Y.2008).

With respect to the second, subjective component, the Second Circuit further explained:

The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind. In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware **\*358** of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. But recklessness

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.

*Salahuddin,* 467 F.3d at 280 (citations and quotation marks omitted); *see also Jones,* 557 F.Supp.2d at 414. The Supreme Court has stressed that

in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle v. Gamble,* 429 U.S. 97, 105-06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal citations omitted); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("A showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." (internal quotations omitted)); *Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000) (a medical practitioner who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not evince the culpability necessary for deliberate indifference).

### 2. Application

Plaintiff alleges that defendants violated his Eighth Amendment rights by: (1) prescribing an incorrect dosage of his renal disease medication; (2) failing to have him tested for the kidney transplant list; and (3) failing to properly treat his shoulder pain. The Court considers each claim in turn and, for the reasons discussed below, concludes that defendants are entitled to summary

judgment on plaintiff's claim regarding his medication dosage and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

#### a. Medication Dosage

Defendants concede that plaintiff's kidney condition is serious (Defs.' Br. at 21), but argue that the dosage of Renagel and PhosLo prescribed for plaintiff did not result in any injury. Defendants also argue that, even if the dosage was incorrect, it was at most "an error in medical judgment." Finally, defendants argue that plaintiff cannot show deliberate indifference because defendants continually tested plaintiff and twice changed the dosage of his medication depending on his phosphorous levels. (Defs.' Br. at 22.) For the reasons set forth below, the Court agrees and concludes that no rational jury could find that defendants acted with deliberate indifference with respect to the prescription **359 of medication for plaintiff's renal disease.

#### i. Objective Prong

[12][13][14] Plaintiff has failed to present any evidence that the allegedly incorrect medication dosage posed an objectively serious risk to plaintiff's health. As a threshold matter, the mere fact that plaintiff's underlying renal disease is a serious medical condition does not mean that the allegedly incorrect treatment for that condition poses an objectively serious health risk. *See Smith v. Carpenter,* 316 F.3d 178, 186-87 (2d Cir.2003) ("As we noted in *Chance* [*v. Armstrong,* 143 F.3d 698 (2d Cir.1998) ], it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."). Furthermore, plaintiff has failed to produce any evidence that his medication dosage at the NCCC caused him any objectively serious harm. Instead, plaintiff testified merely that the prescribed dosage was "wrong" and was "hurting" him.[FN13] (Price Dep. at 60.) Plaintiff's belief that the medication dosage was incorrect is insufficient to establish the objective prong of the deliberate indifference test.[FN14] *See Fox v. Fischer,* 242 Fed.Appx. 759, 760 (2d Cir.2007) ("[T]he fact that [plaintiff] was provided Claritin as a substitute for Allegra

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

fails to establish deliberate indifference to a serious medical need, because there is no allegation that the change in medication caused harm, if any, sufficiently serious to establish the objective prong of a deliberate indifference claim...."); *Reyes v. Gardner,* 93 Fed.Appx. 283, 285 (2d Cir.2004) ( "[Plaintiff] has offered no evidence ... showing that the prescribed medication regimen deviated from reasonable medical practice for the treatment of his condition."). Although there is evidence that plaintiff's phosphorous levels increased when he was prescribed a lesser dosage of medication upon arriving at the NCCC (*see* Price Dep. **\*360** at 23-26), that is not by itself enough to support a finding of an objectively serious condition.[FN15] *See Smith,* 316 F.3d at 188-89 ("Although [plaintiff] suffered from an admittedly serious underlying condition, he presented no evidence that the two alleged episodes of missed medication resulted in permanent or on-going harm to his health, nor did he present any evidence explaining why the absence of actual physical injury was not a relevant factor in assessing the severity of his medical need.") (affirming denial of motion for new trial). Thus, plaintiff's medication dosage claim must fail because he cannot show that the complained-of dosage posed an objectively serious health risk.[FN16]

> **FN13.** Plaintiff does not distinguish between the initial dosage he received at the NCCC and the later dosages he received, instead arguing generally that all of the dosages he received at the NCCC were incorrect.

> **FN14.** Plaintiff's conclusory testimony that the dosage was "hurting" him also is insufficient to establish the objective prong of the deliberate indifference test. To the extent plaintiff claims that the medication caused him pain, there is no evidence in the record that plaintiff suffered from chronic pain or, indeed, any other objectively serious symptoms in connection with the medication dosage. Although not mentioned in plaintiff's deposition or in his opposition to the instant motion, plaintiff alleges in his amended complaint that the lesser dosage put him at risk of "itching" and "breaking of bones." (Amended Complaint, No. 07-CV-2634, at 4.) There is evidence that plaintiff suffered from a rash and/or itching while at the NCCC and that plaintiff was told at one point that he had

eczema. (*See* Price Dep. at 45-51.) However, there is no evidence to connect those symptoms with the medication dosage for his renal disease. (*See, e.g., id.* at 46 ("Q. Did anyone ever tell you what was causing a rash? A. I kept going to the-I had went to the dermatologist at Bellevue. To me, the doctor had an attitude like it ain't nothing wrong; like it was acne or something.").) Furthermore, there is no evidence that the rash and/or itching was an objectively serious condition. *See Lewal v. Wiley,* 29 Fed.Appx. 26, 29 (2d Cir.2002) (affirming summary judgment and holding that plaintiff's alleged "persistent rash" was not a "serious medical condition"); *see also Benitez v. Ham,* No. 04-CV-1159, 2009 WL 3486379, at \*11 (N.D.N.Y. Oct. 21, 2009) ("[T]he evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation."). In any event, even if plaintiff did suffer from an objectively serious condition because of the medication dosage, he cannot prove that defendants acted with a subjectively culpable state of mind, as discussed *infra.*

> **FN15.** In any event, as discussed *infra,* defendants adjusted plaintiff's dosage in response to the increase in phosphorous levels, and there is no evidence from which a rational jury could conclude that defendants acted with deliberate indifference in prescribing plaintiff's medication.

> **FN16.** Although he does not raise it in any of his pleadings or in his opposition to the instant motion, plaintiff testified at his deposition that he had to take the medication with meals but that sometimes he was given the medication without food or at times that interfered with his meals. (Price Dep. at 23, 60; Defs.' Ex. E.) The record is unclear as to how often this occurred. The Court assumes, as it must on this motion for summary judgment, that on some occasions plaintiff was given his medications not at meal times or at times that interfered with meals. However, plaintiff points to no evidence whatsoever of any harm caused by defendants' alleged conduct in this regard, and, therefore, no

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

rational jury could find that the provision of medication without food on some occasions was objectively serious. *See Gillard v. Kuykendall, 295 Fed.Appx. 102, 103 (8th Cir.2008)* (affirming summary judgment for defendants where defendants, on some occasions, "were late in giving [plaintiff] his medications and did not always administer them with meals as [plaintiff] apparently desired" where there was no evidence of any adverse consequences). Thus, any deliberate indifference claim based on these allegations would fail as well.

ii. Subjective Prong

[15][16] Plaintiff's claim with respect to his medication dosage also fails because plaintiff cannot show that defendants acted with subjectively culpable intent, i.e., that they were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff's claim is based on his assertion that the prescribed dosage was "wrong." However, mere disagreement with a prescribed medication dosage is insufficient as a matter of law to establish the subjective prong of deliberate indifference. *See Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir.1998)* ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F.Supp.2d 303, 312 (S.D.N.Y.2001)* ("[D]isagreements over medications ... are not adequate grounds for a Section 1983 claim. Those issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." (citing *Estelle, 429 U.S. at 107, 97 S.Ct. 285*)); *see also, e.g., Fuller v. Ranney, No. 06-CV-0033, 2010 WL 597952, at *11 (W.D.N.Y. Feb. 17, 2010)* ("Plaintiff's claim amounts to nothing more than a disagreement with the prescribed treatment he received and his insistence that he be prescribed certain medications. Without more, plaintiff's disagreement with the treatment he received does not rise to the level of a constitutional violation of his Eighth Amendment rights."); *Covington v. Westchester County Dep't of Corr., No. 06 Civ. 5369, 2010 WL 572125, at *6 (S.D.N.Y. Jan. 25, 2010)* ("[Plaintiff's] claims that Defendants failed **361 to change or increase his medication and counseling

sessions amount to negligence claims at most, which is insufficient."); *Hamm v. Hatcher, No. 05-CV-503, 2009 WL 1322357, at *8 (S.D.N.Y. May 5, 2009)* ("Plaintiff's unfulfilled demand for a larger dosage of [the medication] represents a mere disagreement over the course of Plaintiff's treatment and is inconsistent with deliberate indifference ....").

The fact that defendants adjusted the dosage of plaintiff's medication in response to plaintiff's phosphorous levels (*see* Price Dep. at 25-27) is also inconsistent with deliberate indifference. *See Bellotto v. County of Orange, 248 Fed.Appx. 232, 237 (2d Cir.2007)* ("The record also shows that mental health professionals responded to [plaintiff's] concerns about his medications and adjusted his prescription as they believed necessary.") (affirming summary judgment for defendants); *see also Jolly v. Knudsen, 205 F.3d 1094, 1097 (8th Cir.2000)* ("[Defendant's] actions in this case cannot reasonably be said to reflect deliberate indifference. The only relevant evidence in the record indicates that [defendant's] actions were aimed at correcting perceived difficulties in [plaintiff's] dosage levels [in response to blood tests]."); *Fuller, 2010 WL 597952, at *11* ("Moreover, a subsequent decision to prescribe plaintiff a certain medication does not indicate that the medication should have been prescribed earlier.")[FN17] Thus, there is no evidence in the record sufficient for a rational jury to find that defendants acted with deliberate indifference regarding the prescription dosage of plaintiff's renal disease medication.

FN17. To the extent plaintiff also argues that that defendants acted with deliberate indifference because he has received different prescriptions at different facilities, the Court rejects that argument as well. *See, e.g., Cole v. Goord, No. 04 Civ. 8906, 2009 WL 1181295, at *8 n. 9 (S.D.N.Y. Apr. 30, 2009)* ("[Plaintiff's] reliance upon the fact that subsequent medical providers have provided him with a different course of medication or treatment ... does nothing to establish that [defendant] violated [plaintiff's] Eighth Amendment rights. Physicians can and do differ as to their determination of the appropriate treatment for a particular patient; that difference in opinion does not satisfy the requirements for a constitutional claim of deliberate indifference."

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

(citing *Estelle,* 429 U.S. at 97, 97 S.Ct. 285)).

In sum, based on the undisputed facts and drawing all reasonable inferences in plaintiff's favor, no rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's objectively serious health needs regarding his medication dosage. Accordingly, defendants' motion for summary judgment is granted with respect to this claim.

b. **Kidney Transplant**

[17] Defendants also argue that plaintiff cannot proceed with his deliberate indifference claim regarding his request to be tested for a kidney transplant. Defendants do not dispute the objective seriousness of plaintiff's underlying condition or the requested transplant, and instead argue only that defendants lacked subjective culpability. Specifically, defendants argue that they made reasonable efforts to get plaintiff tested. (Defs.' Br. at 23.) However, construing the facts in the light most favorable to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs.

Plaintiff began requesting a kidney transplant test as early as February or March 2007 and still had not received one by the time he left the NCCC in December 2007. (*See* Price Dep. at 76-77, 90.) Requests were sent on plaintiff's behalf to Dr. Okonta at the Nassau University Medical Center and to Nurse Mary Sullivan at the NCCC medical department. (*See* Defs.' Ex. K.) The record indicates that plaintiff received no response from Okonta. (*See* Price Dep. at 82.) When plaintiff asked Sullivan about the test, Sullivan told him that defendants had "other priorities right now." (Price Dep. at 70.) Even after plaintiff filed a formal grievance in September 2007, he still did not receive the requested test. (*See* Defs.' Ex. F.) On these facts, where there was a delay of at least nine months in arranging a kidney transplant test for plaintiff despite plaintiff's repeated requests, and where defendants do not dispute the necessity of the test, a rational jury could find that defendants acted with deliberate indifference to plaintiff's serious medical needs. *See Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (holding summary judgment inappropriate where there

was evidence that, *inter alia,* plaintiff was delayed dental treatment for a cavity for one year); *Hathaway v. Coughlin,* 841 F.2d 48, 50-51 (2d Cir.1988) ("[Plaintiff's] affidavit in opposition to [defendants'] motion for summary judgment alleged that a delay of over two years in arranging surgery ... amounted to deliberate indifference to his serious medical needs. We believe this is a sufficient allegation to survive a motion for summary judgment under *Archer* [*v. Dutcher,* 733 F.2d 14 (2d Cir.1984) ] because it raises a factual dispute ...."); *see also Lloyd v. Lee,* 570 F.Supp.2d 556, 569 (S.D.N.Y.2008) ("A reasonable jury could infer deliberate indifference from the failure of the doctors to take further steps to see that [plaintiff] was given an MRI. The argument that the doctors here did not take [plaintiff's] condition seriously is plausible, given the length of the delays. Nine months went by after the MRI was first requested before the MRI was actually taken.").

Defendants point to evidence in the record that they were, in fact, attempting to get plaintiff tested throughout the time in question, but were unsuccessful in their efforts. (*See* Defs.' Br. at 23; Reschke Aff. ¶ 3.) However, defendants' proffered explanation for the delay, i.e., the difficulty of finding a hospital because of transportation and security concerns, raises questions of fact and does not, as a matter of law, absolve them of liability. *See Johnson v. Bowers,* 884 F.2d 1053, 1056 (8th Cir.1989) ("It is no excuse for [defendants] to urge that the responsibility for delay in surgery rests with [the hospital]."); *Williams v. Scully,* 552 F.Supp. 431, 432 (S.D.N.Y.1982) (denying summary judgment where plaintiff "was unable to obtain treatment ... for five and one half months, during which time he suffered considerable pain" despite defendants' "explanations for the inadequacy of [the prison's] dental program"), *cited approvingly in Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000). Thus, whether defendants' efforts were reasonable over the nine month period at issue is a question of fact for the jury.

In sum, on this record, drawing all reasonable inferences in plaintiff's favor, the Court concludes that a rational jury could find that defendants acted with deliberate indifference regarding plaintiff's request for a kidney transplant test. Accordingly, defendants' motion for summary judgment on this claim is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

c. Shoulder

Defendants argue that summary judgment is warranted on the claim relating to the alleged shoulder injury because plaintiff's complained-of shoulder pain was not objectively serious and plaintiff has failed to show subjectively culpable intent by defendants. For the reasons set forth below, the Court disagrees and concludes that a rational jury could find that defendants acted with deliberate indifference **363** regarding plaintiff's shoulder pain. Thus, summary judgment on this claim is denied.

i. Objective Prong

[18][19] Defendants argue that plaintiff cannot satisfy the objective element of the deliberate indifference test regarding his shoulder because plaintiff alleges only that he had pain in his shoulder and not that he had "a condition of urgency, one that might produce death, deterioration or extreme pain." (Defs.' Br. at 22.) However, plaintiff did complain to the medical department that his right shoulder was "extremely hurting." (Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Furthermore, plaintiff states that he now has a separated shoulder and wears a brace for carpal tunnel syndrome. (Pl.'s Opp. at 4.) In any event, chronic pain can be a serious medical condition. See Brock v. Wright, 315 F.3d 158, 163 (2d Cir.2003) ("We will no more tolerate prison officials' deliberate indifference to the chronic pain of an inmate than we would a sentence that required the inmate to submit to such pain. We do not, therefore, require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one."); Hathaway v. Coughlin, 37 F.3d 63, 67 (2d Cir.1994); see also Sereika v. Patel, 411 F.Supp.2d 397, 406 (S.D.N.Y.2006) ( "[Plaintiff's] allegation that he experienced severe pain as a result of the alleged delay in treatment, together with his allegation that the alleged delay in treatment resulted in reduced mobility in his arm and shoulder, raise issues of fact as to whether his shoulder injury constitutes a sufficiently serious medical condition to satisfy the objective prong of the deliberate indifference standard.") (denying summary judgment). Thus, the Court cannot conclude at the summary judgment stage that plaintiff did not suffer from a serious medical condition.

ii. Subjective Prong

Defendants also argue that plaintiff cannot meet the subjective prong of the deliberate indifference test because plaintiff was seen repeatedly by the medical department and was given pain medication. (Defs.' Br. at 22.) Defendants also point to the fact that when x-rays were ultimately taken, they were negative.[FN18] However, construing the facts most favorably to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff repeatedly complained to defendants over a period of several months, beginning in January 2007, about the pain in his shoulder (see Defs.' Ex. E), and further complained that the pain medication he was being given was ineffective.[FN19] (See, e.g., Price Dep. at 45, 51.) In June 2007, for instance, plaintiff was still complaining that his right shoulder "hurts really bad," and that he had been "complaining of that for months." (Def.'s Ex. E, Sick Call Requests, June 12 and June 17, 2007.) Thus, it is uncontroverted that defendants were aware of plaintiff's alleged chronic shoulder pain.

FN18. The November 2007 x-ray records indicate that "short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information ...." (See Defs.' Ex. J, Discharge Summary, November 2007.) Defendants point to no evidence in the record that they followed up on that x-ray report.

FN19. Plaintiff also informed defendants that he had been given a Cortisone shot for his shoulder at his previous place of incarceration. (See Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.)

Despite plaintiff's complaints, however, plaintiff was not given an x-ray exam for several months (Price Dep. at 44; Def.'s **364** Ex. J), and was not given any pain medication besides Motrin and Naprosyn. (Price Dep. at 55.) Although defendants argue that the treatment for plaintiff's shoulder pain was reasonable under the circumstances, there are factual questions in this case that preclude

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

summary judgment. *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.") (reversing grant of motion to dismiss). Drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference by not changing plaintiff's pain medication despite his continued complaints that it was ineffective, by failing to take x-rays for several months, and by failing to follow-up on a November 2007 x-ray report indicating that further tests might be needed (*see* Defs.' Ex. J, Discharge Summary, November 2007). *See Brock,* 315 F.3d at 167 ("It is not controverted that [defendant] was aware that [plaintiff] was suffering some pain from his scar. The defendants sought to cast doubt on the truthfulness of [plaintiff's] claims about the extent of the pain he was suffering and, also, to put into question DOCS' awareness of [plaintiff's] condition. But at most, defendants' arguments and evidence to these effects raise issues for a jury and do not justify summary judgment for them."); *Hathaway,* 37 F.3d at 68-69 (holding that, *inter alia,* two-year delay in surgery despite plaintiff's repeated complaints of pain could support finding of deliberate indifference). The fact that defendants offered some treatment in response to plaintiff's complaints does not as a matter of law establish that they had no subjectively culpable intent. *See Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) ("[Plaintiff] received extensive medical attention, and the records maintained by the prison officials and hospital do substantiate the conclusion that [defendants] provided [plaintiff] with comprehensive, if not doting, health care. Nonetheless, [plaintiff's] affidavit in opposition to the motion for summary judgment does raise material factual disputes, irrespective of their likely resolution.... [Plaintiff's] assertions] do raise material factual issues. After all, if defendants did decide to delay emergency medical-aid-even for 'only' five hours-in order to make [plaintiff] suffer, surely a claim would be stated under *Estelle.*"). Specifically, given the factual disputes in this case, the Court cannot conclude as a matter of law that defendants did not act with deliberate indifference when they allegedly declined to change their treatment for plaintiff's shoulder pain despite repeated complaints over several months that the pain persisted. *See, e.g., Lloyd,* 570 F.Supp.2d at 569 ("[T]he amended complaint plausibly alleges that doctors knew that [plaintiff] was experiencing extreme pain and loss of mobility, knew that the course of treatment they prescribed was ineffective, and declined to do anything to attempt to improve

[plaintiff's] situation besides re-submitting MRI request forms.... Had the doctors followed up on numerous requests for an MRI, the injury would have been discovered earlier, and some of the serious pain and discomfort that [plaintiff] experienced for more than a year could have been averted."). Thus, there are factual disputes that prevent summary judgment on defendants' subjective intent.

In sum, on this record, drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference to plaintiff's shoulder pain. Accordingly, defendants' motion for summary judgment on this claim is denied.

**\*365** C. Individual Defendants

Defendants also move for summary judgment specifically with respect to plaintiff's claims against three of the individual defendants: Sheriff Edward Reilly (hereinafter "Reilly"), Edwards, and Okonta. For the reasons set forth below, the Court grants defendants' motion with respect to Reilly, and denies it with respect to Edwards and Okonta.

1. Legal Standard

[20] "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citation and quotation marks omitted). In other words, "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior." *Id.* Supervisor liability can be shown in one or more of the following ways: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Id.* at 145 (citation omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

### 2. Application

[21] Although plaintiff alleges in the complaint that Reilly was aware of plaintiff's condition and failed to assist,[FN20] there is no mention whatsoever of Reilly in plaintiff's deposition or in any of the parties' evidentiary submissions. Because there is no evidence in the record that Reilly was personally involved in any of the alleged constitutional violations or that there was a custom or policy of allowing such constitutional violations (and that Reilly allowed such custom or policy to continue), no rational jury could find Reilly liable for any of plaintiff's deliberate indifference claims. *See Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim."); *see also Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438-39 (E.D.N.Y.2009) ("[T]he plaintiff cannot establish that Sheriff Reilly was grossly negligent in failing to supervise subordinates because the medical care of inmates at the NCCC was delegated to the Nassau Health Care Corporation and plaintiff provides no evidence that Reilly was otherwise personally involved in his treatment."). Therefore, defendants' motion for summary judgment with respect to plaintiff's claims against Sheriff Reilly is granted.

> FN20. Plaintiff actually refers in the complaint to "Sheriff Edwards," but the Court determines, liberally construing the complaint, that this allegation refers to Sheriff Reilly.

[22] With respect to plaintiff's claims against Edwards and Okonta, however, there are disputed issues of fact that preclude summary judgment. Defendants argue that Edwards was not personally involved in the alleged constitutional violations because she did not treat plaintiff and merely responded to his grievance request. (Defs.' Br. at 24-25.) However, plaintiff testified that, although Edwards never physically treated him, she "takes care of appointments and makes sure you get to certain specialists" and that "she was in a position to make sure that I get the adequate care that I needed." (Price Dep. at 61-62.) Plaintiff also testified that he submitted a grievance request to **366** Edwards in order to be tested for the kidney transplant list, but that Edwards failed to get him on the list. (Price Dep. at 62-63.) Drawing all

reasonable inferences in favor of plaintiff, a rational jury could find that Edwards was personally involved in the alleged constitutional violations because she was in a position to get plaintiff tested for the kidney transplant list and failed to do so. *See McKenna v. Wright,* 386 F.3d 432, 437-38 (2d Cir.2004) ("Although it is questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of, [defendant] was properly retained in the lawsuit at this stage, not simply because he rejected the grievance, but because he is alleged, as Deputy Superintendent for Administration at [the prison], to have been responsible for the prison's medical program." (citation omitted)). Thus, plaintiff has presented sufficient evidence of Edwards's personal involvement in the alleged constitutional violations to raise a genuine issue of material fact as to whether Edwards is liable for the alleged Eighth Amendment violations.

[23][24] Defendants also argue that Okonta was not personally involved in the alleged constitutional violations because he did not actually treat plaintiff. (Defs.' Br. at 24-25.) This argument misses the mark. It is plaintiff's allegation that Okonta violated plaintiff's constitutional rights precisely by not treating him. Plaintiff has presented evidence that he received no response from Okonta regarding his requests to be tested for the kidney transplant list. Where a prison doctor denies medical treatment to an inmate, that doctor is personally involved in the alleged constitutional violation. *See McKenna,* 386 F.3d at 437 (finding "personal involvement" where medical defendants were alleged to have participated in the denial of treatment); *see also Chambers v. Wright,* No. 05 Civ. 9915, 2007 WL 4462181, at *3 (S.D.N.Y. Dec. 19, 2007) ("Prison doctors who have denied medical treatment to an inmate are 'personally involved' for the purposes of jurisdiction under § 1983." (citing *McKenna,* 386 F.3d at 437)). Although defendants argue that they were in fact making efforts to get plaintiff tested (Defs.' Br. at 25), the reasonableness of those efforts, as discussed above, is a factual question inappropriate for resolution on summary judgment.

In sum, defendants' motion for summary judgment on plaintiff's claims against Reilly is granted. Defendants' motion with respect to Edwards and Okonta is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

### V. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part defendants' motion for summary judgment. Specifically, the Court grants defendants' motion with respect to plaintiff's claim regarding the dosage of his renal disease medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects. The parties to this action shall participate in a telephone conference on Monday, April 5, 2010 at 3:30 p.m. At that time, counsel for defendants shall initiate the call and, with all parties on the line, contact Chambers at (631) 712-5670.

SO ORDERED.

E.D.N.Y.,2010.
Price v. Reilly
697 F.Supp.2d 344

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Karus LAFAVE, Plaintiff,
v.
CLINTON COUNTY, Defendants.
**No. CIV.9:00CV0744DNHGLS.**

April 3, 2002.

Karus Lafave, Plaintiff, Pro Se, Plattsburgh, for the
Plaintiff.

Maynard, O'Connor Law Firm, Albany, Edwin J. Tobin,
Jr., Esq., for the Defendants.

REPORT-RECOMMENDATION [FN1]

FN1. This matter was referred to the undersigned
for Report-Recommendation by the Hon. David
N. Hurd, United States District Judge, pursuant
to 28 U.S.C. § 636(b)(1)(B) and L.R. 72.3(c).

SHARPE, Magistrate J.

I. INTRODUCTION

*1 Plaintiff, *pro se,* Karus LaFave ("LaFave") originally
filed this action in Clinton County Supreme Court. The
defendant filed a Notice of Removal because the
complaint presented a federal question concerning a
violation of LaFave's Eighth Amendment rights (Dkt. No.
1). Currently before the court is the defendant's motion to
dismiss made pursuant to Rule 12(b)(6) and in the
alternative, pursuant to Rule 56(b) of the Federal Rules of
Civil Procedure (Dkt. No. 5). LaFave, in response, is
requesting that the court deny the motion, excuse his

inability to timely file several motions, and to permit the
matter to be bought before a jury [FN2]. After reviewing
LaFave's claims and for the reasons set forth below, the
defendant's converted motion for summary judgment
should be granted.

FN2. It should be noted that the date for
dispositive motions was February 16, 2001. The
defendant's motion to dismiss was filed on
September 29, 2000. On January 9, 2001, this
court converted the defendant's motion to dismiss
to a motion for summary judgment, and gave
LaFave a month to respond. On April 16, 2001,
after three months and four extensions, LaFave
finally responded.

II. BACKGROUND

LaFave brings this action under 42 U.S.C. § 1983
claiming that the defendant violated his civil rights under
the Eighth Amendment [FN3]. He alleges that the defendant
failed to provide adequate medical and dental care causing
three different teeth to be extracted.

FN3. LaFave does not specifically state that the
defendant violated his Eighth Amendment rights
but this conclusion is appropriate after reviewing
the complaint.

III. FACTS [FN4]

FN4. While the defendant provided the court
with a "statement of material facts not in issue"
and LaFave provided the court with "statement
of material facts genuine in issue," neither
provided the court with the exact nature of the
facts.

Between January and July of 1999, LaFave, on several
occasions, requested dental treatment because he was
experiencing severe pain with three of his teeth. After

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

being seen on several occasions by a Clinton County Correctional Facility ("Clinton") doctor, he was referred to a dentist. Initially, LaFave's mother had made an appointment for him to see a dentist, but he alleges that Nurse LaBarge ("LaBarge") did not permit him to be released to the dentist's office [FN5]. Subsequently, he was seen by Dr. Boule, D.D.S ., on two occasions for dental examinations and tooth extractions.

> FN5. This appears to be in dispute because the medical records show that LaFave at first stated that his mother was going to make arrangements, but later requested that the facility provide a dentist.

IV. DISCUSSION

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc ., 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once this burden is met, it shifts to the opposing party who, through affidavits or otherwise, must show that there is a material factual issue for trial. Fed.R.Civ.P. 56(e); *see Smythe v. American Red Cross Blood Services Northeastern New York Region,* 797 F.Supp. 147, 151 (N.D.N.Y.1992).

Finally, when considering summary judgment motions, *pro se* parties are held to a less stringent standard than attorneys. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716,

720 (2d Cir.1990). With this standard in mind, the court now turns to the sufficiency of LaFave's claims.

B. *Eighth Amendment Claims*

**\*2** LaFave alleges that his Eighth Amendment rights were violated when the defendant failed to provide adequate medical care for his dental condition. The Eighth Amendment does not mandate comfortable prisons, yet it does not tolerate inhumane prisons either, and the conditions of an inmate's confinement are subject to examination under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1975, 128 L.Ed.2d 811 (1994). Nevertheless, deprivations suffered by inmates as a result of their incarceration only become reprehensible to the Eighth Amendment when they deny the minimal civilized measure of life's necessities. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (*quoting Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).

Moreover, the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..." against which penal measures must be evaluated. See *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d (1976). Repugnant to the Amendment are punishments hostile to the standards of decency that " 'mark the progress of a maturing society." ' *Id.* (*quoting Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion)). Also repugnant to the Amendment, are punishments that involve " 'unnecessary and wanton inflictions of pain." ' *Id.* at 103, 97 S.Ct. at 290 (*quoting Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)).

In light of these elementary principles, a state has a constitutional obligation to provide inmates adequate medical care. See *West v. Atkins,* 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988). By virtue of their incarceration, inmates are utterly dependant upon prison authorities to treat their medical ills and are wholly powerless to help themselves if the state languishes in its obligation. See *Estelle,* 429 U.S. at 103, 97 S.Ct. at 290. The essence of an improper medical treatment claim lies

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

in proof of "deliberate indifference to serious medical needs." *Id.* at 104, 97 S.Ct. at 291. Deliberate indifference may be manifested by a prison doctor's response to an inmate's needs. *Id.* It may also be shown by a corrections officer denying or delaying an inmate's access to medical care or by intentionally interfering with an inmate's treatment. *Id.* at 104-105, 97 S.Ct. at 291.

The standard of deliberate indifference includes both subjective and objective components. The objective component requires the alleged deprivation to be sufficiently serious, while the subjective component requires the defendant to act with a sufficiently culpable state of mind. *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety.' " *Id.* (quoting *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979). However, " 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.*

**\*3** However, an Eighth Amendment claim may be dismissed if there is no evidence that a defendant acted with deliberate indifference to a serious medical need. An inmate does not have a right to the treatment of his choice. *See Murphy v. Grabo,* 1998 WL 166840, at \*4 (N.D.N.Y. April 9, 1998) (*citation omitted* ). Also, mere disagreement with the prescribed course of treatment does not always rise to the level of a constitutional claim. *See Chance,* 143 F.3d at 703. Moreover, prison officials have broad discretion to determine the nature and character of medical treatment which is provided to inmates. *See Murphy,* 1998 WL 166840, at \*4 (*citation omitted* ).

While there is no exact definition of a "serious medical condition" in this circuit, the Second Circuit has indicated what injuries and medical conditions are serious enough to implicate the Eighth Amendment. *See Chance,* 143 F.3d at 702-703. In *Chance,* the Second Circuit held that an inmate complaining of a dental condition stated a serious medical need by showing that he suffered from great pain for six months. The inmate was also unable to chew food and lost several teeth. The Circuit also recognized that dental conditions, along with medical conditions, can vary in severity and may not all be severe. *Id.* at 702. The court acknowledged that while some injuries are not serious

enough to violate a constitutional right, other very similar injuries can violate a constitutional right under different factual circumstances. *Id.*

The Second Circuit provided some of the factors to be considered when determining if a serious medical condition exists. *Id.* at 702-703. The court stated that " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain" ' are highly relevant. *Id.* at 702-703 (*citation omitted* ). Moreover, when seeking to impose liability on a municipality, as LaFave does in this case, he must show that a municipal "policy" or "custom caused the deprivation." *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 137 (2d Cir.1999).

In this case, the defendant maintains that the medical staff was not deliberately indifferent to his serious medical needs. As a basis for their assertion, they provide LaFave's medical records and an affidavit from Dr. Viqar Qudsi [FN6], M.D, who treated LaFave while he was incarcerated at Clinton. The medical records show that he was repeatedly seen, and prescribed medication for his pain. In addition, the record shows that on various occasions, LaFave refused medication because "he was too lazy" to get out of bed when the nurse with the medication came to his cell (*Def. ['s] Ex. A, P. 4*) .

FN6. Dr. Qudsi is not a party to this action.

According to the documents provided, Dr. Qudsi, examined LaFave on January 13, 1999, after LaFave reported to LaBarge that he had a headache and discomfort in his bottom left molar (*Qudsi Aff., P. 2*). Dr. Qudsi noted that a cavity was present in his left lower molar. *Id.* He prescribed Tylenol as needed for the pain and 500 milligrams ("mg") of erythromycin twice daily to prevent bacteria and infection. *Id.* On January 18, 19, and 20, 1999, the medical records show that LaFave refused his erythromycin medication (*Def. ['s] Ex. B, P. 1*).

**\*4** Between January 20, and April 12, 1999, LaFave made

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

no complaints concerning his alleged mouth pain. On April 12, 1999, LaFave was examined by LaBarge due to a complaint of pain in his lower left molar (*Def. ['s] Ex. A, P. 4* ). Dr. Qudsi examined him again on April 14, 1999. *Id.* He noted a cavity with pulp decay and slight swelling with no discharge. *Id.* He noted an abscess in his left lower molar and again prescribed 500 mg erythromycin tablets twice daily and 600 mg of Motrin three times daily for ten days with instructions to see the dentist. *Id.* On the same day, LaBarge made an appointment for LaFave to see an outside dentist that provides dental service to facility inmates, Dr. Boule *(Qudsi Aff., P. 3).*

On May 3, 1999, LaBarge was informed by LaFave that his mother would be making a dental appointment with their own dentist and that the family would pay for the treatment (*Def. ['s] Ex. A, P. 4* ). On that same day, Superintendent Major Smith authorized an outside dental visit. *Id.* On May 12, 1999, he was seen by LaBarge for an unrelated injury and he complained about his lower left molar (*Def .['s] Ex. A, P. 5* ). At that time, LaFave requested that LaBarge schedule a new appointment with Dr. Boule because the family had changed their mind about paying an outside dentist. *Id.* LaBarge noted that he was eating candy and informed him of the deleterious effects of candy on his dental condition. *Id.* Thereafter, LaBarge scheduled him for the next available date which was June 24, 1999, at noon. *Id.*

On June 2, 1999, LaFave again requested sick call complaining for the first time about tooth pain in his upper right molar and his other lower left molar (*Def. ['s] Ex. A, P. 6* ). He claimed that both molars caused him discomfort and bothered him most at night. *Id.* LaFave confirmed that he had received treatment from Dr. Boule for his first lower left molar one week before. *Id.* The area of his prior extraction was clean and dry. *Id.* There was no abscess, infection, swelling, drainage or foul odor noted. *Id.* LaBarge recommended Tylenol as needed for any further tooth discomfort. *Id.*

On June 21, 1999, LaFave again requested a sick call and was seen by LaBarge (*Def. ['s] Ex. A, P. 6* ). No swelling, drainage or infection was observed. *Id.* However, LaBarge noted cavities in LaFave's lower left molar and right lower molars. *Id.* LaBarge made arrangements for Dr. Qudsi to further assess LaFave. *Id.* On June 23, 1999, Dr. Qudsi

examined his right lower molar and noted cavitation with decay in that area (*Def. ['s] Ex. A, P. 7* ). In addition, he noted that LaFave had a cavity in his second left lower molar. *Id.* He prescribed 500 mg of erythromycin twice daily for 10 days and 600 mg of Motrin three times daily for 10 days, with instructions to see a dentist. *Id.*

On June 30, 1999, Officer Carroll reported that LaFave was again non-compliant with his medication regimen as he refused to get up to receive his medication (*Def. ['s] Ex. A, P. 8* ). On July 7, 1999, he again requested sick call complaining of a toothache in his lower right molar (*Def. ['s] Ex. A, P. 9* ). Again, LaFave was non-compliant as he had only taken his erythromycin for five days instead of the ten days prescribed. *Id.* During the examination, Dr. Qudsi informed LaFave that extraction of these teeth could be necessary if he did not respond to conservative treatment. *Id.* At that time, LaFave informed Dr. Qudsi that he was going to be transferred to another facility. *Id.* Dr. Qudsi advised LaFave to follow-up with a dentist when he arrived at the new facility. *Id.* Dr. Qudsi prescribed 500 mg Naproxin twice daily for thirty days with instructions to follow-up with him in two weeks if the pain increased. *Id.* The following day, LaFave requested sick call complaining to LaBarge that he had taken one dose of Naproxin and it was not relieving the pain. *Id.* He was advised that he needed to take more than one dose to allow the Naproxin to take effect. *Id.*

**\*5** On July 17, 1999, LaFave was again seen by Dr. Qudsi and he indicated that he did not believe he was benefitting from the prescribed course of conservative treatment with medication (*Def. ['s] Ex. A, P. 10* ). Subsequently, LaBarge made a dental appointment for him on July 23 [FN7], 1999, at 3:15 p.m. *Id.* On July 23, 1999, a second extraction was conducted. *Id.* On July 28, 1999, he was again seen by Dr. Qudsi, for an ulceration at the left angle of his mouth for which he prescribed bacitracin ointment. *Id.* At this time, LaFave continued to complain of tooth pain so he was prescribed 600 mg of Motrin three times daily. *Id.*

FN7. The medical records contain an error on the July 17, 1999, note which indicted that an appointment was set for June 23, 1999, however, it should have been recorded as July 23, 1999.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

On August 4, 1999, he was seen for feeling a sharp piece of bone residing in the area of his lower left molar (*Def. ['s] Ex. A, P. 11* ). Dr. Qudsi recommended observation and to follow-up with dental care if his condition continued. *Id.* The defendant maintains that given all of the documentation that he was seen when he requested to be seen and prescribed numerous medications, the medical staff was not deliberately indifferent to his serious medical needs. The defendant contends that at all times, professional and contentious dental and medical treatment were provided in regards to his various complaints.

In his response, LaFave disagrees alleging that the county had a custom or policy not to provide medical treatment to prisoners. However, LaFave does not allege in his complaint that the county had a "custom or policy" which deprived him of a right to adequate medical or dental care. In his response to the motion for summary judgment, for the first time, LaFave alleges that the county had a policy which deprived him of his rights. He maintains that his continued complaints of pain were ignored and although he was prescribed medication, it simply did not relieve his severe pain.

This court finds that the defendant was not deliberately indifferent to his serious dental and medical needs. Moreover, even if this court construed his complaint to state a viable claim against the county, LaFave has failed to show that the county provided inadequate medical and dental treatment. As previously stated, an inmate does not have the right to the treatment of his choice. The record shows that he was seen numerous times, and referred to a dentist on two occasions over a six month period. While LaFave argues that the dental appointments were untimely, the record shows that the initial delay occurred because he claimed that his mother was going to make the appointment but later changed her mind. In addition, the record demonstrates that he did not adhere to the prescribed medication regime. On various occasions, LaFave failed to get out of bed to obtain his medication in order to prevent infection in his mouth. Although it is apparent that LaFave disagreed with the treatment provided by Clinton, the record does not show that the defendant was deliberately indifferent to his serious medical needs. Accordingly, this court recommends that the defendant's motion for summary judgment should be granted.

**\*6** WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that the defendant's motion for summary judgment (Dkt. No. 5) be GRANTED in favor of the defendant in all respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2002.
Lafave v. Clinton County
Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

H

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Rabindranath BENJAMIN, Plaintiff,
v.
Pang Lay KOOI, Medical Doctor; Carol Wallace,
Registered Nurse, Cayuga County Jail; and Jackie
Chadwick, Registered Nurse, Cayuga County Jail,
Defendants.
**No. 9: 07-CV-0506 (LEK/DRH).**

Feb. 25, 2010.

Rabindranath Benjamin, Philipsburg, PA, pro se.

Petrone & Petrone, P.C., David H. Walsh, IV, Esq., of
Counsel, Utica, NY, for Defendants.

**REPORT-RECOMMENDATION AND ORDER**[FN1]

> FN1. This matter was referred to the undersigned
> for report and recommendation pursuant to 28
> U.S.C. § 636(b)(1)(B) and N.D.N.Y.L.R.
> 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff pro se Rabindranath Benjamin ("Benjamin"),
formerly an **inmate** in the custody of the Cayuga
County Jail ("Cayuga") and currently in custody in the State of
Pennsylvania, brings this action pursuant to 42 U.S.C. §
1983 alleging that three Cayuga employees violated his
constitutional rights under the Eighth and Fourteenth
Amendments. Compl. (Dkt. No. 1). Presently pending is
defendants' motion for **summary judgment** pursuant to
Fed.R.Civ.P. 56. Dkt. No. 42. Benjamin opposes the
motion and has filed a cross-motion for **summary
judgment**. Dkt. No. 44. Defendants have submitted a

reply to the motion for **summary judgment** and have
responded in opposition to Benjamin's cross-motion. Dkt.
Nos. 45, 46. For the reasons which follow, it is
recommended that defendants' motion be granted and that
Benjamin's cross-motion be denied.

**I. Background.**

The facts are related herein in the light most favorable to
Benjamin as the nonmoving party. *See* subsection II.A,
*infra.*

At all relevant times, Benjamin was incarcerated at
Cayuga. Compl. at 4-7. On October 16, 2006, Benjamin
slipped on water outside the shower area, fell, and lost
consciousness. *Id.* at 4. As a result of the fall, Benjamin
"suffered [from] severe neck and back pain, excruciating
pain in [his] legs, loss of short-term memory, headaches
and migraines, and constant pain in [his] hips." *Id.*
Benjamin was transported by ambulance to Auburn
Memorial Hospital where he was examined, x-rays were
taken, and he had a Computed Tomography ("CT") scan.
Dkt. No. 42-5, Deposition Transcript ("Tr.") at 24-25; *see
also* Dkt. No. 42-1, Ex. B ("Auburn Memorial Hospital
Medical Records"). The CT scan taken of his cervical
spine showed narrowing and degeneration at C6-7
intervertabral disc space with moderately severe cervical
spondylosis at that level. Dkt. No. 42-3 at 18-19.

After five hours, Benjamin was returned to Cayuga where
he was placed in a cell for medical observation for two to
three days. Tr. at 26-29; Rule 7.1 Statement (Dkt. No.
42-1), ¶¶ 7, 8. While in the observation cell, Benjamin was
seen by a nurse and given 650 milligrams of Tylenol every
four hours around the clock. Dkt. No. 42-1, Ex. C
("Cayuga Med. Records"); Rule 7.1 Statement, ¶ 10; Tr.
at 29.[FN2] On October 16, 2006, Benjamin was also
checked every thirty minutes as per instructions from the
Auburn Memorial Hospital Emergency Room. *See* Cayuga
Med. Records. Upon his return to Cayuga, Benjamin
complained to nurses that he "was still in a lot of pain."
Tr. at 29. He had neck, head, and back pain. Tr. at 30.
Benjamin did not eat two to three meals because his food
tray was placed on the floor and he was in too much pain

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

"to go down to the floor, to slide down to grab the tray to come back up." *Id.*

> FN2. Benjamin states that he saw either Chadwick or Wallace but does not recall which. *Id.*

Benjamin had appointments with Dr. Kooi, a defendant here, on October 20, November 2, and December 1, 2006, and on February 8, 2007 and with Nurse Wallace, a defendant, on January 6, 2006. Cayuga Med. Records. Each time Benjamin saw Dr. Kooi, Nurse Chadwick, a defendant, was present. Tr. at 39. On October 20, 2006, Benjamin told Dr. Kooi that he had pain in his neck, back and hips and found it difficult to walk. Tr. at 34. Dr. Kooi examined Benjamin and continued him on Motrin. Rule 7.1 Statement, ¶ 12; Cayuga Med. Records. Benjamin asked Dr. Kooi to prescribe stronger medication. Tr. at On November 2, 2006, Benjamin told Dr. Kooi that he was still in pain from his injuries. Tr. at 38. Benjamin complained of headaches; Dr. Kooi prescribed Advil and Tylenol. Cayuga Med. Records. Benjamin asked Dr. Kooi to have him moved to a handicapped cell; Dr. Kooi told him to take it up with the Sergeant. Tr. at 39.

**\*2** On December 1, 2006, at Chadwick's urging, Dr. Kooi saw Benjamin for headaches and prescribed Flexeril. Rule 7.1 Statement, ¶ 14; Cayuga Med. Records; Tr. at 39-40. On January 6, 2007, Wallace gave Benjamin aspirin to be taken at the onset of a headache and noted that Benjamin would be re-examined if the aspirin gave no relief. Rule 7.1 Statement, ¶ 15; Cayuga Med. Records. After Benjamin complained of headaches to Chadwick, she gave him a bottle of nasal spray, said that a dry nose could cause headaches, and the nasal spray might give him relief. Tr. at 58. Benjamin told Wallace that his headaches were from his fall, not a dry nose. *Id.* However, Wallace could not prescribe medication for him. Tr. at 50.

On February 8, 2007, Benjamin saw Dr. Kooi and complained of right chest pain. Cayuga Med. Records. Benjamin said that he was not nauseous and was eating. *Id.*; Rule 7.1 Statement. Dr. Kooi prescribed Motrin. Cayuga Med. Records; Rule 7.1 Statement, ¶ 16. Benjamin also told Dr. Kooi that he still experienced headaches "on and off" but was having more pain in his

back and hips and was having difficulty walking. Tr. at 41. Dr. Kooi told Benjamin that he would improve but that it would take six months to a year. *Id.* Benjamin told Dr. Kooi that he was still in pain. Tr. at 42. Benjamin asked Dr. Kooi for an MRI but was told that it was not necessary because an MRI was only for broken bones. Tr. at 42-43.

Benjamin was never refused a request to see Dr. Kooi. Tr. at 55-56; Rule 7.1 Statement, ¶ 18. During his time at Cayuga, Benjamin saw one of the nurses on a daily basis. Tr. at 62; Rule 7.1 Statement, ¶ 19. Benjamin was always given his prescribed medication. *Id.* Benjamin continued to complain of frequent and severe headaches and lower back pain in September through December, 2007. Dkt. No. 44-2, Ex. A. On September 24 and December 20, 2007, Benjamin was seen by medical staff at Moshannon Valley Correctional Center for complaints of low back pain exacerbated by cold weather. *Id.* He was prescribed Motrin and rest. *Id.*

During the two to three days that Benjamin was in a medical observation cell at Cayuga, he was provided with a mattress so worn that it was half the normal size. Tr. at 27. Benjamin had blankets, a sheet, and a toilet but had to wait a day before he received the sheet and blanket. Tr. at 28. He did not have a pillow. *Id.* Benjamin was then placed in the reception area dormitory for three to four days. Tr. at 36. Benjamin had a steel bed, mattress, blankets, and sheets. Tr. at 39. Benjamin was then transferred to a cell in the housing unit which had a slab of concrete on the wall for a bed, a mattress, a blanket, sheets, a toilet, a sink and a mirror. Tr. at 37. Benjamin had requested a handicapped cell and was told that "they were going to work on it." *Id.* Benjamin wanted to be placed in a handicapped cell "for the bars by the toilet" because he was having trouble walking. Tr. at 57. Benjamin requested an extra mattress and pillow, but the request was denied. Tr. at 52-53. This action followed.

**II. Discussion.**

**\*3** Benjamin alleges that defendants violated his constitutional rights by denying him adequate medical care for his serious medical needs and by subjecting him to cruel and unusual conditions of confinement. Compl. Benjamin alleges that he suffers from "**pain** to the **back**,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

hips, neck and legs along with slight headaches. Benjamin has experienced excessive pain to the same areas of the body, headaches and migraines, uneven walking, lack of sleep, short-term memory loss, and loss of concentration. Compl. at 6. Benjamin also asserts that defendants denied him appropriate pain medication and diagnostic testing after his fall. *Id.* at 5-6. Finally, Benjamin alleges that his request for an extra mattress and pillow were improperly denied.[FN3] *Id.* at 6. Defendants seek **summary judgment** on the grounds that (1) Benjamin has failed to establish the personal involvement of defendants Chadwick and Wallace; (2) Benjamin's **Eighth Amendment deliberate medical indifference** claim is without merit; and (3) Benjamin's claim that his conditions of confinement amounted to cruel and unusual punishment is without merit. Dkt. No. 42.

> FN3. Additionally, Benjamin alleges that he attempted to file multiple grievances pertaining to his lack of medical treatment but he was told that since the medical staff had already treated him, the situation was resolved and he was unable to file a grievance. *Id.* at 4-5.

Benjamin has cross-moved for **summary judgment** on the grounds that (1) defendants failed to provide adequate medical treatment to him after his fall; (2) the negligent act which caused his fall was foreseeable; and (3) defendants failed to provide him with safe and secure housing. Dkt. No. 44. In response to the cross-motion for **summary judgment** and in reply to the motion for **summary judgment**, defendants assert that defendants are entitled to **summary judgment** because (1) Benjamin failed to respond to defendants' statement of material facts; (2) Benjamin has failed to raise a question of fact as to whether he suffered a serious medical condition; (3) Benjamin has failed to raise a question of fact as to whether defendants acted with deliberate indifference; and (4) any negligence claim asserted against the county is legally insufficient. Dkt. No. 45.

### A. Legal Standard

A motion for **summary judgment** may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party

is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for **summary judgment**. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

***4** When, as here, a party seeks dismissal or **summary judgment** against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

### B. Defendants' Motion for Summary Judgment

### 1. Benjamin's Failure To Comply with Local Rule 7.1(a)(3)

As a threshold matter, defendants assert that Benjamin's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

failure to respond to their statement of material facts constitutes an admission to the statements contained therein. Dkt. No. 45 at 1-2. Local Rule 7.1(a)(3) of the Northern District of New York provides that a motion for **summary judgment** must include a Statement of Material Facts. "The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established." N.D.N.Y.L.R. 7.1(a)(3). Once a properly supported Local Rule 7.1(a)(3) Statement of Material Facts ("Rule 7.1 Statement") is submitted by the moving party, Rule 7.1 requires that the party opposing **summary judgment** file a response to the moving party's statement. *Id.* The nonmovant's response shall mirror the movant's statement by admitting or denying each of the movant's assertions in matching numbered paragraphs. *Id.* Each denial shall set forth a specific citation to the record where the factual issue arises. *Id.* The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *Id.*

While Benjamin has opposed defendants' **summary judgment** motion, he has not responded to defendants' Rule 7.1 Statement[FN4] as required by Local Rule 7.1(a)(3). By its terms, Local Rule 7.1(a)(3) provides that *"[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original). Courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts admitted upon an opposing party's failure to properly respond. *See N.Y. Teamsters Conference Pension & Retirement Fund v. Express Services, Inc.,* 426 F.3d 640, 648-49 (2d Cir.2005) (upholding grant of **summary judgment** where "[t]he district court, applying Rule 7.1(a)(3) strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitting a responsive Rule 7.1(a)(3) statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations."); *Gubitosi v. Kapica,* 154 F.3d 30, 31 n. 1 (2d Cir.1998) (per curiam) (accepting as true material facts contained in unopposed local rule statement of material facts); *Meaney v. CHS Acquisition Corp.,* 103 F.Supp.2d 104, 108 (N.D.N.Y.2000) (deeming movant's Rule 7.1(a)(3) Statement admitted where non-movant's response "set forth *no* citations-specific or otherwise-to

the record"); *McKnight v. Dormitory Auth. of State of N.Y.,* 189 F.R.D. 225, 227 (N.D.N.Y.1999) ("deem[ing] the portions of Defendants' 7.1(a)(3) statement that are not specifically controverted by Plaintiff to be admitted"); *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999)(deeming admitted all facts in defendants' Rule 7.1(a)(3) statement where "plaintiff submitted thirteen pages of purported facts without any indication where those facts can be located in the record"). Pro se litigants are not excused from compliance with the rule.[FN5]

> FN4. With his cross-motion for **summary judgment**, Benjamin included what he refers to as his "Statement of Facts in Support of Motion for **Summary Judgment** for Plaintiff." Dkt. No. 44-1. Benjamin's purported Rule 7.1 Statement is not in compliance with Local Rule 7.1 because it does not set forth a specific citation to the record where each fact is established. Therefore the Rule 7.1 Statement submitted with the cross-motion is not properly supported and will not be considered by the Court to be a proper Rule 7.1 Statement. *See* N.D.N.Y.L.R. 7.1(a)(3).

> FN5. *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by **prisoners** who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) ("[P]ro se status does not exempt a party from compliance with relevant rules of procedural and substantive law.") (citation omitted); *LoSacco v. City of Middletown,* 71 F.3d 88, 92 (2d Cir.1995) ("Although pro se litigants should be afforded latitude, ... they generally are required to inform themselves regarding procedural rules and to comply with them.... This is especially true in civil litigation.") (internal quotation marks and citations omitted).

**\*5** Because Benjamin failed to include in his opposition papers a Rule 7.1 Statement specifically controverting

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

defendants' factual assertions in matching numbered paragraphs with specific citations to the record, defendants' factual assertions in their Rule 7.1 Statement are deemed admitted by Benjamin. [FN6] Despite this, "[i]f the evidence submitted in support of the **summary judgment** motion does not meet the movant's burden of production, then **summary judgment** must be denied even if no opposing evidentiary matter is presented." *Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir.2004)* (citations omitted). "Moreover, in determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's [statement of material facts.] It must be satisfied that the citation to evidence in the record supports the assertion." *Id.*

> FN6. In this case, accepting the facts contained in defendants' Rule 7.1 Statement as true is in large part harmless to Benjamin, since many of the facts referenced in the statement are taken from Benjamin's testimony at his pretrial deposition.

## 2. Personal Involvement

Defendants argue that neither Chadwick nor Wallace were personally involved in any wrongdoing. Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994)* (citing *Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir.1991)* and *McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977)*). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson, 790 F.2d 260, 263 (2d Cir.1986)*. The doctrine of respondeat superior is inapplicable to section 1983 claims. *Polk County v. Dodson, 454 U.S. 312, 325 (1981); Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.1973)*.

Benjamin alleges that Chadwick was present every time that Dr. Kooi examined him. Compl. at 6. At his

deposition, Benjamin testified that he told Chadwick about his medical problems every day when she came to his unit, and she heard all of the complaints that he made to Dr. Kooi, yet he received no examination from anyone. Tr. at 58-59. Benjamin alleges that Wallace "denied any request [that he] put in concerning receiving medical attention" and that when he complained of migraine headaches, Wallace gave him a tube of nasal spray. Compl. at 6.

Applying the standards for personal involvement set forth above, a reasonable juror could conclude that Chadwick and Wallace were personally involved in the alleged provision of inadequate medical care to Benjamin. It is recommended, therefore, that defendants' motion for **summary judgment** in favor of Chadwick and Wallace on the basis of lack of personal involvement be denied.

## 3. Eighth and Fourteenth Amendment Claims

Benjamin asserts various claims under the Eighth Amendment, which explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. While not clear from the Complaint, it appears that Benjamin was housed at Cayuga as a pretrial detainee on federal charges. [FN7] The Eighth Amendment protections apply to those who have been convicted of a crime, sentenced, and are thus suffering the "punishment" contemplated by the Cruel and Unusual Punishment Clause. *Benjamin v. Fraser, 343 F.3d 35, 49-50 (2d Cir.2003)* (citing cases). Claims concerning the conditions of confinement brought by a pretrial detainee, such as Benjamin, must be analyzed under the Fourteenth Amendment Due Process Clause. *Id.* The standards when evaluating deliberate indifference to a person in custody are identical whether brought under the Eighth or Fourteenth Amendment. *Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir.2009)* ("Claims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."); *see also Shane v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 199-200 (1989)* ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being ... [including] food, clothing, shelter,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

medical care, and reasonable safety...."). Accordingly, cases analyzed under the Eighth Amendment provide guidance in analyzing cases, as here, considered under the Fourteenth Amendment. Therefore, Benjamin's medical indifference and conditions of confinement claims will be considered under Eighth Amendment standards.

> FN7. On September 27, 2006, Benjamin made an initial appearance in federal court on a criminal complaint. *See United States v. Benjamin,* No. 5:06-cr-0392 (N.D.N.Y.). Benjamin was remanded to custody. *Id.* Benjamin subsequently pleaded guilty on February 8, 2007 and was sentenced on May 21, 2007 to a term of incarceration. *Id.* Since the allegations in Benjamin's complaint preceded his conviction, it appears that during the time relevant to this action, he was housed at Cayuga as a pretrial detainee.

**a. Medical Indifference Claims**

*\*6* Benjamin alleges that he was denied adequate medical care in deliberate indifference to his serious medical needs while he was incarcerated at Cayuga. The Eighth Amendment imposes a duty upon prison officials to ensure that **inmates** receive adequate medical care. *Farmer v. Brennan,* 511 U.S. 825, 832-34 (1994); *see also Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994); U.S. Const. amend. VIII. Not every injury or denial of medical care is a constitutional wrong. Rather, "a prison official violates the Eighth Amendment only when two requirements are met." *Farmer,* 511 U.S. at 834.

First, the **prisoner** must show that the condition to which he was exposed was sufficiently serious. *Farmer,* 511 U.S. at 834. Second, the **prisoner** must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to **inmate** health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844. Thus, negligence alone is not actionable. *Estelle v. Gamble,* 429 U.S. 97,106 (1976). "Medical malpractice does not become a constitutional violation merely because

the victim is a **prisoner**." *Estelle,* 429 U.S. at 106.

**i. Serious Medical Condition**

" 'Because society does not expect that **prisoners** will have unqualified access to healthcare,' a **prisoner** must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.' " *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)); *see also Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) ("A serious medical condition exists where 'the failure to treat a **prisoner's** condition could result in further significant injury or the unnecessary and wanton infliction of pain.' ") (quoting *Chance,* 143 F.3d at 702). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185. Since medical conditions vary in severity, "a decision to leave a condition untreated will be constitutional or not depending on the facts of the particular case." *Harrison,* 219 F.3d at 136-37.

Defendants argue that "Plaintiff has not produced any evidence beyond his own subjective complaints to suggest that any of his injuries of October 16, 2006 were so life-threatening or so urgent that they required immediate care beyond that received at the Emergency Room on October 16, 2006." Dkt. No. 42-9 at 12, Defs. Mem. of Law. On the other hand, Benjamin claims that while at Cayuga, he suffered from neck, hip, and back pain, migraine headaches, and difficulty walking and sleeping.[FN8] Compl. at 6. Construing Benjamin's Complaint with great liberality, Benjamin claims that his medical conditions interfered with his everyday life. Benjamin's medical records from the Federal Bureau of Prisons demonstrate that he was still complaining of pain and suffering in 2007, one year after his fall. Dkt. No. 44-2 at 6; *see also id.,* Ex. A.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

FN8. While Benjamin has not submitted an affidavit with his opposition to the **summary judgment** motion, his verified Complaint may be considered an affidavit. See *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose **summary judgment**."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing **summary judgment**").

*7 Depending upon the facts presented, severe back pain, especially if lasting an extended period of time, and migraine headaches may qualify as "serious medical needs" under the Eighth Amendment. *See, e.g., Mendoza v. McGinnis,* No. 05-CV-1124, 2008 WL 4239760 at *10 & n. 16 (N.D.N.Y. Sept. 11, 2008) ("The question of whether chronic back pain can rise to a level of constitutional significance is dependent upon the circumstances of the particular case presented. In this instance, given plaintiff's diagnosed condition of degenerative disc disease, and resolving all ambiguities in plaintiff's favor, I conclude that a reasonable factfinder could find that the condition constitutes a serious medical need." Moreover, "defendants fail to address plaintiff's migraine headaches, which can also constitute a serious medical need."); *Guarneri v. Hazzard,* No. 06-CV-0985, 2008 WL 552872, at *6 (N.D.N.Y. Feb. 27, 2008) (holding that severe back pain, especially if long-lasting, can amount to a serious medical need); *Peterson v. Miller,* No. 04-CV-797, 2007 WL 2071743, at *7 (N.D.N.Y. July 13, 2007) (noting that migraine headaches have "been found by other courts to represent a sufficiently serious potential medical need as to survive a motion for **summary judgment**."); *Faraday v. Lantz,* No. 03-CV-1520, 2005 WL 3465846, at *5 (D.Conn. Dec. 12, 2005) (holding that persistent complaints of "lower back pain caused by herniated, migrated discs [and] sciatica ..." leading to severe pain constitute a serious medical need.); *Moriarty v. Neubould,* No. 02-CV-1662, 2004 WL 288807, at *2 n. 2 (D.Conn. Feb. 10, 2004) (holding that plaintiff's migraine headaches could constitute a sufficiently serious condition to warrant Eighth Amendment protection since they can be "extremely painful and debilitating.").

In this instance, Benjamin complained of back pain and migraine headaches for more than a year and his CT scan showed evidence of degenerative disc disease. See Cayuga Med. Records; *see also* Tr.; Dkt. No. 42-3 at 18-19. Benjamin stated that the pain interfered with daily activities, such as walking and sleeping. Compl. Defendants have offered nothing, such as an affidavit from Benjamin's treating physician, to refute Benjamin's claims of chronic pain or to lead this Court to conclude that Benjamin's evidence of a serious medical condition is too insubstantial to raise a genuine issue of fact. As stated by the Second Circuit Court of Appeals, an **inmate** should not be required "to demonstrate that he or she experiences pain that is at a limit human ability to bear, nor do we require that his or her condition will degenerate into a life-threatening one." *Brock,* 315 F.3d at 163. Resolving all ambiguities in Benjamin's favor, Benjamin has presented sufficient evidence to allow a reasonable factfinder to conclude that Benjamin's conditions, namely back pain and migraine headaches continuing for an extended period, could rise to the level of serious medical needs.

### ii. Deliberate Indifference

*8 Deliberate indifference requires the **prisoner** "to prove that the prison official knew of and disregarded the **prisoner's** serious medical needs." *Chance,* 143 F.3d at 702. Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. A prison official acts with deliberate indifference where he "knows of and disregards an excessive risk to **inmate** health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (citation omitted). Thus, prison officials must intentionally deny treatment or accommodations for medical conditions or intentionally interfere with treatment once prescribed. *Estelle,* 429 U.S. at 104. "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

adequate grounds for a section 1983 claim ." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F.Supp.2d 303, 312 (S.D.N.Y.2001).

Indeed, prison officials and medical officers have wide discretion in treating **prisoners**, and Section 1983 is not designed to permit federal courts to interfere in the ordinary medical practices of state prisons. *Church v. Hegstrom*, 416 F.2d 449, 450-451 (2d Cir.1969). Federal courts are generally hesitant to second guess medical judgments and to constitutional ize claims which sound in state tort law. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) ("The Constitution does not command that **inmates** be given medical attention that judges would wish to have for themselves.") So strong is this view that determinations of medical providers concerning the care and safety of patients are given a "presumption of correctness." *Perez v. The County of Westchester,* 83 F.Supp.2d 435, 440 (S.D.N.Y.2000) (citing *Kulak v. City of New York,* 88 F.3d 63, 77 (2d Cir.1996)).

*Sonds,* 151 F.Supp.2d at 311-12.

"Further, a delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm." *Thomas v. Nassau County Correctional Center,* 288 F.Supp.2d 333, 339 (E.D.N.Y.2003) (internal quotation marks omitted) (citing *Chance,* 143 F.3d at 703). "The Second Circuit has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years." *Thomas,* 288 F.Supp.2d at 339 (internal quotation marks omitted) (citing *Espinal v. Coughlin,* No. 98 Civ. 2579, 2002 WL 10450, at *3 (S.D.N.Y. Jan. 3, 2002)). Even if a **prisoner** is able to establish delay, he must also show that his condition became worse or deteriorated as a result of the delay. *Thomas,* 288 F.Supp.2d at 339.

**\*9** Benjamin has not established that any of the defendants were deliberately indifferent to his serious medical needs. The record demonstrates that immediately after his fall, staff at Cayuga determined that his injuries warranted

immediate medical attention and he was transported by ambulance to Auburn Memorial Hospital where he was examined and given x-rays and a CT scan. Tr. at 24-25; *see also* Dkt. No. 42-1 (Auburn Memorial Hosp. Med. Records). Upon his return to Cayuga, he was placed in a medical observation cell for several days. Tr. at 26-29; Rule 7.1 Statement, ¶¶ 7, 8. Throughout his stay at Cayuga, he saw a nurse on a daily basis and was never denied his prescribed medication. Tr. at 61-62; Rule 7.1 Statement, ¶ 19. While Benjamin alleges that Wallace only gave him nasal spray when he complained of headaches, he also acknowledged that Wallace had no authority to prescribe medication. Tr. at 50, 58. The record also shows that each time he asked to see Dr. Kooi, the request was granted. Tr. at 55-56. Each time that he saw Dr. Kooi, he was prescribed medication for his pain (*see* Cayuga Med. Records). While Benjamin claimed that Dr. Kooi refused to order an MRI for Benjamin (Tr. at 42-43), Dr. Kooi's decision not to order an MRI does not amount to deliberate indifference. *See Joyner v. Greiner,* 195 F.Supp.2d 500, 505 (S.D.N.Y.2002) ("[w]hether an MRI should have been done is a classic example of a matter for medical judgment as to the appropriate course of treatment and is not actionable under the Eighth Amendment.") (internal quotation marks omitted).

Moreover, the fact that Benjamin wanted different medication than what was prescribed, or that he needed a pillow or extra mattress to ease his pain, also do not state a claim for deliberate medical indifference. A **prisoner** has no right to treatment of his choice and disputes over the proper course of treatment are not actionable under the Eighth Amendment. *See McCloud v. Delaney,* 677 F.Supp. 230, 232 (S.D.N.Y.1988). So long as prison officials act "reasonably," no violation of the Eighth Amendment occurs. *See Salahuddin v. Goord,* 467 F.3d 263, 280-81 (2d Cir.2006).

In other words, Benjamin's medical records and his own testimony confirm that defendants were actively involved in Benjamin's care and were not deliberately indifferent to his needs. Moreover, Benjamin has not alleged or proven that any defendant denied him access to medical care as a form of punishment or to make him suffer. Finally, the Court cannot find, based on the record, that defendants delayed Benjamin's medical treatment. In any event, even if Benjamin could establish that proper medical care was unreasonably delayed, Benjamin has not established that

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

any delay in treatment resulted in a deterioration or worsening of any medical condition. *See Thomas,* 288 F.Supp.2d at 339 ("Even if a **prisoner** is able to establish delay, in order to establish deliberate indifference, he must also show that his condition became worse or deteriorated as a result of the delay.") In this case, the record shows that after Benjamin was transferred to federal custody, his complaints and treatment remained essentially the same. Dkt. No. 44-2 at 11-12. In September and December, 2007, Benjamin was examined by medical staff at Moshannon Valley Correctional Center after complaining of lower back pain. *Id.* Benjamin was prescribed Motrin and rest. *Id.*

**\*10** Accordingly, no reasonable fact-finder could conclude that defendants were deliberately indifferent to Benjamin's serious medical needs. Therefore defendants' motion for **summary judgment** should be granted as to Benjamin's medical indifference claims.

### b. Conditions of Confinement Claims

As discussed above, Benjamin's claims that he was subjected to inadequate conditions of confinement are appropriately analyzed under Eighth Amendment standards. *See* subsection II(B)(3) *supra.* The Supreme Court held that "[t]he Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Farmer,* 511 U.S. at 832 (quoting *Rhodes v. Chapman,* 452 U.S.337, 349 (1981)). The Eighth Amendment requires that prison officials provide "humane conditions of confinement" including "adequate food, clothing, shelter and medical care." *Farmer,* 511 at 832.

To succeed on a conditions of confinement claim, both an objective and subjective test must be met. First, the deprivation must, from an objective standpoint, be "sufficiently serious." *Farmer,* 511 U.S. at 834. Therefore, a plaintiff must demonstrate that the conditions of confinement fell below the "minimal civilized measure of life's necessities." *Rhodes,* 452 U.S. at 347; *see also Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) ("Ultimately, to establish the objective element of an Eighth Amendment claim, a **prisoner** must prove that the conditions of his confinement violated contemporary standards of decency."). Specifically, a **prisoner** must

prove that he has been deprived of a "single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter,* 501 U.S. 294, 304 (1991). The subjective test requires a plaintiff to show that the defendant prison officials imposed the conditions with deliberate indifference. *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996).

In this case, Benjamin alleges that when he returned to Cayuga after his trip to the hospital, he was confined in a medical observation cell for two to three days with a mattress so worn that, it was only one-half to three-quarters of a mattress. Tr. at 27. Benjamin testified that he waited a day before he received a sheet and blanket and he did not have a pillow. Tr. at 28. Benjamin also testified that at some point during his incarceration at Cayuga, he requested an extra mattress and a pillow, but the request was denied. Tr. at 52-53. Finally, Benjamin states that he did not eat two to three meals while in the medical observation cell because he could not reach them without increasing his pain.[FN9]

> FN9. In contrast, in his cross-motion for **summary judgment** Benjamin asserts that he did not eat the first meal delivered to him but that "by the time the second meal came around the plaintiff being a human being was at this point hungry, so the plaintiff has to slide himself down to the floor and use his feet in an attempt to slide his food tray over to him which was a long and tedious not to mention painful task." Dkt. No. 44-2 at 3.

Even construing the facts in the light most favorable to Benjamin, this combination of conditions for the period of time alleged does not constitute a deprivation that is sufficiently serious to deny Benjamin the minimal measure of necessities for civilized living nor does it violate contemporary standards of decency. *Bell v. Artuz,* No. 98-CV-4710, 1999 WL 253607, at *3-4 (S.D.N.Y. Apr. 29, 1999) (holding that no Eighth Amendment claim was stated where **prisoner** alleged poor ventilation, asbestos on catwalk behind cells, no bacterial soap, insufficient lighting, no pillows, and lack of space in cell); *Liles v. Camden County Dept. of Corrections,* 225 F.Supp.2d 450, 458-59 (D.N.J.2002) (holding that allegation that **inmates** receive two sheets and one blanket, but no pillow, does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

not rise to level of sufficiently serious deprivation to constitute Eighth Amendment violation); *Gutridge v. Chesney,* No. COV.A. 97-3441, 1998 WL 248913, at *1 (E.D.Pa. May 8, 1998) (holding that allegation that **inmate's** blanket was removed for approximately a month and a half failed to state Eighth Amendment claim because **inmate** was not deprived of warmth).

**\*11** Moreover, Benjamin never alleges that his lack of a blanket or sheet for a day deprived him of a human need, such as warmth. There is nothing in the record to demonstrate that Benjamin was denied heat or clothing during the one day that he was without a blanket or sheet. In fact, when questioned at the deposition, Benjamin stated that he did not remember the temperature in the cell on the day he was without a sheet or blanket. Tr. at 28. He remembered only that it was moist, dark, and gloomy. *Id.* Additionally, with respect to Benjamin's claim that he had to sleep on an undersized mattress for two to three days, such a limited duration does not suffice to satisfy the subjective prong of the analysis. See *Suprenant v. Rivas,* 424 F.3d 5, 20 (1st Cir.2005) ("[D]uration may affect the [constitutional] calculus [for conditions of confinement].") (citing *Hutto v. Finney,* 437 U.S. 678, 686-87 (1978) (holding that unpleasant conditions of confinement "might be tolerable for a few days and intolerably cruel for weeks or months.").

The same holds true with respect to the lack of a blanket and sheet for one day. As to Benjamin's claim that he was essentially denied anywhere from one to three meals because he could not reach his tray without suffering pain, this too fails to state a claim of constitutional proportion. "While no court has explicitly held that denial of food is a per se violation of a **prisoner's** Eighth Amendment rights ...., under certain circumstances a **substantial** deprivation of food may well be recognized as being of constitutional dimension." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (emphasis added); *see also Waring v. Meachum,* 175 F.Supp.2d 230, 240-41 (D.Conn.2001) (finding no Eighth Amendment claim where **inmates** missed one or two meals and there was no indication that future meals were missed); *cf. Moss v. Ward,* 450 F.Supp. 591, 596-97 (W.D.N.Y.1978) (deprivation of food for four consecutive days held unconstitutionally disproportionate punishment for disciplinary violation).

Since Benjamin has not established that he was subject to conditions that would satisfy the objective prong of such a claim, his conditions of confinement claims fail. *See, Brown v. McElroy,* 160 F.Supp.2d 699, 706, n. 4 (S.D.N.Y.2001) (finding that the subjective prong need not be considered when the conditions of confinement alleged are not sufficiently serious). Moreover, even if Benjamin had established a sufficiently serious deprivation for purposes of the Eighth Amendment, he has not established that any defendant acted with a sufficiently culpable state of mind with regard to any deprivation. In fact, there is nothing in the record to demonstrate that any of the defendants personally denied Benjamin meals or bedding, or that they would have had authority to provide those items to Benjamin.

Based on this record, no reasonable fact-finder could conclude that lack of a sheet and blanket for one day, lack of a pillow and extra mattress, or being denied two or three meals would deprive Benjamin of the minimal measures of necessities required for civilized living. Accordingly, defendants' motion should be granted as to the conditions of confinement claims.

### C. Benjamin's Cross-Motion for Summary Judgment

**\*12** Benjamin has cross-moved for **summary judgment**. Dkt. No. 44. Benjamin also tries to revisit this Court's prior decision denying him the right to amend his Complaint to add a negligence claim against Cayuga County. *Id.; see also* Dkt. No. 38 (February 2, 2009 Order). The February 2, 2009 Order denied Benjamin's motion to amend his Complaint to add a claim against Cayuga County for negligence because, among other things, Benjamin had failed to alleged that he had served the requisite notice of claim on Cayuga County as required by New York General Municipal Law § 50-e. *See* February 2, 2009 Order at 4-5.

With respect to his negligence claim Benjamin asserts that water build-up outside of a shower created a foreseeable risk of harm to **inmates** passing through that area and, therefore, the County should compensate him for injuries sustained in a fall resulting from that hazard. Dkt. No. 44. Benjamin asserts that his "injuries resulted from the [negligent] behavior of the prison's authorities because

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))

they knew of the existing hazardous conditions due to prior incidents at that exact location and neglected to do anything about it." Dkt. No. 44-2 at 1. Benjamin further claims that his original Complaint demonstrated that he intended to sue Cayuga for injuries suffered as a result of staff negligence and points to the Third Cause of Action in his Complaint, wherein he stated "Plaintiff moves to sue facility for further injuries sustained because of facility's staff negligence." *Id.; see also* Compl. at 5. Benjamin's attempt to have the Court reconsider its February 2, 2009 Order is clearly untimely.[FN10] Nevertheless, in light of Benjamin's *pro se* status, the Court will again address his attempt to assert a claim for negligence against Cayuga County.

>        FN10. Local Rule 7.1(g) provides that "a party may file and serve a motion for reconsideration or reargument no later than **FOURTEEN DAYS** after the entry of the challenged judgment, order, or decree." N.D.N.Y.L.R. 7.1(g).

As they did in opposition to Benjamin's motion to amend, defendants argue that Benjamin's state law claims for negligence are futile because he failed to file a notice of claim as is required under New York's General Municipal Law § 50-e. Dkt. No. 45 at 3-4. Defendants also take issue with Benjamin's claim that he intended to also sue Cayuga County, pointing out that Cayuga County was not named as a defendant in Benjamin's complaint. Dkt. No. 45 at 3-4; *see also* Compl.

"As 'a condition precedent' to commencing a tort action against New York municipalities, or any of their officers, agents, or employees, New York General Municipal Law section 50-e requires plaintiffs to file a notice of claim within ninety days after the claim arises." *Olsen v. County of Nassau,* No. CV-05-3623, 2008 WL 4838705, at *1 (E.D.N.Y. Nov. 4, 2008). Accordingly, Benjamin's state law claim for negligence against Cayuga County is futile and he will not be permitted to amend his Complaint to include it. Even if the Court were to liberally construe Benjamin's Complaint as including a claim against Cayuga County for negligence, the claim remains futile.[FN11]

>        FN11. Further, to the extent that Benjamin could have sought permission to file a late notice of

claim, he must do so in state court. *See Olsen,* 2008 WL 4838705, at *3 (citing N.Y. Gen. Mun. Law § 50-e(5)(7)).

Moreover, even if Benjamin could establish that he had filed a timely notice of claim, the Court should not exercise pendent jurisdiction over any state law claims. *See United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726 (1966) ( "Certainly, if the federal claims are dismissed before trial, even if not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

**\*13** As to the medical indifference and conditions of confinement claims, it is recommended herein that judgment be granted to defendants on those claims. *See* subsection II(B)(3) *supra.* For the reasons discussed therein, it is recommended that Benjamin's cross-motion for **summary judgment** be denied in its entirety.

### III. Conclusion.

WHEREFORE, based on the above, it is hereby

**RECOMMENDED** that:

1. Defendants' motion for **summary judgment** (Dkt. No. 42) be **GRANTED** and that judgment be entered in favor of all defendants on all claims; and

Benjamin's cross-motion for **summary judgment** (Dkt. No. 44) be **DENIED** in all respects.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(d).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 985844 (N.D.N.Y.)
(Cite as: 2010 WL 985844 (N.D.N.Y.))


N.D.N.Y.,2010.
Benjamin v. Kooi
Slip Copy, 2010 WL 985844 (N.D.N.Y.)


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)
(Cite as: 2008 WL 4239760 (N.D.N.Y.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Eric MENDOZA, Plaintiff,
v.
M. McGINNIS, Superintendent, Southport Correctional
Facility, et al., Defendants.
**Civil Action No. 9: 05-CV-1124 (TJM/DEP).**

Sept. 11, 2008.

West KeySummary
**Prisons 310 ☞ 192**

[310](#) Prisons
  [310II](#) Prisoners and Inmates
    [310II(D)](#) Health and Medical Care
      [310k191](#) Particular Conditions and Treatments
        [310k192](#) k. In General. [Most Cited Cases](#)

**Sentencing and Punishment 350H ☞ 1546**

[350H](#) Sentencing and Punishment
  [350HVII](#) Cruel and Unusual Punishment in General
    [350HVII(H)](#) Conditions of Confinement
      [350Hk1546](#) k. Medical Care and Treatment.
[Most Cited Cases](#)
Prison employees were not deliberately indifferent to an
inmate's serious medical needs. The inmate was seen on
numerous occasions by infirmary staff. The inmate's
disagreement with a prescribed course of treatment and the
refusal of prison nurses and nurse practitioners to honor
his request to be seen by a prison physician for his back
pain did not provide a basis to find a violation of his rights
under the Eighth Amendment. [U.S.C.A. Const.Amend. 8](#).

Eric Mendoza, pro se.

Hon. [Andrew M. Cuomo](#), Office of the Attorney General,
State of New York, [Senta B. Siuda, Esq.](#), Assistant
Attorney General, of Counsel, Syracuse, NY, for
Defendants.

**DECISION & ORDER**

[THOMAS J. McAVOY](#), Senior District Judge.

**\*1** This *pro se* action brought pursuant to [42 U.S.C. §
1983](#) was referred by this Court to the Hon. David E.
Peebles, United States Magistrate Judge, for a Report and
Recommendation pursuant to [28 U.S .C. § 636(b)](#) and
Local Rule N.D.N.Y. 72.3(c). The Report and
Recommendation dated July 24, 2008 recommended that
Defendants' motion for summary judgment be granted and
the action dismissed. No objections to the Report and
Recommendation have been filed and Plaintiff's time to do
so has expired. Furthermore, after examining the record,
this Court has determined that the Report and
Recommendation is not subject to attack for plain error or
manifest injustice. Accordingly, the Court adopts the
Report and Recommendation for the reasons stated
therein.

It is therefore,

**ORDERED** that Defendants' motion for summary
judgment (dkt.# 53) is **GRANTED**, and Plaintiff's
complaint is **DISMISSED** in its entirety.

**IT IS SO ORDERED**

*REPORT AND RECOMMENDATION*

[DAVID E. PEEBLES](#), United States Magistrate Judge.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)
(Cite as: 2008 WL 4239760 (N.D.N.Y.))

Plaintiff Eric Mendoza, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983, claiming deprivation of his constitutional rights. In his complaint, plaintiff alleges that the defendants were deliberately indifferent to his serious medical needs by refusing his repeated requests for proper treatment of back pain, migraine headaches, ear aches, and a broken tooth, and on one isolated occasion by giving him the wrong medication, in violation of the Eighth Amendment to the United States Constitution. As relief, plaintiff seeks recovery of not less than six million dollars in damages.

Currently pending before the court is a motion by the defendants seeking the entry of summary judgment dismissing plaintiff's complaint. In their motion defendants assert that as a matter of law the plaintiff cannot establish that any of his health conditions was sufficiently serious to rise to a level of constitutional significance, nor does the evidence support a finding that the defendants were subjectively indifferent to any of his medical needs. Based upon a thorough review of the record now before the court, I find that while some of plaintiff's conditions could potentially be viewed as sufficiently serious to trigger the protections of the Eighth Amendment, no reasonable factfinder could conclude that the defendants were deliberately indifferent to those needs, and therefore recommend that the defendants' motion for summary judgment be granted.

I. *BACKGROUND*[FN1]

> FN1. The following recitation is gleaned from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005); *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). To the extent there is any significant controversy regarding facts material to the claims raised in plaintiff's complaint, they will be noted.

Plaintiff is a New York State prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"). *See generally* Complaint (Dkt. No. 1); *see also* Defendants' Local Rule 7.1(a)(3)

statement (Dkt. No. 53-3) ¶ 1. At the times relevant to his claims plaintiff was designated first to the Southport Correctional Facility ("Southport"), and later the Auburn Correctional Facility ("Auburn"), where he was transferred on November 28, 2003. Complaint (Dkt. No. 1) ¶¶ 3, 12; Felker Aff. (Dkt. No. 53-3) ¶ 38; *see also* Defendants' Motion (Dkt. No. 53-4) Exh. 1.

**\*2** On August 2, 2003, during his confinement at Southport, Mendoza slipped and fell upon entering a shower area while handcuffed, injuring his head, shoulder and back.[FN2,FN3] Complaint (Dkt. No. 1) Attachment ¶ 12; Felker Aff. (Dkt. No. 53-5) ¶ 4 and Exh. A (Plaintiff's Ambulatory Health Records) 8/2/03 entry. Following the accident plaintiff was returned to his cell, and later transported to the prison infirmary where he was seen by Nurse Scobble for his injuries. Complaint (Dkt. No. 1) Attachment ¶ 12; Felker Aff. (Dkt. No. 53-5) ¶ 4. Nurse Scobble administered Tylenol and, after evaluating the plaintiff, provided him with an ice-pack for his head injury and placed him in the facility's hospital unit for observation. Defendants' Motion (Dkt. No. 53-4) Exh. 2, 21:9-21; Felker Aff. (Dkt. No. 53-5) Exhibit A-1. After remaining in the hospital unit for approximately two and one half hours, Mendoza was returned back to his cell.[FN4] Felker Aff. (Dkt. No. 53-5) Exhibit A-1.

> FN2. According to his medical records plaintiff's complaints regarding his back pre-date the shower area accident, reaching back at least to June 2, 2003. Kooi Aff. (Dkt. No. 53-6) ¶ 5. Magnetic resonance imaging ("MRI") testing of Mendoza's back conducted on June 25, 2003 revealed the onset of degenerative disc disease. *Id.* ¶ 7 and Exh. B, pp. B-3, B-4. Plaintiff's records further reflect that Mendoza complained of a "sore back" on July 30, 2003, three days before his fall, and at that time was prescribed Ultram for the pain and placed on a list to see a physician. Felker Aff. (Dkt. No. 53-5) ¶ 5 and Exh. A, 7/30/03 and 7/31/03 Entries.

> FN3. While plaintiff now claims to have suffered a broken tooth as a result of the fall, and for purposes of the pending motion that allegation must be credited, plaintiff's medical records make no reference to plaintiff's claim of suffering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)
(Cite as: 2008 WL 4239760 (N.D.N.Y.))

a broken tooth during the fall, nor do they otherwise substantiate that claim.

FN4. Plaintiff asserts that Nurse Scobble told him a doctor would come to his cell in the afternoon to talk with him, but the doctor never appeared to evaluate him. Complaint (Dkt. No. 1), Attachment ¶ 12.

Mendoza alleges that requests made by him on August 4 and 5, 2003 to be seen by a doctor were ignored.FN5 Complaint (Dkt. No. 1) Attachment ¶ 12. On August 6, 2003, after voicing numerous complaints to the floor officer regarding his continuous pain, Mendoza was visited by Nurse Whendon.FN6 Id. During that visit the plaintiff complained of experiencing strong ear pain as a result of his fall in the shower area; defendant Whendon promised to discuss the matter with a prison physician, and prescribed Ultram for plaintiff's pain.FN7 Id.

FN5. There is no entry in the plaintiff's ambulatory health record either documenting sick-call requests or reflecting any request by Mendoza for medical services on August 4 or 5, 2003. Felker Aff. (Dkt. No. 53-5) Exhibit A1-2.

FN6. Plaintiff's health records appear to reflect that he was seen by Nurse Practitioner Northrup on that date, and that it was August 10, 2003 when he was seen by Nurse Whendon. Felter Aff. (Dkt. No. 53-5) ¶¶ 7 & 9 and Exh. A, 8/6/03 & 8/10/03 Entries.

FN7. While given the current procedural posture plaintiff is entitled to the benefit of all inferences and the resolution of all ambiguities in his favor, it nonetheless should be noted that a medical record entry memorializing his discussion with Nurse Ripley on August 8, 2003 reflects that while Mendoza did complain regarding his ears, he claimed not to be experiencing any pain, noting that they "just feel funny." Felker Aff. (Dkt. No. 53-5) Exh. A, 8/8/03 Entry. Plaintiff's medical records entry from the August 6, 2003 visit, which fail to make reference to complaints

of ear pain, confirm that Ultram was prescribed on that date, presumably to address the complaints of back pain lodged during that visit. Id., 8/6/03 Entry.

On August 15, 2003, plaintiff again complained to corrections staff of severe pain in his head, back, shoulders, and teeth, after noticing that the lump on his head was swollen and had become discolored. Complaint (Dkt. No. 1) Attachment ¶ 12. When plaintiff asked to see a doctor, an unidentified corrections sergeant responded that because plaintiff did not appear to be experiencing an emergency situation, he would have to wait until sick-call the next day. Id. On the morning of August 16, 2003, after continuing to experience serious pain, Mendoza was seen by Nurse P. Mills, but was not permitted to see a physician.FN8 Id . Noting that the Ultram which had been prescribed was not working and that plaintiff was also experiencing ear pain, Nurse Mills reported on the medical record entry from that session that plaintiff "needs ear check", discontinued Ultram, and instead prescribed Naprosyn. Felker Decl. (Dkt. No. 53-5) Exh. 1, 8/16/03 Entry.

FN8. While plaintiff's complaint affixes the date of that visit at August 15, 2003, and refers to the medical official who examined him on that date as Nurse Miller, it is apparent from the chronology set forth in that complaint, corroborated by an entry from August 16, 2003 in plaintiff's ambulatory health records, that the visit actually occurred on the latter date, and that the nurse's name is Mills.

A central theme of plaintiff's complaint appears to relate to prison officials' failure to honor his requests to be seen by a prison doctor. In addition to those requests previously discussed, plaintiff's complaint alleges that he requested access to a prison physician on August 15, 16, 23, and 29, 2003, as well as September 2, 4, 11, 16, 18, and 19, 2003. From the time of the accident on August 3, 2003 until his transfer out of Southport on November 24, 2003, Mendoza was not seen by a doctor. Id. Complaint (Dkt. No. 1) Attachment ¶ 12. Plaintiff's medical records also reveal, however, that between the time of his injury on August 2, 2003, and the date of his transfer out of Southport on November 28, 2003, plaintiff was seen on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)
(Cite as: 2008 WL 4239760 (N.D.N.Y.))

twenty-five different occasions by seven different registered nurses and one nurse practitioner ("NP"), and completed six physical therapy sessions. Felker Aff. (Dkt. No. 53-5) ¶¶ 4, 7-9, 11-25, 27-30, 32-37. Those records also reflect considerable efforts on the part of prison medical staff to address plaintiff's back condition, including through the use of physical therapy, pain medication, and a combination of other strategies which included a "front cuff order". *Id.*

**\*3** Plaintiff's ear condition was also addressed during many of his visits with medical personnel at Southport. On August 27, 2003 NP Northrup, upon checking plaintiff's ears, determined that they were both filled with wax and prescribed Debrox drops to address that condition. *Id.* ¶ 15 and Exh. A, 8/27/03 Entry. Plaintiff was seen on August 28, 2003 by Nurse Scobble, again complaining of ongoing ear discomfort. *Id.* ¶ 16. Nurse Scobble similarly observed a wax build-up in both ear canals, and again ordered that plaintiff be provided with Debrox drops to alleviate the condition. *Id.* and 8/28/03 Entry.

Despite several intervening visits with prison medical personnel, the next reference in plaintiff's health records to his ear condition is contained in a note of a visit on September 24, 2003 with Nurse Preiser, who wrote that plaintiff was complaining of left ear pain and stating that his left ear made a "buzzing" sound. *Id.* ¶ 29 and 9/24/03 Entry. After being placed on an NP call-out, plaintiff was seen by NP Northrup on that same date; based upon her examination, NP Northrup determined that plaintiff was experiencing a left eustachian tube dysfunction/allergies and prescribed Allegra D to address the condition. *Id.* ¶ 30 and 9/24/03 Entry. After requesting a refill of the Allegra D on October 13, 2003, plaintiff was seen by Nurse Whendon on October 27, 2003 with residual complaints of left ear pain and an inability to hear. *Id.* ¶¶ 31, 32 and Exh. A, 10/13/03 and 10/27/03 Entries. On that occasion, an ear check was ordered. *Id.*

Plaintiff again presented to medical staff at Southport on several subsequent occasions, including November 2, 2003, November 17, 2003, November 23, 2003 and November 24, 2003, complaining of on-going ear pain. *Id.* ¶¶ 33-36. Plaintiff was prescribed Tylenol following the November 23, 2003 visit, and an ear check was recommended. *Id.*

On November 24, 2003 Nurse Ripley examined plaintiff's left ear. Felker Aff. (Dkt. No. 53-5) ¶ 37 and Exh. A, 11/25/03 Entry. Determining that the ear canal was red and inflamed and discovering fluid behind the tympanic membrane, Nurse Ripley referred the plaintiff to NP Northrup and ordered a prescription for Amoxicillin. *Id.*

While his complaint is lacking in specifics on this score, plaintiff maintains that the deficiencies in his medical care continued following his transfer into Auburn on November 25, 2003. Complaint (Dkt. No. 1) Attachment ¶ 12. Plaintiff's medical records, however, reflect a similarly intensive regimen of treatment of the plaintiff by medical personnel at Auburn. Those records show that upon his entry into Auburn Mendoza was examined by Patty Hefrun, RN, who noted prior diagnoses of degenerative disc disease, disc protrusion based upon the June 25, 2003 MRI testing and a recent history of ear pain, and referred plaintiff's records to a physician for review and determination of appropriate medications. Kooi Aff. (Dkt. No. 53-6) ¶ 16 and Exh. A, 11/28/03 Entry. Thereafter, plaintiff was seen by prison medical personnel on a regular basis, and his back and ear conditions were the subject of many of those visits. *Id.* ¶¶ 17-78. Plaintiff's medical records also reveal that the last complaint registered by plaintiff concerning ear pain came on April 13, 2004, and that on May 17, 2004 he was found by a audiologist to have functional hearing. *Id.* ¶¶ 77 and Exh. B, p. B-22.

## II. *PROCEDURAL HISTORY*

**\*4** Plaintiff commenced this action on September 7, 2005, and was thereafter granted leave to proceed *in forma pauperis*.[FN9] Dkt. Nos. 1, 6. Plaintiff's complaint alleges defendants' deliberate indifference to his medical needs, both initially at Southport and later at Auburn. *See generally* Complaint (Dkt. No. 1). Named as the defendants in plaintiff's complaint are M. McGinnis, the Superintendent at Southport; J. Burge, the Superintendent of Auburn; Dr. Kooi, a prison doctor at Auburn; and J. Scobble, T. Whendon, Preiser, B. Brandt, P. Miller, and P. Nelson, all of whom are alleged to be registered nurses employed by the DOCS at Southport.[FN10] Dkt. No. 1.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)
(Cite as: 2008 WL 4239760 (N.D.N.Y.))

FN9. Since plaintiff's complaint asserts claims based upon occurrences at both the Southport Correctional Facility, which is situated in the Western District of New York, and at Auburn, located in this district, venue properly lies in the Northern District of New York. *See* 28 U.S.C. § 1391(b) (indicating that "[a] civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, [may] be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State [or] (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred ...").

FN10. On March 14, 2006, in response to defendants' filing of a pre-answer motion seeking the dismissal of the plaintiff's complaint, Senior Judge Thomas J. McAvoy ordered dismissal of plaintiff's claims, without prejudice, against defendants J. Scobble, T. Whendon, Preiser and P. Miller for failure to effect timely service of process. Dkt. No. 37. Despite that ruling, defendant J. Scobble nonetheless remains a defendant since although not reflected in the court's records, she was in fact served in the action.

In April of 2007, Mendoza sought leave to file a second amended complaint, see Dkt. No. 42, attempting to join six additional defendants in the action. FN11 Dkt. No. 42. Plaintiff's proposed second amended complaint also purported to rename as defendants the individuals previously dismissed from the action, including T. Whendon, Preiser and P. Miller. Plaintiff's motion to file a second amended complaint, which was opposed by the defendants, *see* Dkt. No. 44, was denied by the court on July 20, 2007. Dkt. No. 48.

FN11. An earlier effort by the plaintiff to amend his complaint without court leave was rejected. *See* Dkt. Nos. 8, 10.

On January 15, 2008, defendants M. McGinnis, J. Burge, Dr. Kooi, J. Scobble, and B. Brandt, moved seeking the

entry of summary judgment dismissing plaintiff's complaint. Dkt. No. 53. In their motion, the defendants argue that the plaintiff has not properly served two defendants, cannot prove certain defendants' personal involvement in the constitutional violations asserted, and has failed to establish that they were deliberately indifferent to any serious medical need. *Id*. That motion, which plaintiff has opposed, *see* Dkt. No. 55, is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).FN12 *See also* Fed.R.Civ.P. 72(b).

FN12. In his opposition to defendants' summary judgment motion, plaintiff appears to expand his claim considerably to now challenge the propriety of the DOCS practice of escorting prisoners to showers with their hands restrained behind their backs and also to implicate Corrections Officer Bennett, who accompanied him to the shower area, as having culpability in the matter. See Plaintiff's Memorandum (Dkt. Nos. 55-3) p. 7. This claim, however, is nowhere contained in plaintiff's complaint, nor is C.O. Bennett named as a defendant in the case. Plaintiff cannot properly now, at the summary judgment stage, interject additional legal arguments or new defendants into the action. *See McAllister v. New York City Police Dep't,* 49 F.Supp.2d 688, 697-68 (S.D.N.Y.1999) (noting that it is inappropriate to raise new claims for first time in opposition to summary judgment); *Carribean Wholesales & Serv. Corp. v. U.S. JVC Corp..* 963 F.Supp. 1342, 1359 (S.D.N.Y.1997) (asserting that a motion for summary judgment is not the appropriate place to present new claims); *Harvey v. New York City Police Dep't,* No. 93 Civ. 7563, 1997 WL 292112, at *2 (S.D.N.Y. June 3, 1997) (same).

III. *DISCUSSION*

A. *Failure To Serve*

In their motion, defendants initially seek dismissal of plaintiff's claims against two unserved defendants,

Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)
(Cite as: 2008 WL 4239760 (N.D.N.Y.))

including a John Doe defendant identified in plaintiff's amended complaint only as a corrections sergeant at Southport, and Nurse P. Nelson. In support of their motion defendants correctly note at this procedural juncture in the case any named but unserved defendants, particularly those Doe defendants whose identities have not yet been ascertained, are entitled to dismissal, although without prejudice, in light of the fact that jurisdiction over them is lacking. *See* Fed.R.Civ.P. 4(m).

In this instance, however, defendants' motion is unnecessary. While both sergeant John Doe and Nurse P. Nelson are specifically mentioned by those designations in plaintiff's complaint, and Nurse P. Nelson appears to be specifically identified in the body of that pleading as a "defendant.", *see* Complaint (Dkt. No. 1) Attachment ¶ 12, neither is listed as a defendant in either the caption or the two locations within the complaint where the parties are described. *See id.* § 3 and Attachment ¶¶ 3-11. Since neither Sergeant John Doe nor Nurse P. Nelson appears to have been intended by Mendoza to be named as a defendant in the case, and neither has been served with process or voluntarily intervened in the action, I recommend this portion of defendants' motion be denied as moot.

B. *Summary Judgement Standard*

**\*5** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

C. *Personal Involvement*

In their motion the defendants challenge the sufficiency of plaintiff's allegations regarding the personal involvement of Superintendents McGinnis and Burge, and as well as of Nurse Brandt, arguing that the allegations against those defendants are wholly conclusory and lack specifics connecting them to any constitutional violation alleged in his complaint.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)
(Cite as: 2008 WL 4239760 (N.D.N.Y.))

**\*6** Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

### 1. Nurse B. Brandt

Plaintiff's complaint fails to elaborate upon Nurse Brandt's role in his medical care at Southport, and in particular the manner in which she was deliberately indifferent to his serious medical needs. The sole mention of that defendant's name in the body of plaintiff's complaint is in a passage in which he alleges, in wholly conclusory fashion and without supporting details, that she and others at Southport and Auburn were deliberately indifferent to his health by failing to provide him with adequate medical care, and additionally that they "intentionally failed to administer proper medication and refused to fulfill any of [his] requests for proper follow up care." Complaint (Dkt. No. 1) Attachment ¶ 13.

In the face of defendants' summary judgment motion, in which they assert the insufficiency of his allegations against Nurse Brandt, Mendoza fails to offer any evidence which would implicate her personal involvement in the deliberate indifference claimed. During his deposition Mendoza was asked to describe Nurse Brandt's involvement in his treatment. Defendants' Motion (Dkt. No. 53-4) Exh. 1 at 53:22-54-2. In response, plaintiff alleged that he spoke with Nurse Brandt complaining of an ear infection on one occasion, at which time she prescribed Antavera, but on that one occasion she would not grant his request to be seen by a prison physician.[FN13] *Id.* This allegation is insufficient to establish Nurse Brandt's role in the medical indifference alleged. *See Schwartz v. Dennison,* 518 F.Supp.2d 560, 573 n. 11 (S.D.N.Y.2007) (Plaintiff's complaint contained no allegations from which it can be inferred that defendants created, or allowed to continue, an unconstitutional

policy); *Graham v. Poole,* 476 F.Supp.2d 257, 261 (W.D.N.Y.2007) ("Plaintiff's conclusory allegation that Poole failed to provide him with adequate medical care is also insufficient to state a claim."). Accordingly, I recommend that this portion of defendants' motion be granted.

> **FN13.** There is no reference in plaintiff's health records to the drug "Antavera". According to the plaintiff's ambulatory health record, his ear infection was treated with Debrox (ear drops), Amoxicillin, and Allegra D. Felker Affidavit (Dkt. No. 53-5) ¶¶ 16, 30, 37.

### 2. Superintendents McGinnis and Burge

Defendants also argue that plaintiff's complaint is devoid of allegations of any personal involvement, or even awareness, on the part of the superintendents at Southport and Auburn regarding the medical treatment which he was receiving at those facilities. Accordingly, defendants assert, it therefore appears that they are being sued by plaintiff solely by virtue of their positions as facility superintendents.

**\*7** A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007); *see also Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986). *Richardson,* 347 F.3d at 435 ("[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)
(Cite as: 2008 WL 4239760 (N.D.N.Y.))

of corrections or a prison superintendent in a § 1983 claim.") (citations omitted); see also, e.g., Gill v. Mooney, 824 F.2d 192, 196 (2d Cir.1987) (dismissal appropriate where plaintiff does no more than allege that defendant was in charge of prison); Ayers v. Coughlin, 780 F.2d 205, 210 (2d Cir.1985) (same).

In his response to defendants' motion plaintiff asserts that his claims against Southport Superintendent McGinnis are tied to his position as having responsibility "for training and over all management of [the] facility", and his contention that accordingly, "he is liable for all deficiencies in his staffs [sic] performance of their official duties of care, custody and control." [FN14] Plaintiff's Memorandum (Dkt. No. 55-3) at 9. While under other circumstances liability on the part of a supervisor can be imputed based upon the acts of subordinate employees, it is well-established that there is no respondeat superior liability under section 1983. See Richardson, 347 F.3d at 435; Wright, 21 F.3d at 501. Similarly, it is also true that a supervisor can under certain circumstances be held accountable for their gross negligence in managing subordinates, or for knowingly tolerating the existence of a policy or custom giving rise to unconstitutional practices, plaintiff has identified no specifics to support such a claim, instead merely making conclusory, unsupported allegations which are simply insufficient to establish liability.[FN15] See Jean-Laurent v. Wilkinson, 540 F.Supp.2d 501, 513 (S.D.N.Y.2008) (indicating that plaintiff must allege specific facts of personal involvement to survive summary judgement); see also Iqbal v. Hasty, 490 F.3d at 152-53; Colon v. Coughlin, 58 F.3d 865, 873-74 (2d Cir.1995).

FN14. Plaintiff's response does not provide any indication as to the basis for his claims against Auburn Superintendent Burge.

FN15. Indeed, in opposition to defendants' motion plaintiff has not even offered any information to indicate the extent, if any, of the supervising responsibilities of a prison superintendent, presumably with little or no medical training, upon medical staff at the prison facility overseen by him or her.

Having carefully reviewed the record in this case I find that plaintiff's claims against those two individuals are predicated exclusively upon their supervisory positions, a conclusion which is buttressed by testimony given during Mendoza's deposition. During his deposition plaintiff asserted that he was suing Southport Superintendent McGinnis not because of any specific denial in medical treatment, but instead because he was the person in charge of the facility. Defendants' Motion (Dkt. No. 53-4) Exh. 2 at 50:8-20. Similarly, plaintiff testified that he was suing Auburn Superintendent Burge because he "is in charge of [the] facility and he had to believe that everything was going straight." Id. at 53:22-54-2.

*8 In order to defeat the portion of defendants' motion for summary judgment asserting lack of personal involvement, it was incumbent upon plaintiff to present evidence to support an inference that the three defendants implicated in that motion had personal involvement in any deliberate indifference to his medical care. In light of his failure to do so, and reliance instead upon mere conclusory allegations regarding their liability, I recommend a finding that defendants Brandt, McGinnis and Burge are entitled to dismissal based upon lack of personal involvement and recommend the entry of an order granting that portion of defendants' summary judgment motion. See Kia P. v. McIntyre, 235 F.3d 749, 763 (2d Cir.2000) ("A plaintiff may not survive a properly asserted motion for summary judgment on the basis of conclusory allegations alone."); D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir.1998); Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir.1985) ("[M]ere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion.").

D. Deliberate Medical Indifference

The centerpiece of defendants' motion is their contention that after surveying the evidence contained in the record the court can only conclude that no reasonable factfinder could find that they were deliberately indifferent to plaintiff's serious medical needs. In their motion, defendants argue both that plaintiff has failed to prove the existence of a serious medical need of constitutional proportions, and that in any event the record belies any claim that they were deliberately indifferent to any such need.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)
(Cite as: 2008 WL 4239760 (N.D.N.Y.))

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M .J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

**\*9** In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious' ". *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). A medical need is serious for constitutional purposes if it

presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance* ). Relevant factors in making this determination include injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or causes " 'chronic and substantial pain.' " *Chance,* 43 F.3d at 701 (citation omitted); *LaFave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *2-*3 (N.D.N.Y. Apr.3, 2002) (Sharpe, M.J.).

Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

*1. Serious Medical Need*

*a) Broken Tooth*

Among plaintiff's medical complaints are those surrounding defendants' alleged failure to treat a broken tooth which, although not referenced in any of the medical reports following that incident, is alleged to have occurred during the course of the shower incident on August 2, 2003. While in the memorandum in support of their summary judgment motion defendants devote no attention to plaintiff's broken tooth, they seemingly argue that it does not constitute a serious medical need.

Under certain circumstances a dental condition can constitute a serious medical need. *See Bennett v. Erie*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)
(Cite as: 2008 WL 4239760 (N.D.N.Y.))

*County Holding Ctr. Med. Dep't),* No. 03-CV-6393P, 2006 WL 897817, at *6 (W.D.N.Y. Mar.31, 2006) (holding that dental infection over nine month period constituted serious medical need); *see also Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) ("[B]ecause a tooth cavity will degenerate with increasingly serious implications if neglected over sufficient time, it presents a 'serious medical need' within the meaning of our case law."). Dental conditions, like all medical conditions, can vary in severity and, if left untreated, can support an Eighth Amendment claim depending on the specific facts of the case. *See Chance,* 143 F.3d at 703 ("[A] cognizable claim regarding inadequate dental care, like one involving medical care, can be based on various factors, such as the pain suffered by the plaintiff ...."); *see also Boyd v. Knox,* 47 F.3d 966, 969 (8th Cir.1995) (three-week delay in dental treatment aggravated problem); *Fields v. Gander,* 734 F.2d 1313, 1314-15 (8th Cir.1984) ("severe pain" due to infected tooth); *cf. Dean v. Coughlin,* 623 F.Supp. 392, 404 (S.D.N.Y.1985) (holding "dental needs-for fillings, crowns, and the like-are serious medical needs as the law defines that term"). Thus, for example, a tooth cavity has been held to constitute a degenerative condition in light of the fact that, if left untreated indefinitely "it is likely to produce agony and to require more invasive and painful treatments, such as root canal therapy or extraction." *Harrison,* 219 F.3d at 137 (citation omitted).

*10 In this instance, by contrast, plaintiff asserts the existence of a broken tooth, and does not allege either that it has caused him to experience extreme pain or the likelihood, that if left untreated, his broken would have resulted in degeneration. Indeed, during his deposition Mendoza testified that the pain associated with his broken tooth diminished after medication was prescribed, and that when he complained to a prison nurse regarding the tooth she made an appointment with a dentist who, after determining that it could not be saved, extracted it without causing additional pain. Defendants' Motion (Dkt. No. 53-4) Exh. 1 at 59:5-60:9. Accordingly, I recommend a finding that no reasonable factfinder could conclude that plaintiff's broken tooth represents a medical condition of constitutional significance. *See Chance,* 143 F.3d at 703 (indicating that the factors to consider in determining if dental problems raise to the level of constitutional significance are whether plaintiff suffers from severe pain, deterioration of teeth, or inability to engage in normal activities) (internal citations omitted).

b) *Back Pain and Migraine Headaches*

While noting a conflict among the various court decisions which address the issue, defendants argue that Mendoza's back condition does not rise to a level sufficient to trigger the protections of the Eighth Amendment.[FN16] The question of whether chronic back pain can rise to a level of constitutional significance is dependent upon the circumstances of the particular case presented. In this instance, given plaintiff's diagnosed condition of degenerative disc disease, and resolving all ambiguities in plaintiff's favor, I conclude that a reasonable factfinder could find that the condition constitutes a serious medical need. *See Guarneri v. Hazzard,* No. 06-CV-0985, 2008 WL 552872, at * 6 (N.D.N.Y. Feb. 27, 2008) ("[s]evere back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment.") (citing *Nelson v. Rodas,* No. 01-CV-7887, 2002 WL 31075804, at *14 (S.D.N.Y. Sept.17, 2002)); *Faraday v. Lantz,* No. 03-CV-1520, 2005 WL 3465846, at *5 (D. Conn. Dec 12, 2005) (holding that persistent complaints of "lower back pain caused by herniated, migrated discs [and] sciatica ..." leading to severe pain constitutes a serious medical need.).

FN16. In presenting this argument, defendants fail to address plaintiff's migraine headaches, which can also constitute a serious medical need. *Moriarity v. Neubold,* No. 02-CV-1662, 2004 WL 288807, at *2 n. 2 (D.Conn. Feb. 10, 2004) (suggesting plaintiff's migraine headaches constituted a serious medical need warranting Eighth Amendment protection since they can be "extremely painful and debilitating"); *O'Bryan v. Sedgwick County,* No. 98-3308, 2000 WL 882516, at *5 (D.Kan. June 12, 2000) (assuming plaintiff's migraine headaches, for which he was prescribed medication, was a serious medical need under the Eighth Amendment); *but see Rodriguez v. Mercato,* No. 00 Civ. 8588, 2002 WL 1997885, and *2-3, 8 (S.D.N.Y. Aug, 28, 2002) (migraines and back pain not "sufficiently serious" to implicate the Eighth Amendment)

c) *Ear Pain*

Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)
(Cite as: 2008 WL 4239760 (N.D.N.Y.))

As is true of back pain, the cases addressing the issue of whether an ear condition, including an infection, may constitute a serious medical need for purposes of the Eighth Amendment are similarly equivocal and fact-specific. *Compare* Duffield v. Jackson, No. CIV-07-90-R, 2007 WL 4210863, at *13 (W.D.Okla. Nov.27, 2007) (assuming that the plaintiff's ear infection, and ear pain was a sufficiently serious condition under the Eighth Amendment); *Golden v. Berge,* No. 03-C-0403, 2003 WL 23221483, at *6 (W.D.Wis. Sept.25, 2003) (finding that plaintiff's allegation that he suffered severe pain in his ear as a result of an ear infection was sufficient to suggest that he had a serious medical need) *with* Feazell v. Augusta County Jail, 401 F.Supp. 405, 407 (D.Va.1975) (ear infection found not to constitute a serious medical need for constitutional purposes). Given this conflict, and resolving all ambiguities in plaintiff's favor, I am unable to conclude, as defendants argue, that plaintiff's ear pain did not constitute a serious medical need.

2. *Deliberate Indifference*

**\*11** Even assuming that any of plaintiff's medical conditions arises to the level of a serious medical need, the record nonetheless is devoid of evidence from which a reasonable factfinder could conclude that defendants were indifferent to that need. A review of plaintiff's medical records from both Southport and Auburn, which are comprehensive, fail to substantiate plaintiff's claim that his complaints were ignored and medical treatment was withheld. Instead, those records reveal at times intense regimens of testing, prescription of medication, use of physical therapy, and other strategies employed by prison medical officials in an effort to address plaintiff's conditions. The records also show that during the relevant periods he was seen frequently by medical staff at Southport and Auburn. Particularly given the extent of efforts on the part of medical personnel at those facilities plaintiff's allegations, even when liberally construed, fall far short of demonstrating indifference by prison officials to his medical needs.

Plaintiff's quarrel with the medical treatment received at Southport appears to center upon his disagreement with chosen courses of treatment and the refusal of prison nurses and nurse practitioners to honor his request to be seen by a prison physician. Unfortunately for the plaintiff, mere disagreement by a prison inmate with a prescribed course of treatment does not provide a basis to find a violation of inmate's rights under the Eighth Amendment. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 201-02; *Chance,* 143 F.3d at 703; *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828, 121 L.Ed.2d 698 (1992). Determinations made by medical providers within their discretion are given a "presumption of correctness" when it concerns the care and safety of patients. *Perez v. County of Westchester,* 83 F.Supp.2d 435, 440 (S.D.N.Y.2000) (citing *Kulak v. City of New York,* 88 F.3d 63, 77 (2d Cir.1996)). As for plaintiff's claims that he should have been permitted to see a doctor at his insistence, it should be noted that the Eighth Amendment, while prohibiting cruel and unusual punishment, does not guarantee a prison inmate unfettered access, at his or her insistence, to a prison physician. *See* Wandell v. Koenigsmann, No. Civ.A. 99-8652, 2000 WL 1036030, at *3 (S.D.N.Y. July 27, 2000) (indicating that as long as the medical care provided was adequate, there is no Eighth Amendment violation); *Church v. Hegstrom,* 416 F.2d 449, 450-51 (2d Cir.1969) (maintaining that medical professionals have wide discretion in treating prisoners, and section 1983 was not designed to permit the federal courts to sit as the final arbiter of the ordinary medical practices of state prisons). In this instance the record reflects that plaintiff was seen at appropriate intervals by medical personnel at Southport, and that those personnel, utilizing their discretion, determined whether it was necessary for the plaintiff to be seen by a physician. Accordingly, the record yields no evidence from which a factfinder could conclude that medical officials at Southport were deliberately indifferent to plaintiff's medical needs.

**\*12** Turning to his period of incarceration at Auburn, Mendoza asserts that while there, Dr. Kooi treated him in a "poor manner" and he was unhappy with Dr. Kooi's conservative course of treatment. Defendants' Motion (Dkt. No. 53-4) Exhibit 1, 54:3-7. Plaintiff also disagreed with the reduced level of pain medication prescribed for him by Dr. Kooi. *Id.* at 45:13-46:17. The records reveal that Dr. Kooi examined the plaintiff on eleven separate occasions over a sixteen month period, and additionally referred him to an audiologist, a neurologist, and a physical therapist, and requested repeat MRI testing of plaintiff's back. Kooi Aff. (Dkt. No. 53-6) ¶¶ 21, 24, 29, 33, 34, 39, 45, 50, 54, 56, 59, 65, 67. In addition, Dr.

Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)
(Cite as: 2008 WL 4239760 (N.D.N.Y.))

Kooi prescribed for the plaintiff a range of different pain and anti-inflammatory medications in order to find which medications provided him the most relief for his conditions, and continued to monitor his progress at regular intervals.

The question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998). Moreover, plaintiff's disagreement over the level of pain medication, without more, is insufficient to avoid dismissal of the plaintiff's claim; "[r]ather, to prevail on a claim involving choices between alternative course of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.' " *Toguchi v. Chung,* 391 F.3d 1051, 1058 (9th Cir.2004) (citing and quoting *Jackson v. McIntosh,* 90 F.3d 330, 332 (9th Cir.1996)).

Based upon the foregoing, I find that no reasonable factfinder could conclude that any of the remaining defendants named in plaintiff's complaint were deliberately indifferent to plaintiff's serious medical needs.[FN17]

FN17. Among plaintiff's complaints is a claim that on or about October 20, 2003 he was administered medication meant for another inmate. Complaint (Dkt. No. 1) Attachment ¶ 12. Because plaintiff has not elaborated regarding the incident, either in his complaint or in his responsive motion papers, and fails to identify the nurse involved, nor does he offer any evidence to indicate that the incident was the result of an intentional act, it appears that at best the matter involves a mistake or negligence which would not suffice to support an Eighth Amendment claim. *See Hudson v. Clark,* 319 F.Supp.2d 347, 352 (W.D.N.Y.2004); *see also Daniels v. Williams,* 474 U.S. 327, 330-31, 106 S.Ct. 662, 664-65, 88 L.Ed.2d 662 (1986)

(stating that mere negligence on the part of state officials is not actionable under section 1983 and does not work a constitutional deprivation by itself).

IV. *SUMMARY AND RECOMMENDATION*

A thorough review of the comprehensive record now before the court fails to disclose evidence from which a reasonable factfinder could conclude that defendants McGinnis, Burge, and Brandt were personally involved in the constitutional deprivations allegedly experienced by the plaintiff. Additionally, the record is lacking in evidence from which a reasonable factfinder could conclude that defendants Nurse Scobble and Dr. Kooi were deliberately indifferent to plaintiff's serious medical need. Accordingly, it is hereby

RECOMMENDED, that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 53) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety.

NOTICE: pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report-recommendation. Any objections shall be filed with the clerk of the court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

**\*13** It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2008.
Mendoza v. McGinnis
Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4239760 (N.D.N.Y.)
(Cite as: 2008 WL 4239760 (N.D.N.Y.))

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)
(Cite as: 2008 WL 552872 (N.D.N.Y.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Joseph P Paul GUARNERI, Plaintiff,
v.
Lt. James HAZZARD; Cpl J. Cronk; Deputy Paul
Marsh, Jr.; Deputy Grippin; Deputy Howland; Frederick
C. Lamy, Commissioner; Francis T. Sullivan,
Commissioner; Deputy Mace; John Doe, Deputy; and
Dr. Weitz, Defendants.
No. 9:06-CV-0985.

Feb. 27, 2008.

Joseph P Paul Guarneri, Elmira, NY, pro se.

Girvin & Ferlazzo, P.C., Gregg T. Johnson, Esq., Jacinda
Hall Conboy, Esq., Scott P. Quesnel, Esq., of Counsel,
Albany, NY, for Defendants Hazzard, Cronk, Marsh,
Grippin, Howland, and Mace.

O'Connor, O'Connor, Bresee & First, P.C., Justin O.
Corcoran, Esq ., of Counsel, Albany, NY, for Defendant
Weitz.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Bruce J. Boivin, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendant Sullivan.

*ORDER*

NORMAN A. MORDUE, Chief Judge.

**\*1** The above matter comes to me following a
Report-Recommendation by Magistrate Judge David R.

Homer, duly filed on the 6th day of February 2008.
Following ten days from the service thereof, the Clerk has
sent me the file, including any and all objections filed by
the parties herein.

After careful review of all of the papers herein, including
the Magistrate Judge's Report-Recommendation, and no
objections submitted thereto, it is

ORDERED, that:

1. The Report-Recommendation is hereby approved.

2. Sullivan's motion to dismiss (Docket No. 43) is granted
and that the amended complaint is dismissed in its entirety
as to her.

3. Dr. Weitz's motion to dismiss (Docket No. 19) is:

   a. Granted as to his lack of personal involvement with
the confiscation of the knee brace;

   b. Denied as to his lack of personal involvement in
Guarneri's neck, back, and mental health treatments;

   c. Denied as to Guarneri's back and neck injuries
sustained in 2003; and

   d. Granted as to Guarneri's back and neck injuries
sustained in 2000.

4. The amend complaint is dismissed without prejudice as
to defendants Lamy and John Doe.

5. The Clerk of the Court shall serve a copy of this Order
upon all parties and the Magistrate Judge assigned to this
case.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)
(Cite as: 2008 WL 552872 (N.D.N.Y.))

IT IS SO ORDERED.

**REPORT-RECOMMENDATION AND ORDER**[FN1]

> FN1. This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Joseph Paul Guarneri ("Guarneri"), presently an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants,[FN2] six Schoharie County employees ("County defendants"), two New York State Commissioners ("State defendants"), and one physician, violated his First and Eighth Amendment rights while Guarneri was incarcerated at the Schoharie County Correctional Facility ("Schoharie"). Am. Compl. (Docket No. 13). Presently pending are the motions for summary judgment of the physician (Docket No. 19) and the State defendants[FN3] (Docket No. 43) pursuant to Fed.R.Civ.P. 12(b)(6). Guarneri opposes both motions. Docket No. 46. For the following reasons, it is recommended that the physician's motion to dismiss is granted in part and denied in part and that the State defendant's motion be granted.

> FN2. Guarneri initially named twelve defendants, two of whom were dismissed by an order dated March 6, 2007 (Docket No. 15) and one who remains unidentified. State Defs. Memorandum of Law (Docket No. 43, Pt. 4) at 3 n. 2.

> FN3. Defendant Lamay has not been served or otherwise appeared in this action. See State Defs. Memorandum of Law at 3 n. 5. Likewise, defendant John Doe has neither been served nor further identified. More than 120 days have elapsed since the amended complaint was filed. Accordingly, it is recommended that the amended complaint be dismissed without prejudice as to both defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b).

**I. Background**

The facts are related herein in the light most favorable to Guarneri as the nonmoving party. See subsection II(A) infra.

Guarneri was incarcerated at Schoharie from June 6 to August 2006 for a parole violation. Am. Compl. at ¶ 2. On June 16, 2006, Guarneri represented himself at his preliminary hearing. Id. at ¶ 2. Guarneri claims that the Schoharie law library was inadequate because it lacked appropriate resources and utilized a crude and unreliable library loan system which delivered requested material, if at all, after the date of the preliminary hearing. Id. These deficiencies "infringed and undermined [Guarneri's] constitutional rights." Id. Additionally, Guarneri claims that his time in the library was "intentionally and unreasonably limited ...." Id. at ¶ 42. Guarneri also contends that defendant Hazzard failed to copy the appropriate Penal Law sections regarding the period of punishment and failed to provide him with the correct case law pertaining to his litigation. Id. at ¶ 45.

**\*2** Besides his legal difficulty, Guarneri also arrived at Schoharie in grave pain due to pre-existing injuries including herniated discs in his neck and lower back, torn ligaments in his knee, Post-Traumatic Stress Disorder (PTSD), bipolar disorder, and depression. Id. Guarneri claims that on July 21, 2006, he was "denied ... emergency medical care by [defendants] Weitz and [ ] Hazzard for a [knee] give-way episode...." Id. at ¶ 22. Furthermore, Guarneri contended that upon receiving medical attention in the emergency room, hours later and after suffering severe pain, the treatment was wholly inadequate. Id. at ¶ 32. Guarneri also makes reference to incidents occurring in 2000 and 2003 which resulted in his herniated discs, alleging that at the time of the incident defendants Marsh and Hazzard delivered inadequate medical care that was further perpetuated by defendants Weitz and Hazzard with their decision to prohibit Guarneri from receiving a back brace. Id. at ¶ 30. Additionally, Guarneri contends that defendants Hazzard, Crook, Marsh, Grippin, Howland, Mace, John Doe, and Weitz all colluded against him "by not letting [Guarneri] speak to mental health counselors when [he was suffering from] mental health episodes ...."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)
(Cite as: 2008 WL 552872 (N.D.N.Y.))

*Id.* at ¶ 35. Lastly, Guarneri contends that after arriving at Elmira Correctional Facility in August 2006, defendants Hazzard, Mace, and John Doe deliberately interfered with his medical treatment by precluding him from wearing the hinged knee brace which had subsequently been provided to him at Schoharie. *Id.* at ¶ 2.

In response to defendants repossessing his knee brace, Guarneri timely filed a grievance. *Id.* at ¶ 22, 25. Guarneri contends that the State defendants failed to respond to this grievance because they were acting in concert with the County defendants, "deliberately and intentionally tak[ing] advantage of ... [Guarneri]." *Id.* at ¶ 25. The State defendants lack of communication led Guarneri to the conclusion that "resort to an administrative remed[y] would be clearly futile ...." *Id.*

Additionally, Guarneri alleges that defendant Hazzard "deliberately and intentionally [attempted to] stop" Guarneri from practicing Catholicism while he was incarcerated. *Id.* at ¶ 36. Guarneri contends that "defendant ... has known for years that [he] has been Catholic and has known the Rev. Ferenezy is not of the Catholic faith;" therefore, Hazzard's actions of arranging meetings between the two when Guarneri requested religious counsel amounted to defendants "tr[ying] to force a different religion on [Guarneri] ... den[ying him] the opportunity to see clergy and Catholic Religious Advisors when requested." *Id.* at ¶ 39.

## II. Discussion

Guarneri asserts two causes of action under the First Amendment that he has been denied (1) meaningful access to the courts and (2) his religious freedom. Additionally Guarneri claims deliberate indifference to a serious medical need in violation of the Eighth Amendment because defendants (1) did not allow him to keep his hinged knee brace upon arrival at Elmira Correctional Facility, (2) provided delayed and inadequate emergency treatment on July 26, 2006, (3) received inadequate care at the time of his disc herniations in 2000 and 2003, and (4) was denied proper medical care when defendants refused to order him a back brace. The physician, Dr. Weitz, moves for summary judgment on the grounds that (1) there was no personal involvement, (2) the amended

complaint fails to state a claim for deliberate indifference to serious medical needs, (3) the amended complaint is barred by res judicata and collateral estoppel, and (4) the medical claims relating to Guarneri's back are barred by the statute of limitations <sup>FN4 FN5</sup> Defendant Sullivan contends dismissal is appropriate because there was no personal involvement.

FN4. Dr. Weitz advances this valid claim expressly, however briefly, in a footnote in his memorandum of law. Weitz Mem. of Law (Docket No. 19, Pt. 3) at 15 n. 2.

FN5. Der. Weitz also advances the claim that Guarneri failed to state a valid pendent state law claim. However, the amended complaint fails to allege any pendant state law claims. Thus this argument need not be addressed.

## A. Legal Standard

*3 Fed.R.Civ.P. 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, a "complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *Gilfus v. Adessa,* No. 5:04-CV-1368 (HGM/DEP), 2006 WL 2827132, at *3 (N.D.N.Y.2006) (citing *De Jesus v. Sears, Roebuck & Co.* 87 F.3d 65, 70 (2d Cir.1996) (internal quotations omitted)). Thus, dismissal is only warranted if it appears, beyond a reasonable doubt, that the non-moving party cannot prove a set of facts which would support his or her claim or entitle him or her to relief. *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999).

When, as here, a party seeks dismissal against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)
(Cite as: 2008 WL 552872 (N.D.N.Y.))

[t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they 'suggest At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, .. or arguments that the submissions themselves do not "suggest, ..." that we should not "excuse frivolous or vexatious filings by *pro se* litigants" ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law ...."

*Id.* (citations and footnote omitted).

### B. Personal Involvement

Both defendants contend that Guarneri has failed sufficiently to allege their personal involvement.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

**\*4** *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

Despite Guarneri's submission of an amended complaint, he has failed to allege how Dr. Weitz was involved in the deprivation of his knee brace upon his arrival at Elmira Correctional Facility. Guarneri only references defendants Hazzard, Mace, and John Doe when discussing the events surrounding the confiscation of his knee brace. Am. Compl. at ¶ 19. Thus Guarneri fails to allege any facts indicating that Dr. Weitz was personally involved in those events.

However, Guarneri has contended that Dr. Weitz "denied [Guarneri] appropriate mental health care by not letting [him] speak to mental health counselors ..." and "refused [to] prescribe treatment for (herniated disk) in [sic] the lower back and neck [FN6] ... based on non-medical concerns like cost." Am. Compl. at ¶¶ 35, 30. These allegations specifically identify Dr. Weitz as a participant in the alleged medical indifference he suffered. Thus, Guarneri has succeeded in alleging facts, indicating that Dr. Weitz was personally involved in his medical care.

FN6. This allegation pertains solely to the neck and back injuries sustained in 2003. Those injuries occurring in 2000 have been dismissed as barred by the statute of limitations. *See infra* at subsection II(E).

Additionally, Sullivan has contended that Guarneri fails to allege her personal involvement. Guarneri alleges that the "State acted in concert with [County] defendants by not answering appeals of grievances submitted by [Guarneri] in a timely manner ...." Am. Compl. at ¶ 25. However, failing to "receive a response to a complaint ... is insufficient to establish personal involvement [especially when] there is no other showing that [defendant] knew of or directly participated in any alleged violation." *Abbas v. Senkowski,* No. 03-CV-476 (GLS/DRH), 2005 WL 2179426, at *2 (N.D.N.Y. Sept. 9, 2005). Additionally, Sullivan may not be held personally liable solely because of his supervisory position. Moreover, Guarneri does not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)
(Cite as: 2008 WL 552872 (N.D.N.Y.))

allege the creation or execution of an unconstitutional policy or negligent supervision. Thus, Guarneri's conclusory assertions are insufficient to provide a factual basis to support the personal involvement of Sullivan.

Therefore, it is recommended that Dr. Weitz's motion to dismiss be granted as to his involvement in the confiscation of the knee brace but denied with respect to his involvement in Guarneri's neck, back, and mental health treatments. Additionally, it is recommended that Sullivan's motion to dismiss be granted.

### C. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII. This includes the provision of medical care. Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir.1994). A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. Wilson v. Seiter, 501 U.S. 294, 297 (1991); Hathaway, 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." Hathaway, 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. Id. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Farmer v. Brennan, 511 U.S. 825, 844 (1994).

*5 " 'Because society does not expect that prisoners will have unqualified access to healthcare', a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir.2003) (quoting Hudson v. McMillian, 503 U.S. 1, 9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or

treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir.2003) (citing Chance, 143 F.3d at 702). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." Chance, 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. Id . at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a § 1983 claim." Magee v. Childs, No. 04-CV-1089 (GLS/RFT), 2006 WL 681223 at *4 (N.D.N.Y. Feb. 27, 2006). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. Hathaway v.. Coughlin, 99 F.3d 550, 553 (2d Cir.1996).

### 1. Knee

Guarneri may have offered evidence sufficient to conclude that the knee injury he sustained was serious. Generally, knee injuries have been "insufficient to trigger Eighth Amendment protection and support a deliberate indifference claim." Johnson v. Wright, 477 F.Supp.2d 572, 575 (W.D.N.Y.2007) (holding that a prisoner's torn meniscus suffered as a result of a basketball injury was not a serious medical need) (quoting Moody v. Pickles, No. 03-CV-850 (DEP), 2006 WL 2645124, at *6 (N.D.N.Y. Sept. 13, 2006) (holding that a "medial meniscal tear, with joint effusion" which did not render plaintiff immobile was not a serious medical need); see also Williamson v. Goord, No. 02-CV-521(GLS/GHL), 2006 WL 1977438, at *9, 14, 16 (N.D.N.Y. July 11, 2006) (holding that a prisoner's knee injuries including arthrosis, degenerative joint disease, and partially torn anterior cruciate ligament ("ACL"), did not constitute "death or degeneration, or [constitute the appropriate level of] extreme pain

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)
(Cite as: 2008 WL 552872 (N.D.N.Y.))

[contemplated by] the law").

**\*6** In this case, it is unclear how significantly the deprivation of Guarneri's knee brace affected his mobility as he has subsequently indicated his ability to ambulate. Docket No. 46 at 3. However, construing the facts in the light most favorable to Guarneri, the excruciating pain that he alleges may be of sufficient severity. *Id.* Therefore, viewing the evidence in the light most favorable to Guarneri, it appears that his knee injury was a serious medical condition.

Additionally, construing Guarneri's allegations as true, it appears that there exists a question of fact whether defendant acted with deliberate indifference to that medical condition. Guarneri contends that after he was prescribed the hinged knee brace, defendants intentionally interfered with his treatment by denying him use of the brace. Am. Compl. at ¶ 19. Moreover, Guarneri contends that defendants intentionally delayed transporting him to an emergency room when his knee gave way, causing him excruciating pain for an unnecessarily long period of time. *Id.* at ¶ 32.

Therefore, it is recommended that Dr. Weitz's motion on this ground be denied.

### 2. Mental Health

Guarneri also alleges that he suffered from and received inadequate medical treatment for PTSD, bipolar disorder, and depression. "Treatment of mental disorders of mentally disturbed inmates is ... a serious medical need" as contemplated by *Estelle. Guglielmoni v. Alexander, 583 F.Supp. 821, 826 (D.Conn.1984).* Thus, considering all of Guarneri's various complaints concerning his mental health, it is clear that he has alleged facts sufficient to provide relief as to whether he suffered a serious medical need as a result of his mental illnesses.

Moreover, Guarneri also contends that defendants have deliberately precluded him "from speaking to mental health counselors when hav[ing] mental health episodes ...." Am. Compl. at ¶ at 34-35. If proven, this constitutes

deliberate indifference to Guarneri's mental health needs. Therefore, it is recommended that Dr. Weitz's motion on this ground be denied.

### 3. Back

Guarneri alleges sufficient evidence to present a serious medical need. Other courts have held that "[s]evere back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment." *Nelson v. Rodas,* No. 01-CV-7887 (RCC/AJP), 2002 WL 31075804, at \*14 (S.D.N.Y. Sept. 17, 2002) (citations omitted); *see also, Farraday v. Lantz,* No. 03-CV-1520 (SRU), 2005 WL 3465846, at \*5 (D. Conn. Dec 12, 2005) (holding that "persistent[ ] complain[ts] of lower back pain caused by herniated, migrated discs [and] sciatica ..." leading to severe pain constitutes a serious medical need). Therefore, with regard to the 2003 back injury, Guarneri has alleged a serious medical need.

Additionally, Guarneri alleges that defendant Hazzard "deliberately and with malice denied adequate medical care ...." Am. Compl. at ¶ 23. Thus, construing these allegations in the light most favorable to Guarneri, he has alleged deliberate indifference to this medical need. Thus, it is recommended that defendant's motion on this ground be denied.

### D. Res Judicata/Collateral Estoppel

**\*7** "A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry,* 449 U.S. 90, 94 (1980) (applying res judicata to a 42 U.S.C. § 1983 action). Thus, to sustain a claim of res judicata, the defense must show that "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 285 (2d Cir.2000) (citations omitted). In New York State, the analysis is governed by the transactional approach in which later claims are barred if they "aris[e]

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)
(Cite as: 2008 WL 552872 (N.D.N.Y.))

out of the same factual grouping as an earlier litigated claim even if the[y are] ... based on different legal theories or seek[ ] dissimilar or additional relief." *Id.*

Under the Full Faith and Credit Clause of the Constitution, federal courts must grant state court judgments the same preclusive effects as those given to other courts located within the state. *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (citing *Migra v. Warren City Sch. Dist.,* 465 U.S. 75, 81 (1984)). However, the bar of res judicata will not apply where the original forum is incapable of providing the relief requested by the plaintiff. *Id.; Davidson v. Capuano,* 792 F.2d 275, 278 (2d Cir.1986). The Second Circuit has held that a plaintiff in a § 1983 action who is seeking damages will not be vulnerable to dismissal based upon res judicata, although, a similar plaintiff seeking injunctive relief will be. *Davidson,* 792 F.2d at 277-78; *Fay v. South Colonie Cent. Sch. Dist.,* 802 F.2d 21, 30 (2d Cir.1986).

As a threshold matter, Dr. Weitz correctly notes that Guarneri's previous lawsuit, also filed in the Northern District of New York, is still pending. *See Guarneri v. Bates,* No. 05-CV-444 (GLS/DRH) (report-recommendation of magistrate judge pending final decision before district court). Because the previous action has not received an adjudication on the merits, Dr. Weitz cannot overcome the first prong of the analysis. Thus, it is recommended that Dr. Weitz's motion on this ground be denied without prejudice.

In the alternative, Dr. Weitz also raises the broader affirmative defense of collateral estoppel. "Once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen,* 449 U.S. at 94 (1980). Collateral estoppel is applicable:

> [I]f (1) there has been a final determination on the merits of the issue sought to be precluded; (2) the party against whom ... preclusion is sought has a full and fair opportunity to contest the decision ...; and (3) the issue sought to be precluded by the earlier suit is the same issue involved in the later action.

*8 *Davis v. Halpern,* 813 F.2d 37, 39 (2d Cir.1987) (citation omitted). The requirement of a full and fair opportunity to contest requires that the plaintiff "was fully able to raise the same factual or legal issues" in the prior litigation as asserted in the present case. *LaFleur v. Whitman,* 300 F.3d 256, 274 (2d Cir.2002).

However, it is clear that there has not been a final determination in the pending federal case and Dr. Weitz, again, cannot surmount the first prong of the test. Therefore, Dr. Weitz's motion should be denied without prejudice on this ground as well.

**E. Statute of Limitations**

Dr. Weitz moves to dismiss Guarneri's Eighth Amendment allegations concerning inadequate treatment for his neck and back on the ground that they are barred by the statute of limitations. While there is no provision in § 1983, § 1988 provides that state law may apply if not inconsistent with the Constitution or federal law. 42 U.S.C. § 1988(a) (2003); *Moor v. County of Alameda,* 411 U.S. 693, 702-03 (1973). In New York, the applicable statute of limitations for a § 1983 suit is the three-year period governing suits to recover upon a liability created or imposed by statute. *See Owens v. Okure,* 488 U.S. 235, 249-51 (1989); *Romer v. Leary,* 425 F.2d 186, 187 (2d Cir.1970); N.Y. C.P.L.R. 214(2) (McKinney 2003).

Federal law governs the determination of the accrual date for purposes of a § 1983 claim. *Pearl v. City of Long Beach,* 296 F.3d 76, 80 (2d Cir.2002). The claim accrues "when the plaintiff knows or has reason to know" of the harm. *Id.* (citations omitted). "The crucial time for accrual purposes is when the plaintiff becomes aware that he [or she] is suffering from a wrong for which damages may be recovered in a civil action." *Singleton v. City of New York,* 632 F.2d 185, 192 (2d Cir.1980). With regard to medical indifference claims, the statute of limitations in a § 1983 suit is derived from personal injury case law, not medical malpractice. *See e.g. Owens,* 488 U.S. at 251.

Here, Guarneri's initial complaint was filed on August 14, 2006. Compl. (Docket No. 1). Thus, claims relating to medical indifference occurring in 2000 are clearly outside

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)
(Cite as: 2008 WL 552872 (N.D.N.Y.))

the three-year period. However, claims regarding deliberate indifference resulting in herniated discs occurring in 2003 may fall within the three-year statutory period depending on when in 2003 the conduct occurred. Therefore, claims relating to the second back injury in 2003 may present facts upon which relief may be granted depending on when in 2003 the claim is shown to have accrued. At this stage, liberally construing Guarneri's amended complaint, the allegations therein are deemed to assert that claim accrued after August 14, 2003.

Thus, Dr. Weitz's motion on this ground should be granted with regard to the neck and back injuries occurring in 2000 and denied with regard to the back injuries occurring in 2003.

### III. Conclusion

*9 For the reasons stated above, it is hereby **RECOMMENDED** that:

1. Sullivan's motion to dismiss (Docket No. 43) be **GRANTED** and that the amended complaint be **DISMISSED** in its entirety as to her;

2. Dr. Weitz's motion to dismiss (Docket No. 19) be:

a. **GRANTED** as to his lack of personal involvement with the confiscation of the knee brace;

b. **DENIED** as to his lack of personal involvement in Guarneri's neck, back, and mental health treatments;

c. **DENIED** as to Guarneri's back and neck injuries sustained in 2003; and

d. **GRANTED** as to Guarneri's back and neck injuries sustained in 2000; and

3. The amended complaint be **DISMISSED** without prejudice as to defendants Lamy and John Doe.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2008.
Guarneri v. Hazzard
Not Reported in F.Supp.2d, 2008 WL 552872 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 3465846 (D.Conn.)
(Cite as: 2005 WL 3465846 (D.Conn.))

H

Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
William FARADAY, Plaintiff,
v.
Theresa C. LANTZ, Michael E. Carter, and Edward
Blanchette, Defendants.
No. 3:03CV1520(SRU).

Dec. 12, 2005.

Norman A. Pattis, Williams & Pattis, New Haven, CT, for
Plaintiff.

Neil D. Parille, Attorney General's Office, Hartford, CT,
for Defendants.

*RULING ON DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT*

UNDERHILL, J.

**\*1** William Faraday, an inmate in the state prison system,
has brought this civil rights action, pursuant to 42 U.S.C.
§ 1983. Faraday alleges that his Eighth Amendment right
to be free from cruel and unusual punishment was violated
by defendants' deliberate indifference to his known
medical needs, namely "herniated, migrated discs" in his
lower back. In his complaint, he seeks compensatory and
punitive damages and injunctive relief against defendant
Edward Blanchette, M.D., the clinical director for the
Department of Correction ("DOC"), who has been sued in
his individual and official capacities. He also seeks
injunctive relief against defendant Theresa C. Lantz, the
DOC Commissioner, and defendant Michael E. Carter, the
former warden of MacDougall-Walker Correctional
Institution ("MacDougall"), both of whom are sued only

in their official capacities.

The defendants have moved for summary judgment
seeking judgment on the grounds that: (1) the undisputed
facts show that Dr. Blanchette was not deliberately
indifferent to Faraday's medical needs; (2) defendants
Lantz and Carter had no personal involvement in the
treatment decisions concerning Faraday and, therefore, are
not proper defendants; and (3) injunctive relief is not
warranted because the DOC is providing Faraday with
constitutionally appropriate care.

*Summary Judgment Standard*

The standard for granting a motion for summary judgment
is well-established. A moving party is entitled to summary
judgment "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to
any material fact and that the moving party is entitled to a
judgment as a matter of law." Fed.R.Civ.P. 56(c). The
burden of establishing that there is no genuine factual
dispute rests with the moving party. *See Gallo v.
Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219,
1223 (2d Cir.1994). In ruling on a summary judgment
motion, the court cannot resolve issues of fact. Rather, it
is empowered to determine only whether there are material
issues in dispute to be decided by the trier of fact. The
substantive law governing the case determines which facts
are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S.
242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In assessing the record to determine whether a genuine
dispute about a material fact exists, the court is required to
resolve all ambiguities and draw all reasonable inferences
in favor of the non-moving party. *Id.* at 255; *Matsushita
Electric Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574,
587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Summary
judgment is improper if there is any evidence in the record
that could reasonably support a jury's verdict for the
non-moving party." *Marvel Characters, Inc. v. Simon,* 310
F.3d 280, 285-86 (2d Cir.2002).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3465846 (D.Conn.)
(Cite as: 2005 WL 3465846 (D.Conn.))

*Factual Backgroud*

Faraday began his incarceration at Walker Prison on October 13, 1999. The medical intake forms from Walker indicate that Faraday gave a history of severe lower back pain and three ruptured discs in his lower back. He was referred to a medical doctor for evaluation. (Pl.'s Ex. 2.) The medical records indicate that he was seen in the medical clinic on October 25, 1999, October 29, 1999, December 2, 1999, and December 3, 1999, for continuing complaints of persistent back pain. (*Id.*) He was prescribed Motrin and Advil and given a medical pass for a bottom bunk and extra pillow. (*Id.*)

**\*2** On February 9, 2000, Faraday was transferred to MacDougall. A health history form dated February 16, 2000, indicates that Faraday provided a history of two ruptured discs. (Pl.'s Ex. 3.) The medical records show that Faraday was seen on February 20, 2000, for complaints of lower back pain due to a "known" diagnosis of three ruptured discs, specifically "(?L4, 5, + ?)," secondary to an old injury. The clinical notes indicate that Faraday described having pressure and pain, and limited range of motion. Ibuprofen was prescribed. Again, on February 28, 2000, Faraday was seen at the clinic with complaints of constant lower back pain with sciatica. X-rays were performed on March 22, 2000, at the request of Dr. Timothy Silvis, the staff doctor at MacDougall. The diagnostic radiologic report concluded:

There is no fracture or dislocation seen. Further workup with bone scan is recommended to rule out underlying destructive process involving the left pedicle of the L5 vertebral body. A CT scan of the lumbosacral spine may be necessary if bone scan findings are positive.

(Pl.'s Ex. 4.)

The record contains no medical records for 2001 relating to Faraday's back problems.

On January 17, 2002, Faraday filed an inmate request form asking to speak to the "M.D. (not sick call)" regarding his back, which was bothering him more than usual. He stated that it "comes and goes." He described his problem once again as "herniated migrated disks which ruptured into the vertibre [sic], pressing against my spinal column. Please see me ASAP." (Pl.'s Ex. 1.)

On May 2, 2002, Dr. Silvis sent a request to UCONN Correctional Managed Health Care's Utilization Review Committee, requesting an MRI of Faraday's spine to rule out disc disease.[FN1] The summary of his request set forth in the Utilization Review Report states that Faraday had been having increasing, intermittent low back pain this past year. No old medical records were available despite multiple requests. On the day of the request, Dr. Silvis stated that Faraday was having severe pain in his right leg when walking down stairs. On physical examination, he observed no loss of reflex, wide gait, no point tenderness. The Utilization Review Determination/ Recommendations were that Faraday should start a back exercise program and that Dr. Silvis should resubmit the request if there was no improvement in eight weeks or if there was a significant clinical change. (Pl.'s Ex. 5.)

FN1. In an affidavit filed with defendants's reply brief, Dr. Silvis now states that he submitted this form at the request of Faraday and that he personally did not believe an MRI was medically necessary. (Silvis Aff. ¶ 6.) At this stage of the proceeding, the court gives little credence to this statement, made during the course of litigation. Defendants have not produced a copy of Dr. Silvis' request, which presumably would bear some indication to confirm that the request was at the behest of Faraday, with which Dr. Silvis disagreed. Additionally, two years earlier, Dr. Silvis had stated that he recommended a further workup with bone scan and that a CT scan of the lumbosacral spine might be necessary. The Utilization Review Committee's response indicates that Dr. Silvis had reported that Faraday had been experiencing increasing, intermittent low back pain and severe pain in his right leg on the day of the request. Given these complaints and Dr. Silvis' earlier concerns that further workup, including a CT Scan, might be necessary, his statement that he did not believe an MRI was medically necessary cannot be credited at the summary judgment stage.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3465846 (D.Conn.)
(Cite as: 2005 WL 3465846 (D.Conn.))

On May 18, 2002, Faraday filed another inmate request form, seeking an egg crate foam mattress to alleviate his "continuing back problems, numbness of the arms and legs, and lack of sleep because of discomfort." (Pl.'s Ex. 1.) The response was that the doctor had ordered an x-ray of his cervical spine. (*Id.*) An x-ray performed on May 16, 2002, showed "degenerative disc changes at L4-5 and L5-S1." (Pl.'s Ex. 9.)

At some point, Faraday was admitted to Medical for three and one-half days because he could not walk and on two other occasions had to be taken to Medical in a wheel chair because he was unable to walk.[FN2]

> FN2. Faraday testified to these incidents during his state court habeas hearing (Tr. 28), but neither side has provided medical records relating to these incidents.

**\*3** During 2002, Faraday filed a number of inmate request forms for a pillow pass (to allow him to keep the second pillow he received at Walker), prescription refills, and an MRI, all related to his back problems. (Pl.'s Ex. 1.) Having failed to receive a positive response to these requests, Faraday filed a medical grievance. (*Id.*) Eventually, after his level-three grievance was not answered, Faraday filed a petition for writ of habeas corpus in state court, complaining that the conditions of his confinement were inhumane and dangerous because he had been denied the medical attention necessary to remedy, *inter alia,* his back condition consisting of herniated migrated disks.[FN3] In his petition, Faraday described constant discomfort and difficulty walking, sitting, and sleeping. He stated that, before his incarceration, he had planned to have surgery to remove the discs. He was requesting an MRI to confirm the condition of his back and the need for an operation. He also complained that the officers at MacDougall had refused to issue a double pillow pass. Thus, he requested an MRI to confirm his herniated, migrated disc, an operation to remedy the condition, a foam pad for his bed, and a pass allowing him to keep his second pillow. (Pl.'s Ex. 1.)

> FN3. Faraday also sought medication to lower his cholesterol, but that aspect of his habeas petition is not relevant to the issues presented

here.

A hearing on Faraday's habeas petition was held before the Hon. Richard M. Rittenband on April 16, 2003, at which Faraday and Dr. Blanchette, an internist and infectious disease specialist and the DOC clinical director, testified. Dr. Blanchette testified based on his review of Faraday's medical records, and discussions with Drs. Silvis and Lange, a doctor who he understood had treated Faraday prior to his incarceration.[FN4] Dr. Blanchette testified that a number of representations by Faraday "had been proven to be untrue," including "[f]or example, that he had an MRI of his back. There's no indication this ever occurred." (Tr. at 8.) He also questioned whether Faraday had actually been treated by some of the doctors or at certain hospitals. (Tr. 8-9.) He further testified that Faraday had

> FN4. Faraday explained in the hearing that he had treated with a Dr. Geiter (phonetic) who had since retired, and who had formerly worked in the same office as Dr. Lange. Faraday stated that he had never been treated by Dr. Lange and denied ever having told Dr. Silvis that he had been treated by Dr. Lange. (Tr. 10-11.)

no findings that would indicate ... that an MRI is necessary, and I certainly agree with all his physicians ... that Mr. Faraday is not someone that requires an MRI of his back or surgery.... I would be very much against doing this because it's not clinically indicated. (Tr. at 10.)

[T]he basic issue it comes down to medically ... is: Is this man a candidate for surgery-for neurosurgery-for discectomy and the way to determine that is our clinical findings, and clearly, regardless of what an MRI would show if-if we did it-the only reason to do it is to see, you know, to proceed with surgery otherwise there's no reason to do an MRI, and in this case there is no indication that this man would be a surgical candidate. He doesn't have the neurologic findings. His back pain comes and goes.... If he has exacerbations I would treat him as I would anyone on the street and that is with muscle relaxants and pain medication and bed rest until it-it relieved itself. (Tr. 14.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3465846 (D.Conn.)
(Cite as: 2005 WL 3465846 (D.Conn.))

**\*4** Following the hearing, Judge Rittenband denied Faraday's claim that defendants had been deliberately indifferent to his medical needs, subject to new information being provided to the court. (Tr. 19, 36.)

At the time of the hearing, Faraday only possessed part of his prior medical records. (Tr. 16.) He subsequently obtained his complete medical records from Manchester Memorial Hospital, which indicated that Faraday had been in a motor vehicle accident in 1990 and presented at the hospital the following day complaining of low back pain, pain upon lifting, stiffness and spasms in the lumbar paraspinal muscle. (Pl.'s Ex. 8.) Faraday was treated at the hospital again in 1992 for complaints of severe back pain, difficulty walking, and tingling in his right foot. (*Id.*) A CT Scan was performed on November 12, 1992, which showed "herniated migrated central right sided disc herniation at the L5-S1 level." (*Id.*)

Faraday filed a motion for reconsideration based on this new evidence, which was granted by Judge Rittenband. Faraday also filed another grievance, complaining that he was still being denied necessary medical treatment even after he supplied Dr. Silvis with proof that he had a herniated migrated disk. (Pl.'s Ex. 9.) His grievance was denied. (*Id.*) Finally, on October 15, 2003, an MRI was ordered for Faraday at the University of Connecticut Health Center. The conclusion on the MRI report was:

1. Degenerative disc disease with mild diffuse disc bulge at L4-5.

2. Small central disc protrusion with degenerative disc disease at L5-S1.

3. No evidence of any disc extrusion, central spinal canal and/or foraminal stenosis.

(Pl.'s Ex. 10.)

Subsequently, at a later state court hearing on February 14, 2005, Judge Rittenband held that the Warden's refusal to provide for a neurological evaluation constituted "deliberate indifference" to Faraday's medical needs. (Def.'s Reply Mem. at 6.) He then ordered the Warden to take Faraday for a neurological evaluation. (*Id.*) The Warden has moved for certification to appeal that decision. The outcome of that request is not known.

*Discussion*

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments, which includes punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). In order to establish an Eighth Amendment claim arising out of the denial of medical care, an inmate must prove deliberate indifference to his serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). This standard incorporates both objective and subjective components. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003). Thus, a prisoner must first make a showing of a serious illness or injury. *Hudson v. McMillan,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). A prisoner must then demonstrate that the prison official knew of and disregarded an "excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)) (internal quotation marks omitted). "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." *Smith,* 316 F.3d at 184.

*A. The Objective Test*

**\*5** Based on the facts of record, the court concludes that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3465846 (D.Conn.)
(Cite as: 2005 WL 3465846 (D.Conn.))

defendants are not entitled to summary judgment on the ground that Faraday's medical needs were not sufficiently serious to meet the objective test set forth in *Estelle v. Gamble, supra.* As the Second Circuit held in *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003), there is no precise, settled metric to guide the court in its estimation of the seriousness of a prisoner's medical condition. Any inquiry into the objective component of an Eighth Amendment claim must be tailored to the specific facts of each case. *Smith v. Carpenter,* 316 F.3d at 185. In *Chance v. Armstrong,* the Court set forth a non-exhaustive list of factors that are relevant to the inquiry whether a given medical condition is a serious one: (1) whether a reasonable doctor or patient would perceive the medical need in question as "important and worthy of treatment;" (2) whether the medical condition significantly affects daily activities; and (3) "the existence of chronic and substantial pain." 143 F.3d at 702.

There are numerous cases from this circuit and others finding various back conditions to be sufficiently serious to support an Eighth Amendment claim. *E.g., Veloz v. State of New York,* 339 F.Supp.2d 505, 522-24 (S.D.N.Y.2004) (various spinal and lower back conditions); *see also Hathaway,* 37 F.3d at 67 (2d Cir.1994) (finding as "serious" a hip condition that caused a prisoner a great deal of pain over an extended period of time and difficulty walking). That is not to say that all back problems and/or conditions meet this standard. Back conditions, like other medical conditions, vary significantly in severity. *See Chance,* 143 F.3d at 702. In this case, however, Faraday has produced medical records indicating that since his arrival at Walker in 1999, he has persistently complained of lower back pain caused by herniated, migrated discs, sciatica, severe pain walking downstairs, of pain and stiffness when he gets out of bed. He has also produced objective evidence in the form of a CT Scan report supporting his subjective complaints. Indeed, even Dr. Blanchette testified that Faraday had back pain and degenerative joint disease of his spine. (Tr. 21.) Defendants have produced no medical evidence that would lead this court to conclude that Faraday's evidence of his serious medical condition is too insubstantial to raise a genuine issue of material fact.

*B. The Subjective Test*

In addition, Faraday must show that a particular defendant knew and disregarded an excessive risk to inmate health and safety. *Farmer v. Brennan,* 511 U.S. at 837. Mere disagreement over the proper course of treatment is not sufficient. So long as the treatment that the prisoner received was adequate, the fact that he might have preferred a different treatment does not give rise to a constitutional claim. *See Chance,* 143 F.3d at 703. Additionally, negligence, without more, does not establish a violation of a prisoner's Eighth Amendment rights. *Id.*

**\*6** At the same time, "[i]n certain instances, a physician may be deliberately indifferent if he or she consciously chooses 'an easier and less efficacious' treatment plan." *Id.* (quoting *Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir.1974)). "Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case." *Id.* at 703-04 (finding that plaintiff's allegations, if true, that the doctors' recommendation of a certain course of treatment was based not on their medical views, but monetary incentives, was sufficient to show a culpable state of mind).

*1. Defendant Blanchette*

Dr. Blanchette is the Clinical Director of the Connecticut Department of Corrections, in which capacity he supervises the provision of medical care to inmates confined by the DOC. (Blanchette Aff. ¶ 5.) In addition to supervising the medical care provided to Faraday, Dr. Blanchette reviewed all of Faraday's medical records, spoke with Dr. Silvis, who treated Faraday at MacDougall, and attempted to obtain some of Faraday's pre-incarceration medical records from Dr. Lange. He testified on behalf of the Warden in Faraday's state habeas case, questioning Faraday's credibility about a prior diagnosis by MRI of herniated, migrated discs, and agreeing with "all his physicians" that an MRI was not necessary. Dr. Blanchette would not allow Faraday to have an egg crate foam mattress or second pillow, since these were not indicated for Faraday's condition. (Tr. 14, 21-22.) Contrary to Dr. Blanchette's testimony, Faraday has produced his clinical records from MacDougall, which include a report that a CT Scan of the lumbosacral spine may be necessary and a Utilization Review Report in which Dr. Silvis, as the "requestor," [FN5] had requested an

Not Reported in F.Supp.2d, 2005 WL 3465846 (D.Conn.)
(Cite as: 2005 WL 3465846 (D.Conn.))

MRI, but which request was denied. There is also a question presented by the evidence of record about how diligent the medical staff was in requesting Faraday's previous medical records.

FN5. *See* Note 1, *supra.*

Viewing the evidence in the light most favorable to Faraday, and drawing all reasonable inferences in his favor, the court finds sufficient evidence in the record from which a jury could find that defendant Blanchette intentionally disregarded certain of Faraday's medical records and his complaints of the severity of his condition and, thus, acted with deliberate indifference in denying Faraday's requests for a diagnostic MRI or other neurological consultation. A reasonable jury could find that, without trying to determine the source or cause of Faraday's complaints of severe pain, Dr. Blanchette simply dismissed his complaints. As the Second Circuit held in *Hart v. Blanchette,* No. 04-6399, 2005 WL 2300225, at *2 (2d Cir. Sept.21, 2005) (slip op.), in vacating in part the grant of summary judgment, "[w]hile the evidence at trial may establish only negligence, the determination of the difference between negligence and deliberate indifference is, in the circumstances of this case, one for the trier of fact to make." Therefore, the court will deny the defendants' motion for summary judgment insofar as it pertains to Faraday's claims for money damages and injunctive relief against defendant Blanchette.

*2. Defendants Lantz and Carter*

**\*7** It is unnecessary to reach the issue whether defendants Lantz and Carter acted with deliberate indifference because they were not sufficiently involved with the alleged deprivation of medical care to be liable under section 1983.

In support of their motion for summary judgment, defendants provided the affidavit of Dr. Blanchette in which he testified that defendant Lantz, the DOC Commissioner, and defendant Carter, the former warden of MacDougall, were not medical professionals and had no involvement in the day-to-day medical treatment of inmates.

For liability to exist under 42 U.S.C. § 1983, a defendant must be personally involved in the underlying conduct or events, such that he subjects or causes the plaintiff to be subjected to a violation of constitutional rights. *See Provost v. City of Newburgh,* 262 F.3d 146, 154 (2d Cir.2001). Personal liability cannot be imposed on a state official based on a theory of respondeat superior. *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In the Second Circuit, personal involvement of a supervisory official may be established when:

(1) the official participated directly in the alleged constitutional violation;

(2) the official, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the official created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the official was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the official exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*See Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003), *cert. denied,* --- U.S. , 543 U.S. 1093, 125 S.Ct. 971, 160 L.Ed.2d 905 (2005); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). "Some personal responsibility on the part of the officer must be established and proof of linkage in the prison chain of command is sufficient to establish liability." *Veloz,* 339 F.Supp.2d at 519 (quoting *Hernandez v. Keane,* 341 F.3d at 145) (internal quotation marks omitted).

Faraday relies on the fact that he filed several grievances

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3465846 (D.Conn.)
(Cite as: 2005 WL 3465846 (D.Conn.))

concerning his inadequate medical care as evidence that defendants Lantz and Carter were aware of the constitutional violations but failed to intervene. There is nothing in the record, however, indicating that any of those requests or grievances were sent to defendants Lantz or Carter. In fact, it appears that by 2002, when these requests and grievances were filed, the warden at MacDougall was Brian Murphy. (Pl.'s Ex. 1.)

Neither a "receipt of letters or grievances," *Woods v. Goord,* No. 01 Civ. 3255(SAS), 2002 WL 731691, at *7 (S.D.N.Y. Apr.23, 2002) (collecting cases), nor allegations that an official ignored a prisoner's letter or grievance, is sufficient to establish personal liability for purposes of section 1983. *See Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *Atkins v. County of Orange,* 251 F.Supp.2d 1225, 1233 (S.D.N.Y.2003). Faraday has failed to set forth any facts that either of these defendants violated Faraday's constitutional rights either directly or as a supervisor, or that they were aware of the alleged violations and failed to take action to prevent these violations. Accordingly, summary judgment is granted in favor of Lantz and Carter on Faraday's claims against them.

*Faraday's Claims for Injunctive Relief*

**\*8** Defendants urge this court to grant summary judgment on Faraday's claims for injunctive relief on the ground that the DOC is affording adequate medical care to Faraday. In particular, they note that Faraday has had an MRI, which was part of the relief he was requesting. Obviously the court would not order medical tests that have been performed and are no longer necessary. Still, Faraday may still have an Eighth Amendment claim for the delay in treatment. *See Smith v. Carpenter,* 316 F.3d at 186. Whether Faraday is now being afforded proper medical care is an issue that goes to the issue of damages and appropriate injunctive relief, assuming liability is found. That issue cannot be resolved on the basis of the summary judgment papers now before the court.

*Conclusion*

For the reasons set forth above, the court GRANTS

defendants' motion for summary judgment with respect to the claims against defendants Lantz and Carter. Because there are genuine issues of material fact whether defendant Blanchette was deliberately indifferent to Faraday's serious medical needs, the court DENIES the motion for summary judgment with respect to Faraday's claims against defendant Blanchette.

SO ORDERED.

D.Conn.,2005.
Faraday v. Lantz
Not Reported in F.Supp.2d, 2005 WL 3465846 (D.Conn.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 2431948 (S.D.N.Y.)
(Cite as: 2009 WL 2431948 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Andrew WILLIAMS, Plaintiff,
v.
J(A) SMITH (First Deputy Supt.), Dr. J. Perilli
(F.H.S.D.), Mrs. Capuano (Nurse Admin.), Mr.
Williams (Physician Assistant), T.G. Eagan (Grievance
Director), Sergeant Krusen, Sergeant MacNamara,
Correction Officer Clark, Correction Officer
Maldonado, Correction Officer Goffe, Defendants.
**No. 02 Civ. 4558(DLC).**

Aug. 10, 2009.

West KeySummary
**Prisons 310** 🔑 **192**

310 Prisons
    310II **Prisoners and Inmates**
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In General. Most Cited Cases

**Sentencing and Punishment 350H** 🔑 **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical Care and Treatment.
Most Cited Cases
A prison doctor was not deliberately indifferent to a
**prisoner's** serious medical need in violation of the Eighth
Amendment when he determined that morning showers
were no longer necessary to treat the **prisoner's** back
condition. The **prisoner** argued that the doctor had denied
the request for continued daily showers because the
**prisoner** had filed grievances about the security staff not

allowing him to take the daily morning showers. However,
the **prisoner** failed to raise a question of material fact as
to whether the doctor acted with the necessary intent.
U.S.C.A. Const.Amend. 8.

Andrew Williams, Woodbourne, NY, pro se.

Thomas M. Biesty, State of New York, Office of the
Attorney General, New York, NY, for Defendants.

*OPINION & ORDER*

DENISE COTE, District Judge.

**\*1** Andrew Williams ("Williams"), an **inmate** at Sing Sing
Correctional Facility ("Sing Sing"), has brought this *pro
se* civil rights action pursuant to 42 U.S.C. § 1983 against
First Deputy Superintendent Joseph Smith ("Smith"),
Facility Health Services Director John Perilli ("Perilli"),
Nurse Administrator Kimberly Capuano ("Capuano"),
Physician Assistant Phillip Williams ("P.A.Williams"),
Grievance Director Thomas Eagan ("Eagan"), Sergeants
John MacNamara ("MacNamara") and Robert Krusen
("Krusen"), and Corrections Officers John Clark
("Clark"), Enrique Maldonado ("Maldonado"), and
Melvin Goffe ("Goffe") (collectively, "Defendants") [FN1]
for their deliberate **indifference** to his serious **medical**
needs in violation of the **Eighth Amendment**, and for
retaliation in violation of the First Amendment. Williams
had an arthritic right knee and he injured his back in 1996.
He had back surgery in 1997. This lawsuit complains that
the defendants failed to accommodate these ailments
following that surgery, in particular by denying him access
to daily morning showers to relieve his **back pain** and
requiring him to climb stairs despite his knee condition.
Defendants have moved for **summary judgment**. For the
following reasons, **summary judgment** is granted in part.

FN1. Williams also named Physical Therapist
Mr. Abraham as a defendant in his Amended
Complaint. The Court noted in its September 18,
2003 Memorandum and Order that the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)
(Cite as: 2009 WL 2431948 (S.D.N.Y.))

had provided no proof of service of Abraham. Plaintiff having failed to cure this defect, this Order and Opinion does not address Williams's allegations concerning Abraham.

Background

Unless otherwise noted, the following facts are undisputed. While an **inmate**, Williams fell down a flight of stairs in 1996 and hurt his back, suffering multiple disc herniations. In December 1997, Williams underwent surgery for these injuries. After he returned to Sing Sing later that month, he continued to suffer from degenerative disc disease in his spine and a bulging disc and herniation in his back. In addition, he suffered from arthritis in his right knee.

Soon after Williams returned to Sing Sing following surgery, Sing Sing began referring him to outside specialists and physical therapists regularly, often multiple times per month. Between his 1997 surgery and the filing of this **summary judgment** motion, he had over 100 medical consultations. He was regularly given pain and anti-inflammatory medication, was provided with a back brace, and was issued medical passes that were supposed to allow him to be moved to the flats,[FN2] to take a daily shower, to use the elevator, to sleep on a firm bed, and to be served dinner in his cell on a "feed-up" tray.[FN3] Nonetheless, Williams experienced pain, tenderness, and decreased range of motion in his back and legs through his filing of this suit in 2002.

> FN2. A flats pass allows an **inmate** to be housed on the first floor of a facility so as to avoid climbing stairs.

> FN3. The pass allowing an **inmate** to have dinner delivered to his cell is called a feed-up pass.

*Daily Morning Shower*

Williams complained frequently about back pain that

occasionally radiated to his shoulders, buttocks, and legs. He had difficulty "bending, twisting, standing or sitting for long duration ... [and] with certain movements and lifting heavy objects." Williams also complained about pain, stiffness, tightness, and spasms in his back, particularly in the morning. Outside specialists prescribed daily morning showers as heat treatment to alleviate these symptoms.

**\*2 Inmates** at Sing Sing are generally entitled to shower three evenings per week. Beginning in 1999, Williams was issued a medical pass for a daily morning shower. Despite his possession of that pass, Williams asserts that on occasion certain defendants refused to honor his right to a daily morning shower, and instead allowed him to shower only three evenings per week.

a. Goffe, Maldonado, MacNamara, Krusen and Smith

Williams presented a valid pass for his daily morning showers to officers Goffe and Maldonado for the first time on April 30, 1999.[FN4] Despite this pass, Goffe and Maldonado refused to permit a morning shower, asserting their understanding that administrative and safety considerations, as well as the housing block operating policy, did not allow **inmates** to take morning showers unless they were in keeplock (i.e., confined to their cells) or were **inmate** porters. Goffe and Maldonado consulted their superiors Krusen and MacNamara in making this determination. After this incident, officers repeatedly refused to honor his shower pass. In September 1999, Williams filed a grievance about the denial of his morning showers, which Smith asserts he rejected in reliance on "the medical department's conclusion that plaintiff did not need morning showers." He wrote on the denial that "although [Williams's] pass says AM showers, block policy dictates otherwise," and "staff can find no reason for AM shower."

> FN4. Williams's medical record shows that an outside specialist first prescribed hot showers on April 23, 1999. Before that date, he was prescribed "moist heat" and heat packs.

b. Capuano and Eagan

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)
(Cite as: 2009 WL 2431948 (S.D.N.Y.))

When Williams's September 1999 grievance was denied, he appealed to the Central Office Review Committee ("CORC") in Albany. CORC asked Nurse Capuano for information regarding the underlying events. According to Capuano, she spoke with Dr. Perilli about Williams's case and then relayed to CORC that Williams did not need daily morning showers. Relying on evidence showing that Capuano spoke to Dr. Perilli on December 23, 1999, eight days after CORC had already denied Williams's grievance on December 15, and on evidence that Dr. Perilli did not withdraw the authorization for Williams to have a daily shower until the following year, Williams claims that Capuano never spoke to Dr. Perilli about this appeal, and instead changed Williams's treatment plan herself.

As Director of the **Inmate** Grievance Program for the New York State Department of Correctional Services, Eagan was responsible for the administrative function of the **inmate** grievance program. Although was not a voting member of CORC, he signed the December 15, 1999 CORC decision. Williams claims that Eagan was aware of Capuano's alleged misrepresentation and did not intervene. Williams does not explain how Eagan learned of Capuano's alleged misrepresentation.

c. P.A. Williams

On July 31, 2000, an outside specialist wrote in Williams's medical chart "Daily shower x 3 mos (for lumbar pain)-AM." Williams claims that when P.A. Williams reviewed this instruction, he crossed out "AM" and wrote "not indicated, has daily shower written 6/27 x 3 mos." P.A. Williams does not remember reviewing this entry for "AM" showers, and neither admits nor denies that the handwritten annotation was his. He adds that if he altered the prescription for a pass, he did so because it called for a morning shower, and the medical pass form did not permit the designation of a time for showers. Although he authorized thousands of daily shower passes, as a general practice, he authorized passes for a certain time of day "extremely rarely" because "facility, security and administrative policies weighed against" doing so.

d. Dr. Perilli

**\*3** Dr. Perilli began serving as Facility Health Services Director in December 1999. Williams had a daily morning shower pass at that time and Dr. Perilli renewed it. On October 16, 2000, however, Dr. Perilli reviewed Williams's medical chart and wrote in it *"no need for daily shower based on his medical diagnosis."* At a November 16, 2000 consultation, Dr. Perilli refused to renew Williams's pass for daily morning showers. Dr. Perilli noted in Williams's medical file on that date, "discussion held about shower pass-[patient] has chronic back problem. I will recommend shower per block, but *not* daily showers."

Williams claims that Dr. Perilli denied his request for daily shower passes at the November 16 meeting for non-medical reasons. Williams says that he told Dr. Perilli at the meeting that he had filed grievances in September 1999 about the security staff not allowing him to take daily morning showers. In response, Dr. Perilli said "you file[d] grievance[s], oh I don't know about this," shook his head, and rescinded Williams's shower pass. Williams also claims that Dr. Perilli told him at this meeting that he would no longer issue daily morning shower passes because the security staff did not want to honor them, and the administration wanted Dr. Perilli to reduce the number of medical passes issued.

On November 20, Dr. Perilli wrote in Williams's medical file

I have reviewed ortho consultation 11-14-00 + recommendation for shower. Any outside consultant recommendations are always subject to provider review + DOC policies. As this is a chronic condition, there is no specific indicator for a daily shower (i.e., acute sprain, colostomies, etc.), but I will give shower per block [policy].

Subsequently, a number of outside specialists and physical therapists recommended daily morning showers, but Dr. Perilli repeatedly declined to issue Williams a pass for such showers, asserting it was not medically necessary.

e. Williams's Assertions of Pain Related to Deprivation of Daily Morning Showers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)
(Cite as: 2009 WL 2431948 (S.D.N.Y.))

On November 11, 1999, Williams reported to a physical therapist that his back pain was an eight out of ten in intensity, and that this pain was relieved by hot showers. At a physical therapy appointment on April 5, 2000, he reported that showers relaxed his back, and at an appointment eight days later, the physical therapist noted that Williams's back was responding to heat and stretching. Williams asserts that he reported to an outside orthopedic specialist on November 14, 2000 that his back pain and spasms were reduced with heat treatment, but Williams's medical record does not reflect such a comment.

Williams's complaints about his back after Dr. Perilli terminated his shower pass on November 16, 2000 were similar to his complaints before. In both time periods, he complained about back spasms, back pain radiating to other parts of his body, and difficulty sitting. Williams does not make specific assertions, in either his medical records or in his opposition to this motion, that his back pain increased after Dr. Perilli terminated his daily morning shower pass. On September 25, 2002, almost two years after Dr. Perilli terminated Williams a daily morning shower pass, Williams reported his pain to be a persistent five to seven out of ten in intensity, a decrease from the eight he reported November 1999.

*Climbing Stairs*

**\*4** Williams had right knee surgery in 1996. Subsequently, he suffered from arthritis, stiffness, limited range of motion, and pain. As a result, doctors recommended that Williams limit his stair climbing.

a. Feed-Up and Flats Passes

Williams was issued feed-up and flats passes so he would not have to climb stairs regularly. He claims that he presented valid feed-up and flats passes on April 30, 1999 to officers Goffe and Maldonado. Williams claims Goffe and Maldonado said they would work on accomodating these passes. A month and a half later, Williams started receiving his feed-up tray. He does not claim defendants

rejected his feed-up pass or directly interfered with it in any way. Goffe, Maldonado, and Krusen assert that they had no role in determining whether Williams should be served meals in his cell or in implementing such an accommodation; Krusen asserts that he did not even know about Williams's request.

Goffe, Maldonado, and Krusen claim they also had no role in the decision to move Williams to a new cell. Williams says Goffe and Maldonado intentionally delayed his move to the flats, never notified the appropriate authorities about his request, and told him the more he asked the longer he had to wait to be moved. Williams does not explain how Krusen delayed his move to the flats; he asserts only that Krusen told him that there was no room in the flats and that a gallery officer would inform him when there was room. Williams claims that other **inmates** were being moved to the flats ahead of him. He was moved to the flats in October 2000, eighteen months after first presenting his flats pass.

b. Fishkill Stairs

Sing Sing sent Williams to Fishkill Correctional Facility ("Fishkill") for physical therapy from April 1999 through December 2000. Clark worked at Fishkill and escorted Williams to the clinic there a number of times. Williams claims that "on approximately 10 occasions" Clark refused to allow Williams to use the elevator, and, instead, made Williams walk up six flights of stairs to the treatment unit, despite the fact that he had an elevator pass at Sing Sing. Williams claims that on April 13, 2000, Clark told him the elevator was not working properly and was only to be used in emergencies; after he walked up the stairs, though, he saw other **inmates** using the elevator. Williams refused to attend therapy sessions at Fishkill in October, November, and December 2000. He was discharged from the Fishkill clinic in December because of his refusal to attend, and he was immediately sent to another facility for therapy where he did not need to walk up stairs.

c. Williams's Assertions of Pain Related to Climbing Stairs

Over the course of the period in question, Williams

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)
(Cite as: 2009 WL 2431948 (S.D.N.Y.))

complained about knee pain at dozens of medical consultations. He had limited range of motion in his right knee, complained about it giving out occasionally and being painful on range of motion tests, and he was diagnosed with right knee effusion.[FN5]

FN5. Knee effusion is a condition where excess fluid accumulates in and around the knee joint.

**\*5** Doctors recommended that he limit his stair climbing. Williams does not make specific assertions about the quantity or quality of pain he experienced directly related to climbing stairs. He instead asserts generally that he had "perplexities" walking up stairs, and that he eventually refused to attend physical therapy at Fishkill because it was too painful to walk up six flights of stairs to the treatment unit.

Procedural History

Williams filed an amended complaint on November 12, 2002. Defendants moved to dismiss the suit on January 22, 2003. By a Memorandum and Order dated September 18, 2003, the Honorable Lawrence McKenna, to whom this case was then assigned, granted the motion to dismiss with respect to only one defendant, Superintendent Brian Fisher. Defendants filed a motion for **summary judgment** on May 15, 2007, which became fully submitted on March 5, 2009. On June 5, 2009, this case was reassigned from Judge McKenna to this Court.

DISCUSSION

**Summary judgment** may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the court must view all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986);

*Sista v. CDC Ixis N. Amer., Inc.,* 445 F.3d 161, 169 (2d Cir.2006). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot rest "merely on allegations or denials in its own pleading." Fed.R.Civ.P. 56(e); *accord Sista,* 445 F.3d at 169. "It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they *suggest." Triestman v. Fed. Bur. of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (per curiam) (citation omitted).

This Opinion first addresses Williams's Eighth Amendment claim, discussing in turn: personal involvement, deliberate indifference, and qualified immunity. This Opinion then discusses Williams's First Amendment retaliation claim.

*Personal Involvement*

Defendants Smith and Eagan move for **summary judgment** on the ground that they were not personally involved in the alleged deprivation of Williams's rights. Section 1983 provides in part that

[e]very person who, under color of any statutes, ordinance, regulation, custom or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured.

**\*6** 42 U.S.C. § 1983. To state a claim under Section 1983, a plaintiff must show: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages." *Roe v. City of Waterbury,* 542 F.3d 31, 36 (2d Cir.2008).

A defendant's conduct must be a proximate cause of the claimed violation in order to find that the defendant deprived the plaintiff of his rights. *Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). As a consequence, "the doctrine of respondeat

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)
(Cite as: 2009 WL 2431948 (S.D.N.Y.))

superior ... does not suffice to impose liability for damages under section 1983 on a defendant acting in a supervisory capacity." *Hayut v. State Univ. of N.Y.,* 352 F.3d 733, 753 (2d Cir.2003); *see also Reynolds v. Giuliani,* 506 F.3d 183, 190-191 (2d Cir.2007) (discussing municipal liability). It is thus "well settled" that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (citation omitted); *accord Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009).

The personal involvement and liability of supervisory personnel is established when the supervisory official has "actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act." *Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989) (citation omitted); *Blyden v. Mancusi,* 186 F.3d 252, 265 (2d Cir.1999). Thus, a plaintiff may establish a supervisor's personal involvement by showing that the supervisor:

> (1) directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated.

*Iqbal v. Hasty,* 490 F.3d 143, 152-153 (2d Cir.2007) (citation omitted).

Defendants argue that Smith and Eagan are entitled to **summary judgment** as they were not personally involved in the alleged deprivation of Williams's rights. Williams has not asserted that either Eagan or Smith were directly involved in interfering with Williams's medical treatment. Williams instead argues that Eagan is liable because he was aware of Capuano's alleged misrepresentation and failed to intervene. Williams has failed, however, to explain how Eagan became aware of Capuano's alleged misrepresentation or how he was otherwise personally involved in the deprivation of his rights. Eagan is therefore entitled to **summary judgment**.

Williams argues that Smith was personally involved in depriving Williams of his rights by denying Williams's grievance. Under Second Circuit law, it is "questionable" whether Smith's denial of Williams's grievance constitutes sufficient personal involvement to make him liable. *McKenna v. Wright,* 386 F.3d 432, 437-38 (2d Cir.2004). *See also Rahman v. Fisher,* 607 F.Supp.2d 580, at 585 (S.D.N.Y.2009) (personal involvement may exist where supervisor fails to act on reports of violation and violation continues). It is not necessary to reach this issue, though, as Smith is entitled to **summary judgment** on Williams's deliberate indifference claim for other reasons, as discussed below.

*Deliberate Indifference*

**\*7** All of the defendants argue that Williams has failed to show that he suffered a serious lapse in care for his back and knee conditions or that the defendants were deliberately indifferent to his medical needs. Although the "Eighth Amendment imposes a duty upon prison officials to ensure that **inmates** receive adequate medical care," it is well-established that "not every lapse in medical care is a constitutional wrong." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). "[A] prison official violates the Eighth Amendment only when two requirements are met." *Id.* (citation omitted). The first requirement is that the alleged deprivation must be "sufficiently serious." *Id.* (citation omitted). The second requirement is that the "charged official must act with a sufficiently culpable state of mind." *Id.* at 280.

To determine whether the deprivation was sufficiently serious, a court must first ascertain whether "the **prisoner** was actually deprived of adequate medical care," keeping in mind that "the prison official's duty is only to provide reasonable care." *Id.* at 279. An **inmate** is not entitled to treatment by every available medical alternative as long as his treatment is reasonable. *Estelle v. Gamble,* 429 U.S. 97, 107, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Nonetheless, even if a plaintiff receives "extensive" and "comprehensive, if not doting, health care," he may still be able to identify deficiencies in care that establish a deliberate indifference claim, particularly when the issue is a failure to treat pain. *Archer v. Dutcher,* 733 F.2d 14,

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)
(Cite as: 2009 WL 2431948 (S.D.N.Y.))

16 (2d Cir.1984).

A court must consider whether any deprivation was itself "sufficiently serious." *Salahuddin,* 467 F.3d at 280. This inquiry requires an examination of "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the **prisoner**." *Id.* If the inadequacy at issue is "a failure to provide any treatment for an **inmate's** medical condition, courts examine whether the **inmate's** [underlying] medical condition is sufficiently serious." *Id.* If, however, "the inadequacy is in the medical treatment given, the seriousness inquiry is narrower." *Id.* Then, "it's the particular risk of harm faced by a **prisoner** due to the challenged deprivation of care, rather than the severity of the **prisoner's** underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir.2003). Even in cases where an **inmate** "suffers from an admittedly serious medical condition," if the alleged deficiencies in treatment are "minor and inconsequential," those lapses will not sustain an Eighth Amendment claim. *Id.* "[T]he actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the **prisoner** to a significant risk of serious harm." *Id.* at 187.

**\*8** "Because the objective component of an Eighth Amendment claim is necessarily contextual and fact-specific, the serious medical need inquiry must be tailored to the specific circumstances of each case." *Id.* at 185 (citation omitted). Courts use a number of factors to determine whether a medical condition is serious. These factors, which are also instructive in determining whether the medical consequences of a denial of certain treatment are serious, include: "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin,* 467 F.3d at 280 (citation omitted). "Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* at 279 (citation omitted).

Second Circuit decisions have primarily discussed the serious medical need standard in the context of total failures to treat underlying medical conditions. *Smith,* 316 F.3d at 184 n. 8. In this context, courts in this district have determined that claims that fail to meet the constitutional standard of seriousness include: a "cut finger, even where skin is ripped off," *Sonds v. St. Barnabas Hosp. Correctional Health Servs.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001); a broken finger, *Henderson v. Doe,* No. 98 Civ. 5011(WHP), 1999 WL 378333, at *2 (S.D.N.Y. June 10, 1999); and a foot condition involving a fracture, bone cyst and degenerative arthritis, *Veloz v. New York,* 35 F.Supp.2d 305, 312 (S.D.N.Y.1999). Claims that have met the constitutional standard of seriousness include failures to treat, *inter alia:* a painful facial keloid scar, *Brock v. Wright,* 315 F.3d 158, 162-63 (2d Cir.2003); a dental cavity at risk of "acute infections, debilitating pain and tooth loss," *Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000); abscessed teeth causing "great pain" for six months and tooth degeneration, *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998); ruptured Achilles tendon that resulted in swelling and pain, *Hemmings v. Gorczyk,* 134 F.3d 104, 106-09 (2d Cir.1998) (per curiam); eye problems that resulted in loss of vision in one eye, *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996); and three-year extreme hip pain caused by embedded broken pins, *Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994).

The question of whether persistent back pain rises to a level of constitutional significance depends upon the circumstances of the particular case presented. *Compare Mendoza v. McGinnis,* No. 05 Civ. 1124 (TJM/DEP), 2008 WL 4239760, *10 (N.D.N.Y. Sept.11, 2008) (finding degenerative disc disease to constitute a serious medical need); *Guarneri v. Hazzard,* No. 06 Civ. 0985, 2008 WL 552872, at * 6 (N.D.N.Y. Feb. 27, 2008) ("Severe back pain, especially if lasting an extended period of time, can amount to a serious medical need under the Eighth Amendment.") (citation omitted); *Faraday v. Lantz,* No. 03 Civ. 1520(SRU), 2005 WL 3465846, at *5 (D. Conn. Dec 12, 2005) (persistent complaints of "lower back pain caused by herniated, migrated discs [and] sciatica" leading to severe pain constitutes a serious medical need), *with Cain v. Jackson,* No. 05 Civ. 3914(LAP), 2007 WL 2193997, *6 (S.D.N.Y. July 27, 2007) (degenerative disc disease in cervical spine, which was compounded when plaintiff fell from her cell bunk and injured her back, was not sufficiently serious); *Jackson v. Fairchild,* No. 04 Civ. 73 (FJS/DRP), 2007 U.S. Dist. LEXIS 17497, *5, *9 (N.D.N.Y Mar. 12, 2007) (back pain did not constitute serious medical need where

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)
(Cite as: 2009 WL 2431948 (S.D.N.Y.))

despite being seen frequently by prison medical officials, plaintiff "did not voice a significant number of concerns regarding pain, nor did he request pain medication beyond simple Ibuprofen and similar over-the-counter medications."); *Veloz v. New York,* 339 F.Supp.2d 505, 522-26 (S.D.N.Y.2004) (plaintiff's chronic back pain and mild to moderate degenerative arthritis of spinal vertebrae did not establish a serious medical need); *Davis v. Reilly,* 324 F.Supp.2d 361, 368 (E.D.N.Y.2004) (A "sprained back and neck ... do not constitute a serious medical condition.").

**\*9** To show that a defendant acted with a sufficiently culpable state of mind, "it suffices if the plaintiff proves that the official acted with deliberate indifference to **inmate** health," which "is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280. "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious **inmate** harm will result." *Id.*

Prison medical staff is given wide discretion in determining how to treat **inmates**. In this context, "[t]he decisions of physicians regarding the care and safety of patients are entitled to a presumption of correctness." *Kulak v. City of New York,* 88 F.3d 63, 77 (2d Cir.1996) (citation omitted); *Church v. Hegstrom,* 416 F.2d 449, 450 (2d Cir.1969) (Section 1983 "does not authorize federal courts to interfere in the ordinary medical practices ... of state prisons."). As such, a disagreement between an **inmate** and medical personnel over the course of treatment does not give rise to a deliberate indifference claim. *Chance,* 143 F.3d at 703. Moreover, a prison doctor who relies on his medical judgment to modify or disagree with an outside specialist's recommendation of how to treat an **inmate** is not said to act with deliberate indifference. *See, e.g., Revenell v. Van Der Steeg,* No. 05 Civ. 4042(WHP), 2007 U.S. Dist LEXIS 17868, \*16-17, 2007 WL 765716 (S.D.N.Y. Mar. 14, 2007); *Sully-Martinez v. Glover,* No. 00 Civ. 5997(GEL), 2001 WL 1491278, \*4 (S.D.N.Y. Nov.26, 2001).

Non-medical prison staff cannot, however, alter an **inmate's** treatment plan. "Prison officials are more than merely negligent if they deliberately defy the express instructions of a **prisoner's** doctors." *Gill v. Mooney,* 824

F.2d 192, 196 (2d Cir.1987). "[A] deliberate indifference claim can [therefore] lie where prison officials deliberately ignore" such medical recommendations. *Johnson v. Wright,* 412 F.3d 398, 404 (2d Cir.2005).

a. Shower Pass

Defendants argue that they are entitled to **summary judgment** because the denial of Williams's daily morning showers did not cause a serious enough injury to sustain an Eighth Amendment claim. Defendants point to the fact that Williams received extensive treatment for his back, including surgery, pain and anti-inflammatory drugs, a back brace, and regular physical therapy sessions, which Williams admits helped the very back condition for which the showers were prescribed. Dr. Perilli opines that denial of Williams's daily showers did not create a serious risk of harm. Williams does not show that he suffered greater back pain in the periods when he was denied daily morning showers than when he was permitted them. In fact, almost two years after Dr. Perilli refused to renew Williams's shower pass, Williams reported his back pain to be somewhat less intense than it was during a period when he was taking daily morning showers. Moreover, Williams has made no showing that the lack of showers affected his daily activities.

**\*10** Williams does, however, show contemporaneous reports by him and by his doctors that daily morning showers helped his painful back condition. In addition, outside specialists repeatedly found Williams's back condition and his need for daily morning showers worthy of comment. Moreover, a failure to treat serious, chronic pain adequately when such treatment is available can constitute a sufficiently serious deprivation of medical care. *See Salahuddin,* 467 F.3d at 281 (applying presumption that five month failure to treat pain causes sufficiently serious harm). This is true even when other, substantial medical care is given for the underlying condition. Although the record suggests that Williams may have difficulty meeting the seriousness inquiry at trial, all inferences must be drawn in Williams's favor at the **summary judgment** stage, particularly because he is proceeding *pro se.* As such, although not every denial or even series of repeated denials of medical showers constitutes a serious medical injury, the record does not permit a finding as a matter of law that the deficiency in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)
(Cite as: 2009 WL 2431948 (S.D.N.Y.))

Williams's treatment was "minor and inconsequential," or that the deficiency did not create "a significant risk of serious harm." *Smith*, 316 F.3d at 187. Williams's papers must be read as showing that for approximately a year and a half, until Dr. Perilli revoked his medical pass for daily morning showers, the defendants denied him medically prescribed treatment for the chronic pain he experienced due to a back injury from which no one disputes that Williams suffered.

Defendants argue that they are entitled to **summary judgment** on the second prong of the deliberate indifference inquiry. Indeed, Smith and Dr. Perilli are. Smith asserts that he deferred to the medical staff's recommendation to deny Williams's grievance. Williams does not contest that Smith did so; and Williams offers no evidence that raises a question as to whether Smith actually took this course of action or whether this course of action reflected recklessness. Dr. Perilli shows that in his medical opinion he determined daily morning heat treatment was no longer necessary for Williams's condition. As discussed below, Williams attempts but fails to raise a question as to whether Dr. Perilli's decision was based on an ulterior motive rather than on medical judgment. Williams therefore has not raised a question of material fact as to whether Dr. Perilli acted with the intent necessary to satisfy the second prong of the deliberate indifference inquiry. Both Smith and Dr. Perilli are therefore entitled to **summary judgment**.

None of the remaining defendants identified as depriving Williams of a medically prescribed shower are entitled to full **summary judgment** on this prong. It is undisputed that Williams presented a valid medical pass for morning showers and that Goffe, Maldonado, Krusen and MacNamara did not honor that pass. Despite these defendants' claims that they were following facility protocol, a reasonable jury could conclude that their disregard of a medical pass constituted recklessness. P.A. Williams's assertion that if he changed Williams's prescription of morning showers he did so to comply with facility protocol is subject to the same analysis. As for Capuano, evidence suggesting that she changed Williams's treatment plan without consulting Dr. Perilli raises a question of material fact as to whether she acted not just recklessly but intentionally. None of these defendants is therefore entitled to full **summary judgment** on Williams's deliberate indifference claim related to shower

passes.

**\*11** Goffe, Maldonado, Krusen, and MacNamara, are, however, entitled to partial **summary judgment**. After Dr. Perilli rescinded Williams's shower pass on November 16, 2000, these defendants were entitled to rely on Williams's lack of a valid medical pass to deny him daily morning showers. Williams has raised no question of material fact about whether these defendants acted recklessly in denying him daily morning showers after he no longer possessed a shower pass.

b. Climbing Stairs

Defendants are entitled to partial **summary judgment** on Williams's deliberate indifference claims related to climbing stairs. Dr. Perilli opines that climbing stairs at Fishkill when Clark refused to honor Williams's elevator pass and climbing stairs at Sing Sing when Williams's feed-up and flats passes were delayed did not create a serious medical risk of death, degeneration, or extreme pain. Although Williams has made only a limited showing about the pain climbing stairs caused him, he has asserted that climbing stairs did cause him pain, and outside specialists found the issue worthy of comment, and recommended that he avoid climbing stairs. Moreover, the pain of climbing stairs was apparently intense enough to cause Williams to choose not to attend physical therapy sessions that required him to walk up stairs. Although a serious medical injury is not inflicted every time an **inmate** with a bad knee is required to climb stairs, in this case, with all inferences drawn in his favor, Williams has raised a question of material fact as to whether the pain caused by climbing stairs was serious enough to sustain an Eighth Amendment claim.

Goffe, Maldonado, and Krusen are entitled to **summary judgment** on Williams's deliberate indifference claim related to his feed-up pass. They claim that they were not responsible for accommodating Williams's feed-up pass, and Williams offers no evidence that they interfered with his pass being accommodated. Krusen is entitled to **summary judgment** for Williams's claim related to his flats pass, as well. Williams asserts that he had a conversation with Krusen about the delay in accommodating his pass, but he does not explain how

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)
(Cite as: 2009 WL 2431948 (S.D.N.Y.))

Krusen was responsible for that delay. Goffe and Maldonado are not, however, entitled to **summary judgment** related to the flats pass claim. Despite their assertions that they had no responsibility for accommodating this pass, Williams's assertions that they threatened to delay his move, paired with the fact that his flats pass was not accommodated until eighteen months after his first conversation with Goffe and Maldonado, raise a question of material fact as to whether they did interfere with his move and thereby acted recklessly. Although an ordinary delay in moving an **inmate** to a new cell to accommodate his medical condition would not constitute a serious medical injury, Williams has alleged that these defendants intentionally delayed his move to the flats for a year and a half, while other **inmates** were getting moved there ahead of him.

**\*12** Clark is not entitled to **summary judgment**. There is no dispute that Clark knew that Williams had an elevator pass due to his knee condition. Although Clark asserts that he denied Williams access to an elevator because the Fishkill elevator had maintenance problems and was only to be used for emergencies, Williams's assertion that he saw **inmates** using the elevator has raised a question of material fact as to whether Clark acted intentionally or recklessly in denying Williams use of the elevator. While an occasional denial of access to an elevator would not rise to the level of serious injury to Williams's health, Williams has alleged that Clark repeatedly, and without justification, refused over a period of months to allow Williams to use the elevator.

*Qualified Immunity*

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* --- U.S. ----, ----, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (citation omitted). In determining whether a defendant is entitled to qualified immunity, the "appropriate question is the objective inquiry whether a reasonable officer could have believed that his actions were lawful in light of clearly established law and the information the officer possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (citation omitted). To assess a qualified immunity claim,

a court must therefore consider:

(1) whether the right in question was defined with reasonable specificity; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005) (citation omitted).

Williams has defined with sufficient specificity the Eighth Amendment right upon which his deliberate indifference claim rests; and the Supreme Court and Second Circuit have clearly established that right. As for the third prong, Goffe, Maldonado, Krusen, MacNamara, P.A. Williams and Capuano cannot avail themselves of qualified immunity as they are all alleged to have knowingly disregarded or altered Williams's medical passes or treatment plan, which was unlawful. *See* Gill, 824 F.2d at 196. Bald assertions by Goffe, Maldonado, Krusen, and MacNamara that they took their respective actions to comply with administrative and safety concerns do not provide an adequate ground for finding these actions objectively reasonable. These defendants have not explained the bases of their administrative and safety concerns or how their actions addressed those concerns. It is therefore impossible at this point to determine as a matter of law that these defendants acted reasonably in choosing to serve those purposes rather than honor Williams's medical passes and treatment plans. If Capuano is liable to Williams, it is because she unilaterally changed his treatment plan. Although she contests the underlying allegation that she altered his plan, she offers no explanation of why a defendant who does, in fact, take such actions could reasonably believe she is acting lawfully. P.A. Williams offers a potential explanation for his actions, suggesting it was impossible for him to grant Williams's prescription for a morning shower pass because there was no place on the standard pass to indicate timing of showers. P.A. Williams's acknowledgment, however, that he has authorized medical passes for a certain time of day, albeit rarely, undercuts his explanation of why he overrode Williams's prescription in this case. He therefore offers an inadequate explanation of why a reasonable

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2431948 (S.D.N.Y.)
(Cite as: 2009 WL 2431948 (S.D.N.Y.))

officer in his position would feel his actions were lawful.

*Retaliation*

**\*13** To prove a First Amendment retaliation claim, "a **prisoner** must show that (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord,* 554 F.3d 216, 227 (2d Cir.2009) (citation omitted). Exercising the right to petition for redress of a grievance is protected conduct. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir.2001). "A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal,* 554 F.3d at 228. "[I]f taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996).

Williams claims that after he filed a grievance in September 1999 about the security officers denying his morning shower pass, Dr. Perilli retaliated against him by rescinding Williams's daily morning shower pass on November 16, 2000. Williams argues that there was a temporal connection between these two events, because Dr. Perilli did not know about the grievances until Williams told Dr. Perilli about them at the November 16 meeting. This argument fails. Dr. Perilli made a note one month before the November 16 meeting concluding that Williams had no medical reason for daily morning showers. This prior note requires a finding that Dr. Perilli had a proper reason to deny Williams a morning shower pass even after Williams described his grievance filing to Dr. Perilli. Williams has thus failed to raise a question of material fact as to whether Dr. Perilli's allegedly retaliatory action was causally related to Williams's filing of grievances. Dr. Perilli is therefore entitled to **summary judgment** on the retaliation claim.

CONCLUSION

Defendants' May 15, 2007 motion for **summary judgment** is granted in full as to Dr. Perilli, Eagan, and Smith. **Summary judgment** is also granted as to Goffe, Maldonado, Krusen, and MacNamara for Williams's deliberate indifference claim related to his shower pass after November 11, 2000; **summary judgment** is granted as to Goffe, Maldonado, and Krusen for Williams's deliberate indifference claim related to his feed-up pass; and **summary judgment** is granted to Krusen for Williams's deliberate indifference claim related to his flats pass. **Summary judgment** is denied in all other respects as to defendants Goffe, Maldonado, Krusen, MacNamara, P.A. Williams, Capuano, and Clark.

SO ORDERED.

S.D.N.Y.,2009.
Williams v. Smith
Slip Copy, 2009 WL 2431948 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory
Committee Notes. Accordingly, the Court adopts the

Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

> FN1. This matter was referred to the undersigned
> pursuant to 28 U.S.C. § 636(b) and
> N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff
and failed to provide adequate medical treatment for his
injuries and drug problem. Plaintiff seeks declaratory
relief and monetary damages. Presently pending is

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

> FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

### I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

### II. Motion to Dismiss

*2 When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46,

78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

### III. Discussion

#### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

#### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl., ¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

*Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,* 524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above,

plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at *3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at *3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Jamal KEARSEY, Plaintiff,
v.
Adeyemi WILLIAMS, Defendant.
**No. 99 Civ. 8646 DAB.**

Sept. 1, 2005.

*MEMORANDUM & ORDER*

BATTS, J.

**\*1** Plaintiff Jamal Kearsey, proceeding *prose,* has filed the above-captioned case against Defendant Dr. Adeyemi Williams ("Dr.Williams") pursuant to 42 U.S.C. § 1983 alleging that Dr. Williams violated Plaintiff's Eighth Amendment rights by being deliberately indifferent to Plaintiff's serious medical needs. Defendant has moved to dismiss the Complaint for failure to exhaust administrative remedies, for failure to state a claim, and because Defendant is shielded by qualified immunity.<sup>FN1</sup> For the reasons stated herein, Defendant's Motion to Dismiss is DENIED.

> FN1. This Court granted Defendant's Motion to Dismiss for failure to exhaust administrative remedies in its June 6, 2002 Order but vacated that Order on September 20, 2004 upon Plaintiff's motion pursuant to Fed.R.Civ.P. 60(b). *See Kearsey v. Williams,* No. 99 Civ. 8646, 2004 WL 2093548 (S.D.N.Y. Sept. 20, 2004).

I. BACKGROUND

In his Complaint, Plaintiff alleges that while he was incarcerated at Rikers Island Correctional Facility ("Rikers"), Defendant, a doctor at Rikers, violated Plaintiff's Eighth Amendment rights by refusing to provide him with an asthma pump when Plaintiff experienced breathing difficulties. Specifically, on April 4, 1999, Plaintiff requested to speak with a doctor because the heat in his cell was aggravating his asthma. (Compl. at 3-4.) When Dr. Williams went to Plaintiff's cell, Plaintiff stated that his chest had "tighten[ed] up" and that he "couldn't breath[e]," and requested that Dr. Williams take him "downstairs" to get an asthma pump. (Id. at 4.) Dr. Williams declined to take Plaintiff downstairs but said that he would send a pump to Plaintiff's cell that evening. (Id.) After a period of time, a corrections officer called Dr. Williams and he also informed him of Plaintiff's medical condition. (Id.) Dr. Williams told the officer that he would bring the asthma pump. (Id.) Plaintiff alleges that Dr. Williams forgot to bring the pump. (Id.)

Plaintiff complained for a third time to Dr. Williams of his inability to breathe and stated that he was experiencing chest pain. (Id.) Once again, Dr. Williams responded by promising to send an asthma pump that evening. (Id.) Plaintiff subsequently asked for Defendant's name, to which Dr. Williams allegedly responded, "I won't send you anything now!" (Id.) Dr. Williams then handed Plaintiff a note with his name. (Id. at 5.) No pump was given to Plaintiff. Shortly after Dr. Williams left, Plaintiff borrowed an asthma pump from a fellow minute, although that pump was different from the one Plaintiff was used to. (Id.) Plaintiff complained of chest pains and breathing difficulties for the rest of the day. (Id.) On April 6, 1999, Plaintiff was having blood work done and spoke with a nurse about his medical condition. (Id.) The nurse ordered an emergency pump that arrived later in the day. (Id.)

On June 24, 1999, Plaintiff filed a Complaint pursuant to 42 U.S.C. § 1983 alleging that Defendant exhibited deliberate indifference to his serious medical needs in violation of Plaintiff's Eighth Amendment rights. Defendant has filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that Plaintiff failed to exhaust administrative

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), and, in particular, the exhaustion procedure established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7, that Plaintiff failed to state a cause of action for which relief can be granted, and that Defendant is shielded from liability based on the doctrine of qualified immunity. (Def.'s Mem. Law at 1, 3, 20.) On June 6, 2002, this Court issued an Order granting Defendant's Motion to Dismiss on the ground that Plaintiff failed to comply with the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7. *Kearsey v. Williams,* No. 99 Civ. 8646, 2002 WL 1268014, at *2 (S.D.N.Y. June 6, 2002).

**\*2** Plaintiff filed a Motion for Relief from Judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.[FN2] Plaintiff argued that the Court had erred in holding that he was required to exhaust the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7, because those procedures are required only of inmates at state-run facilities, whereas Rikers, as a municipally-run facility, has different grievance procedures. *Kearsey,* No. 99 Civ. 8646, 2004 WL 2093548, at *2 (S.D.N.Y. Sept. 20, 2004). In its September 20, 2004 Order, the Court vacated its dismissal Order, finding Plaintiff was not required to exhaust the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7. *Id.* at *4.

> FN2. Plaintiff was represented by counsel when he filed the 60(b) Motion.

Because the Court's June 6, 2002 Order did not reach the additional grounds in Defendant's Motion to Dismiss, the remaining motions were *subjudice.* In this Order, the Court considers Defendant's remaining arguments: that Plaintiff has failed to state a cause of action and that Defendant is entitled to qualified immunity.

## II. DISCUSSION

### A. Rule 12(b)(6) Standard

In a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court "must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995) (citations omitted). "The district court should grant such a motion only if, after viewing [the] plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). A court's review of such a motion is limited and "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Burnheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). In fact, it may appear to the court that "a recovery is very remote and unlikely but that is not the test." *Branham v. Meachum,* 72 F.3d 626, 628 (2d Cir.1996).

These liberal pleading standards "appl[y] with particular force where the plaintiff alleges civil rights violations or where the complaint is submitted *prose."Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998). It is well-settled that *prose* complaints are held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 521 (1972).

### B. Eighth Amendment

Defendant moves to dismiss the Complaint on the grounds that Plaintiff has failed to state a cause of action under 42 U.S.C. § 1983.

### 1. Standard for § 1983 deliberate indifference claim

Section 1983 of Title 42, United States Code, enables a plaintiff to bring a cause of action against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Thus, a plaintiff bringing a § 1983 action must

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

demonstrate that "the conduct complained of was committed by a person acting under color of state law ... [and that] this conduct deprived a person of rights ... secured by the Constitution or laws of the United States." *Greenwich Citizens Committee, Inc. v. Counties of Warren and Washington Indus. Development Agency,* 77 F.3d 26, 29-30 (2d Cir.1996) (quoting *Parratt v. Taylor,* 451 U.S. 527, 535 (1981)) (internal quotations omitted). Section 1983 is not in itself "a source of substantive rights," but instead "provides a method for vindicating federal rights elsewhere conferred." *Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 225 (2d Cir.2004) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)).

**\*3** One such source of federal rights is the Eighth Amendment of the Constitution, which states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. In *Estelle v. Gamble,* the Supreme Court held that prison employees' "deliberate indifference [to an inmate's] serious medical needs" violates the inmate's Eighth Amendment rights and is actionable under § 1983. *Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976). A plaintiff pursuing a § 1983 claim for deliberate indifference to serious medical needs must meet a two-prong standard by demonstrating a serious medical need (the objective prong) and by showing that the defendant employee possessed the requisite culpable mental state (the subjective prong). See *Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

2. Serious medical need

The objective prong of the deliberate indifference standard requires a showing of a "sufficiently serious" medical need. *Hathaway,* 99 F.3d at 553 (internal quotations and citations omitted). While "it is a far easier task to identify a few exemplars of conditions so plainly trivial and insignificant as to be outside the domain of Eighth Amendment concern than it is to articulate a workable standard for determining 'seriousness' at the pleading stage," several factors are helpful in determining the seriousness of a medical condition. *Chance,* 143 F.3d at 702-03 (quoting *Gutierrez v. Peters,* 111 F.3d 1364, 1372 (7th Cir.1997)).

A serious medical need is generally characterized by "a condition of urgency that may result in degeneration or extreme pain" or "the unnecessary and wanton infliction of pain." *Chance,* 143 F.3d at 702 (citation omitted). Whether "a reasonable doctor or patient would find [the condition] important and worthy of comment or treatment" reflects on the seriousness of the medical need, as does the effect of the condition on the inmate's "daily activities" and the extent to which the condition causes "chronic and substantial pain." *Id.* (citation omitted). The refusal to treat a patient suffering from what ordinarily would not be considered a serious medical condition also raises Eighth Amendment concerns if the condition is easily treatable and degenerative. See *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) (holding that "the refusal to treat an inmate's tooth cavity unless the inmate consents to extraction of another diseased tooth constitutes a violation of the Eighth Amendment"). The constitutional implications of a decision not to treat an inmate's medical condition depend on the specific facts of the case-"a prisoner with a hang-nail has no constitutional right to treatment, but ... prison officials [who] deliberately ignore an infected gash ... might well violate the Eighth Amendment." *Id.* at 137-37 (internal quotations and citations omitted).

**\*4** While the failure to treat an inmate's generalized asthmatic condition may not implicate the Eighth Amendment, "an actual asthma attack, depending on the severity, may be a serious medical condition." *Scott v. DelSignore,* No. 02 Civ. 029F, 2005 WL 425473, at \*9 (W.D.N.Y. Feb. 18, 2005); see *also Patterson v. Lilley,* No. 02 Civ. 6056, 2003 WL 21507345, at \*3-4 (S.D.N.Y. June 30, 2003). Indeed, "it is common knowledge that a respiratory ailment, such as asthma, can be serious and life-threatening. *Whitley v. Westchester County,* No. 97 Civ. 0420, 1997 WL 659100, at \*4 (S.D.N.Y. Oct. 22, 1997). An acute asthma attack is inarguably a "condition of urgency" that may cause "substantial pain" and that "reasonable doctor[s] or patient[s] would find important and worthy of comment or treatment." *Chance,* 143 F.3d at 702 (citation omitted); see *Whitley,* No. 97 Civ. 0420(SS), 1997 WL 659100, at \*4.

Plaintiff has alleged that on three separate occasions, he

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

informed Defendant that he was unable to breathe. (Compl. at 4-5.) He also complained that his chest had "tighten[ed] up," and, later, that he was experiencing "chest pains." (Id.) Plaintiff resorted to using a fellow inmate's inhaler when Defendant refused to provide him with one, which suggests the seriousness of his need. (Id. at 5.) Moreover, by alleging in his Complaint that his asthma "started to act up," Plaintiff describes a time-specific incident more in line with an asthma attack than with a generalized asthmatic condition. (Id. at 4.)

Defendant cites *Reyes v. Corrections Officer Bay,* No. 97 Civ. 6419, 1999 WL 681490 (S.D.N.Y. Sept. 1, 1999), as a case similar to this one where the court found that the plaintiff did not allege a sufficiently serious medical condition. However, unlike the plaintiff in *Reyes,* who went ahead with his scheduled visit with his family after complaining of an asthma attack, Plaintiff continued to complain to officers of his condition. Plaintiff resorted to self-medication, by borrowing an asthma pump from a fellow inmate in order to alleviate his condition. In light of these facts, it can hardly be said that Plaintiff was merely suffering from "discomfort."

Accordingly, the Court finds that in his Complaint, Plaintiff alleges facts that he experienced an asthma attack, serious enough to constitute a sufficiently serious medical need for purposes of an Eighth Amendment claim.

3. Deliberate indifference

To satisfy the subjective prong of the deliberate indifference standard, Plaintiff must prove that the prison official was aware of, and consciously disregarded, the prisoner's medical condition. *Chance,* 143 F.3d at 703; *see also Farmer,* 511 U.S. at 837. The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Chance,* 143 F.3d at 702 (quoting *Farmer,* 511 U.S. at 837). While purposefully refusing to treat a serious medical condition constitutes deliberate indifference, it need not be the official's purpose to harm the inmate; "a state of mind that is the equivalent of criminal recklessness" is sufficient. *Hathaway,* 37 F.3d at 553.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*5** A physician's mere negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a § 1983 action. *Estelle,* 429 U.S. at 105-06; *Chance,* 143 F.3d at 703. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106. Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under § 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

In the instant case, Plaintiff informed Defendant on a number of occasions that he was unable to breathe and that he was experiencing chest pains. (Compl. at 4.) While Defendant's initial decision not to take Plaintiff downstairs for immediate treatment is the sort of prisoner-physician dispute regarding the particularities of medical care that is outside the scope of the Eighth Amendment, the unmistakable inference to be drawn from Plaintiff's allegation that Defendant refused to provide an asthma pump when Plaintiff asked for Defendant's name is that Defendant withheld medical care as retaliation or punishment for Plaintiff's conduct. (Id.) Because consciously delaying treatment in order to punish or retaliate against an inmate meets the subjective standard for deliberate indifference, the Court finds that the Complaint adequately alleges that Defendant acted with the requisite culpable mental state in refusing to treat Plaintiff's asthma attack.

C. Qualified Immunity

Defendant's final argument for dismissal is that, as a government official, Dr. Williams is entitled to qualified immunity.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

At the outset, the Court notes that while a defendant may assert a qualified immunity defense on a Rule 12(b)(6) motion, "that defense faces a formidable hurdle when advanced on such a motion." *McKenna v. Wright,* 386 F.3d 432, 434 (2d Cir.2004). This is because "[n]ot only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Id.* (internal quotations and citations omitted). The plaintiff thus benefits from all reasonable inferences against the defendant's qualified immunity defense on a Rule 12(b)(6) motion. *Id.*

The defense of qualified immunity protects public officers, including prison physicians, from civil actions related to their conduct while they are acting in an official capacity so long as they do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ford v. McGinnis,* 352 F.3d 582, 596 (2d Cir.2003). Such a defense "serves important interests in our political system. It protects government officials from liability they might otherwise incur due to unforeseeable changes in the law governing their conduct." *Sound Aircraft Services, Inc. v. Town of East,* 192 F.3d 329, 334 (2d Cir.1999). Qualified immunity also serves the important public interest of "protecting public officials from the costs associated with the defense of damages action ... [including] the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from accepting public positions." *Crawford-El v. Britton,* 523 U.S. 574, 590 at fn. 12 (1998).

**\*6** Qualified immunity shields a defendant from liability "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Englarged Sch. Dist.,* 293 F.3d 246, 250 (2d Cir.2001); *Brosseau v. Haugen,* 125 S.Ct. 596, 599 (2004)* ("Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted"); *see*

*alsoHarlow,* 457 U.S. at 818-19.

"[A] court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne,* 526 U.S. 603, 609 (1999); *see also Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993). Determining the constitutional question first serves two purposes: it spares the defendant of unwarranted demands and liability "customarily imposed upon those defending a long drawn-out lawsuit" and determining the constitutional question first "promotes clarity in the legal standards for official conduct, for the benefit of both the officers and the general public ." *Id.*

If a deprivation of a constitutional right has been alleged, a court must determine whether the constitutional right was clearly established by determining: (1) if the law was defined with reasonable clarity, (2) if the Supreme Court or the law of the Second Circuit affirmed the rule, and (3) whether a reasonable defendant would have understood from existing law that the conduct was lawful. *See Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998). "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 634, 640 (1987).

As the Supreme Court made clear in *Saucier,* determining whether the right in question was clearly established requires particularized, case-specific analysis. *Id.* at 201-02. The case-specific nature of the inquiry does not mean that official conduct is protected by qualified immunity whenever "courts had not agreed on one verbal formulation of the controlling standard." *Id* . at 202-03. A "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct" even if courts have not ruled on the constitutionality of the specific act in question, and previously decided cases with comparable but not identical facts influence the clarity of the right in question. *Hope v. Pelzer,* 536 U.S. 730 at 741 (2002) (quoting *Anderson v. Creighton, 483 U.S. 635, 640 (1987)*). The fundamental question is whether "the state of the law" at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

the time of the alleged violation gave the defendant "fair warning" that his conduct was unconstitutional. *Id.*

**\*7** Even if the right is clearly established, "defendants may nonetheless establish immunity by showing that reasonable persons in their position would not have understood that their conduct was within the scope of the established protection." *LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998). "[R]easonableness is judged against the backdrop of the law at the time of the conduct.... [T]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau,* 125 S.Ct. at 599.

In the present matter, the Court has already determined that Plaintiff's allegations, taken as true, indicate that Defendant violated Plaintiff's Eighth Amendment rights by refusing to treat Plaintiff's asthma attack in retaliation for Plaintiff's request for Defendant's name. *See supra* at 10-13.

With regard to whether the right allegedly violated was clearly established at the time of the violation, neither the Supreme Court nor the Second Circuit has held that an asthma attack constitutes a serious medical condition for purposes of a deliberate indifference claim. In considering whether Defendant nonetheless had fair warning of the unconstitutionality of the conduct he is alleged to have engaged in, the Court notes that the Second Circuit has repeatedly held as unlawful denials of treatment that "cause or perpetuate pain" falling short of torture and not resulting in death. *Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003). Among the conditions the Second Circuit has deemed serious for Eighth Amendment purposes are a tooth cavity, *Harrison,* 219 F.3d at 137; a degenerative hip condition, *Hathaway,* 99 F.3d 550, 551-52; a painful tissue growth, *Brock,* 315 F.3d at 161; a ruptured Achilles tendon that caused pain and swelling, *Hemmings v. Gorczyk,* 134 F.3d 104, 106-07 (2d Cir.1998); and an eye condition that led to blindness in one eye, *Koehl v. Dalsheim,* 85 F.3d 86, 87 (2d Cir.1996). These various conditions, held to be sufficiently serious, are not life-threatening, although they are painful. An asthma attack, however, can be both painful and fatal. Given the state of the law in the Second Circuit, Defendant had ample warning that the law prohibits a prison doctor from

consciously withholding medical care from an inmate with a painful and potentially fatal medical condition.

The Court finds that at this early stage of litigation, Defendant has not shown that he is entitled to qualified immunity.

### III. CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss is DENIED.

Defendant shall file an Answer to the Complaint within thirty (30) days of this Order.

SO ORDERED.

S.D.N.Y.,2005.
Kearsey v. Williams
Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff[FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and filed
the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski,* 430 F.3d 560, 562 (2d
Cir.2005)(deeming *pro* se prisoner's § 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
the operative date is between August 27, 2004
and September 20, 2004. As discussed, *infra,*
both of these dates occur before Hargrove
properly exhausted the administrative remedies
available to him at NCCF.

FN2. The Nassau County University Medical
Staff are employed by the Nassau Health Care
Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement
between the County of Nassau and NHCC, dated
September 24, 1999, NHCC provides medical
services for inmates at NCCF. County Defs.'s
Not. of Motion, Decl., at 1.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.[FN4] Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF. NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March

15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.[FN5] Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

**(3)**

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. FN6 The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

> FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form FN7 to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

**(4)**

## Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II; Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes);

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy copy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13,

2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005).* Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,* --- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'afford[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525). *See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524). Section 1997e(a) provides that:

> **\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383; *Ruggiero,* 467 F.3d at 174; *Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth,* 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford,* 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2385

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

(emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Kerik,* 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero,* 467 F.3d at 176 (quoting *Woodford,* 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2382).

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams,* 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca,* No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct.31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

*7 Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This

five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero,* 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford,* 126 S.Ct. at 2382).

FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19, 2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams,* 418 F.Supp.2d at 101, 102 (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams,* 418 F.Supp.2d at 101 (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

**\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at * 8-11; *Sloane,* 2006 WL 3096031, at *4; *Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to

exhaust is justified. *See Ruggiero,* 467 F.3d at 175; *Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.'")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)). [FN13]

FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law"). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6, 2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No.99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14] *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

> FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

> FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs.' Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

[does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at \*4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at

1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at \*8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at \*2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at \*8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465, at \*4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

**c. Special circumstances**

**\*10** Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Hemphill,* 380 F.3d at 688 (quoting *Giano,* 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

prison official's interpretation has been held to constitute a "special circumstance." _Giano, 380 F.3d at 676-77._ No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. _See Sloane, 2006 WL 3096031, at *8; Freeman v. Goord,_ No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

**Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice**

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct its own mistakes with respect to the programs it administers." _Woodford, 126 S.Ct. at 2385. See also Ruggiero, 467 F.3d at 178_ (citing _Porter, 534 U.S. at 525)._ Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. _Berry v. Kerik, 366 F.3d 85, 87 (2d Cir.2004)._ Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." _Berry, 366 F.3d at 88._ Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests were given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to

seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. _Berry, 366 F.3d at 88_ (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

**\*11** Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. _Shangold v. The Walt Disney Co.,_ No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing _Chambers v. NASCO, Inc.,_ 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." _Gleason v. Jandrucko,_ 860 F.2d 556, 559 (2d Cir.1988); _McMunn v. Mem'l Sloan-Kettering Cancer Center,_ 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering the presentation of the opposing party's claim or defense." _McMunn,_ 191 F.Supp.2d at 455 (quoting _Aoude v. Mobil Oil Corp.,_ 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. _See, e.g., Shangold, 2006 WL 71672, at *1, *3_ (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); _McMunn,_ 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. _See_ Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn,* 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence; *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

**Conclusion**

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
No. 9:04-CV-0471.

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney
General, The Capitol Albany, NY, for Defendants.

**DECISION and ORDER**

THOMAS J. McAVOY, Senior District Judge.

*1 Plaintiff commenced the instant action asserting
various violations of his constitutional rights arising out of
his placement at the Southport Correctional Facility. In his
Complaint, Plaintiff alleges that he was improperly sent to
the Special Housing Unit ("SHU") at a maximum security
facility and that being in SHU has put his life in jeopardy.
Currently before the Court is Defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56 seeking
dismissal of the Complaint in its entirety for failure to
exhaust administrative remedies.

**I. FACTS**[FN1]

> FN1. The following facts are taken from
> Defendants' statement of material facts submitted

pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts
are deemed admitted because they are supported
by the record evidence and Plaintiff failed to
submit an opposing statement of material facts as
required by Rule 7.1(a)(3). Plaintiff was
specifically advised by Defendants of his
obligation to file an opposing statement of
material facts and to otherwise properly respond
to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State
Department of Correctional Services. Plaintiff signed the
instant Complaint on April 7, 2004. On his Complaint
form, Plaintiff indicated that there is a grievance
procedure available to him and that he availed himself of
the grievance procedure by filing a complaint with the
IGRC [FN2], followed by an appeal to the superintendent of
the facility, and then to the Central Office Review
Committee in Albany. The Complaint indicates that
Plaintiff is "waiting for response from Albany." The
Complaint was filed on April 27, 2004.

> FN2. Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant
Complaint, Plaintiff filed a grievance relating to the issues
presented in this case. On April 19, 2004, the IGRC
recommended that Plaintiff's grievance be denied. Plaintiff
then appealed that decision to the facility Superintendent.
In the meantime, on April 27, Plaintiff commenced the
instant litigation. On May 3, 2004, after Plaintiff filed the
Complaint in this case, the Superintendent denied
Plaintiff's grievance. On May 5, 2004, Plaintiff appealed
the decision to the Central Office Review Committee in
Albany. On June 23, 2004, the Central Office Review
Committee denied Plaintiff's appeal. Plaintiff did not file
any other grievances in connection with the matters raised
in this lawsuit.

Defendants now move to dismiss on the ground that
Plaintiff commenced the instant action before fully
exhausting his available administrative remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

## III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.
**No. 96 CV 5396(GBD).**

Feb. 20, 2004.

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).
Motion granted.

West Headnotes

Civil Rights 78 ☞ 1395(7)

78 Civil Rights
　78III Federal Remedies in General
　　78k1392 Pleading
　　78k1395 Particular Causes of Action
　　78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases
Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of

1996 was patently false; there was no explanation offered that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** This § 1983 action was originally commenced by the plaintiff, [FN1] a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,[FN2] and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

> FN1. Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

> FN2. In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78-81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. _Blisset v. Casey,_ 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. _Scott v. Coughlin,_ 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10-12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[FN3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996.[FN4]

> FN3. The amended complaint reads as follows:
>
> That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10-12 of 1996. (Am.Compl. § 2).
>
> FN4. Plaintiff's wife application for _in forma pauperis_ relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May 13, 1996, and it is stamped as

received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed Affirmation of Service, dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, _i.e.,_ May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10-12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12-13).

**\*2** Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections.[FN5] The Court must make a _de novo_ determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a _de novo_ hearing on the matter. _United States v. Raddatz,_ 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. _Nelson v. Smith,_ 618 F.Supp. 1186, 1189-90 (S.D.N.Y.1985) (quoting _Hernandez v. Estelle,_ 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations. _Raddatz,_ 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C. §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on the face of the record. *Nelson v. Smith,* 618 F.Supp. at 1189; *see also Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom. Heisler v. Rockland County,* 164 F.3d 618 (2d Cir.1998).

> FN5. Plaintiff himself filed objections which was not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e (a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott,* 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003). A defendant may assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See, McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz,* 245 F.Supp.2d 527, 534-35 (S.D.N.Y.2003); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See, Scott v. Gardner,* 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy,* 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996.[FN6] On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz,* 303 F.3d 147, 150-51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

> FN6. In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

*3 Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10-12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay Energy Co.,* 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That hearing began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18-19, 1996). Specifically, in the original complaint, plaintiff refers to the testimony given by this fellow inmate.[FN7] (Compl. at 8). That inmate testified on April 19th. (Hr'g. Tr. at 53-54, 57). Thus, plaintiff's claim that he filed the complaint between April 10-12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim.[FN8] *See, Silva Run Worlwide Ltd. v. Gaming Lottery Corp.,* 2001 WL 396521, *1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

FN7. In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

FN8. At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37-38).

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. *See,* Fed.R.Civ.P. 3, 5(e). For *pro se* litigants, who are not imprisoned and have been granted *in forum pauperis* relief, their complaints are deemed filed when received by the Pro Se Office. *See, Toliver v. County of Sullivan,* 841 F.2d 41 (2d Cir.1998). The complaint of a *pro se* prisoner, however, is deemed filed when he or she gives the complaint to prison officials to be mailed. *Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds,* 25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. *See e.g., Forster v. Bigger,* 2003 WL 22299326, *2 (S.D.N.Y. Oct.7, 2003); *Hosendove v. Myers,* 2003 WL 22216809, *2 (D.Conn. Sept.19, 2003); *Hayes v. N .Y.S. D.O.C. Officers,* 1998 WL 901730, *3 (S.D.N.Y. Dec.28, 1998); *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

*4 In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

days prior to the date that the Pro Se Office stamped it received on May 10th.[FN9] Moreover, absent evidence to the contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres,* 33 F.Supp.2d at 270). Even if the Court gave plaintiff the benefit of the date plaintiff's wife signed the complaint, *i.e.,* the earliest date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

FN9. The benefit of the mailbox rule does not apply where the plaintiff delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendoz v. Goord,* 2002 WL 31654855 (S.D.N.Y. Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002). Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.[FN10] The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he

commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999). In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear.

FN10. In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2-3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

*5 Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

S.D.N.Y.,2004.
Mingues v. Nelson
Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Roger SULTON, Plaintiff,
v.
Charles GREINER, Superintendent of Sing Sing Corr.
Fac., Doctor Halko & P.A. Williams of Sing Sing Corr.
Fac. Medical Department, Doctor Lofton, Defendants.
**No. 00 Civ. 0727(RWS).**

Dec. 11, 2000.

Roger Sulton, Wende Correctional Facility, Alden, NY,
Plaintiff, pro se.

Honorable Eliot Spitzer, Attorney General of the State of
New York, New York, NY, By: S. Kenneth Jones,
Assistant Attorney General, for Defendants, of counsel.

*OPINION*

SWEET, J.

**\*1** Defendants Charles Greiner ("Greiner"), past
Superintendent of Sing Sing Correctional Facility ("Sing
Sing") and Dr. Nikulas Halko, ("Halko"), P.A. Williams
("Williams"), and Dr. Lofton ("Lofton"), all of the Sing
Sing Medical Department, (collectively, the
"Defendants"), have moved to dismiss the amended
complaint of *pro se* inmate Roger Sulton ("Sulton"),
pursuant to Fed.R.Civ.P. 12(b)(6) and 12(h)(2) for failure
to exhaust administrative remedies. For the reasons set
forth below, the motion will be granted.

*Prior Proceedings*

Sulton filed the complaint in this action on February 2,
2000, asserting a claim against the Defendants under
Section 1983 for alleged violation of his constitutional
rights under the Eighth Amendment for acting with
deliberate indifference to his serious medical needs.
Sulton filed an amended complaint on May 3, 2000, to
identify additional defendants to his suit. Additionally,
Sulton alleges negligent malpractice by the Sing Sing
medical staff. Sulton seeks monetary damages. The instant
motion was filed on August 9, 2000, and was marked fully
submitted on September 6, 2000.

*Facts*

The Defendants' motion comes in the posture of a motion
to dismiss for failure to state a claim, pursuant to Federal
Rule of Civil Procedure 12(b)(6). However, both the
Defendants and Sulton have submitted materials outside
the pleadings. Where a District Court is provided with
materials outside the pleadings in the context of a 12(b)(6)
motion to dismiss, it has two options: the court may
exclude the additional materials and decide the motion on
the complaint alone or convert the motion to one for
summary judgment. *See* Fed.R.Civ.P. 12(b); *Kopec v.
Coughlin, 922 F.2d 152, 154 (2d Cir.1991); Fonte v.
Board of Managers of Continental Towers Condominium,
848 F.2d 24, 25 (2d Cir.1988)*. The Court has determined
to treat the instant motion as a motion for summary
judgment. Therefore, the following facts are gleaned from
the parties' submissions, with all inferences drawn in favor
of the non-movant as required on a motion for summary
judgment. They are not findings of fact by the Court.

Sulton is a prison inmate who was incarcerated in Sing
Sing at the time of the incidents in question. Greiner was
Superintendent of Sing Sing at that time. Halko was and is
a doctor on medical staff at Sing Sing. Williams and
Lofton are alleged to be affiliated with the Sing Sing
Medical Department.

According to Sulton, on October 8, 1998, he slipped on a
flight of wet stairs, where there was no "wet floor" sign
posted, and injured his left knee. The next day his knee
was swollen and the pain "was real bad." That same day

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

Sulton went to sick call and saw P.A. Williams. Williams ordered x-rays and also ordered "no-work, feed-in cell, pain killers and a cane" for Sulton. The swelling went down, but the pain got stronger.

For four months Sulton complained to the Sing Sing medical staff about his pain. During this time his left knee would give out "at any time." Yet, "nothing was done." However, the Sing Sing Medical Department did send Sulton to the Green Haven Correctional Facility for an M.R.I. and, subsequently, knee surgery was recommended by an attending physician on April 23, 1999. A hinged knee brace was recommended for post-surgery recovery.

**\*2** At some point thereafter, Sulton wrote to Greiner concerning his medical problem and he was placed on "a call-out" to see Halko. Halko then informed Sulton that he would not be going for surgery because Correctional Physician Services [FN1] ("CPS") would not allow it. CPS wanted the inmate to undergo physical therapy before they would approve surgery. Sulton continued to be in pain and requested outside medical care from Williams. However, Williams could not do anything about Sulton's surgery until it was approved by CPS.

> FN1. CPS is the health maintenance organization which must pre-approve any outside medical service to be provided to inmates outside of the correctional facility.

In September 1999, Sulton was transferred to Wende Correctional Facility ("Wende"). The medical department there provided him with physical therapy for his left knee, which was "still in constant pain" and was prone to giving out beneath his body weight.

Sulton filed grievance # 14106-99 on November 3, 1999, and on November 24, 1999, he received a response from the Inmate Grievance Resolution Committee (the "IGRC"). Sulton contends that on that same date he indicated his desire to appeal their decision to the Superintendent. Sulton did not appeal his grievance to the highest level of administrative review, the Central Office Review Committee (the "CORC"). In a letter to Wende Superintendent Donnelly ("Donnelly") dated December

17, 2000, Sulton complained that he never received a response to his appeal of the IGRC decision. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly stated that he concurred with the IGRC's decision.

In January 2000, "plaintiff['s] legs gave out and the right leg took the weight of the body ... causing the plaintiff to suffer ... torn joints in the ankle area." Surgery was performed on the ankle and he was placed on "medical confinement status."

*Discussion*

I. *This Action Will Be Dismissed For Plaintiff's Failure To Comply With The Prison Litigation Reform Act Of 1996*

In his amended complaint, Sulton alleges that he filed a grievance and, although initially the Defendants were unable to identify the grievance, by his opposition to the instant motion Sulton has identified the process he undertook to pursue his grievance.

Section 1997e(a) of the Prison Litigation Reform Act (the "PLRA") provides that:

No action shall be brought with respect to prison conditions under ... 42 U.S.C. § 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

In enacting Section 1997e(a), Congress made exhaustion mandatory. *Salahuddin v. Mead,* 174 F.3d 271, 274-75 (2d Cir.1999). As a result, where an inmate fails to satisfy the PLRA's exhaustion requirement, the complaint must be dismissed. *See, e.g., Santiago v. Meinsen,* 89 F.Supp.2d 435, 439-40 (S.D.N.Y.2000) (citations omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

In New York, the relevant administrative vehicle is the Inmate Grievance Program ("IGP"). *See* N.Y. Correct. Law § 139 (directing Commissioner of the Department of Correctional Services to establish a grievance mechanism in each correctional facility under the jurisdiction of the Department); N.Y. Comp.Codes R. & Regs., tit. 7, § 701.1 (instituting IGP). New York inmates can file internal grievances with the inmate grievance committee on practically any issue affecting their confinement. *See In re Patterson*, 53 N.Y.2d 98, 440 N.Y.S.2d 600 (N.Y.1981) (interpreting N.Y. Correct. Law § 139 broadly); N.Y. Comp.Codes R. & Regs., tit. 7, §§ 701.2(a) (inmates may file grievances about the "substance or application of any written or unwritten policy, regulation, procedure or rule of the Department of Correctional Services ...") and 701.7 (procedures for filing, time limits, hearings and appeals).

**\*3** The New York State Department of Correctional Services ("DOCS") has established a grievance program with specific procedures which must be followed in order for a prisoner to exhaust his administrative remedies. *See Petit v. Bender*, No. 99 Civ. 0969. 2000 WL 303280, at \*2- \*3 (S.D.N.Y. March 22, 2000) (holding that prisoner failed to exhaust his administrative remedies where prisoner only partially complied with the grievance procedures established by Section 701 *et seq.*). These procedures include a requirement that an inmate appeal a Superintendent's decision to the CORC by filing an appeal with the Grievance Clerk. *See* N.Y. Comp.Codes R. & Regs., tit. 7, § 701.7(c)(1).

There is, however, an additional issue to be addressed in this case, which is that the administrative remedies available to Sulton do not afford monetary relief. The Second Circuit has not yet ruled on whether the PLRA's exhaustion requirement applies where the available administrative remedies available do not provide the type of relief the prisoner seeks. *Snider v. Dylag*, 188 F.3d 51, 55 (2d Cir.1999) ("We note that it is far from certain that the exhaustion requirement of 42 U.S.C. § 1997e(a) applies to deliberate indifference claims ... under Section 1983, where the relief requested is monetary and where the administrative appeal, even if decided for the complainant, could not result in a monetary award.").

There is disagreement among the district courts within this circuit as to this issue, although there is "clear trend ... to find exhaustion applicable even where the requested relief, money damages, cannot be awarded by the administrative body hearing the complaint." *Santiago v. Meinsen*, 89 F.Supp.2d at 440; *see Snider v. Melindez*, 199 F.3d 108, 114 n. 2 (2d Cir.1999) (noting disagreement among courts as to applicability of exhaustion requirement where administrative remedies are unable to provide the relief that a prisoner seeks in his federal action); *but cf. Nussle v. Willette*, 224 F.3d 95, (2d Cir.2000) (holding that exhaustion not required for excessive force claim because such claim is not "prison conditions" suit and overruling district court decisions applying exhaustion requirement to excessive force claims seeking monetary relief).

Moreover, this Court has previously held that a prisoner must exhaust his administrative remedies before seeking relief in federal court in connection with a prison conditions claim even where a prisoner seeks damages not recoverable under an established grievance procedure. *Coronado v. Goord*, No. 99 Civ. 1674, 2000 WL 52488, at \*2 (S.D.N.Y. Jan. 24, 2000); *Edney v. Karrigan*, No. 99 Civ. 1675, 1999 WL 958921, at \*4 (S.D.N.Y. Oct. 14, 1999). This is the rule that will be applied here.

In his response to the motion to dismiss, Sulton indicates that he filed grievance # 14106-99 on November 3, 1999 and on November 24, 1999 he received a response IGRC and that on the same date Sulton indicated his desire to appeal their decision to the Superintendent. Sulton does not contend that he appealed his grievance to the highest level of administrative review, namely, the CORC. Instead, Sulton has asserted that Superintendent Donnelly never replied to the appeal of the IGRC decision and submits a letter dated December 17, 2000 in which Sulton complains that he never received a response from Donnelly. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly concurred with the decision of the IGRC denying Sulton relief. There is no evidence in the record that Sulton appealed the grievance to CORC.

**\*4** Accordingly, because Sulton failed to exhaust his administrative remedies by appealing the grievance to the CORC, his claims of medical indifference will be dismissed pursuant to 42 U.S.C. § 1997e. *See Petit*, 2000 WL 303280, at \*3.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

*Conclusion*

Therefore, for the reasons set forth above, the Defendants'
motion will be granted and the amended complaint will be
dismissed without prejudice to the action being renewed
once Sulton has exhausted all administrative remedies.

It is so ordered.

S.D.N.Y.,2000.
Sulton v. Greiner
Not Reported in F.Supp.2d, 2000 WL 1809284
(S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 1392164 (S.D.N.Y.), 24 NDLR P 61
(Cite as: 2002 WL 1392164 (S.D.N.Y.))

H

United States District Court, S.D. New York.
Abdul SHARIFF, Mark Bartley, Jamal Stephenson,
David Gobern, Lewis Purcell, Sam Johnson, Terence
Stevens, Stephen Gowins, and Abdul Suluk, Plaintiffs,
v.
Philip COOMBE, Commissioner of New York State
Docs; Glen Goord, Acting Commissioner; Christopher
Artuz, Superintendent of Green Haven Corr. Facility;
Gail Haponic, Acting Deputy of Admin. of Green
Haven; Roger Maines, Supervisor of Green Haven; M.
Muller, Maintenance Supervisor of Green Haven,
individually and in their official capacities, and the State
of New York, Defendants.
**No. 96 Civ. 3001(BSJ).**

June 26, 2002.

*Memorandum & Order*

JONES, J.

## I. INTRODUCTION

**\*1** Plaintiffs, nine disabled prisoners who depend on
wheelchairs for mobility, bring this action against the State
of New York and six individuals employed by the New
York State Department of Correctional Services
("DOCS") in an administrative capacity. Those six
individuals, who are sued both in their individual and in
their official capacities, are two former DOCS
Commissioners and four administrators at Green Haven
Correctional Facility ("Green Haven"), including the
Superintendent, the former Plant Superintendent, a Deputy
Superintendent, and a Maintenance Supervisor. Plaintiffs
seek both injunctive and monetary relief for conditions
affecting disabled inmates at Green Haven. The gravamen
of the Fourth Amended Complaint [FN1] is that the
conditions at Green Haven amount to unlawful

discrimination against disabled inmates. These conditions
allegedly violate (1) Title II of the Americans with
Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*; (2)
Title V of the Rehabilitation Act of 1973 ("Rehabilitation
Act"), 29 U.S.C. § 794 *et seq.*; (3) Section 70 of the New
York State Correction Law; and (4) the Eighth and
Fourteenth Amendments of the Constitution pursuant to 42
U.S.C. § 1983.

> FN1. Unless otherwise noted, references to the
> "Fourth Amended Complaint" refer to Plaintiffs'
> most recent Complaint, the Fourth Amended
> Complaint dated September 29, 1998.

Defendants move for summary judgment on several
grounds pursuant to Federal Rule of Civil Procedure 56.
Due to changes in the legal standards applicable to
Plaintiffs' claims and the facts relevant to the issues of
injunctive relief, exhaustion, and prior adjudication, the
court must reserve decision on some issues at this time. In
such circumstances, the court has identified issues for
additional briefing by the parties in a second round of
dispositive motions. Indeed, the complexity of those and
other issues applicable to Plaintiffs' remaining claims may
require a hearing for proper resolution. For the reasons
stated below, Defendants' Motion for Summary Judgment
is GRANTED in part and DENIED in part without
prejudice to renew.

## II. CLAIMS FOR INJUNCTIVE RELIEF

Any Plaintiff who is no longer incarcerated at Green
Haven is barred from asserting a claim for injunctive relief
regarding conditions at Green Haven. *See Prins v.
Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) ("It is settled in
this Circuit that a transfer from a prison facility moots an
action for injunctive relief against the transferring
facility.") (citing cases). Plaintiffs Bartley, Gobern,
Johnson, Purcell, Stevens, and Suluk are no longer
incarcerated at Green Haven. Therefore, the court
dismisses with prejudice all claims for injunctive relief
brought by those six Plaintiffs.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1392164 (S.D.N.Y.), 24 NDLR P 61
(Cite as: 2002 WL 1392164 (S.D.N.Y.))

Plaintiffs are not entitled to injunctive relief for those claims that are now moot because they have been addressed by prison officials. *See Prins v. Coughlin, 76 F.3d 504, 506; see also Farmer v. Brennan,* 511 U.S. 825, 846 (1994). Plaintiffs' injunctive claims as to the A & B yard have been rendered moot because Defendants have "repaired and repaved" this yard. (*See, e.g.,* Pls.' Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. at 11.) Accordingly, all Plaintiffs, but particularly Plaintiffs Shariff and Stephenson, are precluded from seeking injunctive relief as to the conditions of the A & B yard that have been repaired, and the court dismisses those claims with prejudice.

**\*2** In light of the changes in both Plaintiffs' circumstances and the conditions at Green Haven that have occurred since this motion was filed, the court has been unable to address Plaintiffs' remaining claims for injunctive relief. For example, when this motion was filed, numerous repairs and renovations were scheduled for Green Haven. (*See* Turbin Aff. Ex. E.) If any such repairs were, in fact, conducted, Plaintiffs' claims for injunctive relief concerning those repairs would also be mooted. The court directs the parties to address these issues, as well as other changes in the facts of this case that may affect the viability of Plaintiffs' claims for injunctive relief, in the additional briefing ordered by the court.

### III. CLAIMS FOR MONETARY RELIEF

#### A. CLAIMS UNDER 42 U.S.C. § 1983

Absent express statutory abrogation or consent by a state to suit, the Eleventh Amendment bars suits brought in federal court against a state by citizens of another state or the state's own citizens. *See Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 72-73 (2000); *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 54 (1996). Section 1983 does not abrogate a state's immunity, *Quern v.. Jordan,* 440 U.S. 332, 343-45 (1979), and New York has not consented to suit in federal court, *Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 38-40 (2d Cir.1977). State employees sued in their official capacities are also immune from suits for monetary damages under the Eleventh Amendment in cases where the state is the real party in interest. *See Al- Jundi v. Estate of*

*Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). Moreover, "[s]tates[ ] and state officers, if sued in their official capacities for retrospective relief ... are not 'persons' subject to suit under § 1983." *K & A Radiologic Tech. Services, Inc. v. Commissioner of Dep't of Health,* 189 F.3d 273, 278 (2d Cir.1999). Therefore, the court dismisses Plaintiffs' claims for monetary relief pursuant to § 1983 against the State of New York and the other six Defendants in their official capacities.

#### B. THE ADA AND THE REHABILITATION ACT [FN2]

> FN2. The ADA, which was adopted in 1992 and covers individuals and entities that do not receive federal funds, is broader in scope than the Rehabilitation Act, which was adopted in 1973 and is limited to programs receiving financial assistance from the federal government. *See Kilcullen v. New York State Dep't of Labor,* 205 F.3d 77, 79 n. 1 (2d Cir.2000).

Neither Title II of the ADA nor Section 504 of the Rehabilitation Act provides for suits against state officials in their individual capacities. *Garcia v. S.U.N.Y. Health Sci. Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001) (collecting cases). Therefore, the court dismisses with prejudice Plaintiffs' claims under the ADA and the Rehabilitation Act against the six individual Defendants in their individual capacities.

The legal standards applicable to Plaintiffs' claims under the ADA and the Rehabilitation Act against the State of New York and the other six Defendants in their official capacities have changed during the pendency of this motion. The changes in the law render much of Defendants' briefing on these claims inapplicable. The court directs the parties to brief Plaintiffs' remaining claims under the ADA and the Rehabilitation Act in light of the standards set forth in *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn,* 280 F.3d 98 (2d Cir.2001). *See also Harris v. New York State Dep't of Health,* No. 01 Civ. 3343, 2002 WL 726659, at \*27-\*31 (S.D .N.Y. Apr. 24, 2002) (applying the standards set forth in *Garcia* ).

#### C. STATE LAW CLAIMS

Not Reported in F.Supp.2d, 2002 WL 1392164 (S.D.N.Y.), 24 NDLR P 61
(Cite as: 2002 WL 1392164 (S.D.N.Y.))

**\*3** Plaintiffs raise state law claims alleging that Defendants have failed to fulfill their duties under Section 70 of the New York State Correction Law. The court dismisses Plaintiffs' claims under Section 70 against the State of New York and the six other defendants in both their personal and their official capacities for lack of subject matter jurisdiction pursuant to New York State Correction Law Section 24 and the Eleventh Amendment. *See Baker v. Coughlin,* 77 F.3d 12, 14-15 (2d Cir.1996).

## IV. OTHER ARGUMENTS CONCERNING PLAINTIFFS' REMAINING CLAIMS

### A. EXHAUSTION OF ADMINISTRATIVE REMEDIES

In their Motion for Summary Judgment, Defendants argue that Plaintiffs' claims must be dismissed for failure to exhaust administrative remedies. Under 42 U.S.C. § 1997e(a), as amended by the Prison Litigation Reform Act of 1996 ("PLRA") on April 26, 1996, no action brought by a prisoner pertaining to prison conditions may be brought until all available administrative remedies are exhausted. *Porter v. Nussle,* 122 S.Ct. 983, 988 (2002); *see* 42 U.S.C. § 1997e(a) (Supp.2000) (as amended by PLRA § 803). While the mandatory exhaustion requirement of the PLRA does not apply retroactively, any claim filed after April 26, 1996, must be exhausted administratively before it may be raised in federal court. *See Salahuddin v. Mead,* 174 F.3d, 272, 275 (2d Cir.1999); *Blissett v. Casey,* 969 F.Supp. 118, 125 (N.D.N.Y.1997).

The court denies without prejudice to renew that portion of Defendants' motion seeking dismissal of Plaintiffs' claims for failure to exhaust administrative remedies. The court reserves final decision on the issues raised by Defendants' arguments relating to exhaustion for three reasons. First, the issue of exhaustion was briefed insufficiently by the parties to permit the court to rule. Specifically, the court requires a detailed, plaintiff-by-plaintiff analysis of the exhaustion requirements applicable to each claim and the actions taken by each Plaintiff. Second, the court recognizes that

Plaintiffs may have pursued additional administrative remedies during the pendency of this motion. Third, changes in the law since briefing was submitted on this motion have clarified the exhaustion requirements applicable to each Plaintiff's claims. Depending on the exhaustion requirements applicable to each claim and the actions taken by individual Plaintiffs to pursue administrative relief, the court may lack jurisdiction over some of Plaintiffs' remaining claims. The court notes the following as guidance for the parties in fashioning future arguments:

Plaintiff Shariff's initial *pro se* Complaint was filed on February 27, 1996; therefore, the claims he alleged therein are not subject to mandatory exhaustion. Nevertheless, the court retains discretion and may require exhaustion with respect to the pre-PLRA claims raised by Plaintiff Shariff under certain circumstances. *See* 42 U.S.C. § 1997e(a) (1994) (amended 1996). The court expressly leaves open the questions of whether the court should, in its discretion, require exhaustion as to Plaintiff Shariff's claims and whether Plaintiff Shariff did, in fact, pursue administrative remedies with respect to the claims raised in this case.[FN3]

> FN3. Additionally, the parties have not addressed the question of whether any claims raised by Shariff in amendments to the initial Complaint filed after April 26, 1996, should be subject to the mandatory exhaustion requirements of the PLRA. The court reserves decision as to that issue.

**\*4** The other eight Plaintiffs first included their claims as part of the multiple amended complaints filed in this case after the exhaustion provisions were amended in 1996. Thus, it seems likely to the court that those eight Plaintiffs are required to have exhausted their claims prior to filing them in federal court. *Cf. Farber v. Wards Co., Inc.,* 825 F.2d 684, 689 (2d Cir.1987) (noting that "Rule 15(c) governs the 'relation back' of amended pleadings only for the purpose of the statute of limitations"). "Rule 15(c) does not exist merely to keep the door open for any tardy plaintiff.... Rather, Rule 15(c) stands as a remedial device for adding or substituting a party who 'but for a mistake concerning the identity of the proper party' would have been named originally." *Morin v. Trupin,* 778 F.Supp. 711, 735 (S.D.N.Y.1991). Thus, the decision by the other

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1392164 (S.D.N.Y.), 24 NDLR P 61
(Cite as: 2002 WL 1392164 (S.D.N.Y.))

eight Plaintiffs, who raise many claims distinct from those initially filed by Plaintiff Shariff in his *pro se* Complaint, to file their claims as part of this case rather than filing their own lawsuits is unlikely to have obviated the PLRA's mandatory exhaustion requirement with respect to their claims. Since this issue has not been addressed in the light of current case law, the court reserves decision on this issue as well.

## B. PRIOR ADJUDICATION

When briefing was submitted on this motion, some of Plaintiffs' claims already had been adjudicated or were pending in other fora. (Defs.' Reply Mem. for Summ. J., Table C.) Defendants argue for dismissal of Plaintiffs' claims on the basis of such prior adjudication, which may preclude Plaintiffs from raising those claims in this court. *See Harris v. New York State Dep't of Health,* No. 01 Civ. 3343, 2002 WL 726659 (S.D.N.Y. Apr. 24, 2002) (discussing interaction between preclusion rules and abstention doctrines). Once again, the court has not been provided with enough detail of the claims raised by Plaintiffs in other proceedings to determine whether preclusion rules, abstention doctrines, or principles concerning double recoveries would bar any of the claims raised in the Fourth Amended Complaint, and Defendants have not addressed those topics substantively in their briefing on this motion. Thus, the court denies without prejudice to renew Defendants' motion to dismiss Plaintiffs' claims as a result of prior adjudication.

## C. PRIOR PHYSICAL INJURY REQUIREMENT

Pursuant to 42 U.S.C. § 1997e(e), "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." Claims by prisoners brought pursuant to § 1983 for emotional damages unrelated to any physical injuries are subject to dismissal. *See, e.g., Dawes v. Walker,* 239 F.3d 489, 494 (2d Cir.2001) (finding failure to make an objective showing of actual injury necessary to state an Eighth Amendment claim based on prison conditions); *Siglar v. Hightower,* 112 F.3d 191, 193-94 (5th Cir.1997) (finding bruised ear an insufficient physical injury to overcome bar of § 1997e(e)); *Zehner v.*

*Trigg,* 952 F.Supp. 1318, 1322-23 (S.D.Ind.) (dismissing claim based on prisoners' exposure to asbestos), *aff'd* 133 F.3d 459, 461 (7th Cir.1997); *Brazeau v. Travis,* No. 96 CV 783, 1996 WL 391701, at *1 (N.D.N.Y. July 9, 1996) (holding that claim for emotional damages caused by delay in receipt of parole hearing transcript was barred by § 1997e(e)).

**\*5** The absence of a physical injury does not constitute a total bar to claims by prisoners under § 1983, since application of § 1997e(e) does not bar claims for nominal damages, punitive damages, or declaratory or injunctive relief. *Wagnoon v. Gatson,* 00 Civ. 3722 and 99 Civ. 5872, 2001 U.S. Dist. LEXIS 8417, at *12-*13 (June 25, 2001). Nevertheless, Plaintiffs' claims for compensatory damages relating to non-physical accidents, particularly those raised by Plaintiffs Gobern, Johnson, and Purcell, may not meet the physical injury requirement of the PLRA. The court expressly leaves open the question of whether any Plaintiff can meet the prior physical injury requirement, which has been inadequately briefed on a plaintiff-by-plaintiff basis. Indeed, Defendant raises this issue only briefly in the context of argument presented as to the standard applicable to claims of a deprivation of rights under the Eighth Amendment. (*See* Defs.' Mem. of Law in Supp. of Mot. for Summ. J. at 30-31.)

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part without prejudice to renew. The following claims raised in the Fourth Amended Complaint are dismissed with prejudice: claims by Plaintiffs Bartley, Gobern, Johnson, Purcell, Stevens, and Suluk for injunctive relief; all claims for injunctive relief as to the conditions of the A & B yard that have been repaired; all claims against the State of New York and the other six Defendants in their official capacities for monetary relief pursuant to § 1983; all claims against the six individual Defendants in their individual capacities pursuant to the ADA and the Rehabilitation Act; and all claims against all Defendants under Section 70 of the New York State Correction Law. The remainder of Defendants' Motion for Summary Judgment is denied without prejudice to renew.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1392164 (S.D.N.Y.), 24 NDLR P 61
(Cite as: 2002 WL 1392164 (S.D.N.Y.))

The court directs the parties to appear before the court for a conference at 3:00 p.m. on Tuesday, July 2, 2002, prepared to discuss Plaintiffs' remaining claims and current conditions at Green Haven. If Defendants choose to submit additional briefing, such briefing must be submitted as a renewed motion for summary judgment filed within thirty days of the date of this Memorandum and Order.

SO ORDERED:

S.D.N.Y.,2002.
Shariff v. Coombe
Not Reported in F.Supp.2d, 2002 WL 1392164 (S.D.N.Y.), 24 NDLR P 61

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 2829876 (S.D.N.Y.)
(Cite as: 2004 WL 2829876 (S.D.N.Y.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
John DOE, Plaintiff,
v.
Glenn S. GOORD, et al. Defendants.
**No. 04 CV 0570 GBD AJP.**

Dec. 10, 2004.

*REPORT AND RECOMMENDATION*

PECK, Chief Magistrate J.

**\*1** Pro se plaintiff John Doe, a drug addicted **inmate** in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging violations of his constitutional rights by various employees of DOCS and the Office of Alcoholism and Substance Abuse Services ("OASAS"); Title II of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12132; FN1 and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. (*E.g.,* Dkt. No. 1: Compl. ¶ 2.) FN2 Doe alleges that the defendants: (1) violated his Eighth Amendment right to be free from cruel and unusual punishment by failing to provide him adequate comprehensive substance abuse services (Compl. ¶¶ 45-47 & *passim* ); (2) violated Doe's Fourteenth Amendment right to equal protection by denying him equal access to "comparable comprehensive mental health services than are provided to similarly situated groups of mentally disableds," specifically, "mentally ill" and "developmentally (sensorially)" disabled **prisoners** (Compl. ¶¶ 48-51; Doe Aff. ¶ 4); and (3) discriminated against Doe solely on the basis of his drug addiction disability, in contravention of the ADA and the Rehabilitation Act (Compl. ¶¶ 52-58). Doe seeks compensatory and punitive damages (Compl. ¶¶ 61-71) as well as injunctive relief. (Compl. ¶¶ 59-60, 72.) Doe sues defendants in their

individual and official capacities. (Compl.¶ 7.)

FN1. Doe states in his complaint that he is suing pursuant to 42 U.S .C. § "121232" (Dkt. No. 1: Compl. ¶ 2), and in his Affidavit states that the applicable section is "1211232" (Dkt. No. 9: Doe Aff. ¶ 2). However, because there are no such sections and the substance of his claim alleges violations of § 12132, this Court construes the extra numerals as merely typographical mistakes.

FN2. References to paragraphs in the Complaint are to the "Statement of Claim," unless otherwise indicated.

Presently before this Court is defendants' motion to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, 42 U.S.C. §§ 1997e(a) & (c), and 28 U.S.C. § 1915(e)(2)(B)(i). (Dkt. No. 5: Defs. Notice of Motion at 1.) Defendants move to dismiss on the grounds that: (1) Doe failed to **exhaust** available administrative remedies as required by the Prison Litigation Reform Act ("**PLRA**"), 42 U.S.C. § 1997e (Dkt. No. 7: Defs. Br. at 7-12); (2) Doe's claims are barred by the statute of limitations (*id.* at 12-14); (3) Doe fails to state a claim of deliberate medical indifference under the Eighth Amendment (Defs. Br. at 14-17); (4) Doe fails to state a Fourteenth Amendment equal protection claim (Defs. Br. at 17-18); (5) Doe fails to state a claim under the ADA or Rehabilitation Act (Defs. Br. at 18-22); (6) Doe's § 1983 claims fail because the defendants were not personally involved (Defs. Br. at 22-23); and (7) defendants have qualified immunity for the damages claims (*id.* at 23-24).

For the reasons set forth below, defendants' motion to dismiss should be: (1) GRANTED as to the damages claims under § 1983 against defendants in their official capacities; (2) GRANTED as to the damages claims under the ADA and Rehabilitation Act against the individual defendants in their individual capacities; and (3) DENIED in all other respects. Leave is granted for Doe to amend his complaint within 30 days to name DOCS, FN3 OASAS and Grievance Counselor C. Kjellander as defendants in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2829876 (S.D.N.Y.)
(Cite as: 2004 WL 2829876 (S.D.N.Y.))

this action.[FN4]

> **FN3.** Even though DOCS was served with the summons and complaint (Dkt. No. 4: Aff. of Service), it is not named as a defendant in the complaint's caption and defendants have not understood DOCS to be a defendant in this action. (*See* Dkt. No. 7: Defs. Br. at 18-19; Dkt. No. 11: Defs. Reply Br. at 6). Leave is granted for Doe to amend his complaint within 30 days of this Report and Recommendation to name DOCS as a defendant.

> **FN4.** Doe alleges facts against grievance counselor C. Kjellander (Compl.¶¶ 37, 41), and seeks damages from her (Compl.¶ 66, 71), but Kjellander is not named in the complaint's caption, nor is there any affidavit of service as to Kjellander. (*See* Dkt. No. 4 & 3/24/04 & 3/31/04 Affs. of Service.)

### FACTS

**\*2** The facts alleged in the complaint (and in Doe's affidavit in opposition to defendants' motion to dismiss)[FN5] are assumed to be true for purposes of this motion, and will be set forth herein without use of the preamble of "Doe alleges."

> **FN5.** In response to defendants' motion to dismiss, Doe submitted an affidavit in addition to his brief. (Dkt. No. 9: Doe. Aff.) Because Doe is a pro se plaintiff and this Court construes his pleadings with the liberal standard appropriate for such a plaintiff, this Court also takes as true for purposes of this motion those facts contained in Doe's affidavit.

Doe is currently incarcerated at Mid-Orange Correctional Facility. (Dkt. No. 1: Compl. at III(A); Dkt. No. 8: Doe Br. at 13; Dkt. No. 9: Doe Aff. at p. 15.) Doe previously was incarcerated at Sing Sing Correctional Facility. (Doe Aff. ¶ 33; Compl. ¶ 34.) Doe is "certified" as substance dependent and therefore qualifies as mentally disabled.

(Compl. ¶¶ 1, 18-19; Doe Aff. ¶¶ 12, 13 (citing Mental Hygiene Law § 1.03(3)).)

*The Defendants*

Defendant Glenn S. Goord is Commissioner of DOCS and is responsible for "providing state **prisoners** with timely and appropriate mental health care." (Dkt. No. 9: Doe Aff. ¶ 27 (citing Corr. Law §§ 45(6), 148).)

Defendant William A. Gorman is Commissioner of OASAS and is responsible for "establishing programs for the treatment of **prisoners** with substance dependence confined in state correctional facilities in New York." (Doe Aff. ¶ 27; Compl. ¶ 8.) The OASAS Commissioner also is responsible for administering federal, state, local and private funds for substance abuse services. (Compl.¶ 9.)

Defendant James H. Nuttall is DOCS Deputy Commissioner for Program Services and is responsible for "the delivery of program services to DOCS **inmates**, including substance abuse services." (Doe Aff. ¶ 28.)

Defendant Susan I. Schultz, Superintendent of Mid-Orange Correctional Facility, "is charged with the supervision, management, and control of Mid [-]Orange, including directing the work and defining the duties of all subordinate officers and employees of the facility," as well as being "responsible for the delivery of program services at Mid-Orange, including substance abuse services." (*Id.*)

Defendants Raimondo[FN6] and Hodelin are senior DOCS counselors and defendants Tully and Campbell are DOCS counselors. (Doe Aff. ¶ 29; Compl. ¶¶ 64-65.) DOCS counselors are responsible for evaluating **prisoners** and providing additional input in order to help determine the appropriate programs in which to place **inmates**. (Doe Aff. ¶ 29.)

> **FN6.** Doe originally referred to this defendant as senior counselor "Romano" in his complaint but corrected the name in his opposition affidavit

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2829876 (S.D.N.Y.)
(Cite as: 2004 WL 2829876 (S.D.N.Y.))

after defendants pointed out the error in their motion to dismiss. (Dkt. No. 7: Defs. Br. at 4 & n.3; Doe Aff. ¶ 26.)

### Doe's Drug Addiction and Alleged Treatment Needs

DOCS and OASAS share responsibility for providing substance abuse services to **inmates**. (Dkt. No. 1: Compl. ¶ 8; Dkt. No. 9: Doe Aff. ¶ 14.) Such services, as defined in the New York Mental Hygiene Law, are mandated to "include services to inhibit the onset of substance abuse or substance dependence, to address the social dysfunction, medical problems or other disabilities associated with substance abuse or substance dependence, and to rehabilitate persons suffering from substance abuse or substance dependence." (Doe Aff. ¶ 15 (citing Mental Hygiene Law § 1.03(43)).) Carrying out its mandate, OASAS and DOCS implemented the Comprehensive Alcohol and Substance Abuse Treatment ("CASAT") program which, despite "the [l]egislative intent of providing comprehensive treatment was to address the medical and mental health issues of 'legally disabled' substance abusers," is operated by non-medical personnel and does not have clinical eligibility criteria. (Compl. ¶ 16; Doe Aff. ¶ 17.) DOCS and OASAS also have not established uniform standards for services offered to all categories of mentally disabled **inmates**. (Compl. ¶ 23; *see* Doe Aff. ¶ 6.) DOCS and OASAS have implemented a comprehensive treatment program for substance abusers that denies access to violent offenders, such as Doe. (Doe Aff. ¶ 18.) There is no treatment program comparable to CASAT available to Doe. (Compl. ¶¶ 20, 30, 42.)

**\*3** Comprehensive treatment is essential to Doe's recovery because routine drug treatment has failed him in the past. (Compl. ¶¶ 28-29.) Since his incarceration in 1979, Doe has been in and out of the state prison system and currently is serving his fourth prison sentence. (Compl. ¶¶ 18, 29.) As a certified drug addict (Doe Aff. ¶ 10), Doe's medical condition " 'substantially limits' the condition, manner, and duration in which he can work in the free society." (Compl. ¶ 19; Doe Aff. ¶ 12.) Upon his release from each period of incarceration, Doe was less likely to "seek necessary substance abuse services" and was "less likely to trust substance abuse health care providers" as his disability became more and more severe with each prison tour. (Compl. ¶ 18.) "As punishment for recidivism and

current or prior criminal conduct," DOCS and OASAS have deprived Doe of access to "medically required treatment in a comprehensive therapeutic residential program with an aftercare and community reintegration component." (Compl. ¶ 20; *see also* Compl. ¶¶ 28, 42; Doe Aff. ¶ 3.)

After twenty-five years of being denied comprehensive drug treatment, Doe has "physically and mentally deteriorate[d] and [has] engage[d] in behavior symptomatic of his illness: commission of crimes, recidivism, and continued heroin use with resulting contraction of liver disease (HCV), physical scarring of the body from needle marks, and other physical ailments." (Compl. ¶ 43.) Doe has suffered as a result of the "intentionally discriminatory practices, polices, and procedures" to the extent that there is "a grave and substantial risk of harm that [Doe] will not recover from substance dependence." (Compl. ¶ 44.)

### Doe's Requests for Treatment

Doe alleges that "[a]pplying for CASAT was nothing more than a 'procedural merry-go-round' that defendants knew ... Doe would never qualify to participate [in]." (Dkt. No. 1: Compl. ¶ 32; *see* Dkt. No. 9: Doe Aff. ¶ 42.) On April 5, 1999, Doe applied for admission to the CASAT program. (Doe Aff. ¶ 44 & Ex. A at 55.) [FN7] Doe's application was approved at the facility level but denied on appeal to the Temporary Release Committee ("TRC") interviewer and Doe appealed by letter dated April 18, 1999 to the TRC Director but never received a response. (Doe Aff. ¶ 44 & Ex. A at 57-58.)

FN7. As defendants explain in their motion to dismiss (Dkt. No. 7: Defs. Br. at 3), CASAT is a three-phase program which provides sustained support and services to chemically dependent **inmates** so that **inmates** can successfully reintegrate into society upon parole. *See* 7 N.Y.C.R.R. §§ 1950.1, 1950.2. **Inmates** become time eligible for CASAT when they are within 12-24 months of their earliest release date and are eligible for presumptive work release approval contingent on completion of Phase I of CASAT. 7 N.Y.C.R.R. §§ 1950.3(a)(1), (4). In

Not Reported in F.Supp.2d, 2004 WL 2829876 (S.D.N.Y.)
(Cite as: 2004 WL 2829876 (S.D.N.Y.))

Phase I, **inmates** enter a correctional treatment facility and then must be granted presumptive work release to enter Phase II wherein **inmates** are transferred to a work release facility in preparation for Phase III which is the aftercare component in the community provided **inmates** are granted parole. 7 N.Y.C.R.R. § 1950.2(a)-(c).

"Between September, 2000 and July 2003, [Doe] wrote numerous letters of complaint to OASAS and DOCS Commissioners requesting comprehensive medical treatment." (Compl. ¶ 34; Doe Aff. ¶ 31.) Doe's complaints were referred to Counselors Raimondo and Tully while Doe was at Sing Sing from July 2000 through April 2002. (Compl.¶ 34.) Counselors Raimondo and Tully knew of Doe's "disability and medical needs for comprehensive treatment, past failures to respond to routine drug treatment, and likelihood of relapsing should he not receive comprehensive therapy." (Compl.¶ 36; Doe Aff. ¶ 32.) Counselors provide the initial screening process for **inmates** being considered for comprehensive substance abuse services. (Compl. ¶ 35; Doe Aff. ¶ 30.) Despite their knowledge that "the deprivation of such services posed a grave and substantial risk that plaintiff will not recover from substance dependence," Counselors Raimondo and Tully "intentionally disregarded ... Doe['s] request for required medical treatment." (Compl. ¶ 36; Doe Aff. ¶ 32.) In 2001, when Doe applied for "CASAT and Work-Release," Raimondo and Tully "intentionally mischaracterized "Doe's request as only an application for work-release. (Doe Aff. ¶ 33.) Raimondo and Tully " 'personally' " chaired the temporary release committee and denied Doe's application despite the grave risk such denial posed to Doe's chance of recovery. (Id.)

**\*4** Additionally, in the decision by the TRC reviewer rejecting Doe from CASAT again in 2001, he was told he could reapply in 2003. (Doe Aff. ¶ 34 & Ex. A at 30.) Doe sent a letter of appeal to the "Temporary Release Supervisor," the same person who had just denied his application. (Id. & Ex. A at 31-33.) Doe received a response from the TRC supervisor that his appeal was being returned to him because "it refers to a decision which was made on a previous appeal and is, in effect, an appeal of an appeal decision. There is no provision in Temporary Release Procedures for such action. An **inmate** is entitled to one appeal, and one only, on any given application." (Doe Aff. Ex. A at 34.) Doe was also

informed he could reapply eight weeks "after the final decision, or as otherwise directed." (Id.)

In July 2003, Doe encountered a similar response at Mid-Orange when he filed a "formal grievance, along with several letters of complaint to DOCS and OASAS commissioners requesting access to a comprehensive therapeutic residential treatment program with an aftercare and community reintegration component" that his condition required. (Compl.¶ 37.) Doe's grievance was assigned to **Inmate** Grievance Counselor Kjellander who referred his case to senior Counselor Hodelin. (Id.) They, along with Counselor Campbell, Doe's assigned counselor at the time, intentionally mischaracterized Doe's complaint as a "request for discretionary CASAT." (Id.) Counselors Hodelin and Campbell, who were fully apprised of Doe's history and risk of relapse without comprehensive treatment (id. ¶ 41), knew that Doe would be denied participation in CASAT and that "the deprivation of comprehensive medical treatment would pose a grave and substantial risk that [Doe] would not recover from substance dependence," but engaged in the mischaracterization nonetheless (id. ¶ 37). The grievance resolution officials "intentionally mischaracterized [Doe's] grievance as 'Wants RSAT' and recommended that he apply for CASAT upon becoming time eligible." (Id. ¶ 38.) Superintendent Shultz agreed with the mischaracterization and suggested Doe "revert to participation in the same conventional drug therapy that had failed him over the past 25 years." (Id.) The Central Office Review Committee ("CORC"), the body that handles appeals for DOCS' internal grievance procedure, continued the mischaracterization by referring to Doe's grievance as " 'Wants CASAT' " and found that Doe could not be remedied through the internal grievance procedure because CASAT has its own appeal mechanism which meant Doe had recourse only through the CASAT appeal procedure. (Id.) Deputy Commissioner James H. Nuttall, who "often responded on behalf of Commissioner Goord" (Compl.¶ 39), "repeatedly" referred Doe's complaints to corrections counselors "for disposition under CASAT." (Id.)

The "supervisory" defendants, "Commissioners Goord and Gorman, Deputy Commissioner Nuttall, and Superintendent Schultz, all had actual and constructive notice of the unconstitutional practices and policies which totally deprived [Doe] of comprehensive medical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2829876 (S.D.N.Y.)
(Cite as: 2004 WL 2829876 (S.D.N.Y.))

treatment and reasonable accommodation [sic] for his disability." (Compl. ¶ 40; *see* Doe Aff. ¶ 31.) None of these supervisory defendants acted to provide the treatment, "despite kn [o]wing that the deprivation of comprehensive medical treatment will pose a grave and substantial risk that [Doe] would not recover from substance dependence." (Compl. ¶ 40; Doe Aff. ¶ 31.) In sum, Doe alleges that DOCS and OASAS officials intentionally disregarded Doe's complaints and "relegated [Doe's] requests for treatment of his disability to disposition under DOCS's CASAT component ... to avoid providing [Doe] the requisite comprehensive medical treatment due in light of his disability status." (Compl.¶ 30.)

*Doe's Allegations of Differential Treatment Between Mentally Disabled **Prisoners***

**\*5** DOCS and OASAS deny Doe

equal protection of the law by denying him access to comprehensive treatment services as provided to similarly situated groups of mentally disableds: the mentally ill and developmentally (sensorially) disabled. Moreover, mentally disabled substance dependents are selectively denied access to comprehensive treatment services based on non-clinical reasons like history of violence and recidivism, while the mentally ill and developmentally disabled groups [a]re afforded unimpeded access to comprehensive treatment services solely on basis of their clinical criteria. Such discriminatory treatment is [n]ot rationally related to a legitimate state interest.

(Dkt. No. 1: Compl. ¶ 24; *see* Dkt. No. 9: Doe Aff. ¶ 4.) For example, the mentally ill have access to "intermediate level and long term care" by the Office of Mental Health ("OMH") through the Central New York Psychiatric Center ("CNYPC"). (Compl.¶ 25.) The CNYPC provides "both inpatient and outpatient services to **prisoners** in DOCS facilities." (*Id*.) Inpatient services include Residential Crisis Treatment Programs where **prisoners** are housed within treatment units and admission is based on clinical criteria "without regard to history of violence or recidivism." (*Id*.) Similarly, sensorially developmentally disabled **inmates** have access to "intermediate level and long term care" through units

provided by the Office of Developmentally Disabled. (Compl.¶ 26.) The facilities allow the "sensorially" disabled **inmates** to serve part of their sentences in units that can accommodate their disabilities and placement is based on clinical criteria only. (*Id* .)

As a "disabled substance abuser[ ]," "unlike similarly situated mentally ill or sensorially disabled" **inmates**, Doe is denied access to comprehensive treatment services for "non-clinical reasons." (Compl.¶ 27.) Moreover, while DOCS and OASAS furnish mentally ill and developmentally disabled **inmates** with service-level numbers to categorize their treatment needs, no such designations are provided to substance abusers. (*Id.*) "There is [n]o rational basis for the difference in treatment among the disabled groups." (*Id.*) The DOCS facilities that Doe has access to are ill-equipped to meet his treatment needs. (Compl.¶ 28.)

*Doe's Claims*

Doe asserts claims for:

(1) Eighth Amendment cruel and unusual punishment because of deliberate indifference to Doe's "medically required comprehensive substance dependence treatment." (Dkt. No. 1: Compl. ¶¶ 45-47.)

(2) Denial of equal protection under the Fourteenth Amendment, by denying him equal access to comprehensive mental health services provided to other similarly situated groups of mentally disableds, to wit, mentally ill and developmentally (sensorially) disabled, and by denying him access to treatment because of his history of violence and recidivism. (Compl.¶¶ 48-51.)

(3) Violation of the ADA and Rehabilitation Act. (Compl.¶¶ 52-57.)

*ANALYSIS*

I. *THE STANDARD GOVERNING A MOTION TO*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2829876 (S.D.N.Y.)
(Cite as: 2004 WL 2829876 (S.D.N.Y.))

*DISMISS* [FN8]

> [FN8.](#) For additional cases by this Judge discussing the standard governing a motion to dismiss, *see, e.g., Lynch v. Menifee,* 02 Civ. 5219, 2004 WL 1738888 at *3-4 (S.D.N.Y. Aug. 4, 2004) (Peck, M.J.); *Pierce v. Marano,* 01 Civ. 3410, 2002 WL 1858772 at *3-4 (S.D.N.Y. Aug. 13, 2002) (Peck, M.J.); *Bolanos v. Norwegian Cruise Lines Ltd.,* 01 Civ. 4182, 2002 WL 1465907 at *3 (S.D.N.Y. July 9, 2002)* (Peck, M.J.), *aff'd,* 2004 WL 769766 (S.D .N.Y. Apr. 12, 2004) (Berman, D.J.); *Pantoja v. Scott,* 96 Civ. 8593, 2001 WL 1313358 at *4 (S.D.N.Y. Oct. 26, 2001) (Peck, M.J.); *Leemon v. Burns,* 175 F.Supp.2d 551, 553-54 (S.D.N.Y.2001) (Peck, M.J.); *LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co ., 951 F.Supp. 1071, 1080-81 (S.D.N.Y.1996)* (Knapp, D.J. & Peck, M.J.); *In re Towers Fin. Corp. Noteholders Litig.,* 93 Civ. 0180, 1995 WL 571888 at *11 (S.D.N.Y. Sept. 20, 1995) (Peck, M.J.), *report & rec. adopted,* 936 F.Supp. 126 (S.D.N.Y.1996) (Knapp, D.J.).

**\*6** A district court should deny a Rule 12(b)(6) motion to dismiss " 'unless it appears to a certainty that a plaintiff can prove no set of facts entitling him to relief." ' *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1052 (2d Cir.1993) (quoting *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 779 (2d Cir.1984)), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86 (1994).[FN9] A court must accept as true the facts alleged in the complaint and draw all reasonable inferences in favor of the nonmoving party-here, the plaintiff. *Cosmas v. Hassett,* 886 F .2d 8, 11 (2d Cir.1989).[FN10]

> [FN9.](#) *Accord, e.g., Weinstein v. Albright,* 261 F.3d 127, 131 (2d Cir.2001); *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 69 (2d Cir.), *cert. denied,* 534 U.S. 1071, 122 S.Ct. 678 (2001); *Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir.1998).

> [FN10.](#) *Accord, e.g., Weinstein v. Albright,* 261 F.3d at 131; *In re Scholastic Corp. Sec. Litig.,*

252 F.3d at 69.

The "standards for dismissal under [Rule] 12(b)(6) and 12(b)(1) are substantively identical." *Lerner v. Fleet Bank, N.A.,* 318 F .3d 113, 128 (2d Cir.), *cert. denied,* 124 S.Ct. 532 (2003); *see also, e.g., Moore v. PaineWebber, Inc.,* 189 F.3d 165, 169 n.3 (2d Cir.1999); *Bishop v. Porter,* 02 Civ. 9542, 2003 WL 21032011 at *3 (S.D.N.Y. May 8, 2003); *Tennant v. United States Bureau of Prisons,* 02 CV 00558, 2003 WL 1740605 at *1 (D.Conn. Mar. 29, 2003).[FN11]

> [FN11.](#) The only substantive difference is "that the party invoking the jurisdiction of the court has the burden of proof in a 12(b)(1) motion, in contrast to a 12(b)(6) motion, in which the defendant has the burden of proof." *Lerner v. Fleet Bank, N.A.,* 318 F.3d at 128 (citing *Thompson v. County of Franklin,* 15 F.3d 245, 249 (2d Cir.1994)); *see also, e.g., Langella v. Bush,* 306 F.Supp.2d 459, 463 (S.D.N.Y.2004) ("On a motion to dismiss pursuant to Rule 12(b)(1), plaintiff carries the burden of establishing that subject matter jurisdiction exists over his complaint."); *Bishop v. Porter,* 2003 WL 21032011 at *3.

A motion to dismiss challenges only the face of the pleading. Thus, in deciding a motion to dismiss, "the Court must limit its analysis to the four corners of the complaint." *Vassilatos v. Ceram Tech Int'l Ltd.,* 92 Civ. 4574, 1993 WL 177780 at *5 (S.D.N.Y. May 19, 1993) (citing *Kopec v. Coughlin,* 922 F.2d 152, 154-55 (2d Cir.1991)).[FN12] The Court, however, may consider documents attached to the complaint as an exhibit or incorporated in the complaint by reference. *E.g., Chambers v. Timer Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) ("Because this standard has been misinterpreted on occasion, we reiterate here that a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough."); *Yak v. Bank Brussels Lambert, BBL (USA) Holdings, Inc.,* 252 F.3d 127, 130 (2d Cir.2001) (citing *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 1125 S.Ct. 1561 (1992)); *Rothman v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2829876 (S.D.N.Y.)
(Cite as: 2004 WL 2829876 (S.D.N.Y.))

*Gregor,* 220 F.3d 81, 88 (2d Cir.2000) ("For purposes of a motion to dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference ...."); *see also, e.g., Paulemon v. Tobin,* 30 F.3d 307, 308-09 (2d Cir.1994); *Brass v. American Film Tech., Inc.,* 987 F.2d 142, 150 (2d Cir.1993).

FN12. *Accord, e.g., Aniero Concrete Co. v. New York City Constr. Auth.,* 94 Civ. 3506, 2000 WL 863208 at *31 (S.D.N.Y. June 27, 2000); *Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.,* 97 Civ. 5499, 2000 WL 264295 at *12 (S.D.N.Y. Mar. 9, 2000) ("When reviewing the pleadings on a motion to dismiss pursuant to Rule 12(b)(6), a court looks only to the four corners of the complaint and evaluates the legal viability of the allegations contained therein.").

When additional materials are submitted to the Court for consideration with a 12(b)(6) motion, the Court must either exclude the additional materials and decide the motion based solely upon the complaint, or convert the motion to one for summary judgment under Fed.R.Civ.P. 56. *See* Fed.R.Civ.P. 12(b); *Friedl v. City of New York,* 210 F.3d 79, 83 (2d Cir.2000); *Fonte v. Board of Managers of Cont'l Towers Condos,* 848 F.2d 24, 25 (2d Cir.1988).

The Court's role in deciding a motion to dismiss " 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.' " *Saunders v. Coughlin,* 92 Civ. 4289, 1994 WL 88108 at *2 (S.D.N.Y. Mar. 15, 1994) (quoting *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980)); *accord, e.g., Watson v. McGinnis,* 964 F.Supp. 127, 130-31 (S.D.N.Y.1997) (Kaplan, D.J. & Peck, M.J.). " '[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." ' *Saunders v. Coughlin,* 1994 WL 88108 at *2 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686 (1974)). A Rule 12(b)(6) motion will be granted " 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." ' *Saunders v.*

*Coughlin,* 1994 WL 88108 at *2 (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232 (1984)).

**\*7** When reviewing a pro se complaint, the Court must use less stringent standards than if the complaint had been drafted by counsel. *See, e.g., LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991); *Watson v. McGinnis,* 964 F.Supp. at 131; *Saunders v. Coughlin,* 1994 WL 88108 at *2 (citing *Hughes v. Rowe,* 449 U.S. 5, 101 S.Ct. 173 (1980)). However, "[d]ismissal under Rule 12(b)(6) is proper if the complaint lacks an allegation regarding an element necessary to obtain relief...." 2 *Moore's Federal Practice* § 12.34 [4][a], at 12-72.7 (2004). Thus, the " 'duty to liberally construe a plaintiff's complaint [is not] the equivalent of a duty to re-write it." ' *Id.,* § 12.34[1][b], at 12-61; *see also, e.g., Joyner v. Greiner,* 195 F.Supp.2d 500, 503 (S.D.N.Y.2002) (action dismissed because pro se plaintiff "failed to allege the facts tending to establish" that defendants violated his constitutional rights).

The **PLRA** allows dismissal of claims that are "frivolous or malicious." 28 U.S.C. § 1915(e)(2)(B)(i); *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 198 (2d Cir.2004). "An action is 'frivolous' for § 1915(e) purposes if it has no arguable basis in law or fact, as is the case if it is based on an 'indisputably meritless legal theory." ' *Montero v. Travis,* 171 F.3d 757, 759-60 (2d Cir.1999). "A complaint will be dismissed as 'frivolous' when 'it is clear that the defendants are immune from suit." ' *Montero v. Travis,* 171 F.3d at 760. Additionally, 42 U.S.C. § 1997e(c) requires the Court, *inter alia,* to dismiss an action which is frivolous or malicious or seeks money damages from a defendant who is "immune from such relief."

II. *THE COURT SHOULD DENY DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES FOR DOE'S EIGHTH AMENDMENT AND FOURTEENTH AMENDMENT CLAIMS* FN13

FN13. Defendants also contend that Doe's **ADA** claims are unexhausted because Doe did not follow the additional administrative remedies set by the Department of Justice ("DOJ"). (Dkt. No.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2829876 (S.D.N.Y.)
(Cite as: 2004 WL 2829876 (S.D.N.Y.))

7: Def. Br. at 11.) Doe concedes that his **ADA** claims were not exhausted through the DOJ. (*See* Dkt. No. 9: Doe Aff. ¶ 20.) District court decisions in this Circuit are split as to whether exhaustion of DOJ remedies is required before **prisoner ADA** claims may be brought in federal court. Several courts have held exhaustion was not mandatory because Title II of the **ADA** does not require exhaustion prior to filing a federal suit and filing external grievances is not necessary for the **PLRA's** policy concerns of allowing corrections officials to address **inmate** complaints internally. *E.g., Veloz v. State of New York,* 02 Civ. 7070, 2004 WL 2274777 at *8 (S.D.N.Y. Sept. 30, 2004) (Stein, D.J.); *Parkinson v. Goord,* 116 F.Supp.2d 390, 398 (W.D.N.Y.2000) (Larimer, D.J.). Other district court decisions in this Circuit have dismissed **prisoner ADA** claims for failure to **exhaust** them with the DOJ. *E.g., Burgess v. Garvin,* 01 Civ. 10994, 2004 WL 527053 at *3 (S.D.N.Y. Mar. 16, 2004) (Lynch, D.J.); *Rosario v. New York State Dep't of Corr. Servs.,* 03 Civ. 859, 2003 WL 22429271 at *3-4 (S.D.N.Y. Sept. 24, 2003) (Brieant, D.J.).

Since Doe's constitutional claims survive and the **ADA** claims do not expand the scope of discovery, it makes sense to let this claim proceed at this stage and revisit the DOJ exhaustion issue after discovery via a summary judgment motion, if appropriate, by which time the Second Circuit may have resolved the conflict in the caselaw. *See, e.g., Metallia U.S.A. LLC v. Stulpinas,* 98 Civ. 3497, 1998 WL 1039103 at *2 n.3 (S.D.N.Y. Dec. 16, 1998) (Peck, M.J.) (denying defendant's motion to dismiss certain claims where decision on the motion would not affect scope of discovery) (citing cases).

Moreover, the record is not clear at this stage as to whether the information provided to **prisoners** such as Doe informs them of the DOJ procedures. Even decisions requiring **prisoners** to **exhaust** DOJ procedures have recognized that this is dependent on DOCS making this information known to **prisoners**.

*See, e.g., Burgess v. Garvin,* 2004 WL 527053 at *5.*

The DOJ exhaustion issue can be re-visited after discovery at the summary judgment or trial stage of this case.

A. *Exhaustion of Administrative Remedies: Background*

Under 42 U.S.C. § 1997e(a), as amended by the Prison Litigation Reform Act ("**PLRA**"), a **prisoner** must exhaust administrative remedies before bringing suit in federal court under federal law:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a **prisoner** confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). This provision requires complete exhaustion in accordance with the administrative procedures within DOCS. Exhaustion is required even when a **prisoner** seeks a remedy that cannot be awarded by such administrative procedures. *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 988 (2002); *Booth v. Churner,* 532 U.S. 731, 741, 121 S.Ct. 1819, 1825 (2001).[FN14] The Supreme Court has made clear that the **PLRA's** exhaustion requirement applies to all **prisoner** claims:

FN14. *See also, e.g., Beharry v. Ashcroft,* 329 F.3d 51, 58 (2d Cir.2003); *Rivera v. Pataki,* 01 Civ. 5179, 2003 WL 21511939 at *4, 8 (S.D.N.Y. July 1, 2003); *Muhammad v. Pico,* 02 Civ. 1052, 2003 WL 21792158 at *7 (S.D.N.Y. Aug. 5, 2003) (Peck, M.J.); *Nelson v. Rodas,* 01 Civ. 7887, 2002 WL 31075804 at *2 (S.D.N.Y. Sept. 17, 2002) (Peck, M.J.).

[W]e hold that the **PLRA's** exhaustion requirement applies to all **inmate** suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2829876 (S.D.N.Y.)
(Cite as: 2004 WL 2829876 (S.D.N.Y.))

**\*8** *Porter v. Nussle,* 534 U.S. at 532, 122 S.Ct. at 992.

The Second Circuit recently held that the defendants' behavior may render administrative remedies unavailable. *Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) (Defendant prison officials' failure to implement **inmate's** favorable rulings resulting from the internal grievance procedure rendered administrative relief "unavailable" under the **PLRA** because "[a] **prisoner** who has not received promised relief is not required to file a new grievance where doing so may result in a never-ending cycle of exhaustion."); *accord, Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004) ("We hold today in *Abney v. McGinnis* that, in some circumstances, the behavior of the defendants may render administrative remedies unavailable."). Therefore, where a **prisoner's** failure to exhaust administrative remedies has been raised, courts should first determine whether the remedies were in fact available to be exhausted. *Abney v. McGinnis,* 380 F.3d at 667. "The test for deciding whether the internal grievance procedures were available must be an objective one: that is, would a 'similarly situated individual of ordinary firmness' have deemed them available." *Hemphill v. New York,* 380 F.3d at 688.

Even if the administrative remedies are determined to have been "available," the Second Circuit has ruled that certain "caveats" apply to the **PLRA's** mandatory exhaustion requirement. *Giano v. Goord,* 380 F.3d 670, 676-78 (2d Cir.2004) (" 'Special circumstances' ' may serve as justification for a **prisoner's** failure to exhaust available administrative remedies, including a **prisoner's** reasonable mis-interpretation of DOCS regulations.).[FN15] Justification for a failure to exhaust otherwise available administrative remedies is determined by "looking at the circumstances which might understandably lead usually uncounselled **prisoners** to fail to grieve in the normally required way." *Giano v. Goord,* 380 F.3d at 678 ( **prisoner's** belief that direct appeal of his disciplinary conviction was his only available remedy was a reasonable interpretation of DOCS' directives on the grievance procedure and therefore his failure to exhaust was justified).

FN15. *See also, e.g., Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004) (affirmative defense of exhaustion is waived if not raised by defendants); *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004) (affirmative defense of exhaustion is subject to estoppel when defendants prevent an **inmate** from following grievance procedures).

Dismissal of an action for failure to exhaust administrative remedies ordinarily is without prejudice. *E.g., Giano v. Goord,* 380 F.3d at 675 ("[A]dministrative exhaustion is not a jurisdictional predicate."); *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004) ("As we have noted, '[f]ailure to exhaust administrative remedies is often a temporary, curable procedural flaw. If the time permitted for pursuing administrative remedies has not expired, a **prisoner** who brings suit without having exhausted these remedies can cure the defect simply by exhausting them and then reinstituting his suit....' In such circumstances, we have recognized that dismissal without prejudice is appropriate.") (citations omitted).[FN16]

FN16. *See also, e.g., Townsend v. Armstrong,* No. 02-0175, 67 Fed. Appx. 47, 49, 2003 WL 21309185 at *1 (2d Cir. June 5, 2003); *De La Motte v. Menifee,* No. 01-0313, 40 Fed. Appx. 639, 639, 2002 WL 1635422 at *1 (2d Cir. July 23, 2002); *Muhammad v. Pico,* 2003 WL 21792158 at *8; *Stevens v. Goord,* 99 Civ. 11669, 2003 WL 21396665 at *4 (S.D.N.Y. June 16, 2003); *Nelson v. Rodas,* 2002 WL 31075804 at *2.

It is useful briefly to summarize DOCS' "well-established" normal three tier internal grievance procedure ("IGP"):

**\*9** It consists of three levels. The first is the filing of a complaint with the facility's **Inmate** Grievance Review Committee. The second is an appeal to the facility superintendent. The final level is an appeal to the DOCS Central Office Review Committee in Albany.... A **prisoner** has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure.

*Muhammad v. Pico,* 2003 WL 21792158 at *8 & n.21 (citing cases); *see* N.Y. Correct. Law §§ 138-39; 7 N.Y.C.R.R. § 701.1, et seq.; *see also, e.g., Abney v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2829876 (S.D.N.Y.)
(Cite as: 2004 WL 2829876 (S.D.N.Y.))

*McGinnis,* 380 F.3d at 668.

**B.** *Doe's Exhaustion of Administrative Remedies*

Defendants concede that Doe exhausted DOCS' three-tier Internal Grievance Procedure. (Dkt. No. 7: Defs. Br. at 7.) Defendants contend, however, that Doe's failure to appeal the denial of his CASAT application, which has its own appeal mechanism, amounts to a failure to exhaust under the **PLRA**. (Defs. Br. at 7-10 (citing 7 N.Y.C.R.R. § 701.3(e)(1)).) [FN17] Defendants specifically point to Doe's 1999 application for the CASAT program which was denied by the central office for temporary release but Doe did not appeal to the director of the temporary release program as required by regulation. (Defs. Br. at 7, 9.)

FN17. Section 701.3(e) of DOCS Regulations sets forth that certain matters need to be grieved outside the Internal Grievance Procedure:

Some grievances request actions that are not obtainable through the IGP. These cases, although initially accepted as grievances, may be dismissed at the IGRC hearing. In such cases the grievant shall be directed to the appropriate mechanism where he/she can seek the solution requested.

(1) The individual decisions or dispositions of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered nongrievable.

(2) The policies, rules and procedures of any such nongrievable programs or procedures, however, may be the subject of a grievance.

However, Doe alleges that he did in fact appeal to the Director of TRC, in a letter dated April 18, 1999, and never received a response. (Dkt. No. 9: Doe Aff. ¶ 44 & Ex. A at 57-58.) [FN18] Such an appeal would appear to satisfy the CASAT exhaustion requirement.

FN18. Doe attached this letter to his opposition affidavit; while it is addressed generally to the "Temporary Release Program," it is not clear whether it was intended for the Director, since the salutation is to "Sir/Madame." (Doe Aff. Ex. A at 57-58.) However, viewing the facts as alleged by Doe to be true, the letter is considered to have been directed to the director and therefore would serve as proper exhaustion.

Additionally, after his appeal of the denial of his CASAT application to the TRC reviewer, Doe received a response telling him he could not appeal an already appealed decision. (*See* page 8 above.) Doe also was told he could reapply at a later date. (*See* page 8 above.) Doe's acceptance of this notice as an indication that he had no further avenues of appeal would seem to be objectively reasonable. Under the considerations outlined by the Second Circuit, Doe may well have been justified in any unexhausted appeals through CASAT because he reasonably interpreted the appeals process as it was presented to him.[FN19]

FN19. Finally, recognizing that the denial of temporary release through CASAT is non-grievable under DOCS regulations (Doe Aff. ¶ 22), Doe outlined the requirements for challenging a DOCS policy regarding accommodations for disabilities as he understood them. (Doe Aff. ¶¶ 23-25.) Doe apparently believed that his desire to change DOCS's policies required grievances filed through the IGP process, which he did.

In short, on a motion to dismiss (or even considered as an early, pre-discovery summary judgment motion), the Court cannot say for certain that plaintiff will be unable to show that he exhausted administrative remedies. Defendants' motion to dismiss for failure to exhaust should be *DENIED.*

**III.** *DEFENDANTS' MOTION TO DISMISS ON STATUTE OF LIMITATIONS GROUNDS SHOULD BE DENIED*

Not Reported in F.Supp.2d, 2004 WL 2829876 (S.D.N.Y.)
(Cite as: 2004 WL 2829876 (S.D.N.Y.))

The statute of limitations for a § 1983 action is three years. *See, e.g., Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir.2004) ("The statute of limitations applicable to claims brought under § ... 1983 in New York is three years."); *Holiday v. Martinez,* No. 02-7848, 68 Fed. Appx. 219, 222, 2003 WL 21242641 at *2 (2d Cir. May 29, 2003) (three-year statute of limitations applies to § 1983 due process claim, which accrues when plaintiff knows or has reason to know of the injury which is the basis of his action); *Warren v. Altieri,* No. 02-69, 59 Fed. Appx. 426, 427, 2003 WL 1191173 at *1 (2d Cir. Mar. 13, 2003) (plaintiff's " § 1983 action is governed by New York's three-year statute of limitations as set out in N.Y. C.P.L.R. § 214, the provision applicable to actions for personal injury."). [FN20]

> [FN20.] *See also, e.g., Pearl v. City of Long Beach,* 296 F .3d 76, 79 (2d Cir.2002), *cert. denied,* 123 S.Ct. 1574 (2003); *Paige v. Police Dep't,* 264 F.3d 197, 199 n. 2 (2d Cir.2001); *Connolly v. McCall,* 254 F.3d 36, 40-41 (2d Cir.2001); *Muhammad v. Pico,* 02 Civ. 1052, 2003 WL 21792158 at *18 (S.D.N.Y. Aug. 5, 2003) (Peck, M.J.); *Bristow v. Smith,* 03 Civ. 2663, 2003 WL 21437005 at *1 (S.D.N.Y. June 18, 2003) (Peck, M.J.); *cf. Noguera v. Hasty,* 99 Civ. 8786, 2000 WL 1011563 at *12 (S.D.N.Y. July 21, 2000) (Peck, M.J.) *report & rec. adopted in part,* 2001 WL 243535 (S.D.N.Y. Mar. 12, 2001) (Wood, D.J.).

**\*10** Defendants claim that Doe's claim accrued in 1999, when he first was rejected for CASAT. (Dkt. No. 7: Defs. Br. at 13.) Doe, however, clearly claims injuries arising out of the denials of his August 2001 and July 2003 applications and the continuing failure to provide him comprehensive drug treatment up through the present. (Dkt. No. 1: Compl. ¶¶ 34-42; *see also* Dkt. No. 9: Doe Aff. Ex. A at 25-34, 35-52.) These claims are within the three-year statute of limitations and therefore provide Doe with the possibility of relief. *See, e.g., Harris v. City of New York,* 186 F.3d 243, 250 (2d Cir.1999) (At the motion to dismiss stage, "in the statute of limitations context ... dismissal is appropriate only if a complaint clearly shows the claim is out of time. And consistently with the Amended Complaint it is possible that [plaintiff]

could demonstrate some discriminatory act that did occur within the statute of limitations, so that his claim would not be time-barred."). [FN21] Defendants' motion to dismiss on statute of limitations grounds therefore should be *DENIED*.

> [FN21.] Whether the "continuing violation doctrine" should apply also need not be determined at this stage; nevertheless as required by that doctrine Doe has alleged both "the existence of an ongoing policy of discrimination and some non-time-barred acts taken in furtherance of that policy." *See, e.g., Harris v. City of New York,* 186 F.3d at 250.

## IV. *DEFENDANTS' MOTION TO DISMISS SHOULD BE DENIED AS TO DOE'S § 1983 CLAIMS* [FN22]

> [FN22.] Doe has sued the defendants in their official and individual capacities. It is well-settled that suits brought pursuant to § 1983 against state officials in their official capacities are barred by the Eleventh Amendment insofar as they seek money damages. *E.g., Baker v. Welch,* 03 Civ. 2267, 2003 WL 22901051 at *6 (S.D.N.Y. Dec. 10, 2003) (Peck, M.J.) (" 'It is black letter law that a suit against a state official in his official capacity seeking damages is barred by the Eleventh Amendment ...' ") (quoting *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *1 (S.D.N.Y. Sept. 29, 2000) (Peck, M.J.) (quoting *Jackson v. Johnson,* 30 F.Supp.2d 613, 618 (S.D.N.Y.1998) (Kaplan, D.J. & Peck, M.J.) ( & cases cited therein)). The Eleventh Amendment does not, however, bar suits against state officials seeking prospective injunctive relief. *Jackson v. Johnson,* 30 F.Supp.2d at 618 ("[A] suit against a state official in his official capacity based on federal law and seeking prospective injunctive relief is not barred by the Eleventh Amendment.") (citing cases). Therefore, Doe's § 1983 damages claims survive against the individual defendants in their individual capacities, and his claims for injunctive relief may go forward against the defendants in their official capacities.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2829876 (S.D.N.Y.)
(Cite as: 2004 WL 2829876 (S.D.N.Y.))

To state a claim under § 1983 the plaintiff must show that: "(1) the defendant officials acted under 'color of state law'; and (2) their conduct or actions deprived plaintiff of a right, privilege, or immunity guaranteed by the Constitution or laws of the United States." *Shabazz v. Vacco,* 97 Civ. 3761, 1998 WL 901737 at *2 (S.D.N.Y. Dec. 28, 1998) (citing *Pitchell v. Callan,* 13 F.3d 545, 547-48 (2d Cir.1994)); *see also, e.g., Feingold v. New York,* 366 F.3d 138, 159 (2d Cir.2004) ("To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."); *Hall v. Perilli,* 03 Civ. 4635, 2004 WL 1068045 at *5 (S.D.N.Y. May 13, 2004) (Peck, M.J.) ("To prevail in a § 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory right and that the deprivation occurred under color of state law."); *Nelson v. Rodas,* 01 Civ. 7887, 2002 WL 31075804 at *11 (S.D.N.Y. Sept. 17, 2002) (Peck, M.J.) (same). Further, to survive a motion to dismiss, the § 1983 complaint must make specific allegations of facts "indicating a deprivation of constitutional rights." *Shabazz v. Vacco,* 1998 WL 901737 at *2. Section 1983 claims brought by **prisoners** will fail if the complaint " 'consist[s] of nothing more than naked assertions....' " *Shabazz v. Vacco,* 1998 WL 901737 at *2 (quoting *Mitchell v. Keane,* 974 F.Supp. 332, 338 (S.D.N.Y.1998) (quoting *Martin v. New York State Dep't of Mental Hygiene,* 588 F.2d 371, 372 (2d Cir.1978)), *aff'd,* No. 98-2368, 175 F.3d 1008 (table) (2d Cir.1999)).

A. *Defendants' Personal Involvement* [FN23]

FN23. For additional decisions by this Judge discussing the personal involvement standard for § 1983 claims in language substantially similar to that in this entire section of this Report and Recommendation, *see Hall v. Perilli,* 03 Civ. 4635, 2004 WL 1068045 at *8-9 (S.D.N.Y. May 13, 2004) (Peck, M.J.); *Muhammad v. Pico,* 02 Civ. 1052, 2003 WL 21792158 at *16 (S.D.N.Y. Aug. 5, 2003) (Peck, M.J.); *Walker v. Pataro,* 99 Civ. 4607, 2002 WL 664040 at *10 (S.D.N.Y. Apr. 23, 2002) (Peck, M.J.); *Espinal v. Goord,* 00 Civ. 2242, 2001 WL 476070 at *10 (S.D.N.Y. May 7, 2001) (Peck, M.J.); *Fulmore v. Mamis,* 00 Civ. 2831, 2001 WL 417119 at *8 (S.D.N.Y. Apr. 3, 2001) (Peck, M.J.) ( & cases cited therein); *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *7 (S.D.N.Y. Sept. 29, 2000) (Peck, M.J.); *Djonbalic v. City of New York,* 99 Civ. 11398, 2000 WL 1146631 at *11 (S.D.N.Y., Aug 14, 2000) (Peck, M .J.); *Carbonell v. Goord,* 99 Civ. 3208, 2000 WL 760751 at *6 (S.D .N.Y. June 13, 2000) (Peck, M.J.); *Ali v. Szabo,* 81 F.Supp.2d 447, 462 (S.D.N.Y.2000) (Pauley, D.J. & Peck, M.J.).

*11 "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *accord, e.g., Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 122 (2d Cir.2004); *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003); *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999); *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Torres v. Mazzuca,* 246 F.Supp.2d 334, 338-39 (S.D.N.Y.2003); *Zamakshari v. Dvoskin,* 899 F.Supp. 1097, 1109 (S.D.N.Y.1995) (Sotomayor, D.J. & Peck, M.J.) ("In order to maintain a cause of action [under § 1983] against any official, a plaintiff must show that the defendant was personally involved in the alleged deprivation of his constitutional rights, since the doctrine of *respondeat superior* does not apply to § 1983 actions.").[FN24]

FN24. *See also, e.g., Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 254 (2d Cir.2001); *see also, e.g., Provost v. City of Newburgh,* 262 F.3d 146, 154 (2d Cir.2001); *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001) ("Proof of an individual defendant's personal involvement in the alleged wrong is ... a prerequisite to his liability on a claim for damages under § 1983."); *Brown v. Peters,* No. 97-2725, 175 F.3d 1007 (table), 1999 WL 106214 at *1 (2d Cir. Feb. 26, 1999).

"The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2829876 (S.D.N.Y.)
(Cite as: 2004 WL 2829876 (S.D.N.Y.))

unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of **inmates** by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* *58 F.3d at 873.*[FN25]

> FN25. *Accord, e.g., Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *Wright v. Smith,* 21 F.3d at 501; *Torres v. Mazzuca,* 246 F.Supp.2d at 339; *Zamakshari v. Dvoskin,* 899 F.Supp. at 1109; *see also, e.g., Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002).

Defendants Schultz, Raimondo, Hodelin, Tully and Campbell contend that they were not personally involved because Doe alleges injuries resulting from the policy of denying residential drug treatment programs to **inmates** like him and they are not policymakers. (Dkt. No. 7: Defs. Br. at 22.) However, Doe alleges that counselors Raimondo, Campbell, Tully and Hodelin, as counselors, are charged with evaluating **inmates** for appropriate program placements. (Dkt. No. 9: Doe Aff. ¶ 29; *see also* Dkt. No. 1: Compl. ¶¶ 2, 34-37, 41 .) Further, Raimondo and Tully knew of Doe's history of addiction, his recidivism, past relapses and failures to respond to drug treatment and "likelihood of relapsing should [Doe] not receive comprehensive therapy," and nonetheless intentionally mischaracterized Doe's applications. (Compl. ¶ 36; Doe Aff. ¶ 33 .) Hodelin and Campbell also mischaracterized Doe's applications (Compl. ¶¶ 37, 41; Doe Aff. ¶ 37), and "intentionally refused to initiate the 'screening' and 'review' process for CASAT" which impeded Doe's administrative exhaustion process. (Doe Aff. ¶ 35.) The Court cannot say that there are no facts that Doe can prove that would entitle him to relief against these defendants for their roles in denying him proper drug treatment. (*See* Point I above.) Whatever the results on a summary judgment motion or at trial, at this motion to dismiss stage, these defendants' motion to dismiss for lack of personal involvement should be *DENIED.*

**\*12** As to the "supervisory defendants," Doe alleges that they failed to remedy the deficient treatment once they had received notice of it, and acted with deliberate indifference

when they were aware that unconstitutional practices were ongoing as to Doe. (Compl.¶¶ 40, 42-43.) Specifically, Doe alleges that Deputy Commissioner Nuttall, who is "responsible for the delivery of program services to DOCS **inmates**, including substance abuse services" (Doe Aff. ¶¶ 28, 30), referred Doe's complaints back to the corrections counselors for "disposition under CASAT." (Compl.¶ 39.) Doe alleges that Superintendent Schultz, in addition to her role as supervisor of employees at Mid-Orange, also is responsible for the delivery of "program services at Mid-Orange, including substance abuse services." (Doe Aff. ¶ 28.) Superintendent Schultz participated in the intentional mischaracterization of Doe's complaints despite having notice of the unconstitutional practices which resulted in the deprivation of adequate services provided Doe. (Compl.¶ 38, 40.)

Doe alleges that OASAS Commissioner Gorman is responsible for "establishing programs for the treatment of **prisoners** with substance dependence confined in state correctional facilities." (Doe Aff. ¶ 27.) DOCS Commissioner Goord is responsible for providing **inmates** with "timely and appropriate mental health care." (*Id.*) Doe wrote numerous letters to Commissioners Gorman and Goord requesting access to comparable comprehensive substance abuse treatment which alerted them to the unconstitutional policy that Doe alleges is in place. (Doe Aff. ¶¶ 31, 36; Compl. ¶¶ 34, 40, 42.)

In addition, implicit in defendants' argument that the counselor defendants were not personally involved because Doe is complaining about DOCS/OASAS policies and the counselors "are not policymakers" (Defs. Br. at 22) is the concession that the policymakers-the Commissioners and Superintendents-are personally involved in creating and/or continuing the challenged policy.

Doe's allegations satisfy the factors necessary to show personal involvement of all defendants at the motion to dismiss stage. Defendants' motion to dismiss for lack of personal involvement should be *DENIED.*

**B.** *Doe's Eighth Amendment Deliberate Medical Indifference Claim*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2829876 (S.D.N.Y.)
(Cite as: 2004 WL 2829876 (S.D.N.Y.))

The Eighth Amendment protects **prisoners** from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials and conduct that offends "evolving standards of decency." *E.g., Hudson v. McMillan,* 503 U.S. 1, 5, 8, 112 S.Ct. 995, 998, 1000 (1992); *Wilson v. Seiter,* 501 U.S. 294, 297, 308, 111 S.Ct. 2321, 2323, 2329 (1991); *Estelle v. Gamble,* 429 U.S. 97, 102, 104-05, 97 S.Ct. 285, 290, 291 (1976); *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925 (1976); *Hall v. Perilli,* 03 Civ. 4635, 2004 WL 1068045 at *5 (S.D.N.Y. May 13, 2004) (Peck, M.J.).

To establish an Eighth Amendment violation based on a claim that a prison official has placed an **inmate's** health in danger, the **inmate** must show that the prison official acted with "deliberate indifference" to the **inmate's** serious medical needs. *E.g., Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 2480 (1993); *Estelle v. Gamble,* 429 U.S. at 104-05, 97 S.Ct. at 291." [FN26]

> [FN26]. *Accord, e.g., Hall v. Perilli,* 2004 WL 1068045 at *5; *see also, e.g., Smith v. Carpenter,* 316 F.3d 178, 183 (2d Cir.2003); *Selby v. Coombe,* No. 00-172, 17 Fed. Appx. 36 (table), 2001 WL 964195 at *1 (2d Cir. Aug. 20, 2001) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998); *Perkins v. Obey,* 00 Civ. 1691, 2004 WL 238036 at *8 (S.D.N.Y. Feb. 10, 2004).

**\*13** As the Second Circuit has explained, "the deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)." [FN27] "Objectively, the alleged deprivation must be 'sufficiently serious.' " *Hathaway v. Coughlin,* 99 F.3d at 553; *see, e.g., Hudson v. McMillan,* 503 U.S. at 9, 112 S.Ct. at 1000 ("Because society does not expect that **prisoners** will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious' ").[FN28] Eighth Amendment protection is limited to " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d at 702.

> [FN27]. *Accord, e.g., Smith v. Carpenter,* 316

F.3d at 183; *Selby v. Coombe,* 2001 WL 964195 at *1; *Chance v. Armstrong,* 143 F.3d at 702; *Hall v. Perilli,* 2004 WL 1068045 at *5.

> [FN28]. *See also, e.g., Smith v. Carpenter,* 316 F.3d at 183-84 ("The objective "medical need' element measures the severity of the alleged deprivation ..."); *Selby v. Coombe,* 2001 WL 964195 at *1; *Chance v. Armstrong,* 143 F.3d at 702; *Hall v. Perilli,* 2004 WL 1068045 at *5; *Torres v. Mazzuca,* 246 F.Supp.2d 334, 339 (S.D.N.Y.2003).

"Subjectively, the charged official must act with a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d at 553; *accord, e.g., Smith v. Carpenter,* 316 F.3d at 184 ("[T]he subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind."); *Selby v. Coombe,* 2001 WL 964195 at *1; *Chance v. Armstrong,* 143 F.3d at 702; *Hall v. Perilli,* 2004 WL 1068045 at *5. "The required state of mind, equivalent to criminal recklessness, is that the official " 'knows of and disregards an excessive risk to **inmate** health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." " ' *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (quoting *Hathaway v. Coughlin,* 99 F.3d at 553 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979 (1994))); *accord, e.g., Hall v. Perilli,* 2004 WL 1068045 at *6.

While defendants contend that Doe's complaint "merely alleges the kind of disagreement about treatment which has long been held not to arise to the level of a violation of the Constitution" (Dkt. No. 7: Defs. Br. at 16), Doe's complaint sufficiently alleges that defendants acted with deliberate indifference to his drug treatment needs as a mentally disabled substance dependent **prisoner**. According to Doe, the defendants intentionally mischaracterized his complaints and failed to provide him access to a drug treatment program comparable to the CASAT program. (Dkt. No. 1: Compl. ¶¶ 1-6, 36, 37, 39-47.) Doe alleges that he already has suffered injuries as a result of decades of insufficient treatment for his drug addiction. (Compl.¶ 43.) He also alleges that defendants

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2829876 (S.D.N.Y.)
(Cite as: 2004 WL 2829876 (S.D.N.Y.))

were aware of the "grave and substantial risk" that Doe would not recover from substance dependence. (See e.g., Com pl. ¶¶ 40-41, 44.) Doe sufficiently pleads deliberate indifference to both present and future injuries. See, e.g., Warren v. Keane, 196 F.3d 330, 333 (2d Cir.1999) (holding risk of future harm is actionable under Eighth Amendment in § 1983 prisoner suit alleging unreasonable exposure to second-hand tobacco smoke) (citing Helling v. McKinney, 509 U.S. 25 at 32, 113 S.Ct. 2475 at 2480 (same)).[FN29]

> FN29. Whether the denial of a comprehensive drug treatment is "sufficiently serious" to satisfy the objective prong of the medical needs analysis is "fact-specific" and "must be tailored to the specific circumstances of [this] case." See Smith v. Carpenter, 316 F.3d at 185. Constitutionally required medical treatment has been held to include drug addiction therapy. Fiallo v. Batista, 666 F.2d 729, 731 (1st Cir.1981); Waldo v. Goord, 97-CV-1385, 1998 WL 713809 at *4 (N.D.N.Y. Oct. 1, 1998). Doe admits in his complaint to having received some "routine" drug counseling for his addiction (Compl.¶¶ 29, 41)-when he was first convicted in 1973 (Doe Aff. ¶ 10), and then again in 1995 (Doe Aff. Ex. A at 52)-and emphasizes his failure to respond to any past drug therapy (Compl.¶ 41). Defendants contend, as discussed above, that a disagreement with treatment is not a cognizable constitutional claim. (Defs. Br. at 16.) The fact that Doe has received some treatment for his drug addiction, albeit ineffective according to Doe, may provide the basis for dismissal of this claim on a summary judgment motion as it did in Fiallo v. Batista, 666 F.2d at 731. In Fiallo, a drug addicted prisoner who had received some drug treatment while incarcerated alleged a constitutional violation for the denial of more comprehensive drug therapy which he desired. Id. at 730. The First Circuit granted defendants summary judgment on this claim, construed as an Eighth Amendment claim, because the plaintiff had not alleged " 'acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.' ' Id. at 731. Rather, the First Circuit held, the plaintiff had only alleged that he had "not received the type of treatment which he desire[d]." Id. at 731. The motion

before this Court, however, is a motion to dismiss, and the Court cannot say on this record that Doe can prove no facts that would entitle him to relief.

*14 Defendants' motion to dismiss Doe's Eighth Amendment deliberate medical indifference claim should be DENIED.

## C. Doe's Fourteenth Amendment Equal Protection Claim

"The Equal Protection Clause directs that 'all persons similarly circumstanced shall be treated alike.' " Plyler v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394 (1982); see also, e.g., Giano v. Senkowski, 54 F.3d 1050, 1057 (2d Cir.1995). "To prove an equal protection violation, claimants must prove purposeful discrimination ... directed at an identifiable or suspect class." Giano v. Senkowski, 54 F.3d at 1057; see, e.g., Verley v. Goord, 02 Civ. 1182, 2004 WL 526741 at *20 (S.D.N.Y. Jan. 23, 2004); Lee v. State of New York Dep't of Corr. Servs., 97 Civ. 7112, 1999 WL 673339 at *12 (S.D.N.Y. Aug. 30, 1999); see also, e.g., Hayden v. County of Nassau, 180 F.3d 42, 48 (2d Cir.1999) ("intentional discrimination can be demonstrated in several ways. First, a law or policy is discriminatory on its face if it expressly classifies persons on the basis of race or gender. In addition, a law which is facially neutral violates equal protection if it is applied in a discriminatory fashion. Lastly, a facially neutral statute violates equal protection if it was motivated by discriminatory animus and its application results in a discriminatory effect.") (citations omitted).

Doe alleges that as a matter of DOCS/OASAS policy and practice, he has been denied equal protection of the law because defendants provide him with "fewer and less comparable comprehensive mental health services than are provided to other similarly situated groups of mentally disableds: mentally ill and developmentally (sensorially) disabled." (Compl.¶ 48.) According to Doe, the mentally ill and developmentally disabled inmates have access to comprehensive treatment programs based on their clinical needs, not on their "non-clinical" history such as recidivism or violent offender status. (Compl.¶¶ 24-26.) On the other hand, Doe, as a disabled substance dependent inmate, is denied access to comparable comprehensive

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2829876 (S.D.N.Y.)
(Cite as: 2004 WL 2829876 (S.D.N.Y.))

treatment based solely on "non-clinical" factors. (Compl.¶¶ 27-28.)

Defendants, however, claim that Doe's "admission" that "he was denied participation in the CASAT program because of his violent criminal history ... is fatal to [his] claim," because it provides a rational basis for his different treatment. (Dkt. No. 7: Defs. Br. at 17.) That may prove to be so on a summary judgment motion or at trial, but on a motion to dismiss, the Court cannot say that there are no facts that plaintiff could prove pursuant to his complaint that would entitle him to relief.[FN30] Defendants' motion to dismiss Doe's equal protection claim should be *DENIED*.

FN30. The state interest that defendants have proffered, "violent criminal history," does not go towards Doe's equal protection claim of being treated differently than other mentally ill **prisoners** who are provided comprehensive treatment regardless of any "non-clinical" reasons. (*See* Compl. ¶ 24.) However, were Doe's criminal history construed as the state's "rational basis" for the allegedly discriminatory treatment of Doe, the Court would be faced with a closer question: While the Rule 12(b)(6) standard requires the court to deny a motion to dismiss if relief " 'could be granted under any set of facts that could be proved consistent with the allegations," ' the rational basis standard " 'requires the government to win if any set of facts reasonably may be conceived to justify its classification." ' *Zavatsky v. Anderson,* 130 F.Supp.2d 349, 356 (D.Conn.2001). To overcome the "presumption of rationality" a plaintiff, therefore, must allege more than conclusory allegations that a policy is " 'without rational basis." ' *Id.* at 357. Doe does allege facts about the accommodations provided other groups of mentally disabled **prisoners** and the comprehensive treatment they are provided but that he, a drug addicted mentally disabled, is not. (Compl.¶¶ 25-28.) As recognized above, this Court does not have to decide this issue because the defendants have argued that Doe's violent history serves as the rational basis for the state to deny Doe entrance into CASAT, not as the rational basis for treating Doe differently than

other mentally ill **prisoners**. Again, at a summary judgment phase, evidence produced through discovery may serve to resolve this claim one way or another.

## V. *DOE'S ADA AND REHABILITATION ACT CLAIMS*

### A. *Doe's ADA and Rehabilitation Act Claims for Damages Against the Individual Defendants In Their Individual Capacity Should Be Dismissed*

**\*15** Damage claims against state officials in their individual capacities brought under the ADA and the Rehabilitation Act are not actionable. *Garcia v. S.U.N.Y. Health Sciences Ctr.,* 280 F.3d 98, 107 (2d Cir.2001). "Insofar as [plaintiff] is suing the individual defendants in their individual capacities, neither Title II of the ADA, nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials." *Garcia v. S.U .N.Y. Health Sciences Ctr.,* 280 F.3d at 107 (citing cases). Accordingly, Doe's ADA and Rehabilitation Act damage claims against the individual defendants in their individual capacities should be dismissed.

"Insofar as [plaintiff] is suing the individual defendants in their official capacities, he is seeking damages from New York, and the Eleventh Amendment therefore shields them to the same extent it shields [the State or State agencies]." *Garcia v. S.U.N.Y. Health Sciences Ctr.,* 280 F.3d at 107. The Court therefore turns in the next sub-sections to the availability of ADA and Rehabilitation Act claims against the State under the Eleventh Amendment.

### B. *Doe's ADA Damage Claims Against the Individual Defendants In Their Official Capacity Is Not Barred By the Eleventh Amendment*

A damage claim under the ADA against a state (or state agency or official) is not barred by the Eleventh Amendment as long as the "plaintiff can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability." *Garcia v. S.U.N.Y. Health Sciences Ctr.,* 280 F.3d 98, 112 (2d Cir.2001). The Second Circuit, in *Garcia,* recognized that "direct proof of

Not Reported in F.Supp.2d, 2004 WL 2829876 (S.D.N.Y.)
(Cite as: 2004 WL 2829876 (S.D.N.Y.))

this will often be lacking: smoking guns are rarely left in plain view," and that plaintiffs may establish "discriminatory animus" by relying on a "burden-shifting technique similar to that adopted in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), or a motivating-factor analysis similar to that set out in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 252-58, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)." *Garcia v. S.U.N.Y. Health Sciences Ctr.,* 280 F.3d at 112. Defendants claim that Doe has not done so because the complaint asserts that denial of treatment was based on a distinction "between violent and nonviolent criminal history, not between drug addiction and the lack of it." (Dkt. No. 7: Defs. Br. at 21.) Doe's complaint, liberally read, asserts that he was discriminated against because of his substance dependence. (*E.g.,* Dkt. No. 1: Compl. ¶ 56.) The Court cannot say, on a motion to dismiss, that there are no facts Doe can prove consistent with his complaint that would entitle him to relief.[FN31]

FN31. Since the Court also is granting Doe leave to amend, however, he would be wise to elaborate on the facts supporting his ADA claim consistent with the legal standard for abrogating sovereign immunity.

Defendants' motion to dismiss Doe's ADA damage claim against defendants in their individual capacity should be *DENIED.* (*See also* pages 37-39 & n.35 below.)

C. *Doe's Rehabilitation Act Damage Claim Against the Individual Defendants In Their Official Capacity Is Not Barred By The Eleventh Amendment*

**\*16** Congress enacted Section 504 of the Rehabilitation Act pursuant to its authority under the Spending Clause of Article I of the Constitution. *See Garcia v. S.U.N.Y. Health Sciences Ctr.,* 280 F.3d 98, 113 (2d Cir.2001). When Congress provides federal funding, it may require that a state agree to waive its sovereign immunity as a condition of accepting the funds. *Id.* The Second Circuit in *Garcia* recognized that Congress expressly intended such a condition to apply for Section 504 of the Rehabilitation Act, *Garcia v. S.U.N.Y. Health Sciences Ctr.,* 280 F.3d at 113 (citing 42 U.S.C. § 2000d-7), but ruled that a state may only effectively waive its sovereign

immunity through an " 'intentional relinquishment or abandonment of a *known* right or privilege.' " *Garcia v. S.U.N.Y. Health Sciences Ctr.,* 280 F.3d at 114 (quoting *College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 682, 119 S.Ct. 2219, 2229 (1999)). *Garcia* held that SUNY had not effectively waived its sovereign immunity because at the time it accepted federal funds, the Second Circuit had held that states did not have sovereign immunity under the essentially-similar provisions of the ADA. *Garcia v. S.U.N.Y. Health Sciences Ctr.,* 280 F.3d at 114 (citing *Killcullen v. New York State Dep't of Labor,* 205 F.3d 77, 82 (2d Cir.2000) ( "Congress has validly abrogated the States' immunity from suit under both the ADA and Section 504 of the Rehabilitation Act."), *overruled by Garcia v. S.U.N.Y. Health Sciences Ctr.*

Since *Garcia,* state agencies in New York including DOCS have continued to accept federal funds and, therefore, waived immunity from suit under Section 504 of the Rehabilitation Act. (*See* cases cited immediately below.) The district court decisions in this Circuit disagree as to whether New York effectively waived its sovereign immunity only by accepting federal funds after *Garcia* was decided, on September 25, 2001, or whether the waiver occurred as early as February 25, 2001, when the U.S. Supreme Court handed down its decision in *Bd. of Trustees of the University of Alabama v. Garrett,* 531 U.S. 356, 121 S.Ct. 955 (2001)* (holding Title I of the ADA exceeded Congress' authority under § 5 of the Fourteenth Amendment and therefore suits against states were barred by the Eleventh Amendment). *Compare, e.g., Cardew v. New York State Dep't of Corr. Servs.,* 01 Civ. 3669, 2004 WL 943575 at \*8 (S .D.N.Y. Apr. 30, 2004) (holding sovereign immunity waived as of the decision in *Garrett* ); *with Killcullen v. New York State Dep't of Labor,* No. 97-CV-484, 2003 WL 1220875 at \*3 n. 1 (N.D.N.Y. Mar. 13, 2003) (collecting cases holding sovereign immunity waived as of *Garcia* ); *and with Wasser v. New York State Office of Vocational & Educ. Servs. for Individuals with Disabilities,* No. 01-CV-6788, 2003 WL 22284576 at \*10 (E.D.N.Y. Sept. 30, 2003) (dicta; finding an "arguable" basis that sovereign immunity may have been waived as of April 17, 2000, when the Supreme Court granted certiorari in *Garrett* ).

**\*17** This Court need not decide the exact date that sovereign immunity was effectively waived because part

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2829876 (S.D.N.Y.)
(Cite as: 2004 WL 2829876 (S.D.N.Y.))

of Doe's claims arise out of conduct in 2003, by which time New York was clearly subject to suit under Section 504 of the Rehabilitation Act. Whether Doe's damages will be limited with respect to his 2001 or earlier claims need not be decided at this stage. (*See* pages 22-23 above.)

D. *Doe Has Adequately Plead ADA and Rehabilitation Act Claims*

To state a claim under the ADA [FN32] and the Rehabilitation Act, [FN33] a plaintiff must plead that "(1) [he] has a disability for purposes of § 504/ADA, [FN34] (2)[he] is otherwise qualified for the benefit that has been denied, and (3)[he] has been denied the benefit by reason of [his] disability." *Weixel v. Bd. of Educ. of the City of New York,* 287 F.3d 138, 146-47 (2d Cir.2002) (reversing and remanding the district court's grant of defendants' motion to dismiss because the district court failed to apply the liberal pleading standard afforded pro se litigants); *see also, e.g., Clarkson v. Coughlin,* 898 F.Supp.2d 1019, 1036-38 (S.D.N.Y.1995). [FN35] To fulfill the first prong, *i.e.* that the plaintiff is disabled within the meaning of the ADA and the Rehabilitation Act, a plaintiff must demonstrate (1) he "suffers from a physical or mental impairment"; (2) the "activity claimed to be impaired ... constitutes a 'major life activity' "; and (3) his "impairment 'substantially limits' the major life activity previously identified." *Weixel v. Bd. of Educ. of the City of New York,* 287 F.3d at 147.

FN32. 42 U.S.C. § 12132 provides: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

FN33. 29 U.S.C. § 794(a) provides in pertinent part: "No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

FN34. Both statutes define a disabled individual as one who has "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2); *accord,* 29 U.S.C. § 705(20)(B).

FN35. In addition to these common elements, under the ADA, the plaintiff must show that the entity that provides the service, program, or activity is a "public entity," 42 U.S.C. § 12132, and under the Rehabilitation Act, the plaintiff must show that the entity denying the **inmate** participation "receiv[es] Federal financial assistance," 29 U.S.C. § 794(a). *See, e.g., Gowins v. Greiner,* 01 Civ. 6933, 2002 WL 1770772 at *9 (S.D.N.Y. July 31, 2002). Defendants do not challenge these elements. (*See* Defs. Br. at 18-22.)

Defendants contend that Doe fails to state a claim because he has not sufficiently alleged a physical or mental impairment that substantially limits a major life activity. (Defs. Br. at 19.) However, as defendants note, drug addiction can be an "impairment" within the statutory definitions of a disability. *Regional Econ. Cmty. Action Program, Inc., v. City of Middletown,* 294 F.3d 35, 46-48 (2d Cir.2002) (Addiction can substantially limit the ability to live independently without suffering a relapse, which limits the major life activity of caring for one's self.). Further, "working" is recognized as a "major life activity." *Id.* at 47 (citing 28 C.F.R. § 41.31(b)(2), & 45 C.F.R. § 85.3(j)(2)(ii))). Doe alleges that he became more "severely disabled" each time he was released from prison without any comprehensive drug treatment program and that the substance dependence from which he has suffered "much of his adult life" " 'substantially limits' the condition, manner, and duration in which he can work in the free society." (Com pl.¶¶ 18-19.) These allegations satisfy Doe's pleading requirements.

Defendants also argue that Doe's claim fails because he was not denied a comprehensive treatment program based solely on his handicap. (Defs. Br. at 19-20.) Doe alleges that he has been denied access to comprehensive mental

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2829876 (S.D.N.Y.)
(Cite as: 2004 WL 2829876 (S.D.N.Y.))

health treatment, comparable to those offered mentally ill and developmentally disabled **inmates**, because of his status as a substance dependent. (Compl.¶ 24.) While defendants may well prevail on summary judgment or at trial on their argument that "it is not discriminatory to restrict access to a program because the applicant's addiction creates a danger to the community" (Defs. Br. at 20), the Court cannot decide that question on the record of this motion to dismiss. (*See* cases cited at page 34 above.)

**\*18** Therefore, construing Doe's pro se complaint liberally as required, Doe has sufficiently plead his claim under the ADA and the Rehabilitation Act, and defendants' motion to dismiss on that ground should be *DENIED*.

E. *The Proper Defendants Subject to Liability Under the ADA and the Rehabilitation Act*

Defendants argue that Doe has named the wrong defendants for his ADA and Rehabilitation Act claims because he has not sued DOCS, the appropriate public entity. (Dkt. No. 7: Defs. Br. at 18-19; Dkt. No. 11: Defs. Reply Br. at 6.) As discussed above, *Garcia v. S.U.N.Y. Health Sciences Ctr.,* 280 F.3d 98, 107 (2d Cir.2001), appears to allow ADA and Rehabilitation Act damages claims against individual defendants in their official capacity as the equivalent of a suit against the entity. Nevertheless, some district court decisions in this Circuit, even post-*Garcia,* have held that no such claims can be brought against individual defendants even in their official capacity. [FN36] To avoid any issue here, the Court will allow (and strongly encourages) Doe to amend to name DOCS as an additional defendant on his ADA and Rehabilitation Act claims.

FN36. *Compare, e.g., Carrasquillo v. City of New York,* 324 F.Supp.2d 428, 441 (S.D.N.Y.2004) ("Individuals cannot be named as defendants in ADA suits in either their official or representative capacities.") (citing pre-*Garcia* cases); *Neville v. Goord,* No. 03-CV-155, 2004 WL 2202659 at \*2 (W.D.N.Y. Sept. 28, 2004) ("[I]ndividuals cannot be named as defendants in suits under either the ADA or the Rehabilitation Act in their official or representative capacities.") (citing pre-*Garcia* cases); *Lyman v.*

*City of New York,* 01 Civ. 3789, 2003 WL 22171518 at \*10 (S.D.N.Y. Sept. 19, 2003) ("While the Second Circuit has yet to decide whether individual liability exists under the ADA and § 504 of the Rehabilitation Act, The Honorable Denny Chin has thoughtfully considered the issue in *Hallett v. N.Y.S. Dep't of Correctional Services,* 109 F.Supp.2d 190 (S.D.N.Y.2000), concluding that there is no individual liability under either statute."); *with Johnson v. Goord,* 01 Civ. 9587, 2004 WL 2199500 at \*19 (S.D.N.Y. Sept. 29, 2004) ("[P]laintiffs' claims against the individual defendants in their official capacities under section 504 of the Rehabilitation Act and Title II of the ADA fail because those laws do not provide for money damages against the state or state officials in their official capacities, absent a showing that any violation was motivated by discriminatory animus or ill will due to the disability."). The oft-cited pre-*Garcia* case of *Hallett v. New York State Dep't of Corr. Servs.,* 109 F.Supp.2d 190, 199-200 (S.D.N.Y.2000) (relying upon *Candelaria v. Cunningham,* 98 Civ. 6273, 2000 WL 798636 at \*3 (S.D.N.Y. June 20, 2000)), found that officials could not be sued in their official capacity because the public entities could be sued directly.

Moreover, State officials sued in their official capacities are considered public entities for purposes of the ADA and the Rehabilitation Act in suits for prospective injunctive relief. *See, e.g., Henrietta D. v. Bloomberg,* 331 F.3d 261, 288 (2d Cir.2003) ("[A]n individual sued in his or her official capacity under the doctrine of *Ex parte Young*" is a "'public entity' subject to liability under the ADA" because "[t]he real party in interest in an official-capacity suit is the government entity ... since the suit is in effect against the 'public entity,' it falls within the express authorization of the ADA."), *cert. denied,* 124 S.Ct. 1658 (2004); *Gowins v. Greiner,* 01 Civ. 6933, 2002 WL 1770772 at \*9 (S.D.N.Y. July 31, 2002) ("[N]otwithstanding the Eleventh Amendment, both the Rehabilitation Act claim and the ADA claim may proceed under *Ex parte Young* as claims for prospective injunctive relief against the individual Green Haven officials named in their official capacities."). Therefore, Doe's claim against the individual defendants in their official capacity clearly may proceed insofar as Doe seeks injunctive relief.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2829876 (S.D.N.Y.)
(Cite as: 2004 WL 2829876 (S.D.N.Y.))

VI. *DEFENDANTS' MOTION TO DISMISS ON QUALIFIED IMMUNITY GROUNDS SHOULD BE DENIED*

The defendants have raised the affirmative defense of qualified immunity from the damages claims because, they contend, their actions were objectively reasonable and did not violate any clearly established rights. (Dkt. No. 7: Defs. Br. at 23.) A Rule 12(b)(6) motion to dismiss is usually not the appropriate pleading in which to raise an affirmative defense. *See, e.g., McKenna v. Wright,* 386 F.3d 432, 435 (2d Cir.2004). However, the Second Circuit has recently recognized a caveat to this general rule: "we see no reason why even a traditional qualified immunity defense may not be asserted on a Rule 12(b)(6) motion as long as the defense is based on facts appearing on the face of the complaint." *McKenna v.. Wright,* 386 F.3d at 436.

**\*19** While the complaint acknowledges that the CASAT program is not available to **inmates** with a violent history (*see* Defs. Br. at 23-24; Dkt. No. 1: Compl. ¶¶ 24, 32, 37), the Court cannot say, as defendants argue, that as a matter of law, on a motion to dismiss, defendants are entitled to qualified immunity, since other mental health treatment is provided to violent mentally disabled (but not drug addicted) **inmates**. Moreover, qualified immunity is not available to DOCS, *Timmons v. New York State Dep't of Corr. Servs.,* 887 F.Supp. 576, 582 (S.D.N.Y.1995) ("The defense of qualified immunity is available to state actors who are sued in their *individual* capacities, not to sovereign state bodies such as DOCS that only exist in *official* capacities.") (emphasis in original); *see Ford v. Reynolds,* 316 F.3d 351, 356 (2d Cir.2003) (" '[T]he defense of qualified immunity protects only individual defendants sued in their individual capacity, not governmental entities, and it protects only against claims for damages, not against claims for equitable relief.' "), which will be added as a defendant (*see* page 3 above).

*CONCLUSION*

For the reasons discussed above, defendants' motion to dismiss should be *GRANTED* to the limited extent of dismissing (1) Doe's damage claims under § 1983 against

defendants in their official capacity and (2) Doe's damage claims under the ADA and Rehabilitation Act against defendants in their individual capacity, and in all other respects *DENIED*. Doe is directed to amend his complaint within thirty days of this Report and Recommendation to add DOCS, OASAS and Kjellander as defendants.

*FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels, 40 Centre Street, Room 410, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Daniels. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57-59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

*SCHEDULING ORDER*

**\*20** 1. All fact and expert discovery must be completed by March 31, 2005. Expert reports must be served by March 1, 2005 plaintiff, March 15, 2005 defendants.

2. Each party will notify the Court by April 5, 2005 as to whether it intends to move for summary judgment. Summary judgment motions must be filed by April 22, 2005, and must comply with the Federal Rules of Civil Procedure, the Local Rules of this Court, and the chamber

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2829876 (S.D.N.Y.)
(Cite as: 2004 WL 2829876 (S.D.N.Y.))

rules of the District Judge to whom this case is assigned.

3. The parties are to submit a joint proposed pretrial order, in conformance with the Federal Rules of Civil Procedure, the Local Rules of this Court, and the chamber rules of the District Judge to whom this case is assigned, by April 22, 2005 if neither party is moving for summary judgment, or 30 days after decision on the summary judgment motion. The case will be considered trial ready on 24-hours notice after the pretrial order has been submitted.

4. A status conference will be held before the undersigned on December 21, 2004 at 9:30 a.m. in Courtroom 20D (500 Pearl Street). Defense counsel shall arrange for plaintiff's telephonic participation.

5. The parties are directed to follow the "Individual Practices of Magistrate Judge Andrew J. Peck," a copy of which is enclosed.

S.D.N.Y.,2004.
Doe v. Goord
Not Reported in F.Supp.2d, 2004 WL 2829876 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 721568 (N.D.N.Y.)
(Cite as: 2006 WL 721568 (N.D.N.Y.))

▷

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Richard LIGHTHALL, Plaintiff,
v.
Dr. Krishna Kumar VADLAMUDI, Director of Medical
Services at Marcy Correctional Facility, William Lape,
Superintendent of Marcy Correctional Facility, Barbara
Schultz-Inman, Corrections Counselor at Marcy
Correctional Facility, J.E. Rowlands, Senior Alcohol
and Substance Abuse Counselor at Marcy Correctional
Facility, and Lester Wright, Associate Commissioner of
Health Services, New York State Department of
Correctional Services, Defendants.
No. 9:04-CV-0721.

March 17, 2006.

Richard Lighthall, Marcy Correctional Facility, Marcy,
NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General for the State of New
York, Bruce J. Boivin, Assistant Attorney General, The
Capitol, Albany, New York, for Defendants.

Bruce J. Boivin, Assistant Attorney General, of counsel.

MEMORANDUM-DECISION AND ORDER

MORDUE, Chief J.

**\*1** In his *pro se* amended complaint (Dkt. No. 10) in this
action under 42 U.S.C. § 1983, plaintiff, an inmate of New
York State Department of Correctional Services
("DOCS"), alleges violations of the Eighth Amendment,
Due Process and Equal Protection under the Fourteenth

Amendment, 42 U.S.C. § 1985, the American with
Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et
seq., and § 504 of the Rehabilitation Act of 1973, 29
U.S.C. § 794.

Presently before the Court are the following motions: (1)
plaintiff seeks a preliminary injunction to have the
Defendants provide medical treatment, to receive
reasonable accommodations for his attendance at the
Alcohol and Substance Abuse Training program
("ASAT"), and to enjoin the Defendants from
"withholding good time credits and parole eligibility"
(Dkt. No. 11); (2) defendant Dr. Krishna Kumar
Vadlamudi moves for summary judgment on certain of
plaintiff's claims (Dkt. No. 27); and (3) the remaining
defendants, joined by Dr. Vadlamudi, move to dismiss the
amended complaint pursuant to Fed.R.Civ.P. 12(b)(6)
(Dkt. No. 42).

The motions were referred to United States Magistrate
Judge Randolph F. Treece for a Report and
Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B)
and Local Rule 72.3(c). Magistrate Judge Treece has
submitted a Report and Recommendation (Dkt. No. 51)
which recommends that the motion for a preliminary
injunction be denied, the motion for summary judgment be
granted, the motion to dismiss be granted, and the
amended complaint be dismissed in its entirety.

Plaintiff has submitted objections to the Report and
Recommendation (Dkt. No. 53). Pursuant to 28 U.S.C. §
636(b)(1)(C), this Court conducts a *de novo* review of
those parts of a magistrate judge's Report and
Recommendation to which a party specifically objects.
Failure to object to any portion of a Report and
Recommendation waives further judicial review of the
matters therein. *See Roldan v. Racette,* 984 F.2d 85, 89
(2d Cir.1993). Defendants have no objection to the Report
and Recommendation (Dkt. No. 54).

Upon *de novo* review, the Court determines that the
Report and Recommendation of Magistrate Judge Treece
is correct in all respects. It is therefore

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 721568 (N.D.N.Y.)
(Cite as: 2006 WL 721568 (N.D.N.Y.))

ORDERED that plaintiff's motion for a preliminary injunction (Dkt. No. 11) is denied; and it is further

ORDERED that the motion for summary judgment by defendant Dr. Krishna Kumar Vadlamudi (Dkt. No. 27) is granted; and it is further

ORDERED that the defendants' motion to dismiss (Dkt. No. 42) is granted; and it is further

ORDERED that the amended complaint (Dkt. No. 10) is dismissed in its entirety.

IT IS SO ORDERED.

*REPORT RECOMMENDATION and ORDER*

TREECE, Magistrate J.

*Pro se* Plaintiff Richard Lighthall brings causes of action pursuant to 42 U.S.C. § 1983 alleging violations of the Eighth Amendment, Due Process and Equal Protection under the Fourteenth Amendment, 42 U.S.C. § 1985, the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.,* and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Dkt. No. 10, Am. Compl. at ¶¶ 79, 80, 83-86, 89-90, 92-93, 95-96, 99-100, 102, 104-07, & 109-110. Plaintiff also seeks a Preliminary Injunction to have the Defendants provide medical treatment, to receive reasonable accommodations for his attendance at the Alcohol and Substance Abuse Training program ("ASAT"), and to enjoin the Defendants from "withholding good time credits and parole eligibility." Dkt. No. 11, Prelim. Inj. Mot., Mem. of Law at pp. 7 & 16. Dr. Krishna Kumar Vadlamudi, Director of Medical Services at Marcy Correctional Facility, opposes the Preliminary Injunction and brings this Cross-Motion for Summary Judgment on Plaintiff's Eighth Amendment claims, Conspiracy claims, and ADA claims. Dkt. Nos. 27-30. Rather than joining Dr. Vadlamudi in filing a Motion for Summary Judgment, William Lape, Superintendent of Marcy Correctional Facility ("Superintendent"), Barbara Schultz-Inman, Corrections

Counselor at Marcy Correctional Facility ("Corrections Counselor"), J.E. Rowlands, Senior Alcohol and Substance Abuse Counselor ("Senior ASA Counselor") at Marcy Correctional Facility, and Lester Wright, Associate Commissioner of Health Services ("Associate Commissioner") bring a Motion to Dismiss pursuant to FED. R. CIV. P. 12(b)(6) and Dr. Vadlamudi joins in Defendants' Motion to Dismiss as to all other claims. Dkt. No. 42. For the reasons to follow, it is hereby recommended that the Motion for a Preliminary Injunction be denied, the Motion for Summary Judgment be granted, the Motion to Dismiss be granted, and the Amended Complaint be dismissed in its entirety.

## I. FACTS

### A. Motion to Dismiss

**\*2** The following allegations contained in Lighthall's Amended Complaint are construed as true as required by the motion to dismiss standard.[FN1] Prior to Lighthall's imprisonment, Plaintiff suffered multiple injuries after falling from the roof of his home, including a back injury for which he had surgery. Am. Compl. at ¶ 16. In addition to his injuries, Plaintiff had two strokes which caused some paralysis on his left side as well as coordination and speech problems. *Id.* at ¶ 17. Plaintiff's doctor also stated that he suffers from fatigue and sleep apnea. *Id.* at ¶ 21; Ex. A, Timothy A. Mathis, M.D., Lt., dated July 30, 2002.

FN1. *See infra* Part II.A.

A few days after his transfer to Marcy Correctional Facility ("Marcy") in early 2003,[FN2] Plaintiff was seen by Dr. Vadlamudi, the Director of Medical Services at the facility. *Id.* at ¶ 30. Plaintiff told Dr. Vadlamudi of his medical conditions, including the need for vitamin B-12 shots, his paralysis, his trouble sitting for long periods of time, his trouble going to the bathroom, his back pain, along with the possible need for an operation on his back. *Id.* at ¶¶ 30 & 31; Mathis, M.D., Lt.

FN2. Plaintiff states that shortly after sending a letter to Lester Wright in December 2002, he was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 721568 (N.D.N.Y.)
(Cite as: 2006 WL 721568 (N.D.N.Y.))

transferred to Marcy Correctional Facility. Am. Compl. at ¶ 26; Ex. B, Lighthall Lt., dated Dec. 5, 2002.

Soon after the transfer, Plaintiff was also placed into ASAT. *Id.* at ¶ 32. Plaintiff states that the location of ASAT was not set up for the "medically disabled." *Id.* Nevertheless, Plaintiff participated in ASAT until his hospitalization,[FN3] during which Plaintiff was told he suffered from an enlarged heart and that he would need a catheterization. *Id.* at ¶¶ 33 & 34. One to two months later, Plaintiff was told he would need to see a specialist for the catheterization. As a result of Plaintiff's medical conditions, Dr. Vadlamudi removed Plaintiff from ASAT. *Id.* at ¶ 37.

> FN3. Plaintiff was taken to St. Elisabeth's Hospital in Utica. *Id.* at ¶ 33; Ex. C, Ambulatory Health Record.

In March 2003, Plaintiff had requested vitamin B-12 shots from Dr. Vadlamudi. *Id.* at ¶ 39. Plaintiff also complained of "swelling of his left testicle," burning in his legs, and back pain. *Id.* at ¶¶ 40 & 41. Because of these complaints, Plaintiff requested to see a specialist and Dr. Vadlamudi prescribed antibiotics. *Id.* at ¶ 41. In July 2003, Dr. Vadlamudi placed a referral for Plaintiff to be examined by a gastroenterology specialist due to rectal pain and the enlarged testicle. *Id.* at ¶ 42; Ex. D, Patient Referral Form & Req. and Report of Consultation.

On September 14, 2003, Plaintiff made a formal request for "reasonable accommodations" for participation in ASAT due to his disabilities. *Id.* at ¶ 43; Ex. E, Req. for Reasonable Accommodations. This request was denied by Dr. Vadlamudi and the Deputy Superintendent of Administration affirmed the denial. *Id.* at ¶¶ 45 & 46; Req. for Reasonable Accommodations. Plaintiff filed a grievance complaint, which was denied by Superintendent Lape on December 23, 2003.[FN4] *Id.* at ¶¶ 47 & 48; Ex. F, Inmate Grievance Compl. Plaintiff appealed to the Central Office Review Committee ("CORC"), and the determination was affirmed based on Associate Commissioner Wright's recommendation. *Id.* at ¶ 48; Ex. G, Inmate Grievance Report of the Superintendent & CORC.

> FN4. The grievance also challenged his medical treatments. *Id.* at ¶ 47.

**\*3** On September 25, 2003, Plaintiff was sent to the hospital where he received a colonoscopy for his rectal pain and problems with constipation and diarrhea.[FN5] *Id.* at ¶ 50; Ex. H, Patient Referral Form & Operative/Procedure Report. The doctor at the hospital recommended a neurological consult for Plaintiff's prior back surgery and a urological consult, which Plaintiff states were never ordered by Dr. Vadlamudi. *Id.* at ¶¶ 50 & 51.

> FN5. The results of the colonoscopy were normal. *Id.* at ¶ 50; Ex. H, Patient Referral Form & Operative/Procedure Report.

On October 20, 2003, Corrections Counselor Schultz-Inman stated to Lighthall that he had been cleared to rejoin ASAT by the authorization of Dr. Vadlamudi. *Id.* at ¶ 55; Exs. I, Schultz-Inman Lt. to Lighthall, dated Oct. 20, 2003, & J, Schultz-Inman Lt. to Dr. Vadlamudi, dated Oct. 14, 2003. However, that same month, Plaintiff was denied "eligibility for Merit Time and Presumptive Release" for failing to complete ASAT. *Id.* at ¶ 57; Ex. K, Merit Time Determination Notice & Presumptive Release Determination. On November 11, 2003, Plaintiff wrote a letter to Senior ASA Counselor Rowlands requesting that he be allowed to participate in ASAT, which Plaintiff states went unanswered. *Id.* at ¶ 58; Ex. L, Lighthall Lt. to Rowlands, dated Nov. 10, 2003.

In January 2004, Plaintiff was taken to Rome Memorial Hospital in regards to the enlarged testicle. *Id.* at ¶ 59; Ex. M, Rome Memorial Hosp. Notes & Lab Result. After determining there were two small cysts on the right testicle and one large cyst on the left testicle, an operation was performed to drain the cysts. *Id.;* Rome Memorial Hosp. Notes & Lab Result. Plaintiff then returned to Marcy and was told by Dr. Vadlamudi that "surgery [was not] necessary [for the enlarged testicle]" and that "the only medication" to be dispensed to him would be Motrin. *Id.* at ¶ 60.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 721568 (N.D.N.Y.)
(Cite as: 2006 WL 721568 (N.D.N.Y.))

On February 23, 2004,[FN6] Plaintiff met with Corrections Counselor Schultz-Inman to discuss his participation in ASAT. *Id.* At that time Plaintiff was told that his failure to sign up for ASAT would constitute a refusal and that if it was determined that Plaintiff did not write a letter to Senior ASA Counselor Rowlands requesting participation in ASAT then that would also be marked as a refusal. *Id.* at ¶ 61; *see* Ex. N, Inmate Assessment & Case Management Info. In March 2004, Plaintiff received a copy of Corrections Counselor Schultz-Inman's report stating that Plaintiff had refused to participate in ASAT. *Id.* at ¶¶ 62 & 63. As a result, Plaintiff filed another grievance. *Id.* at ¶ 63; Ex. O, Inmate Grievance Compl., dated Mar. 17, 2004. On April 5, 2004, after a hearing, the Inmate Grievance Resolution Committee ("IGRC") found Plaintiff wanted to participate and that Plaintiff should challenge the records supplied for the hearing.[FN7] *Id.* at ¶ 66; Ex. Q, IGRC Report. Plaintiff appealed the decision to Superintendent Lape who affirmed the IGRC decision, which Plaintiff also appealed. *Id.* at ¶ 67; Ex. R, Superintendent Grievance Report, dated Apr. 13, 2004 & Appeal. The appeal to the CORC was also denied. *Id.* at ¶ 68; Ex. S, CORC Grievance Report, dated June 2, 2004. In June 2004, Plaintiff then wrote to Senior Counselor Mulvihill asking to have his name placed on the ASAT waiting list but was told that Senior ASA Counselor Rowlands stated Plaintiff had not reapplied to join ASAT. *Id.* at ¶¶ 69 & 70; Ex. T, Lighthall Lt. to Mulvihill, dated June 24, 2004.

FN6. The Amended Complaint reflects a date of February 23, 2003, but a careful examination of Plaintiff's timeline in the Amended Complaint and attached Exhibits would make it 2004, not 2003. *Id.* at ¶ 61; Ex. N, Inmate Assessment & Case Management Info.

FN7. Plaintiff states that Corrections Counselor Schultz-Inman "perjured" herself by submitting documents that said Senior ASA Counselor Rowlands had contacted "Medical" to determine whether Plaintiff could join ASAT, that Rowlands had answered Plaintiff's letter, and that Dr. Vadlamudi had cleared Plaintiff to participate in ASAT. *Id.* at ¶ 65; Ex. P, Marcy Mem.

*4 On June 28, 2004, Plaintiff had X-rays taken for his back problems. *Id.* at ¶ 71; Ex. V, Victor Regenbogen, M.D., Lt. about MRI. In August 2004, Plaintiff was suspended from "all programs, recreation and work" due to his medical conditions which remained in effect until February 2, 2005. *Id.* at ¶ 72; Ex. W, Inmate Medical Excuse.

B. Motion for Summary Judgment

Pursuant to the summary judgment standard,[FN8] the following additional facts present no genuine issues of material fact.[FN9] Upon Plaintiff's transfer to Marcy on January 29, 2003, Plaintiff was seen by Dr. Vadlamudi but no reference was made in the health records as to Plaintiff's need for B-12 injections until Plaintiff requested B-12 injections on February 12, 2003, to someone other than Dr. Vadlamudi. Dkt. No. 30, Dr. Krishna Kumar Vadlamudi Aff., Ex. A at pp. 84-86.[FN10] Plaintiff was examined by Dr. Vadlamudi on March 4, 2003, whereby Plaintiff made reference to his B-12 vitamin level. *Id.* at p. 82. Plaintiff's B-12 level was subsequently tested on March 11, 2003, and the results, which were returned on March 13, 2003, indicated that the level was within the normal range. Dkt. No. 28, Dr. Krishna Kumar Vadlamudi's Stat. of Material Facts at ¶ 2; Dr. Vadlamudi Aff., Ex. A at p. 107. Despite one hundred and fourteen (114) Ambulatory Health Records entries dealing with Plaintiff's numerous complaints since March 13, 2003, it was not until October 26, 2004, that the health records showed that the B-12 issue was raised and addressed once again. *See* Dr. Vadlamudi Aff., Ex. A at pp. 17-80. In November 2004, around the time Plaintiff received his catheterization, Plaintiff was retested for his vitamin B-12 level. Dr. Vadlamudi's Stat. of Material Facts at ¶¶ 3 & 4; Dr. Vadlamudi Aff., Ex. A at pp. 277-78; Dkt. No. 33, Pl.'s Stat. of Material Facts at ¶ 7. When it was found that his level fell slightly below the normal range, on November 11, 2004, Dr. Vadlamudi began giving Plaintiff vitamin B-12 injections, which he prescribed to be given to Plaintiff for six months. Dr. Vadlamudi's Stat. of Material Facts at ¶¶ 3 & 4; Dr. Vadlamudi Aff., Ex. A at p. 277-78; Pl.'s Stat. of Material Facts at ¶ 7.

FN8. *See infra* Part II.B.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 721568 (N.D.N.Y.)
(Cite as: 2006 WL 721568 (N.D.N.Y.))

FN9. *See* N.D.N.Y.L.R. 7.1(a)(3).

FN10. The exhibits include documents of records of medical consultations, diagnoses, treatments, ambulatory health records as well as related documents.

Prior to Plaintiff's complaints made to Dr. Vadlamudi involving any rectal pain, testing had been conducted on February 18, 2003, regarding some complaints by Plaintiff to the medical staff on rectal problems, where it was found that cultures were negative. Dr. Vadlamudi Aff., Ex. A at p. 108. On March 14, 2003, Plaintiff made his first complaint about rectal pain. *Id.* at p. 80. After several more complaints were made, Plaintiff was again tested on May 9, 2003, where the culture came back negative. *Id.* at pp. 72-80 & 106. After two more complaints on May 11th and 14th, another test was performed on May 20th with the same result as previous tests. *Id.* at pp. 104-105.

On June 19, 2003, Dr. Vadlamudi requested that Plaintiff receive a colonoscopy, which was scheduled for and performed on September 25, 2003. *Id.* at pp. 169 & 171. On October 10, 2003, the surgeon who performed the procedure recommended Plaintiff receive a neurological consult for his 1998 back surgery, a urological consult for his prostate and bladder dysfunction, and Flomax twice a day. *Id.* at pp. 169-70 & 171-72. On September 30, 2003, a urological consult was ordered and the consultation occurred on December 12, 2003, where it was found that Plaintiff had an enlarged testicle and that medications should be prescribed along with a follow up visit in two months. Pl.'s Stat. of Material Facts at ¶¶ 21, 22, & 23; Dr. Vadlamudi's Stat. of Material Facts at ¶ 7; Dr. Vadlamudi Aff., Ex. A at pp. 51, 157, & 168. Follow up tests were conducted and another appointment was scheduled for February 13, 2004. Pl.'s Stat. of Material Facts at ¶¶ 27, 28, 30, & 31; Dr. Vadlamudi Aff, Ex. A at pp. 51, 100-01, 120, 140, & 156.

**\*5** However, on January 23, 2004, an ultrasound was performed where it was discovered that Plaintiff had cysts on his testicles, for which medication was prescribed. Dr. Vadlamudi's Stat. of Material Facts at ¶ 7; Pl.'s Stat. of Material Facts at ¶¶ 24, 25, & 26; Dr. Vadlamudi Aff., Ex. A at pp. 46 & 121-23. In February 2004, Plaintiff was again seen by the urologist who prescribed antibiotics and recommended monitoring Lighthall's condition with a notation that surgery could be necessary to drain the cysts. Dr. Vadlamudi's Stat. of Material Facts at ¶ 7; Pl.'s Stat. of Material Facts at ¶ 27; Dr. Vadlamudi Aff, Ex. A at p. 140. Plaintiff was also seen by the urologist in May, July, and November of 2004 and although Plaintiff returned to the urological specialist several times and medication was prescribed each time, the urologist had not, as of December 1, 2004, recommended surgery for his testicle problem. Pl.'s Stat. of Material Facts at ¶¶ 28, 29, 30, & 31; Dr. Vadlamudi's Stat. of Material Facts at ¶ 7; Dr. Vadlamudi Aff. at pp. 97, 98-99, 161, 162, & 282. During the period of Plaintiff's complaints from March 2003 till October 2004 about his testicular pain, Plaintiff not only received consultations but was also prescribed many medications in an attempt to alleviate his pain. Dr. Vadlamudi, Aff., Ex. A at pp. 25, 27, 42, 44, 45, 50, 57, 58, 73, & 74.

When Plaintiff was examined upon his entry into Marcy, it was noted that Plaintiff had a heart condition for which he received medications. Dr. Vadlamudi Aff., Ex. A at p. 86. On March 3, 4, and 18, 2003, Plaintiff complained about chest pains. *Id.* at pp. 77 & 82-83. At those times and because of the complaints, Lighthall was prescribed medication and was told to come back to see Dr. Vadlamudi if he had pains again. *Id.* However, during the March 4th examination, Plaintiff noted he did not have any chest pains at that time but that he had actually felt chest pains the previous night. *Id.* at p. 82. On March 23, 2003, Plaintiff complained of chest pains and was taken to St. Luke's Hospital. Pl.'s Stat. of Material Facts at ¶ 40; Dr. Vadlamudi Aff., Ex. A at p. 76. Several tests were performed and it was determined that Plaintiff had an enlarged heart with blockage and that he would need a catheterization. Pl.'s Stat. of Material Facts at ¶ 41. After Lighthall returned from the hospital, Plaintiff made several complaints regarding some pain, but no direct reference to chest pain was made again until December 9, 2003. Pl.'s Stat. of Material Facts at ¶ 42; Dr. Vadlamudi Aff., Ex. A at pp. 19-51, 52, & 53-76.

On June 23, 2003, Plaintiff was seen by a cardiologist who recommended several medications and that Plaintiff stop smoking. Dr. Vadlamudi Aff., Ex. A at pp. 64 & 180. On December 1, 2003, Plaintiff was again seen by a heart specialist who recommended certain medications and a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 721568 (N.D.N.Y.)
(Cite as: 2006 WL 721568 (N.D.N.Y.))

catheterization. Dr. Vadlamudi Aff., Ex. A at p. 166; Pl.'s Stat. of Material Facts at ¶ 44. On December 18, 2003, Plaintiff refused to have the catheterization performed until he was seen by the heart specialist. Pl.'s Stat. of Material Facts at ¶ 45; Dr. Vadlamudi Aff., Ex. A at p. 165. Besides having chest pain, Plaintiff also complained of rectal and back pain. On October 25, 2004, in conjunction with the possibility of surgery on his back, cardiology clearance was needed and it was at this time when Plaintiff was willing to have the catheterization performed. Dr. Vadlamudi Aff., Ex. A at p. 264. On October 26, 2004, a request was made to schedule the catheterization. Id. at pp. 17 & 263. On November 10, 2004, Plaintiff received a consultation with the heart specialist who performed a catheterization. Pl.'s Stat. of Material Facts at ¶ 47; Dr. Vadlamudi's Stat. of Material Facts at ¶ 6; Dr. Vadlamudi Aff., Ex. A at pp. 280-281. Prior to the catheterization, Plaintiff has been treated for his heart ailments by receiving blood pressure and cholesterol medications, stress tests, and referrals to a cardiologist. Dr. Vadlamudi's Stat. of Material Facts at ¶ 6; see generally Dr. Vadlamudi Aff., Ex. A at pp. 17-282. Since the catheterization, the cardiologist recommended Plaintiff take certain medications and follow up with Dr. Vadlamudi. Dr. Vadlamudi Aff., Ex. A at p. 280.

*6 With regard to Plaintiff's back pain, on April 22, 2003, Plaintiff was prescribed medication and a recommendation was made for an X-ray. Dr. Vadlamudi Aff., Ex. A at p. 73. On April 24, 2003, it was determined that he had some mild back problems. Id. at p. 126. Plaintiff then made specific complaints about his back pain on September 30, 2003, November 25, 2003, March 12 and 22, 2004, May 1, 2004, and then again on June 3, 2004. Dr. Vadlamudi Aff., Ex. A at pp. 38, 41, 42, 43, 44, 53, & 59. During this period, Plaintiff received numerous medications for the back pain. Id. On June 8, 2004, Dr. Vadlamudi requested an MRI for Lighthall, which was conducted on June 28, 2004. Id. at p. 158. The MRI revealed "bulging of discs at L5-S1, L4-5 and L3-4." Pl.'s Stat. of Material Facts at ¶ 56; Dr. Vadlamudi Aff., Ex. A at pp. 124-25. A neurosurgery consult was requested on July 7 and August 11, 2004, and was eventually scheduled on September 15, 2004. Dr. Vadlamudi Aff, Ex. A at pp. 159 & 269. The neurologist recommended a CT scan and referral to a cardiologist for clearance of the back surgery. Id. at pp. 269-72. On September 30, 2004, Dr. Vadlamudi requested a follow up visit and approval for the CT scan. Id. at p. 136. The CT scan was performed on October 1, 2004. Id.

at pp. 118-19. After clearance was given by the cardiologist, Plaintiff was scheduled for surgery in March 2005. Dr. Vadlamudi's Stat. of Material Facts at ¶ 5.

As a facility physician, Dr. Vadlamudi notes that he has no role in deciding parole eligibility or the dispensation of good time credits, which Plaintiff admits. Dr. Vadlamudi's Stat. of Material Facts at ¶ 8; Pl.'s Stat. of Material Facts at ¶ 8. Moreover, Dr. Vadlamudi does not have the authority to "approve or disapprove requests for reasonable accommodations" as he can only provide medical recommendations regarding the requests.[FN11] Dr. Vadlamudi's Stat. of Material Facts at ¶ 9; Pl.'s Stat. of Material Facts at ¶ 63. However, Plaintiff sought many medical excuses to be excused from participation in ASAT. Dr Vadlamudi Aff., Ex. A at pp. 34, 36, 37, 59, & 76. Furthermore, Dr. Vadlamudi gave Plaintiff medical restrictions that would have allowed him to participate in ASAT.[FN12] Dr. Vadlamudi's Stat. of Material Facts at ¶ 10; Pl.'s Stat. of Material Facts at ¶ 71. Dr. Vadlamudi also notes that he never spoke to Associate Commissioner Wright about Plaintiff's medical condition. Dr. Vadlamudi's Stat. of Material Facts at ¶ 11.

FN11. Furthermore, in regards to Plaintiff's grievance filed based on accommodations in September 2003, the reason for the denial was that Lighthall could "receive a medial excuse for a specific medical need if medically warranted." Pl.'s Aff., Ex. at p. A-31.

FN12. Plaintiff only argues that Dr. Vadlamudi did not specify the medical restrictions, not that Dr. Vadlamudi refused to allow Plaintiff to participate in ASAT. Pl.'s Stat. of Material Facts at ¶¶ 70 & 71.

II. DISCUSSION

A. Motion to Dismiss Standard

Upon a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), a court may dismiss a complaint "only if 'it appears beyond a doubt that the plaintiff can prove no set

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 721568 (N.D.N.Y.)
(Cite as: 2006 WL 721568 (N.D.N.Y.))

of facts in support of his claim which would entitle him to relief." ' *Equal Employment Opportunity Comm'n v. Staten Island Sav. Bank,* 207 F.3d 144, 148 (2d Cir.2000) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957) & citing *Drake v. Delta Air Lines, Inc.,* 147 F.3d 169, 171 (2d Cir.1998)); *see also Green v. New York State Dep't of Corr. Serv. et al,* 2003 WL 22169779, at *1 (N.D.N.Y. Aug. 27, 2003). Furthermore, "the court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999); *see also Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir.2002) (citations omitted). Additionally, "[i]n assessing the legal sufficiency of a claim [under 12(b)(6) ], the court may consider those facts alleged in the complaint, documents attached as an exhibit thereto or incorporated by reference ... and documents that are integral to plaintiff's claims, even if not explicitly incorporated by reference." *Green,* 2003 WL 22169779, at *1 (internal quotation marks and citations omitted) (alterations in original).

**\*7** Moreover, pleadings submitted by *pro se* litigants "should be 'construed liberally,' ' and a complaint "should not be dismissed unless 'it is clear that the plaintiff would not be entitled to relief under any set of facts that could be proved consistent with the allegations." ' *Phillips v. Girdich,* 408 F.3d 124, 127 (2d Cir.2005) (internal citations omitted). A "dismissal on the pleadings is *never* warranted unless the plaintiff's allegations are doomed to fail under any available legal theory." *Id.* at 128.

B. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and

has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the moving party. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994).

C. Eleventh Amendment

**\*8** Plaintiff brings suit against Defendants Vadlamudi, Lape, Schultz-Inman, Rowlands, and Wright in both their individual and official capacities. Am. Compl. at ¶¶ 3-7. Plaintiff seeks a declaratory judgment, injunctive relief, as

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 721568 (N.D.N.Y.)
(Cite as: 2006 WL 721568 (N.D.N.Y.))

well as compensatory and punitive damages against these individuals in their individual and official capacities. *Id.* at § VII(a), (b), (d), & (e).

The Eleventh Amendment states "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The Eleventh Amendment bars a suit against the state in federal court unless the state consents to being sued or Congress legislatively overrides a state's immunity. *Huang v. Johnson,* 251 F.3d 65, 69 (2d Cir.2000). The state's immunity extends to state officials "act[ing] on behalf of the state" when the state is the " 'real, substantial party in interest .' " *Id.* at 69-70 (citing *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddie, Inc.,* 506 U.S. 139, 142-47 (1993) & quoting *Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 101-02 (1984)). Moreover, the Eleventh Amendment will bar recovery for money damages in a suit "against state officials in their official capacities." *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003).

Therefore, the Defendants cannot be sued in their official capacities in a claim for money damages. However, Lighthall may seek damages from them in their individual capacities. Furthermore, Plaintiff may sue the Defendants for declaratory and injunctive relief in both their individual and official capacities because " 'official-capacity actions for prospective relief are not treated as actions against the State." *Cruz v. Gomez,* 202 F.3d 593, 595 n. 2 (2d Cir.2000) (quoting *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 n. 10 (1989)).

D. Eighth Amendment Cruel and Unusual Punishment Claim

Lighthall claims that Dr. Vadlamudi violated his Eighth Amendment rights by acting with deliberate indifference to his medical needs when Dr. Vadlamudi did not adequately treat Plaintiff's conditions, delayed treatment, failed to follow another doctor's recommendations, and provided medications that were ineffective. Am. Compl. at ¶¶ 83, 92, & 93. Plaintiff states that Dr. Vadlamudi

declined to take additional measures to "improve his deteriorating serious medical conditions." *Id.* at ¶ 93. Additionally, Plaintiff claims that Associate Commissioner Wright was deliberately indifferent by failing to "train and supervise health services employees under his authority." *Id.* at ¶¶ 79 & 80. Plaintiff also states that Associate Commissioner Wright implemented policies that allowed for denial of Plaintiff's grievances, thus aiding in Dr. Vadlamudi's Eighth Amendment violations. *Id.* at ¶ 86. Plaintiff further alleges that Superintendent Lape was deliberately indifferent to his medical needs when Lape affirmed Dr. Vadlamudi's determination and the denial of Plaintiff's grievances. *Id.* at ¶¶ 84 & 102.

**\*9** The Eighth Amendment to the U.S. Constitution prohibits cruel and unusual punishment. Prohibited punishment includes that which " 'involve[s] the unnecessary and wanton infliction of pain." ' *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173 (1976)). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to [his] serious medical needs." *Smith v. Carpenter,* 316 F.3d 178, 183 (2d Cir.2003) (internal quotation marks and citations omitted) (alteration in original). This standard contains objective and subjective elements. *Id.* "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberative indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Id.* at 183-84 (citing *Chance,* 143 F.3d at 702 & *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). The subjective element " 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." ' *Hathaway v. Coughlin,* 99 F.3d at 553 (quoting *Farmer v. Brennan,* 511 U.S. 825 (1994)).

This deliberate indifference must be in regards to the "prisoner's serious illness or injury[.]" *Estelle v. Gamble,* 429 U.S. 97, 105 (1976). Additionally, " '[b]ecause society does not expect that prisoners will have unqualified access to health care,' a prisoner must first make this threshold showing of serious illness or injury in order to state an Eighth Amendment claim for denial of medical care." *Smith,* 316 F.3d at 184 (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)) (further citation

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 721568 (N.D.N.Y.)
(Cite as: 2006 WL 721568 (N.D.N.Y.))

omitted). Some factors that determine whether a prisoner's medical condition is serious include: "1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, 2) whether the medical condition significantly affects daily activities, and 3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162-63 (2d Cir.2003) (internal quotation marks and citations omitted) (noting that an inmate is not required to show "that he or she experiences pain that is the limit of human ability to bear, nor [does the court] require a showing that his or her condition will degenerate into a life threatening one").

The prisoner has to show "more than an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability." *Smith,* 316 F.3d at 184 (internal quotation marks and citation omitted). Prison officials act with deliberate indifference "when [they] 'know [ ] of and disregard[ ] an excessive risk to inmate health or safety; the official[s] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference.' " *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. at 837). The Eighth Amendment deals with "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract[.]" *Smith,* 316 F.3d at 186 (citations omitted). Moreover, the "severity of the alleged denial of medical care should be analyzed with regard to all relevant facts and circumstances." *Id.* at 187 (citation omitted).

**\*10** A prisoner's disagreement with the form of treatment proscribed by medical personnel will not necessary implicate the Eighth Amendment. *Ifill v. Goord,* 2004 WL 1663994, at \*3 (W.D.N.Y. Apr. 8, 2004) (citation omitted). Furthermore,

disagreements between a prisoner and prison officials over treatment decisions fall short of cruel and unusual punishment. Thus, disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a section 1983 claim. These issues implicate medical judgments and, at

worst, negligence amounting to medical malpractice, but not the Eighth Amendment.

*Id.* (quoting *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001)).

Notably, when a prisoner, in essence, claims medical malpractice,

a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omission sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Hathaway v. Coughlin,* 99 F.3d at 553 (quoting *Estelle,* 429 U.S. at 106 & n. 14).

If the malpractice involved "culpable recklessness, i.e., an act or failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of harm,' " then it may constitute deliberate indifference. *Id.* (quoting *Farmer,* 511 U.S. at 839). Additionally, "[p]rison officials and medical personnel have wide discretion in treating prisoners, and Section 1983 is not designed to permit federal courts to interfere in the ordinary medical practices of state prisons." *Ifill v. Goord,* 2004 WL 1663994, at \*3 (internal quotation marks and citation omitted).

Because every doctor does not treat an illness in the same way, the mere difference in treatment by a defendant physician does not amount to culpability. *McKenna v. Wright,* 2002 WL 338375, at \*8 (S.D.N.Y. Mar. 4, 2002) (citing *Douglas v. Stanwick,* 93 F.Supp.2d 320, 325 (N.D.N.Y.2000)). There will be no Eighth Amendment claim then " 'when a *doctor* disagrees with the professional judgment of another doctor.' " *Id.* (quoting *White v. Napoleon,* 897 F.2d 103, 110 (3d Cir.1990) (emphasis in original)); *see also Webb v. Jackson,* 1994 WL 86390, at \*3 (S.D.N.Y.), *aff'd* 47 F.3d 1158 (2d Cir.1995) (stating that "mere differences in opinion,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 721568 (N.D.N.Y.)
(Cite as: 2006 WL 721568 (N.D.N.Y.))

whether between doctors or laymen, based on medical care does not give rise to an Eighth Amendment violation of inadequate medical treatment pursuant to section 1983" (citation omitted)).

Furthermore, a delay in medical treatment does not necessarily invoke the Eighth Amendment. The "delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm.' " Thomas v. Nassau County Corr. Ctr., 288 F.Supp.2d 333, 339 (E.D.N.Y.2003) (quoting Chance, 143 F.3d at 703). Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, such a classification is reserved "for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast degenerating condition for three days; or delayed major surgery for over two years." Freeman v. Stack, 2000 WL 1459782, at *6 (S.D.N.Y. Sept. 29, 2000) (internal quotation marks omitted).

*11 Moreover, if a plaintiff seeks to bring a § 1983 action for supervisory liability, there needs to be a showing of personal involvement by the supervisor. Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir.2003). " 'Absent some personal involvement by [the supervisory official] in the allegedly unlawful conduct of his subordinates,' he cannot be liable under section 1983." Id. at 144-45 (quoting Gill v. Mooney, 824 F.2d 192, 196 (2d Cir.1987)) (alterations in original). However, liability on the part of the supervisor may exist

in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

Id. at 145 (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995)) (further citations omitted).

In this case, it must first be determined whether Lighthall's illnesses and injuries are serious. It has been well documented that Lighthall at least suffered from back, chest, and testicular pain as well as conditions resulting from his stroke. See Am. Compl. at ¶¶ 16, 17, 30, 33, 42, 50, 59, & 71; see also Dr. Vadlamudi's Aff., Ex. A at pp. 1-282. None of the Defendants dispute whether Lighthall's illnesses or injuries were serious. Dkt. No. 29, Dr. Vadlamudi's Mem. of Law in Opp'n to Prelim. Inj. and for Mot. for Summ. J. at pp. 13-18; Dkt. No. 42, Mot. to Dismiss, Mem. of Law at pp. 15-16. In fact, Defendants fail to address the issue of serious illness or injuries. FN13 Dr. Vadlamudi's Mem. of Law in Opp'n to Prelim. Inj. and for Mot. for Summ. J. at pp. 13-18. Therefore, it will be assumed that Lighthall can withstand the first prong of the analysis.

> FN13. The Court acknowledges that Plaintiff's heart and back problems from the record provided could be serious illnesses; furthermore, the cumulative effect of Plaintiff's illnesses and injuries, including the chest, back, and testicular pain would constitute serious conditions.

Next, Lighthall must show deliberate indifference on the part of Dr. Vadlamudi. Plaintiff must show that Dr. Vadlamudi disregarded excessive risk to his health or safety. Lighthall must also show that Dr. Vadlamudi committed something more than mere negligence. Here, Plaintiff claims that Dr. Vadlamudi failed to treat his illnesses and injuries by "disregarding" the recommendations of other doctors and specialists. Am. Compl. at ¶92. Lighthall also claims that despite receiving medications and treatment from Dr. Vadlamudi, they were ineffective and Dr. Vadlamudi did nothing further to alleviate his pain. Id. at ¶ 93.

Here, there were over a hundred Ambulatory Health Records entries dealing with Lighthall's medical complaints and the treatment provided or course of action to be taken. See Dkt. No. 33, Pl.'s Aff., Ex. at pp. A1 & A47; see generally Dr. Vadlamudi's Aff., Ex. A at pp. 17-282. Plaintiff also had several lab analyses performed for his various conditions. See generally Dr. Vadlamudi's Aff., Ex. A at pp. 1-282. In addition, there were numerous requests and reports for consultations provided by Dr. Vadlamudi. Pl.'s Aff., Ex. at pp. A16, A19, A20-21, A24,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 721568 (N.D.N.Y.)
(Cite as: 2006 WL 721568 (N.D.N.Y.))

& A26-27; Dr. Vadlamudi's Aff., Ex. A at pp. 26-28, 32, 52-53, 61, 74, 118, 121-24, 128-31, 133, 136-41, 145-51, 153-59, 161-62, 166-68, 171-73, 177-80, 182-83, 185-90, 192, 197, 199-200, 237, 262-65, 267-69, & 274-76. Plaintiff also received several hospital stays and emergency room visits for his ailments including chest and testicular pain. Pl.'s Aff., Ex. at p. A15; Dr. Vadlamudi's Aff., Ex. A at pp. 90, 93, 195, & 203-06. Moreover, Plaintiff received medications and treatment, some pursuant to recommendations by other doctors. Pl.'s Aff., Ex. at pp. A22, A28, & A42-43; Dr. Vadlamudi's Aff., Ex. A at pp. 29, 39-40, 44-46, 50, 54, 58, 63-65, 68, 71, 73, 84, 88, 91, 169-70, 223, & 249.

**\*12** A thorough review of the record does not indicate that Dr. Vadlamudi provided a course of treatment that was different from any of those recommended by the specialists. *See generally* Dr. Vadlamudi Aff., Ex. A at pp. 17-282. When tests revealed that Plaintiff's B-12 level was low, Dr. Vadlamudi ordered six months of injections. Dr. Vadlamudi Aff., Ex. A at pp. 277-78. Plaintiff's testicular pain was dealt with in numerous ways including testing, prescribing medications, requesting further consultations and providing a colonoscopy and ultrasound. Dr. Vadlamudi Aff., Ex. A at pp. 46, 51, 72-80, 97, 98-99, 100-01, 104-105, 106, 108, 120, 121-23, 140, 156, 157, 161, 162-168, 169, 171-72, & 282; *see supra* Part I.B. When Plaintiff complained about his chest pain, Dr. Vadlamudi provided medications for the pain and sent Plaintiff to the hospital for tests. Dr. Vadlamudi Aff., Ex. A at pp. 76, 77, 82-83, & 86; *see supra* Part I.B. Plaintiff was then seen by a cardiologist several times; he received medications that were recommended, and a catheterization was performed once Plaintiff had consented. Dr. Vadlamudi Aff., Ex. A at pp. 64, 165, 166, 180, 264, 280-81; Dr. Vadlamudi's Stat. of Material Facts at ¶ 6; *see supra* Part I.B. In regards to Plaintiff's back pain, he received medications, an X-ray, an MRI, and a CT scan along with neurological consults and surgery was slated for March 2005. Dr. Vadlamudi Aff., Ex. A at pp. 38, 41-44, 53, 59, 73, 118-19, 124-25, 126, 136, 158, 159, & 269-72; Dr. Vadlamudi's Stat. of Material Facts at ¶ 5; *see supra* Part I.B. The Court notes that differing opinions in the form of treatment will not necessarily implicate the Eighth Amendment. *See Ifill, 2004 WL 1663994, at \*3; Webb, 1994 WL 86390, at \*3.* This includes disagreements over medications and forms of treatment. *See Ifill, 2004 WL 1663994, at \*3.* Here, only Plaintiff disagrees with the treatment he received. The specialists and Dr. Vadlamudi did not have differing opinions as to the course of treatment that should take place for Plaintiff. The ambulatory health records, reported extensively above, verifies that there was no disagreement between the medical professionals on how to treat and manage Plaintiff's multitude of medical infirmaries, and furthermore, clearly confirms that Dr. Vadlamudi followed the advice and directions provided by the medical consultants. *See supra* Parts I.A. & B. In any case, Dr. Vadlamudi would not be required to follow the recommendations of other doctors since doctors treat ailments differently. Plaintiff has not shown that Dr. Vadlamudi was deliberately indifferent to his medical needs and that Dr. Vadlamudi knew of and disregarded any risks to Plaintiff's health, his disagreement notwithstanding.

In addition, Plaintiff claims substantial delays in the treatment of his numerous ailments. However, delay in and of itself will not necessarily implicate the Eighth Amendment unless "it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Thomas,* 288 F.Supp.2d at 339 (citing *Chance,* 143 F.3d at 703). That is not the case here. Plaintiff's Ambulatory Health entries reflect, beginning in January 2003 and up till October 26, 2004, that there were over one hundred entries dealing with Plaintiff's chest, back, and testicular pain along with other ailments involving his stomach. Dr. Vadlamudi Aff., Ex. A at pp. 17-86. Presumably, the only ostensible delay was that of the B-12 vitamin injections. However, Plaintiff had been tested with results in the normal range in March 2003 and it was not until he was tested for his heart problems when it was revealed that the levels were only slightly below the normal range; injections were immediately ordered. There was no conscious disregard of risk to Plaintiff. In the mean time, Plaintiff was treated for all his other ailments. Some delays in receiving consultations naturally occurred since they had to be approved ostensibly by either the administration or consultant. Once approved, however, appointments and even follow-up visits were scheduled. *See supra* Part I.B. For example, a urological consult was ordered a few days after Plaintiff's colonoscopy and Plaintiff received the consult about two months after the request was placed. Dr. Vadlamudi Aff., Ex. A at pp. 51, 157, & 168. There were no appreciable gaps in the treatment of Plaintiff and Plaintiff has failed to show that Dr. Vadlamudi evinced a conscious disregard of a substantial risk of serious harm. All of Plaintiff's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 721568 (N.D.N.Y.)
(Cite as: 2006 WL 721568 (N.D.N.Y.))

arguments with regard to the Eighth Amendment could connote at best negligence on the part of Dr. Vadlamudi possibly amounting to medical malpractice, but it does not implicate the Eighth Amendment. Therefore, Plaintiff has failed to show that Dr. Vadlamudi violated his Eighth Amendment rights.

**\*13** Additionally, Plaintiff asserts that Associate Commissioner Wright and Superintendent Lape were deliberately indifferent to his serious medical needs.

Lighthall has stated that Associate Commissioner Wright did not properly train and supervise his health employees. Am. Compl. at ¶ 79. Plaintiff also alleges that Wright implemented health policies that in turn aided in Dr. Vadlamudi's deliberate indifference. *Id.* at ¶ 86. Plaintiff does not allege that Wright had actual and direct participation in the constitutional violation in either case. Therefore, with regard to employee training and supervision, it must be shown that Wright was grossly negligent in the supervision of employees who committed a constitutional violation. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (citation omitted); *Hernandez v. Keane,* 341 F.3d at 145 (quoting *Colon v.. Coughlin,* 58 F.3d at 873); *see also Brock v. Wright,* 315 F.3d at 165. As to the health policies, Wright could be held liable if Lighthall could prove that "a jury could reasonable find that [Wright] 'created a policy or custom under which unconstitutional practices occurred or [that Wright] allowed the continuance of such a policy or custom." ' *Brock,* 315 F.3d at 165 (quoting *Colon,* 58 F.3d at 873).

Plaintiff has failed to plead facts that Wright was grossly negligent in any fashion in the training or supervision of his health employees who may have committed a constitutional violation. Furthermore, according to Lighthall, his sole complaint is that the health policy gives Dr. Vadlamudi "sole discretion as to what treatments Plaintiff would receive, regardless of the recommendations of specialists[.]" Am. Compl. at ¶ 86. This is akin to the argument of differing medical opinions as stated previously. *See supra* at pp. 18-19. As previously stated, no Eighth Amendment constitutional violation was found to have occurred by Dr. Vadlamudi. Because Associate Commissioner Wright's Motion to Dismiss on this issue is derivative of Dr. Vadlamudi's Motion for Summary Judgment regarding violations of the Eighth Amendment,

and since no unconstitutional practices occurred, no supervisory liability exists against Defendant Wright on any basis.

In regards to Superintendent Lape, Plaintiff states that the denial of his appeals which were affirmed by Lape and the failure to act upon the grievance constituted deliberate indifference in violation of Plaintiff's rights. Am. Compl. at ¶¶ 84 & 102. As noted above, Dr. Vadlamudi was not deliberately indifferent to Lighthall's medical needs in violation of the Eighth Amendment. Since no constitutional violation occurred and there was no wrong to remedy, no supervisory liability exists as to Defendant Lape.

For the reasons stated above, it is hereby recommended that the Motion for Summary Judgment be granted, and the Motion to Dismiss be granted on the issue of deliberate indifference to Lighthall's medical needs in violation of the Eighth Amendment.

### E. Fourteenth Amendment

**\*14** Plaintiff alleges that Corrections Counselor Schultz-Inman, Superintendent Lape, and Senior ASA Counselor Rowlands violated his due process rights by conspiring to deny Lighthall "the right to consideration for discretionary release from prison" when documents were forged and false information was placed in his file. Am. Compl. at ¶ 104. In addition, Plaintiff claims that Superintendent Lape denied his due process rights by depriving him of "Merit Time Eligibility" pursuant to N.Y. CORRECT. LAWW § 803 when Lape "affirm[ed] grievances" filed by Lighthall. *Id.* at ¶ 84. Furthermore, Plaintiff claims that Defendants Schultz-Inman and Rowlands violated his due process rights by conspiring to forge documents and give false information to deny Lighthall "Merit Time." *Id.* at ¶ 85. Plaintiff asserts this was done with the intent to deny him "Good Time Eligibility" and "discretionary release to Parole Supervision." *Id.* Plaintiff claims that his Due Process claim arises out of a protected liberty interest in "discretionary release consideration" and his "disqualification" from ASAT due to his disabilities. *Id.* at ¶ 106.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 721568 (N.D.N.Y.)
(Cite as: 2006 WL 721568 (N.D.N.Y.))

The Due Process Clause of the Fourteenth Amendment states that no "State [shall] deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. It is well-established that a prisoner who has been lawfully incarcerated will only have "a narrow range of protected liberty interests." *Morris v. Dann,* 1996 WL 732559, at *3 (N.D.N.Y. Dec. 11, 1996). The Supreme Court has stated that "the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Meachum v. Fano,* 427 U.S. 215, 224 (1976); *see also Benjamin v. Fraser,* 264 F.3d 175, 189 (2d Cir.2001). Therefore, in order to succeed on a § 1983 claim based on the Fourteenth Amendment, the prisoner would have to prove "a deprivation of a liberty interest protected by the Due Process Clause itself, or a violation of a state-created liberty interest." *Morris,* 1996 WL 732559, at *3.

It is well-settled that "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of Nebraska Penal and Corr. Complex,* 442 U.S. 1, 7 (1979); *see also Leevon v. Goord,* 2003 WL 22384787, at *7 (W.D.N.Y. Sept. 4, 2003). And, for a prisoner to survive a motion to dismiss on a Due Process claim, the prisoner must allege that: 1) "the State has granted inmates, by regulation or statute, a protected liberty interest with respect to the terms or conditions of confinement; and 2) the defendants' action creates an 'atypical and significant hardship' with regard to those terms or conditions of confinement." *Shariff v. Artuz,* 2000 WL 1219381, at *6 (S.D.N.Y. Aug. 28, 2000) (citing *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) & quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)).

**\*15** Here, the state has not created a protected liberty interest in "Merit Time" or participation in a program that has implications on good time credit. The law states that the prisoner does not have the right to demand or require the state officials to provide "Merit Time." New York's Correction Law [hereinafter N.Y. CORRECT. LAWW] sets forth the standards for good behavior allowances against indeterminate and determinate sentences and states "[n]o person shall have the right to demand or require the allowances authorized by this section. The decision of the

commissioner of correctional services as to the granting, withholding, forfeiture, cancellation or restoration of such allowances shall be final and shall not be reviewable if made in accordance with law." [FN14] N.Y. CORRECT. LAW § 803(4). N.Y. CORRECT. LAW § 803(3) gives the Commissioner of Correctional Services the discretion to decide whether a prisoner is to receive "Merit Time." In addition, denial of participation in a program that could lead to a loss of good time credit is "speculative and 'fail[s] to allege interference with a protected liberty interest." *Shariff,* 2000 WL 1219381, at *6 n. 7 (quoting *Brooks v. DiFasi,* 1997 WL 436750, at *3 (W.D.N.Y. July 30, 1997)).

FN14. N.Y. CORRECT. LAWW § 803 states in pertinent part:

1. (a) Every person confined in an institution of the department or a facility in the department of mental hygiene serving an indeterminate or determinate sentence of imprisonment, except a person serving a sentence with a maximum term of life imprisonment, may receive time allowance against the term or maximum term of his sentence imposed by the court. Such allowances may be granted for good behavior and efficient and willing performance of duties assigned or progress and achievement in an assigned treatment program, and may be withheld, forfeited or canceled in whole or in part for bad behavior, violation of institutional rules or failure to perform properly in the duties or program assigned.

(d)(i) Except as provided in subparagraph (ii) of this paragraph, every person under the custody of the department or confined in a facility in the department of mental hygiene serving an indeterminate sentence of imprisonment with a minimum period of one year or more or a determinate sentence of imprisonment of one year or more imposed pursuant to section 70.70 or 70.71 of the penal law, may earn a merit time allowance.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 721568 (N.D.N.Y.)
(Cite as: 2006 WL 721568 (N.D.N.Y.))

3. The commissioner of correctional services shall promulgate rules and regulations for the granting, withholding, forfeiture, cancellation and restoration of allowances authorized by this section in accordance with the criteria herein specified. Such rules and regulations shall include provisions designating the person or committee in each correctional institution delegated to make discretionary determinations with respect to the allowances, the books and records to be kept, and a procedure for review of the institutional determinations by the commissioner.

Even if Plaintiff's allegations that documents were forged and falsified were taken as true, as the standard of review for a motion to dismiss directs, Lighthall could not survive a motion to dismiss on his Fourteenth Amendment cause of action. Since there is no constitutional right to be conditionally released, Plaintiff must show that New York created a protected liberty interest in the terms of confinement and that the Defendants created an "atypical and significant hardship" as a result of the interest. Shariff, 2000 WL 1219381, at *6. Here, N.Y. CORRECT. LAW W § 803(4) is clear that the state did not create a protected liberty interest. Additionally, Plaintiff has failed to plead any atypical and significant hardship that was placed upon him with regard to his conditions of confinement. "Merit Time" and good time credits are not guaranteed to any prisoner. Therefore, Plaintiff has not stated a cause of action based on the Due Process Clause of the Fourteenth Amendment. [FN15]

FN15. Defendants Lape, Schultz-Inman, Rowlands and Wright also allege that Plaintiff failed to commence an Article 78 proceeding regarding his Due Process claims. Mot. to Dismiss, Mem. of Law at pp. 12 & 14. However, as there were no Due Process violations, this issue is moot. Nonetheless, the Prisoner Reform Litigation Reform Act of 1995, 42 U.S.C. § 1997e(a) states that administrative remedies must be exhausted when an inmate brings suit about prison life. Porter v. Nussle, 534 U.S. 516, 532 (2002). According to the New York State Department of Corrections, a three-step process to exhaust all administrative remedies is available to inmates. See generally N.Y.

COMP.CODES R. & REGS. tit. 7, §§ 701.7(a)(1), (3)-(5), (b), & (c). Here, Plaintiff administratively exhausted his remedies. Am. Compl. at ¶¶ 45-48, 62-63, & 66-68.

In addition to Lighthall's first claim under the Fourteenth Amendment, Plaintiff alleges that Dr. Vadlamudi violated the Due Process Clause when he acted with deliberate indifference to Plaintiff's medical needs. Am. Compl. at ¶ 96. Plaintiff's cause of action for deliberate medical indifference through the Fourteenth Amendment is misplaced.

"[I]ncarcerated prisoners are protected from cruel and unusual punishment in the form of inadequate medical care by the Eighth Amendment, as applied to the state by the Fourteenth Amendment." McKenna v. Wright, 2002 WL 338375, at *9 (S.D.N.Y. Mar. 4, 2002) (citing Estelle v. Gamble, 429 U.S. 97, 101-05 (1976)). A cause of action for deliberate indifference of medical care brought by a pro se prisoner under the Fourteenth and Eighth Amendments will only be construed as a claim pursuant to the Eighth Amendment. McKenna, 2002 WL 338375, at *9. Therefore Lighthall's cause of action under the Due Process Clause of the Fourteenth Amendment against Dr. Vadlamudi is construed as an Eighth Amendment claim, a claim that was disposed of above. See supra Part II.D.

*16 In addition to the Due Process claims, Plaintiff claims that Dr. Vadlamudi violated his Equal Protection rights under the Fourteenth Amendment "by increasing the punishment" of the crime for which he was incarcerated when Dr. Vadlamudi "fail[ed] to treat his medical condition." Am. Compl. at ¶ 95. Furthermore, Plaintiff alleges that Corrections Counselor Schultz-Inman, Superintendent Lape, and Senior ASA Counselor Rowlands violated his Equal Protection rights when they conspired to deny Lighthall any "consideration for discretionary release from prison" when documents were forged and false information was placed in his file. Id. at ¶ 104. Plaintiff states that the Equal Protection Clause applies because he is in a suspect class as being physically disabled, was discriminated against by not being able to complete ASAT, and was further discriminated against when records were falsified. Id. at ¶ 105.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 721568 (N.D.N.Y.)
(Cite as: 2006 WL 721568 (N.D.N.Y.))

The Equal Protection Clause of the Fourteenth Amendment states no "State [shall] deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. It further "directs that all persons similarly circumstanced shall be treated alike." *Plyler v. Doe,* 457 U.S. 202, 216 (1982) (citation omitted).

The Second Circuit has held that in order for a prisoner to state a violation of the Equal Protection Clause, the prisoner "must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (citation omitted). An Equal Protection claim may be brought "by a 'class of one' where a plaintiff alleges that [ ]he has been 'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." ' *African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 362-63 (quoting *Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000)). However, the plaintiff need not specifically identify "actual instances where others have been treated differently" in order for the equal protection claim to be sufficient. *DeMuria v. Hawkes,* 328 F.3d 704, 707 (2d Cir.2003).

As to Plaintiff's claim against Dr. Vadlamudi, it seems as if Lighthall disguises another Eighth Amendment claim under the Equal Protection Clause. Plaintiff fails to state a cause of action under the Equal Protection Clause since he fails to allege that he was treated differently than other inmates who were similarly situated. *See generally* Am. Compl. Additionally, as Plaintiff claims with a marvelously creative theory that Dr. Vadlamudi increased his punishment by failing to treat his medical conditions, nowhere does Plaintiff state that his sentence was increased by any amount of time. *See generally id.*

In regards to Corrections Counselor Schultz-Inman, Superintendent Lape, and Senior ASA Counselor Rowlands, construing that documents were falsified and forged, Plaintiff has failed to plead a cause of action. As noted above, Plaintiff does not claim that he was treated differently. Even though he does not have to state the disparity with specific or particular instances, it still must be pled, which Plaintiff has failed to do. Lighthall also has not shown that any dissimilar treatment was intentional or

purposeful discrimination. Since Lighthall failed to plead the inescapable crux of the Equal Protection claim, it is unnecessary to determine whether any rational basis existed for a possible disparity in treatment.

**\*17** For the reasons stated above, it is hereby recommended the Motion for Summary Judgment and the Motion to Dismiss be granted as to the causes of action alleging violations of the Fourteenth Amendment Due Process and Equal Protection Clauses.

F. Conspiracy Claims

Plaintiff asserts that Dr. Vadlamudi and Associate Commissioner Wright conspired by implementing policies and customs that "denied Plaintiff's grievances without investigating the facts" and the conspiracy also deprived Plaintiff of medical treatment. Am. Compl. at ¶¶ 99 & 100. Additionally, Plaintiff claims that Corrections Counselor Schultz-Inman and Senior ASA Counselor Rowlands conspired to deprive him of early release "by forging documents and relaying false information" to Superintendent Lape about Plaintiff's participation in ASAT. *Id.* at ¶ 89. Plaintiff also states that Superintendent Lape furthered the conspiracy by affirming the denial of Plaintiff's grievance and "acting in concert with Defendant's [sic] Schultz-Inman and Rowlands." *Id.* at ¶ 90.

42 U.S.C. § 1985(3) states that if two or more people conspire to deprive a person of equal protection of the laws thereby injuring the person, then that party "may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators." [FN16] To recover under this section, a plaintiff must be able to show 1) a conspiracy; 2) meant to deprive a person or persons of equal protection of the laws or privileges and immunities under the laws; 3) "an overt act in furtherance of the conspiracy; and 4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." *Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999) (citations omitted).

FN16. In its entirety, 42 U.S.C. § 1985(3) states:

Not Reported in F.Supp.2d, 2006 WL 721568 (N.D.N.Y.)
(Cite as: 2006 WL 721568 (N.D.N.Y.))

Depriving persons of rights or privileges. If two or more persons in any State or Territory conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice-President, or as a member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

The conspiracy need not be shown by an "explicit agreement" between the parties, but can be established through "the parties hav[ing] a tacit understanding to carry out the prohibited conduct." *Id.* (internal quotation marks and citations omitted). If the allegations of a conspiracy to deprive a person of his constitutional rights are " 'conclusory, vague or general,' 'then dismissal is proper. *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (quoting *Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir.1993)); *see also Webb v. Goord,* 340 F.3d 105, 111 (2d Cir.2003). However, the conspiracy does have to be "motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the

conspirators' action." *Thomas,* 165 F.3d at 146 (quoting *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1088 (2d Cir.1993)).

In this case, Plaintiff has failed to state a cause of action under § 1985. First of all, Plaintiff's assertions regarding Superintendent Lape are general and as such warrant dismissal. Plaintiff merely states that Lape affirmed grievances that had been denied. Am. Compl. at ¶ 90. Despite the general allegations as to Lape, Plaintiff has not pled that any of the conspiracies claimed to have occurred were motivated by some racial or class-based discriminatory animus. Even though no racial discrimination was alleged, as Plaintiff noted, "Marcy Correctional Facility is designated as a Medical Facility [ ] because it is set up on flat ground for medically disabled inmates, has housing units designated as wheelchair accessible and does not have stairs." *Id.* at ¶ 27 n. 3. In spite of Plaintiff's residence in a facility for the medically disabled, Plaintiff has also failed to allege that he was discriminated against based on medical disabilities.

**\*18** For the reasons stated above, it is hereby recommended that the Motion for Summary Judgment be granted, and the Motion to Dismiss be granted on the 42 U.S.C. § 1985 action.

G. The ADA and Rehabilitation Act

Plaintiff states that Dr. Vadlamudi and Superintendent Lape violated the ADA and § 504 of the Rehabilitation Act by discriminating against him based on his disability in making a determination of whether he could "participate in therapeutic programming." Am. Compl. at ¶ 109. In addition, Plaintiff claims that Dr. Vadlamudi and Superintendent Lape discriminated against Lighthall in their refusal of Plaintiff's request for "reasonable accommodations so that he would be able to participate and complete his recommended therapeutic programs [.]" *Id.* at ¶ 110.

The Supreme Court has stated that Title II of the ADA applies to state prisons and inmates. *Pennsylvania Dep't of Corr. v. Yeskey,* 524 U.S. 206, 210-12 (1998) (cited in *Singleton v. Perilli,* 2004 WL 74238, at *4 (S.D.N.Y. Jan.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 721568 (N.D.N.Y.)
(Cite as: 2006 WL 721568 (N.D.N.Y.))

16, 2004)). Although suit may be brought against a prison, the Second Circuit has held "neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials." *Garcia v. State Univ. of New York Health Sciences Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001).

42 U.S.C. § 12202 states that "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this [Act]." The Supreme Court has affirmed that this statute is "an unequivocal expression of Congress's intent to abrogate state sovereign immunity." *Unites States v. Georgia et al.,* 546 U.S. 151, 126 S.Ct. 877, 879 (2006). Moreover, the Supreme Court has held that Title II of the ADA creates a private cause of action for damages for conduct that *actually* violates the Fourteenth Amendment as Title II validly abrogates the sovereign immunity of the states. *Unites States v. Georgia et al.,* 126 S.Ct. at 882; *see also Tennessee v. Lane,* 541 U.S. 509, 518 & 520 (2004) (holding that "Congress can abrogate a State's sovereign immunity when it does so pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment to enforce the substantive guarantees of that Amendment" if " 'congruence and proportionality [exists] between the injury to be prevented or remedied and the means adopted to that end." ' (citing *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456 (1976) & quoting *City of Boerne v. Flores,* 521 U.S. 507, 520 (1997))).

The Second Circuit has stated that "a private suit for money damages under Title II of the ADA may only be maintained against a state if the plaintiff can establish that the Title II violation was motivated by discriminatory animus or ill will due to the disability[.]" *Garcia,* 280 F.3d at 111-12. If a plaintiff were to sue individuals in their official capacities for money damages, the Second Circuit has held that it would in fact be a suit against New York and therefore the Eleventh Amendment would shield the individuals to the same extent as it would shield New York. *Garcia,* 280 F.3d at 107 (citing *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989) & *Kentucky v. Graham,* 473 U.S. 159, 165-66 (1985)). As the Supreme Court has abrogated sovereign immunity against the states under Title II, a plaintiff may bring a lawsuit against individuals in their official capacities. In addition to a lawsuit for money damages, a plaintiff may pursue

prospective injunctive relief against a person in his or her official capacity. *Ex parte Young,* 209 U.S. 123, 155-56 (1908); *Cruz v. Gomez,* 202 F.3d at 595 n. 2.

**\*19** In order to state a claim under 42 U.S.C. § 12132, Title II of the ADA, prisoners must show:

(1) they are "qualified individuals" with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities.

*Henrietta D. v. Bloomberg,* 331 F.3d 261, 272 (2d Cir.2003) (citation omitted).

Additionally, to establish a cause of action under § 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), the prisoner must show:

(1) that he has a disability for purposes of the Rehabilitation Act; (2) that he was "otherwise qualified" for the benefit that has been denied; (3) that he has been denied the benefits "solely by reason" of his disability; and (4) that the benefit is part of a "program or activity receiving Federal financial assistance."

*Doe v. Pfrommer,* 148 F.3d 73, 82 (2d Cir.1998) (quoting *Flight v. Gloeckler,* 68 F.3d 61, 63 (2d Cir.1995)).

Since Title II of the ADA and § 504 of the Rehabilitation Act are so closely related, "unless one of those subtle distinctions is pertinent to a particular case, [the Second Circuit will] treat claims under the two statutes identically." *Henrietta D.,* 331 F .3d at 272.

A disability under the ADA is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such impairment." 42 U.S.C. § 12102(2) (quoted in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 721568 (N.D.N.Y.)
(Cite as: 2006 WL 721568 (N.D.N.Y.))

*Bragdon v. Abbott,* 524 U.S. 624, 630 (1998)). The consideration of subsection A requires a three step process set forth by the Supreme Court. First, it must be determined if a plaintiff's conditions constitute a physical impairment. *Bragdon,* 524 U.S. at 631. The Supreme Court, looking to the Department of Health, Education and Welfare regulations to interpret the Rehabilitation Act, defines a physical or mental impairment as:

(A) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following bodily systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine; or (B) any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

45 C.F.R. § 84.3(j)(2)(i) (1997) (quoted in *Bragdon v. Abbott,* 524 U.S. at 632).

Second, upon determining whether a physical or mental impairment exists, an identification must be made as to the "life activity upon which [plaintiff] relies ... and determine whether it constitutes a major life activity under the ADA." *Id.* at 631. Major life activities include " ' functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." ' 45 C.F.R. § 84.3(j)(2)(ii) (1997) & 28 C.F.R. § 41.31(b)(2) (1997) (quoted in *Bragdon v. Abbott,* 524 U.S. at 638-39) (noting that the list is not exhaustive and that reproduction, the claimed activity, was a major life activity). The final step is to ascertain whether "the impairment substantially limited the major life activity." *Id.* at 631.

**\*20** Here, Plaintiff has alleged that there was discrimination based on his disability. Am. Compl. at ¶ 109. Therefore, Plaintiff may proceed with a suit for money damages against Dr. Vadlamudi and Superintendent Lape in their official capacities as well as for prospective relief in both their individual and official capacities.

Plaintiff must state a cause of action under Title II of the ADA and § 504 of the Rehabilitation Act. First, it must be determined if Lighthall is a "qualified individual" within the meaning of Title II. Although Lighthall does not state with any specificity which of his conditions constitute physical impairments, it could be concluded that his heart troubles along with testicular and back problems fall within the definition of physical impairments which include cardiovascular, genito-urinary, and musculoskeletal conditions. The second step concerning the major life activity becomes difficult to address since Plaintiff again fails to identify a major life activity upon which he relies. However, reviewing his Amended Complaint, Lighthall alleges that he has trouble speaking, walking, using the bathroom, and needs assistance in caring for himself. *See* Am. Compl. at ¶¶ 17, 18, 19, 23, & 31. These would constitute major life activities. The last step, which Plaintiff also fails to address, is to determine whether the physical impairments substantially limit the major life activities asserted. It would be a logical conclusion that Plaintiff's physical impairments have substantially limited the life activities described in the Amended Complaint. Therefore, Plaintiff would be a "qualified individual."

Nevertheless, Plaintiff's claim for reasonable accommodations must fail. Pursuant to Title II of the ADA, "a public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity being offered." 28 C.F.R. § 35.130(b)(7). Therefore, the prison need only make reasonable modifications to policies to avoid discrimination on the basis of disability. However, since there is a lack of evidence to show discrimination, the prison would not be required to make the modifications.

Even though the prison would not have to make reasonable modifications, Plaintiff received reasonable accommodations. It must be noted, however, that Dr. Vadlamudi does not have the authority to approve or disapprove requests for reasonable accommodations and that he merely provides medical advice. Dr. Vadlamudi Aff. at ¶ 100. ASAT requires a participant to sit for an hour and a half "followed by a break," then another forty

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 721568 (N.D.N.Y.)
(Cite as: 2006 WL 721568 (N.D.N.Y.))

minute class is held. *Id.* at ¶ 105. In Plaintiff's September 14, 2004 request for reasonable accommodations to attend ASAT, he stated that he was "limited in his ability" to walk, stand, or sit for a long period of time and that he was requesting "that [he] not be held to the same physical standards and expectations as a person ... that had no medical problems or disabilities." Am. Compl., Ex. E. The request was denied stating that Lighthall could "receive a medical excuse for a specific medical need if medically warranted." *Id.* Lighthall, on several occasions, did indeed request medical excuses so that he would not have to participate in ASAT. Dr Vadlamudi Aff., Ex. A at pp. 34, 36, 37, 59, & 76. Notwithstanding, conditions were placed so that Lighthall could participate in the program. On August 18, 2004, Dr. Haidershah stated that Lighthall did not have to sit for more than two hours and that he could stand every ten to fifteen minutes. Dr. Vadlamudi Aff. at ¶ 106, Ex. A at p. 24. Then, on August 30, 2004, Dr. Haidershah modified the conditions so that Lighthall could attend ASAT for up to three hours, while allowing Plaintiff to stand every ten to fifteen minutes. Pl.'s Stat. of Material Facts at ¶¶ 70 & 71; Dr. Vadlamudi Aff. at ¶ 107, Ex. A at p. 23. Plaintiff contests the discretion other officials would have on when and how he could stand. Pl.'s Stat. of Material Facts at ¶ 72. Despite Plaintiff's claim of discrimination, it would, in fact, seem as though Plaintiff's requests were granted. Contrary to his Amended Complaint, Plaintiff is receiving benefits that the normal inmate would not solely because of Plaintiff's disabilities and medical conditions.

**\*21** Plaintiff has not made a showing that any potential violation was motivated by discriminatory animus or ill will due to his disability apart from his general allegations. As a result, Plaintiff is not entitled to money damages or prospective relief as no Title II nor § 504 violation has occurred.

Therefore, it is recommended that the Motion for Summary Judgment and the Motion to Dismiss be granted on this issue.

### H. Preliminary Injunction

Plaintiff seeks a preliminary injunction to obtain medical treatment for sleep apnea, his vitamin B-12 deficiency, his heart condition, and physical therapy for his stroke. Prelim. Inj. Mot., Mem. of Law at pp. 9-11. As a component to this relief, Lighthall also requests reasonable accommodations to attend ASAT. *Id.* at p. 11. Additionally, Plaintiff seeks a preliminary injunction to enjoin the Defendants from "withholding good time credits and parole eligibility" because of Plaintiff's failure to complete ASAT. *Id.* at p. 16.

Plaintiff's first ground for a preliminary injunction arises out of a deliberate indifference claim under the Eighth Amendment and a claim under the ADA for reasonable accommodations. Plaintiff's second ground for a preliminary injunction arises from the Due Process Clause of the Fourteenth Amendment. As stated above, by virtue of his claims being dismissed, the preliminary injunction motion is now moot. *See supra* Parts II.D, II.E, & II.G.

For the reasons stated above, it is hereby recommended that the Motion for a Preliminary Injunction be denied.

### III. CONCLUSION

For the reasons stated herein, it is hereby

RECOMMENDED, that the Motion for a Preliminary Injunction (Dkt.11) be DENIED; and it is further

RECOMMENDED, that the Cross-Motion for Summary Judgment (Dkt. No. 27) be GRANTED; and it is further

RECOMMENDED, that the Motion to Dismiss (Dkt. No. 42) be GRANTED; and it is further

RECOMMENDED, that since all the claims have been disposed of by the above Recommendations, it is further recommended that the Amended Complaint be DISMISSED in its entirety (Dkt. No. 10); and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 721568 (N.D.N.Y.)
(Cite as: 2006 WL 721568 (N.D.N.Y.))


to this action.


Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten
(10) days within which to file written objections to the
foregoing report. Such objections shall be filed with the
Clerk of the Court. *FAILURE TO OBJECT TO THIS
REPORT WITHIN TEN (10) DAYS WILL PRECLUDE
APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85,
89 (2d Cir.1993) (citing *Small v. Sec'y of Health and
Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28
U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), & 6(e).


N.D.N.Y.,2006.
Lighthall v. Vadlamudi
Not Reported in F.Supp.2d, 2006 WL 721568 (N.D.N.Y.)


END OF DOCUMENT


© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.